## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| **INDIANA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (NAACP) and LEAGUE OF WOMEN VOTERS OF INDIANA,** | ) ) ) ) ) ) ) ) | |
| Plaintiffs | ) ) | |
| v. | ) ) | Case No. 1:17-cv-02897 |
| **CONNIE LAWSON,** in her official capacity as Secretary of State for the State of Indiana; **J. BRADLEY KING,** in his official capacity as Co-Director, Indiana Election Division; **ANGELA M. NUSSMEYER,** in her official capacity as Co-Director, Indiana Election Division, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT

Plaintiffs, by and through their attorneys, the Brennan Center for Justice at New York University School of Law, Quinn Emanuel Urquhart and Sullivan, LLP, and McCain Law Offices, P.C., for their Complaint against Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1.    This action is necessary to protect the sacred right of Indiana residents to vote without interference and to prevent the unlawful removal of Indiana residents

from the State's voter registration rolls.  Specifically, this action addresses the manner in which the recently enacted amendments to the Indiana Code expressly violate the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. §§ 20501–20511 by: (i) removing voters from voter registration rolls without providing the required notice, response opportunity, and waiting period; and (ii) utilizing the Interstate Voter Registration Crosscheck ("Crosscheck") in a manner that is not uniform, reasonable, and nondiscriminatory.  It is only through the grant of the requested relief that Indiana voters will be protected from these flagrant violations of federal law.

2.     The NVRA was enacted to protect United States citizens from discriminatory and unfair registration laws, with particular emphasis on those practices that negatively impact voter participation among minority groups, including racial minorities.  To this end, the NVRA establishes, among other things, standards and procedures that protect against discriminatory practices in connection with voter registration and ensure that accurate voter registration rolls are maintained.

3.     Among these protections, the NVRA expressly sets forth requirements states must meet before removing a voter from the registration rolls.  Pursuant to the NVRA, an election administrator cannot remove a voter from the registration rolls because the administrator thinks the voter has moved unless the voter:  (i) receives a formal notice, in writing, that the voter's address needs to be confirmed; and (ii) is given adequate opportunity to respond to the notice or demonstrate continued residency by voting.  The NVRA further mandates that the mechanism used to

2

identify voters who are ineligible must be reasonable, uniform, and nondiscriminatory.

4.     Indiana Code § 3-7-38.2-5(d), as amended by Senate Enrolled Act No. 442 ("SB 442"), flagrantly violates these requirements by, among other things, removing voters without the notice, response opportunity, and waiting period expressly required by the NVRA.  By using the Kansas-administered Crosscheck program to identify voters who allegedly have moved and registered in another state without the necessary protections, the Indiana Code, as amended by SB 442, also exposes voters to removal based on a list maintenance procedure that is neither reasonable, uniform, nor nondiscriminatory.

## PARTIES

5.     Plaintiff Indiana State Conference of the National Association for the Advancement of Colored People (the "NAACP") is a nonpartisan, nonprofit organization chartered in 1940 and currently based in Gary, Indiana.  It was founded with the purpose of assisting African-American citizens to ensure political, educational, social and economic equality of rights for all persons and to fight against racial discrimination.  The majority of its approximately 5,000 members are residents of Indiana who are registered to vote in Indiana and who participate in all aspects of the political process.

6.     Throughout its history, the NAACP has made it its mission to promote civic engagement by educating voters, monitoring polls, and facilitating voter registration.

3

7.     As it has done historically, prior to the most recent presidential election the NAACP launched a voter registration campaign focused on increasing minority registration in the areas with the lowest rates of registration amongst minorities. Last year, through its more than twenty-five local branches and college chapters, the NAACP held at least seventy-five voter registration drives.  Following the voter registration deadline, the NAACP helped get voters to the polls, including by providing rides to voting locations.

8.     SB 442 directly frustrates the NAACP's civic mission and causes it to expend its limited financial resources and dedicate disproportionate energy to rolling back the illegal effects of the bill.  SB 442 will improperly purge eligible voters the NAACP has already registered, force the NAACP to re-register improperly purged voters, require the NAACP to unnecessarily expand its voter education programs to prevent voter confusion, and compel the NAACP to increase its poll monitoring efforts to aid unknowing purged voters and voters needing to cast provisional ballots.

9.     Plaintiff the League of Women Voters of Indiana (the "League") is a nonpartisan, nonprofit organization founded in 1920 and based in Indianapolis, Indiana.  The vast majority of the approximately 1,100 members of the League are residents of Indiana who are registered to vote in Indiana.

10.     The League conducts voter registration drives, encourages and assists individuals in voting, and conducts other activities to boost civic engagement which has been essential to its mission since its founding.  Last year, the League, through

its twenty-one local chapters, conducted at least one hundred voter registration drives.

11.     SB 442 directly frustrates the League's civic engagement mission and causes it to expend its limited financial resources and dedicate disproportionate energy to rolling back the illegal effects of the bill.  SB 442 will improperly purge voters the League has already registered, force the League to re-register improperly purged voters, and redirect a portion of the League's funds and resources that would have gone to voter registration, get-out-the-vote, and civic engagement work to ameliorating the consequences of the Secretary's action.  The League will have to divert time, money, and resources from other activities to expend more time and attention educating and assisting Indiana citizens with regard to improper voter purges.

12.     Defendant Connie Lawson is the Secretary of State of the State of Indiana. As Secretary of State, Defendant Lawson is responsible for overseeing elections through the Indiana Election Division, which is one of the four main divisions of the office of the Secretary of State.  The Secretary of State is the state's "chief election official," Ind. Code § 3-6-3.7-1, and is tasked with implementing the voter registration list, in coordination with the Indiana Election Division, *id.* § 3-7-26.3-3. This suit is being brought against Defendant Lawson in her official capacity.

13.     Defendants J. Bradley King and Angela Nussmeyer are Co-Directors of the Indiana Election Division.  Collectively, the Co-Directors of the Indiana Election Division are designated as the state's NVRA Officer.  *Id.* § 3-7-11-1.  The Election

Division is a supporting division housed within the Office of the Secretary of State. *Id.* § 3-6-4.2-1 ("The election division is established within the office of the secretary of state."); *id.* § 3-6-4.2-2 ("The secretary of state shall perform all ministerial duties related to the administration of elections by the state" and the "election division shall assist the commission and the secretary of state in the administration of this title."). This suit is being brought against Defendants King and Nussmeyer in their official capacities.

## JURISDICTION AND VENUE

14.  This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under the laws of the United States; under 28 U.S.C. §§ 1343(a)(3)-(4) and 1357 because this action seeks equitable and other relief pursuant to an act of Congress providing for the protection of the right to vote; and under 42 U.S.C. §§ 1983 and 1988 because this action seeks to enforce rights and privileges secured by the laws of the United States.

15.  This Court has authority to issue declaratory and injunctive relief in this action pursuant to 28 U.S.C. §§ 2201 and 2202.

16.  Venue is proper in this Court under 28 U.S.C. § 1391 because the events or omissions giving rise to the claim occurred within this district.

## NATIONAL VOTER REGISTRATION ACT

17.  The National Voter Registration Act of 1993, 52 U.S.C. §§ 20501–20511 (the "NVRA"), sets forth mandatory procedures for state election officials that further the statute's several purposes, including to "increase the number of eligible citizens

who register to vote in elections for Federal office;" "to protect the integrity of the electoral process;" and "to ensure that accurate and current voter registration rolls are maintained." *Id.* § 20501(b)(1), (3)-(4).

18.     Section 8 of the NVRA protects registered voters against wrongful removal from the voter registration lists in at least two pertinent ways: *First*, it prohibits the removal of registered voters on the basis of change in residence unless the registrant: (1) confirms the change of residence in writing; or (2) fails to respond to a notice, the contents and manner of mailing of which are prescribed by the NVRA, **and** fails to vote during the next two general election cycles after receiving the notice. *Id.* § 20507(d)(1). *Second*, it requires that list maintenance programs must be reasonable, uniform, and nondiscriminatory. *Id.* §§ 20507(a)(4), (b)(1).

19.     Section 8 of the NVRA mandates that, where a voter had not directly confirmed a change of address or requested removal from the voter rolls, the state cannot cancel the voter's registration unless it has sent the voter: (1) a postage prepaid and pre-addressed return card, sent by forwardable mail, on which the registrant may state his or her current address; and (2) a notice to the following effect:

> (A) If the registrant did not change his or her residence, or changed residence but remained in the registrar's jurisdiction, the registrant should return the card not later than the time provided for mail registration …. If the card is not returned, affirmation or confirmation of the registrant's address may be required before the registrant is permitted to vote in a Federal election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice, and if the registrant does not vote in an election during

7

> that period the registrant's name will be removed from the list of eligible voters.
>
> (B) If the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered, information concerning how the registrant can continue to be eligible to vote.

*Id.* § 20507(d)(2).

20.   Election officials may not subsequently remove a voter based on change of address unless the voter either confirms the move in writing or: (i) "has failed to respond to" an address confirmation notice; and (ii) "has not voted or appeared to vote (and, if necessary, correct[ed] the registrar's record of the registrant's address) in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice." *Id.* § 20507(d)(1)(A)-(B).

21.   The NVRA instructs states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters." *Id.* § 20507(a)(4).   The NVRA further mandates that any such program "shall be uniform [and] nondiscriminatory." *Id.* § 20507(b)(1).

## SB 442 WILL RESULT IN MULTIPLE NVRA VIOLATIONS

22.   Prior to the passage of SB 442, Indiana had a voter registration list maintenance statute that, on its face, included certain NVRA notice and confirmation procedures.   Under the previous framework, the state would submit its voter roll to the Crosscheck program, receive back a list of Indiana voters possibly registered in other states, and follow a protocol designed to identify voters who had registered in another state, and then send them an address confirmation notice.

8

23.    SB 442 has changed Indiana's list maintenance protocols to render it facially noncompliant with federal law by:  (i) removing the NVRA's required notice and waiting period; and (ii) employing an unreliable basis for removal.  SB 442 does not—and cannot—offer any cognizable justification for this noncompliance, as the federal statute offers no exceptions.

24.    Prior to the passage of SB 442, the Indiana Code required that the Election Division annually provide Indiana's statewide voter registration list to the Kansas Secretary of State so that it could be compared to the registration data of all other states participating in Crosscheck.  Ind. Code § 3-7-38.2-5(d) (2016).  Within 30 days of a determination that an Indiana voter had an "identical" "first name, last name, and date of birth of the voter registered in the other state," the NVRA official[1] would provide the appropriate county voter registration office with the name of the registrant (and any other information obtained).  *Id.*  Under the terms of the prior law on its face, the county voter registration office would then engage in an investigative and notice process to "determine" whether each individual identified in the NVRA official's report:  (i) "is the same individual who is a registered voter of the county" (a "matched voter"); (ii) "registered to vote in another state on a date following the date that voter registered in Indiana;" and (iii) "authorized the cancellation of any previous registration."  *Id.*  § 3-7-38.2-5(d)(1)-(3) (2016).  Importantly, if a matched voter had not authorized cancellation, the prior law

---

[1]    Ind. Code § 3-7-11-1 designates the co-directors of the election division as the chief state election officials responsible for the coordination of state responsibilities under the NVRA.  Ind. Code § 3-5-2-33.7 defines these designees as NVRA officials.

required that the county voter registration office "send an address confirmation notice to the Indiana address of the voter." *Id.* § 3-7-38.2-5(e) (2016).

25.    A voter would not, accordingly, be removed from the voter roll without confirmation that the voter had, in fact, changed jurisdiction and been given notice and a chance to respond as required by the NVRA.

26.    On April 13, 2017, the Governor of Indiana signed into law Senate Bill 442. SB 442 flagrantly removes protections mandated by the NVRA and instead unlawfully provides for the *immediate* removal of a voter based solely on the possibility of changed residence reflected by the Crosscheck database which, as detailed below, is unreliable and, in practice, leads to discriminatory results.  The law took effect on July 1, 2017.

27.    SB 442 states that Indiana "shall provide data from the statewide voter registration list without cost to the Kansas Secretary of State to permit the comparison of voter registration data in [Crosscheck]." SB 442 § 15(d).  Within 30 days of receiving Crosscheck's results, the NVRA Official is to identify to county voter registration offices all Indiana voters who meet the statute's minimum criteria of a matching "first name, last name, and date of birth" with a voter registered in another state. *Id.*

28.    Pursuant to SB 442, the county voter registration office then is permitted to determine, based on an indication from the Crosscheck database, whether the individual identified by Crosscheck is the individual registered in the county and if other state registration postdates the Indiana registration.  If such a determination

is made, SB 442 mandates that "the county voter registration office shall cancel the voter registration of that voter."  SB 442 § 15(d)-(e).

29.    The amendments in SB 442, in contravention of federal law, require no inquiry, confirmation, or notice to a voter that his or her registration is being canceled and thereby ensure that any unreliability in Crosscheck disenfranchises voters with discriminatory effect.

30.    It is also notable that the penultimate version of SB 442 included a provision which, consistent with federal law, required that the county voter registration office determine whether the matched voter "authorized the cancellation of any previous registration by the voter when the voter registered in another state" and, if not, required that the office "send an address confirmation notice to the Indiana address of the voter."[2]  The enacted version of SB 442, however, removed this necessary provision.

31.    Both (i) the automatic cancellation of a voter's registration without the notice, response and waiting period mandated by the NVRA; and (ii) reliance on a database that has been established to be unreliable and discriminatory, expressly violate the protections established by the NVRA and would deprive Indiana's citizens of fundamental federal voting rights protections.

32.    Co-Director Nussmeyer already has publicly declared an interpretation of SB 442 that facially violates the requirements of the NVRA.  At the IVRA Conference

---

[2]  SB 442's final amendment, in tracked changes, may be found on the Indiana General Assembly's website at https://iga.in.gov/static-documents/7/d/e/0/7de0171f/SB0442.05. ENRH.pdf.

from May 17–18, 2017, Nussmeyer gave a presentation explicitly stating that SB 442 overrides its predecessor's notice requirement.[3]

## CROSSCHECK IS UNRELIABLE AND DISCRIMINATORY IN PRACTICE

33.   SB 442's exclusive reliance on Crosscheck as the grounds for voter removal renders the application of SB 442 non-uniform and discriminatory.

34.   In order for a list maintenance program based on change of address to constitute a "reasonable effort" under the NVRA, it must be based on reliable information of potential ineligibility.  Crosscheck's unreliable methodology, high error rate, and discriminatory impact violates the NVRA standard.

35.   As a participant in the Crosscheck program, Indiana uploads its voter records to a server run by the Kansas Secretary of State, Kris Kobach.  Mr. Kobach's office compares the data with each other member-state's data, seeking duplicate records and making results available to the uploading state.  At least 30 states participate in Crosscheck, which compares more than 100 million voter records.

36.   In practice, Crosscheck produces inaccurate results, false positives, and leads to the discriminatory disenfranchisement of many legally registered voters.

37.   Among minority populations where the same or similar last names are more common and first name naming conventions are more common and concentrated

---

[3] *See* Angie Nussmeyer, *Voter List Maintenance*, IVRA Conference Presentation, Slide 21 (May 17–18, 2017), https://www.in.gov/sos/elections/files/Voter_List_Maintenance.2017.PPT ("After July 1, 2017, a change in Indiana law will permit counties to cancel a voter record matched to Interstate record after careful review.  Before, state law required counties to send the 'Interstate Mailer' if it wasn't clear if the other state's registration form authorized cancellation in another jurisdiction.").

around historical periods that correspond with birth dates, the identification of identical or similar names among a small sample of distinct voters has been empirically established.[4]  Further, in a group of 180 people, it has been empirically established that it is more likely than not that two will share the same birth date, including year of birth.[5]

38.    When Crosscheck compares more than 100 million voter records, it accordingly, incorrectly matches many *distinct* voters with *common* first names, last names, and dates of birth.  And these incorrect matches are disproportionally concentrated among minority voters.   Indeed, in existing studies, Crosscheck flagged one in six Latinos, one in seven Asian-Americans, and one in nine African-Americans as potential double registrants.[6]

39.    Crosscheck's high rate of false positives has been well documented.   One study found that Crosscheck's standard procedure would eliminate the registrations of about 200 unique, legitimate voters for every one individual it identified that was

---

[4]   Greg Palast, *The GOP's Stealth War on Voters*, ROLLING STONE (Aug. 24, 2016) http://www.rollingstone.com/politics/features/the-gops-stealth-war-against-voters-w435890 ("Swedlund's statistical analysis found that African-American, Latino and Asian names predominate, a simple result of the Crosscheck matching process, which spews out little more than a bunch of common names. No surprise: The U.S. Census data shows that minorities are overrepresented in 85 of 100 of the most common last names. If your name is Washington, there's an 89 percent chance you're African-American. If your last name is Hernandez, there's a 94 percent chance you're Hispanic. If your name is Kim, there's a 95 percent chance you're Asian.").

[5]   *See* Myrna Pérez, BRENNAN CENTER FOR JUSTICE, VOTER PURGES 23 (2008), http://www.brennancenter.org/sites/default/files/legacy/publications/Voter.Purges.f.p df.

[6]   Palast, *supra*.

registered in two jurisdictions.[7]   The Crosscheck Participation Guide, itself, concedes that "a significant number of apparent double votes are false positives and not double votes."[8]

40.   These statistics establish that without the necessary federally mandated protections, use of Crosscheck risks severe, discriminatory disenfranchisement of registered voters in violation of federal law.

41.   The only possible justification for SB 442—that it is necessary to protect against voter fraud—is both false and irrelevant.   The NVRA and Federal law do not excuse a failure to include the necessary mandated protections on the ground that a state law purports to prevent voter fraud.

42.   Moreover, not only by all accounts is rampant voter fraud in the United States a myth,[9] but empirical evidence establishes that SB 442 and Crosscheck

---

[7]  Goel et al., *One Person, One Vote: Estimating the Prevalence of Double Voting in U.S. Presidential Elections*, 30 (Jan. 13, 2017) https://5harad.com/papers/1p1v.pdf ("Not only would few double votes be eliminated by purging the voter registration rolls of the cases identified by Crosscheck, but many legitimate votes would be impeded by such a purge. . . . [A]t least in Iowa, 200 legitimate voters may be impeded from voting for every double vote stopped. This suggests the policies necessary to stop the relatively small number of double votes that do occur would put many more legitimate votes in jeopardy.").

[8]  2014 Participation Guide, INTERSTATE VOTER REGISTRATION DATA CROSSCHECK, 5 (Dec.                                                                                                  2013), https://wei.sos.wa.gov/agency/osos/en/press_and_research/weekly/Documents/Partici pat ion%20Guide%20with%20Comments.pdf.

[9]  *See* Justin Levitt, *The Truth About Voter Fraud*, BRENNAN CENTER FOR JUSTICE (2007) http://www.brennancenter.org/sites/default/files/legacy/The%20Truth%20About%20 Voter%20Fraud.pdf (finding voter fraud rates of incidence between 0.0003% and 0.0025% and noting that Americans are more likely to be struck by lightning than impersonate another voter at the polls);  Justin Levitt, *A comprehensive*

would not even identify such fraud if it did exist.  Indeed, of the 7.2 *million* double registrations Crosscheck had purportedly identified before the 2016 election, only *four* individuals had been charged with double voting or deliberate double registration, according to a 2016 report.[10]

43.     This inherent lack of efficacy is evidenced by Indiana's sister-states' experiences.  For example, in Virginia, prior to a statewide 2013 election, the state instructed county officials to review and cancel voter records based on a Crosscheck report.  Local officials soon discovered error rates as high as 17 percent.  In some cases, Crosscheck identified individuals as having moved from Virginia to another state, when in fact the opposite was true—indicating that Crosscheck's data is inherently flawed and includes the names of individuals who are not ineligible.[11]

44.     Based on similar experiences, Florida, Oregon, and Washington each withdrew their participation in recent years.  A spokesperson for the Oregon

---

*investigation of voter impersonation finds 31 credible incidents out of one billion ballots cast*, THE WASH. POST (Aug. 6, 2014) https://www.washingtonpost.com /news/wonk/wp/2014/08/06/a-comprehensive-investigation-of-voter-impersonation-finds-31-credible-incidents-out-of-one-billion-ballots-cast (finding 31 credible instances of impersonation fraud from 2000 to 2014, out of more than 1 billion votes cast, and fewer prosecutions or convictions); Philip Bump, *There have been just four documented cases of voter fraud in the 2016 election*, THE WASH. POST (Dec. 1, 2016) https://www.washingtonpost.com/news/the-fix/wp/2016/12/01/0-000002-percent-of-all-the-ballots-cast-in-the-2016-election-were-fraudulent (reviewing the 2016 election and finding just four cases of voter fraud).

[10]   Palast, *supra*.

[11]   Jonathan Brater, *Virginia Offers Lessons for Voter List Maintenance*, BRENNAN CENTER FOR JUSTICE (Nov. 25, 2013) https://www.brennancenter.org/analysis/virginia-offers-lessons-voter-list-maintenance.

Secretary of State confirmed that they did so "because the data [they] received was unreliable."[12]  In 2012, Florida Governor Rick Scott reported that he was incorrectly purged from the voter rolls because an individual with the same name had died.[13]

45.    By exclusively relying on Crosscheck to remove voters from voter rolls without registrant notice, response opportunity, and a waiting period before removal, SB 442 thus disenfranchises Indiana's voter in violation of the proscriptions of the NVRA.

## PLAINTIFF PROVIDED THE NECESSARY NOTICE TO INDIANA OFFICIALS

46.    On May 25, 2017, Plaintiff NAACP, along with the Brennan Center for Justice and Service Employees International Union, sent a notice to Secretary Lawson, pursuant to 52 U.S.C. § 20510(b), that the recently enacted amendments to the Indiana Code expressly violate the NVRA.[14]  The Secretary of State's General Counsel, Jerold A. Bonnet, acknowledged receipt on behalf of the Secretary of State, stating:  "We are currently conferring with the Co-Directors of the Indiana Election

---

[12]   Jon Greenberg & Amy Sherman, *Florida no longer part of controversial national voter project*, MIAMI HERALD, Apr. 11, 2014, https://miamiherald.typepad.com/nakedpolitics/2014/ 04/florida-no-longer-part-of-controversial-national-voter-data-project.html.

[13]   Lloyd Dunkelberger, *Elections officials told Rick Scott he was dead and couldn't vote*, SARASOTA HERALD-TRIBUNE (Jun. 14, 2012) http://politics.heraldtribune.com/2012/06/14/scott-mistakenly-declared-dead-on-voting-rolls.

[14]   May 25, 2017 Letter from Myrna Pérez *et al*. to Secretary Lawson.

Division . . . . It's my expectation that a considered response to your letter will be provided in the near future."[15]

47.     Mr. Bonnet later sent a long response as to the SB 442's compliance with the requirements of the NVRA.  Mr. Bonnet's response confirmed that the Secretary of State intended for SB 442 to be implemented in violation of the NVRA[16], by removing voters from voter registration rolls without providing the required notice, response opportunity and waiting period.[17]  The response confirmed that the letter's positions were jointly held by Indiana's NVRA Officials, the Co-Directors of the Election Division.[18]  Thus, all three Defendants have been noticed, pursuant to 52 U.S.C. § 20510(b).

---

[15]   The Secretary of State is also empowered by the Indiana Code to act when the NVRA Officials fail to act in dereliction of their duties. Ind. Code 3-7-38.2-18 (2013) ("If the NVRA official does not perform a duty in accordance with this chapter, the secretary of state shall perform the duty.").

[16]   Mr. Bonnet's response indicated that the state would impose additional requirements, on top of what was required by statute (such as additional matching criteria), but did not list among these a notice, confirmation, and waiting period process.

[17] July 13, 2017 Letter from Jerold A. Bonnet to Myrna Pérez, *et. al.* ("Though NVRA applies specifically to a variety of situations, it does not prohibit immediate cancellation of a duplicate *previous* voter registration based upon reliable, uniform, nondiscriminatory, information received from a voter registration official who has accepted a *subsequent* registration.") (emphasis in original text).

[18] *Id.* ("Indiana's NVRA officials have adopted the position that a voter registration application, signed and affirmed under the penalty of perjury constitutes a registrant's authorization to cancel previous registrations.").

48.    On July 20, 2017, the Co-Directors of the Election Division sent a letter confirming that the Election Division had received the letter dated May 25, 2017.[19] Plaintiffs have received no further correspondence from the Election Division.

### COUNT I
### (Violation of the NVRA, 52 U.S.C. §20507(d))

49.    Plaintiffs reallege every allegation of the preceding paragraphs as though fully set forth herein.

### SB 442 Violates the NVRA Because It Does Not Provide Notice, the Opportunity to Respond and a Proper Waiting Period

50.    Under the NVRA, if a state undertakes to remove registered voters on the basis of a change in residence, the state must provide that voter with notice, the opportunity to respond to that notice, and a proper waiting period for response.  In particular, the NVRA prohibits such removals unless the registrant either: (1) confirms the change of residence in writing, or (2) fails to respond to a notice, the contents and manner of mailing of which are prescribed by the NVRA, and fails to vote during the next two general federal election cycles after receiving the notice. *Id.* §20507(d).

51.    Adequate notice for such a removal must be provided by "a postage prepaid and pre-addressed return card, sent by forwardable mail, on which the registrant may state his or her current address."  *Id.* §20507(d)(2).

---

[19] July 20, 2017 Letter from J. Bradley King and Angela M. Nussmeyer to Myrna Pérez

52.    On its face, Indiana Code § 3-7-38.2-5(d), effective July 1, 2017 as amended by SB 442, violates the NVRA by requiring the removal of voters without the requisite notice, response opportunity, and waiting period required by federal law.

**SB 442's Reliance on Crosscheck Violates the NVRA's Prohibition Against Arbitrary, Unreasonable, and Discriminatory Removals of Voters from Registration Rolls**

53.    The NVRA instructs states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters."   *Id.* §20507(a)(4).   The NVRA further mandates that any such program "shall be uniform [and] nondiscriminatory."   *Id.* §20507(b)(1).

54.    Likewise, the unreliable and discriminatory manner in which Crosscheck has been implemented, and the fact that SB 442 does not require state election officials to determine the accuracy of any voters flagged by Crosscheck, violates the NVRA's prohibition against arbitrary, unreasonable, and discriminatory removals of voters from registration rolls.

55.    By depriving registered voters and qualified citizens of the NVRA's safeguards prior to removing their names from the voting rolls, SB 442 creates the real and immediate risk that Plaintiffs' members will be deprived of their right to vote.

56.    Absent this Court's intervention, Plaintiffs and their members will suffer irreparable injury as a result of Defendants' implementation of the provisions of SB 442 in a way that interferes with Plaintiffs' federal rights.

57.    Plaintiffs and their members have no adequate remedy at law for the deprivation of federal voting rights and interference with their ability to protect their members' interests caused by Defendants' actions.

58.    Defendants must be preliminarily and permanently enjoined from implementing the SB 442 amendments to Indiana Code § 3-7-38.2-5(d) in a way that violates the NVRA's requirements of notice and a waiting period.

WHEREFORE, Plaintiffs pray that the Court order the following relief and remedies:

1.    Declare that the voter removal provisions of Indiana SB 442 violate 52 U.S.C. §20507(d);

2.    Grant a temporary restraining order, preliminary injunction, and permanent injunction enjoining Defendants and any officers, agents, employees, attorneys, and all persons who are in active concert or participation with them from canceling the registration of voters without following the required procedures set forth in 52 U.S.C. §20507(d)

3.    Award Plaintiffs' attorneys' fees and costs; and

4.    Award all such other and further relief as the Court deems to be just and equitable.

Respectfully submitted,


_/s/ Trent A. McCain_
One of Plaintiff's Attorneys



Trent A. McCain, #23960-45
McCAIN LAW OFFICES, P.C.
5655 Broadway
Merrillville, IN 46410
(219) 884-0696 phone
Trent@McCain.Law

Myrna Pérez*
BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271
myrna.perez@nyu.edu

Jonathan Brater*
BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271
jonathan.brater@nyu.edu

Sascha N. Rand*
Ellyde R. Thompson*
Geneva McDaniel*
Alexandre J. Tschumi *
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
sascharand@quinnemanuel.com

(*_Application for Admission Forthcoming_)

Attorneys for Plaintiffs

21