UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

INDIANA STATE CONFERENCE OF THE
NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE
(NAACP) and LEAGUE OF WOMEN
VOTERS OF INDIANA,

                Plaintiffs,

      v.

CONNIE LAWSON, in her official capacity as
the Indiana Secretary of State; J. BRADLEY
KING, in his official capacity as Co-Director of
the Indiana Election Division; ANGELA
NUSSMEYER, in her official capacity as Co-
Director of the Indiana Election Division,

                Defendants.

Docket No. 1:17-cv-02897

**HEARING REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Sascha N. Rand
Ellyde R. Thompson
Ellison Ward Merkel
Geneva McDaniel
Alexandre J. Tschumi
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

Myrna Pérez
Jonathan Brater
BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271

Trent A. McCain
MCCAIN LAW OFFICES, P.C.
5655 Broadway
Merrillville, IN 46410
(219) 884-0696

# TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................................................1

BACKGROUND ......................................................................................................2

    A.    The NVRA Sets Forth Well Defined Requirements for Maintaining Voter Registration Lists ....................................................................................2

    B.    Indiana's Amended Voter List Maintenance Law, "SB 442" Removes the NVRA Notice and Waiting Period ..........................................................4

    C.    The Crosscheck Program Is of Limited Reliability ..................................5

    D.    The Election Division Oversees the Maintenance of Indiana's Voter Registration Lists ....................................................................................9

    E.    Plaintiffs Are Committed to Registering Voters and Protecting Voters' Rights .....................................................................................................12

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ...................15

    A.    SB 442 Facially Violates the NVRA ....................................................15

        1.    SB 442 Removes Provisions Necessary to Comply with the NVRA ........15

        2.    A Crosscheck Match Does Not Constitute Authorization to Cancel a Registration ...................................................................17

    B.    Defendants' Intended Application of SB 442 Is Not Uniform, Reasonable, or Nondiscriminatory ........................................................19

        1.    Defendants Have Failed to Implement a Reasonable and Nondiscrimatory Voter List Maintenance System.....................................19

        2.    Defendants Have Failed to Implement a Uniform Voter List Maintenance System ..........................................................................24

II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION AND HAVE NO ADEQUATE REMEDY AT LAW ............................................................................................................28

III.    THE BALANCE OF THE HARDSHIPS WEIGHS HEAVILY IN FAVOR OF A PRELIMINARY INJUNCTION ..................................................................32

IV.    PRELIMINARY RELIEF WILL SERVE THE PUBLIC INTEREST ............33

CONCLUSION..........................................................................................................................33

# **TABLE OF AUTHORITIES**

**Page**

## **Cases**

*A. Philip Randolph Institute v. Husted,*
    838 F.3d 699 (6th Cir. 2016) ................................................................. 16

*Action NC v. Strach,*
    216 F. Supp. 3d 597 (M.D.N.C. 2016) ................................................... 31

*Am. Civ. Rights Union v. Martinez-Rivera,*
    166 F. Supp. 3d 779 (W.D. Tex. 2015) ................................................... 12

*Ass'n of Cmty. Orgs. for Reform Now (ACORN) v. Edgar,*
    No. 95 C 174, 1995 WL 532120 (N.D. Ill. Sept. 7, 1995) .................. 24, 31

*Az. Democratic Party v. Reagan,*
    No. CV-16-03618, 2016 WL 6523427 (D. Az. Nov. 3, 2016) ..................... 11, 12, 24

*Burlington N. R.R. Co. v. Bair,*
    957 F.2d 599 (8th Cir. 1992) ................................................................ 32

*Charles H. Wesley Educ. Found., Inc. v. Cox,*
    408 F.3d 1349 (11th Cir. 2005) ............................................................ 30

*Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.,*
    28 F.3d 1268 (D.C. Cir. 1994) .............................................................. 30

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.,*
    549 F.3d 1079 (7th Cir. 2008) ......................................................... 14, 15

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) ............................................................................ 30

*League of Women Voters of Fla. v. Browning,*
    863 F. Supp. 2d 1155 (N.D. Fla. 2012) ................................................. 31

*League of Women Voters of N.C. v. North Carolina,* 769 F. 3d 224, 247 (4th Cir. 2014) ..... 32, 33

*N.C. State Conf. of the NAACP v. N.C. State Bd. of Elections,*
    No. 1:16:CV1274, 2016 WL 6581284 (M.D.N.C. Nov. 4, 2016) .............................. 12, 16, 33

*Obama for Am. v. Husted,*
    697 F.3d 423 (6th Cir. 2012) ............................................................. 32, 33

*Planned Parenthood of Wis., Inc. v. Van Hollen*,
    738 F.3d 786 (7th Cir. 2013) ................................................................. 14

*Project Vote v. Madison Cty. Bd. of Elections*,
    1:08-cv-2266, 2008 WL 4445176 (N.D. Ohio Sept. 29, 2008) ......................................... 24, 30

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006) ................................................................................. 33

*Welker v. Clarke*,
    239 F.3d 596 (3d Cir. 2001) ........................................................................ 19

*West v. Atkins*,
    487 U.S. 42 (1988) ................................................................................ 15

*Winter v. Nat'l Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................................. 14

## Statutes

42 U.S.C. § 1983 ........................................................................................ 15

H.R. REP. No. 103-9 (1993), *reprinted in* 1993 U.S.C.C.A.N. 105 ......................................... 2, 24

Indiana Senate Enrolled Act 442, 120TH GEN. ASSEMBLY, 1ST REG. SESS. (Ind. 2017) ....... passim

Ind. Code  § 3-5-2-33.7 ................................................................................... 5

Ind. Code § 3-6-3.7-1 .................................................................................... 10

Ind. Code § 3-6-4.2-1 .................................................................................... 9

Ind. Code § 3-6-4.2-2 .................................................................................... 10

Ind. Code § 3-6-4.2-3 .................................................................................... 10

Ind. Code § 3-6-4.2-5 .................................................................................... 10

Ind. Code § 3-6-4.2-14 ................................................................................... 10

Ind. Code § 3-6-5.2-6 .................................................................................... 11

Ind. Code § 3-6-5-14 ..................................................................................... 11

Ind. Code § 3-7-11-1 .................................................................................... 5, 9

Ind. Code § 3-7-26.3-3 ................................................................................. 9, 11

Ind. Code § 3-7-26.3-4 ................................................................................. 9, 11

Ind. Code § 3-7-26.3-29 ................................................................................................ 9

Ind. Code § 3-7-38.2-5 ......................................................................................... passim

National Voter Registration Act, 52 U.S.C. §§ 20501-20511 ............................... passim

### Other Authorities

Stephen Ansolabehere et al., *The Quality of Voter Registration Records: A State-By-State Analysis* (2010) ..................................................................................................... 7, 23

Mona Chalabi & Andrew Flowers, *Dear Mona, What's The Most Common Name In America*, Nov. 20, 2014 ........................................................................................................... 7

Joshua Comenetz, Frequently Occurring Surnames in the 2010 Census, U.S. Census Bureau, October 2016 ................................................................................................................ 8

Sharad Goel et al., *One Person, One Vote: Estimating the Prevalence of Double Voting in U.S. Presidential Elections* (2017) ........................................................................... 23, 24

Greg Palast, *The GOP's Stealth War on Voters*, Rolling Stone (Aug. 24, 2016) .......................... 8

Lee Hartman, *John Smith et al.: Some observations on how the 20 most popular first names combine with the 20 most popular surnames in the United States* ............................................ 7

Merriam Webster Dictionary ..................................................................................... 20

Michael P. McDonald & Justin Levitt, *Seeing Double Voting: An Extension of the Birthday Problem*, 120 7 Election L.J. 111, 116 (2008) ........................................................... 7

Plaintiffs, the Indiana State Conference of The National Association for the Advancement of Colored People (NAACP) and League of Women Voters of Indiana, respectfully submit this memorandum of law in support of their motion for a preliminary injunction barring implementation of aspects of Indiana's amended voter registration statute—Indiana Senate Enrolled Act 442, 120TH GEN. ASSEMBLY, 1ST REG. SESS. (Ind. 2017) ("SB 442")—that are facially violative of the National Voter Registration Act, 52 U.S.C. §§ 20501-20511 ("NVRA") and enjoining Defendants' administration of a voter list maintenance program that is not "reasonable," "uniform," or "nondiscriminatory" in violation of the NVRA. 52 U.S.C. §§ 20507(a)(4), (b)(1).

## INTRODUCTION

Plaintiffs seek injunctive relief to prevent the implementation of amendments to Indiana's voter registration law that would undermine core protections established by the NVRA. SB 442, which went into effect on July 1, 2017, requires county election officials to summarily cancel, without notice, the registrations of Indiana voters based solely on unverified, cursory, second-hand information provided by a database matching program called Interstate Voter Registration Crosscheck ("Crosscheck"). As detailed below, Crosscheck merely flags—using only first and last name and date of birth as identifiers—the possibility that an Indiana resident may, at some unspecified point in time, have resided in another state. Crosscheck comes nowhere near qualifying as a "reasonable," "uniform" and "nondiscriminatory" voter cancellation mechanism prescribed by the NVRA, nor does it provide for the necessary notice or waiting period required by the NVRA.

Establishing the appropriate balance between clean voter registration lists and access to the ballot box, the NVRA requires election administrators to make a "reasonable," attempt to maintain voter registration lists, which must also be "uniform" and "nondiscriminatory." 52 U.S.C. §§ 20507(a)(4), (b)(1). In addition, the NVRA expressly requires critical procedural and substantive conditions for registration cancellations on account of address changes. Specifically, the NVRA

1

requires states to provide voters with the opportunity to correct errors based on improper inferences by election officials.  It requires either (1) confirmation in writing of changed residence or (2) failure to respond to a notice **and** to vote during the next two federal general election cycles after receiving the notice.  52 U.S.C. § 20507(d)(1).

By purporting to direct the cancellation of voter registration immediately and solely on the basis of a Crosscheck match, SB 442 violates the NVRA in both respects.  *First*, it flagrantly violates the NVRA's express notice and waiting period requirements.  *Second*, SB 442's reliance on unreliable Crosscheck "matches" and the *ad hoc* manner in which county voter registration officials have been left by the Indiana Election Division ("IED") to use this data to make cancellation determinations, violate NVRA's requirement that cancellation be effected in a "reasonable," "uniform,"  and  "nondiscriminatory" manner.  *Id.* §§ 20507(a)(4), (b)(1).

Plaintiffs seek injunctive relief because their members and the voters they seek to assist face the imminent and irrevocable consequence of disenfranchisement of many thousands of Indiana voters, only months before a federal election.  In contrast, Defendants would face only the prospect of waiting until after adjudication of the merits of Plaintiffs' challenge to implement extremely prejudicial aspects of an election bill that was passed only recently.  Weighing the balance of hardships, together with the public's interest in avoiding barriers to voter registration and increasing the number of eligible citizens registered to vote, the need is clear for a preliminary injunction to halt the implementation of SB 442 while the Court reaches a determination on the full merits of the case.

## BACKGROUND

A.    **The NVRA Sets Forth Well Defined Requirements for Maintaining Voter Registration Lists**

In 1993, Congress enacted the NVRA in an effort to "reduc[e] barriers, particularly government-imposed barriers, to applying for voter registration."  H.R. REP. No. 103-9, at 3 (1993),

*reprinted in* 1993 U.S.C.C.A.N. 105, 107.  In passing the statute, Congress specifically recognized that historically, restrictive laws and procedures, including residency requirements, "elaborate administrative procedures," and "selective purges" of voter registration lists, had the effect of suppressing voter turnout.  *Id*. at 2.  In response, the NVRA established mandatory procedures for state election officials designed to "increase the number of eligible citizens who register to vote in elections for Federal office;" "to protect the integrity of the electoral process;" and "to ensure that accurate and current voter registration rolls are maintained."  52 U.S.C. § 20501(b)(1), (3)-(4).

Of the five reasons the NVRA identifies for which voters may be removed from voter rolls, address changes, *see id.* § 20507(a)(4)(B), are the most subject to error because of the sheer volume of changes and the frequent use of based on indirect information.[1]  It is for this reason that the NVRA proscribes the purge of voters based on purported residence changes absent written voter confirmation or compliance with a detailed notice and waiting period requirement.  Specifically, Section 8 of the NVRA mandates that "[a] State shall not remove the name of a registrant from the official list of eligible voters  . . . unless the registrant—

> (A) confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered; or
>
> (B) (i)has failed to respond to a notice described in paragraph (2); and
>
> (ii) has not voted or appeared to vote . . . in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice.

*Id.* § 20507(d)(1).  The voter notice requirement is in turn set out in § 20507(d)(2) and provides that the voter must be sent a notice of presumed change of address via forwardable mail with a pre-

---

[1]   The four other enumerated reasons—(i) the voter requests to be removed, 52 U.S.C. § 20507(a)(3)(A), (ii) the voter is ineligible under state law due to criminal conviction, *id.* § 20507(a)(3)(B), (iii) the voter is ineligible under state law due to mental incapacity, *id.*, and (iv) the voter has died, *id.* § 20507(a)(4)(A)—are all, in the vast majority of cases, derived from ascertainable, recorded, facts that directly prove ineligibility.

addressed and pre-paid card that can be returned to the election official allowing the voter to confirm her address.  Absent a confirmation in writing, or a return of the notice card, the state cannot cancel the voter's registration unless the voter also fails to contact the election office or appear to vote in two federal elections.  *Id.* § 20507(d)(1).  Thus, the notice and waiting period provides a registrant with the opportunity to correct an incorrect conclusion on the part of the registrar that the voter has changed his or her residence based on second-hand evidence. This notice and waiting period is essential given the possibilities of error when doing large and systematic list maintenance efforts and the consequences of disenfranchisement from those errors.

The NVRA also instructs states to "conduct a general program that makes a *reasonable* effort to remove the names of ineligible voters from the official lists of eligible voters."  *Id.* § 20507(a)(4) (emphasis added).  The NVRA further mandates that any such program "shall be uniform [and] nondiscriminatory."  *Id.* § 20507(b)(1).

### B.    Indiana's Amended Voter List Maintenance Law, "SB 442" Removes the NVRA Notice and Waiting Period

Both before and after SB 442, the Indiana Code required the state's Election Division to annually provide Indiana's statewide voter registration list to the Kansas Secretary of State for comparison to the registration data of all other states participating in the Crosscheck system.  Ind. Code § 3-7-38.2-5(d) (2016);  Ind. Code § 3-7-38.2-5(d), as amended by SB 442 (2017).  Not later than 30 days after receiving comparison data from the Kansas Secretary of State, SB 442 and its predecessor law require the Indiana's NVRA Official to provide to county voter registration offices lists of all Indiana voters having an "identical" "first name, last name, and date of birth of the voter registered in the other state," and "any other information obtained."  Declaration of Alexandre J.

Tschumi ("Tschumi Decl") Ex. 1 (Redline of SB 442 Against Its Predecessor Law) § 15(d)-(e).[2]

Prior to SB 442, the county voter registration office was then required to "determine" whether each individual identified by the NVRA official:  (i) "is the same individual who is a registered voter of the county" (a "matched voter"); (ii) "registered to vote in another state on a date following the date that voter registered in Indiana;" and (iii) "authorized the cancellation of any previous registration."  *See id.*  Critically, if a matched voter had not authorized cancellation, prior to SB 442, the county voter registration office was required to "send an address confirmation notice to the Indiana address of the voter."  *See id.*  Once notice was sent, consistent with the NVRA, the voter could not be removed from Indiana's voter rolls unless and until she had failed to respond to the notice ***and*** failed to vote in two general elections.  *See id.*

On April 13, 2017, the Governor of Indiana signed into law SB 442.  In flagrant disregard of the NVRA, SB 442 removed the requirements (i) that the county also determine that there was authorization, and (ii) the notice and waiting provisions.  *See id.*  By so doing, SB 442 purports to unlawfully provide for the ***immediate*** removal and cancellation of a voter based solely on a possible change in residence identified solely by the Crosscheck database.  *See id.*  Each of these excised provisions was necessary to make the prior version of the law NVRA compliant.

### C.     The Crosscheck Program Is of Limited Reliability

Crosscheck is a system administered by the Kansas Secretary of State that purports to identify voters who have moved to and registered to vote in another state. Tschumi Decl. Ex. 2 (2017 Crosscheck Participation Guide).  It purports to do this by comparing certain voter registration information provided by participating states to identify "matches."  *Id.*; *see also* Deposition of

---

[2]   Ind. Code § 3-7-11-1 designates the Co-Directors of the Election Division as the chief state election officials responsible for the coordination of state responsibilities under the NVRA. Ind. Code  § 3-5-2-33.7 defines these designees as NVRA officials.

Indiana Election Division Co-Director Angela Nussmeyer ("Nussmeyer Tr.") 66:16-20.[3] Crosscheck bases these matches on three pieces of information: first name, last name, and birth date. It then presumes that if there are registration records from two or more states for which these three data points match, those records belong to a single person and the person is registered to vote in more than one state. *Id.*

Under Indiana Code §§ 3-7-38.2-5(d)–(e), Indiana annually provides its statewide voter registration list to the Kansas Secretary of State to compare to data from other states participating in the Crosscheck program. *Id.* Crosscheck then sends a list of purported matches back to Indiana, and, within 30 days of receiving that list, Indiana's statute requires that the "NVRA official," *i.e.*, Defendants Angela Nussmeyer and J. Bradley King, "shall provide to the appropriate county voter registration office" the name of and any other information obtained regarding any Indiana voters who share "identical . . . first name, last name and date of birth of [a] voter registered in [another] state." *Id.* Though Crosscheck will find a match where only the first and last name and birth date fields match, Crosscheck may have other data fields such as middle name, suffix, last four digits of social security number, date of registration, and a variable indicating whether the registrant voted in the last general election in the state. Tschumi Decl. Ex. 2 at 7 (2017 Crosscheck Participation Guide). Though not required by Indiana law, due to concerns about the reliability of Crosscheck, Defendants Nussmeyer and King decided voluntarily to provide the counties with Crosscheck data where the first name, middle name, last name, suffix, date of birth, and last four digits of social security number match or are consistent.[4]

---

[3]   A true and correct copy of the transcript for the February 2, 2018 deposition of Angela Nussmeyer is attached to the Tschumi Decl. at Exhibit 21.

[4]   This standard is imposed through use of a "confidence factor," by which points are awarded for matching data fields (for example, 10 points if the last four digits of the social security number match, and 15 points if the last name matches). Tschumi Decl. Ex. 3 at 10, 21 (

Crosscheck contains a number of inherent limitations.  *First*, Crosscheck is unable to reliably match identical voters without additional, careful, review.  Crosscheck yields frequent "false positives,"—i.e. matching two different individuals as the same person, because the three variables it uses to match are commonly shared by different individuals across the nation.  For example, many Americans were born on January 1, 1970 and given the common name "Maria Garcia."  Many of these "Maria Garcias" have registered to vote in states participating in the Crosscheck program.  These distinct "Maria Garcias" will be identified by Crosscheck as possible duplicate registrations despite the likelihood that the matches are false positives.[5]  When Crosscheck compares approximately 100 million voter records, it accordingly matches many distinct voters with common first names, last names, and dates of birth.  These incorrect matches are disproportionally

---

Angela Nussmeyer, May 17-18, 2017 Presentation at the IVRA Conference); *id.* at 8, 19 (J. Bradley King, November 30, 2017 Presentation at the 2018 Election Administrator's Conference).

[5]  Birth dates are an inherently unreliable way to distinguish individuals; in a group of 180 people, it has been empirically established that it is more likely than not that two will share the same birth date, including year of birth, while in a group of 484 people, it is expected that there will be 10 matches sharing the same birth date, including year of birth.  *See* Michael P. McDonald & Justin Levitt, *Seeing Double Voting: An Extension of the Birthday Problem*, 120 7 Election L.J. 111, 116 (2008),  *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=997888.  Further, a recent study of state voter files determined that "1 in 7 records does not have a listed birthdate, and for many voters who do have a listed birthdate, the date entered is inaccurate."  Ansolabehere et al., *The Quality of Voter Registration Records: A State-By-State Analysis* at 1 (2010), *available at* https://dataverse.harvard.edu/dataset.xhtml?persistentId=hdl:1902.1/18550.  Similarly, names are if anything less reliable, and applying this criterion is inherently discriminatory.  Based on data taken from the White Pages, there are at least 32,000 Maria Garcias in the United States.  Lee Hartman, *John Smith et al.: Some observations on how the 20 most popular first names combine with the 20 most popular surnames in the United States*, *available at* http://mypage.siu.edu/lhartman/johnsmith.html. There are an estimated 2.5 million Americans with the last name Smith.  Mona Chalabi & Andrew Flowers, *Dear Mona, What's The Most Common Name In America*, Nov. 20, 2014, *available at* https://fivethirtyeight.com/features/whats-the-most-common-name-in-america/.

concentrated among minority voters.[6]

   *Second*, Crosscheck does not collect or disseminate the actual registration documents underlying its "matches."  Nussmeyer Tr. 96:20-97:9.  This deprives state officials of confirmatory information, such as signature, entries in the "Previous Voter Registration Address" field on a registration form, and information as to whether the underlying documentation supporting the alleged match is even a voter registration form.  Because Crosscheck processes data with inconsistent definitions, recipients of Crosscheck data also cannot confirm individuals' dates of registration.  For example, assuming Crosscheck has, in fact, matched the same "voter," Crosscheck cannot evaluate if or when a voter in fact registered to vote in each of the matched states, and if they did in fact register to vote in two states (as opposed to engaging in some other action unrelated to voting), which state's registration was first and which was second.  *See infra* at I.B.1.

   It is because of Crosscheck's inherent limitations that Crosscheck has historically only been used as an initial step—a starting point—in Indiana's voter cancellation process.  As Co-Director Nussmeyer explains in emails just prior to passage of SB 442, "I'd rather the voter be made aware their Indiana registration is being cancelled because first name/last name/DOB matches can be flawed" and "[o]ur team is hesitant to [allow registration cancellation without voter authorization]

---

   [6]   Non-White people are more likely to have common shared names.  For instance, 16.3 percent of Hispanic people and 13 percent of Black people have one of the 10 most common surnames, compared to 4.5 percent of White people.  Joshua Comenetz, Frequently Occurring Surnames in the 2010 Census, U.S. Census Bureau, October 2016, *available at* https://www2.census.gov/topics/genealogy/2010surnames/surnames.pdf; *see also* Greg Palast, The GOP's Stealth War on Voters, Rolling Stone (Aug. 24, 2016), *available at* https://www.rollingstone.com/politics/features/the-gops-stealth-war-against-voters-w435890 ("Swedlund's statistical analysis found that African-American, Latino and Asian names predominate, a simple result of the Crosscheck matching process, which spews out little more than a bunch of common names.  No surprise:  The U.S. Census data shows that minorities are overrepresented in 85 of 100 of the most common last names.  If your name is Washington, there's an 89 percent chance you're African-American.  If your last name is Hernandez, there's a 94 percent chance you're Hispanic.  If your name is Kim, there's a 95 percent chance you're Asian.").

because data isn't perfect, and notice should be given to the voter."  Tschumi Decl. Ex. 5 (Email re: SB 442 from Angela Nussmeyer to Terri Rethlake, St Joseph County Clerk,  January 25, 2017); *id*. Ex. 6 (Email re: IED D Staff thoughts on SB 442 and SB 417 from Angela Nussmeyer to Senators Tim Lanane and Jean Breaux, January 25, 2017); *see also* Deposition of Hendricks County Clerk Tammy Dooley ("Dooley Tr.") 37:6-38:6[7] ("I am more comfortable when the voter tells me that they have actually moved out of my state or told me that they're still at their address rather than me just assuming."), 66:21-67:9.

### D.   The Election Division Oversees the Maintenance of Indiana's Voter Registration Lists

The NVRA requires that Indiana "designate a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities under [the NVRA]." 52 U.S.C. § 20509.  Indiana has delegated that responsibility to the Co-Directors of the Election Division, Ind. Code § 3-7-11-1, and has delegated overlapping responsibilities to the Secretary of State, Connie Lawson, in whose Office the Election Division sits.  *Id.* § 3-6-4.2-1.[8]

As Secretary of State, Connie Lawson is the state's chief election official and is charged, with the consent of the Co-Directors, with implementing "in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, and interactive statewide voter registration list . . . ." *Id.* § 3-7-26.3-3.

---

[7]   A true and correct copy of the transcript for the February 27, 2018 deposition of Tammy Dooley is attached to the Tschumi Decl. at Exhibit 28.

[8]   State law delegates various responsibilities related to voter registration to the Secretary of State and the Co-Directors, jointly. *See, e.g.*, *id.* § 3-7-26.3-4 (granting joint ownership of the Statewide Voter Registration system to the Secretary of State and Co-Directors so they might "ensure the proper maintenance and administration of the list"); *id.* § 3-7-26.3-29(10) (requiring the Statewide Voter Registration System "[c]ontain full audit controls and management reports to track and manage the work of county voter registration office employees, including the ability of the secretary of state or the co-directors of the election division to determine whether a county voter registration office is performing voter list maintenance functions in the manner required by [Indiana Code Article 7, which governs voter registration]").

Defendants King and Nussmeyer are the Co-Directors of the Indiana Election Division and preside jointly over it.  *Id.*  §§ 3-6-4.2-3(a)-(b), 5.  Defendants in this action are thus directly responsible for overseeing the counties' maintenance of voter registration records and their compliance with the NVRA.  *Id.* §§ 3-6-3.7-1, 3-6-4.2-2(a).

The Co-Directors' duties also include promulgating Indiana's official policies, guidance, and standard operating procedures instructing county election boards and boards of registration on their duties under state and federal law, including the NVRA, and providing training on these policies and procedures to county election officials.  *Id.* § 3-6-4.2-14; Nussmeyer Tr. 11:5-20.  Official guidance, as reflected in these protocols, documents, and trainings, is mandatory and must be followed by county election officials.  *Id.* 81:2-25; Deposition of Hamilton County Clerk Bethany Sheller ("Sheller Tr.")[9] 20:11-21:5, 41:14-42:6; Deposition of Marion County Clerk Cindy Mowery ("Mowery Tr.")[10] 20:4-6, 21:16-18, 22:5-11, 45:17-46:12; Deposition of Hamilton County Clerk Pat Toschlog ("Toschlog Tr.")[11] 16:1-24, 18:2-7; Deposition of Marion County Clerk LaDonna Freeman ("Freeman Tr.")[12] 15:14-18, 16:13-25.

While the 92 different county boards clean voter registration records within their jurisdictions, the list maintenance is governed by the policies, procedures, and guidance promulgated and implemented by the Election Division Co-Directors, and constrained by the Division's business rules governing the electronic State Voter Registration System ("SVRS").  Nussmeyer Tr. 12:14-

---

[9]   A true and correct copy of the transcript for the February 28, 2018 deposition of Bethany Sheller is attached to the Tschumi Decl. at Exhibit 23.

[10]   A true and correct copy of the transcript for the February 27, 2018 deposition of Cindy Mowery is attached to the Tschumi Decl. at Exhibit 24.

[11]   A true and correct copy of the transcript for the February 28, 2018 deposition of Pat Toschlog is attached to the Tschumi Decl. at Exhibit 25.

[12]   A true and correct copy of the transcript for the February 27, 2018 deposition of LaDonna Freeman is attached to the Tschumi Decl. at Exhibit 26.

14:11.[13]  The SVRS is "a single, uniform, official, centralized, and interactive statewide voter registration list."  Ind. Code §§ 3-7-26.3-3, 4.  The Co-Directors and the Secretary of State's Office create the "business rules," which determine the SVRS's functionality.  Nussmeyer Tr. 76:4-15.  Co-Director Nussmeyer explained,

> The business rules are the logic that is programmed into the statewide voter registration system based on statutory framework. It's business rules or, if you will, a decision tree. So if 'x' then 'y' happens, we need to make sure there's a business rule to make sure that that 'y' happens so that there is standardization within the registration system. . . . The business rules are the functionality of the state, the core team, the state. The county does not participate in designing logic for the statewide voter registration system.

*Id.* 109:9-17, 110:20-23.  Defendants thus control the functionality of the SVRS and the Crosscheck matches (called "hoppers") provided to the counties, meaning they can design the system to prevent NVRA noncompliant cancellations by county officials and/or create protocols generating NVRA-compliant mailers upon approval of matches.

Defendants may not, thus, hide behind an assertion that state law delegates list maintenance responsibilities to counties, rather than state actors.  *See Az. Democratic Party v. Reagan*, No. CV-16-03618, 2016 WL 6523427, at *6 (D. Az. Nov. 3, 2016) (rejecting the Secretary of State's contention that she "d[id] not have authority under Arizona law to declare who is, and who is not, a registered voter" because state law "delegate[d] to the *Counties*, not the State th[at] responsibility").  As the Arizona District Court correctly concluded in *Reagan*, the NVRA imposes an "authority" and "duty" on the NVRA Official "to ensure that voter registration regulations are administered in a fair

---

[13]  The individual county boards are responsible for adding, updating, or removing Indiana voters' registration records within their counties.  Ind. Code § 3-6-5-14; Ind. Code § 3-6-5.2-6; Nussmeyer Tr. 13:3-15.

and uniform manner," which "extend[ed] to the Secretary's oversight of voter registration as carried out by the counties." *Id.*[14]

### E.      Plaintiffs Are Committed to Registering Voters and Protecting Voters' Rights

Plaintiffs are two nonprofit organizations focused on increasing civic participation.  A large part of Plaintiffs' work involves promoting and facilitating voter participation.  In particular, voter registration is a vital part of both organizations' missions, and has been since each group's founding. Helping Indiana citizens get on (and stay on) voter registration lists is critical to supporting civic participation, because voters cannot participate in Indiana elections without being registered. Plaintiffs also support laws and policies that allow eligible voters to cast ballots without risk of wrongful disenfranchisement.

Plaintiff Indiana State Conference of the National Association for the Advancement of Colored People (the "NAACP") is a nonpartisan, nonprofit organization chartered in 1940. Declaration of Barbara Bolling-Williams ("Bolling-Williams Decl.") ¶ 5.  It has approximately 5,000 members in Indiana.  *Id*.  It was founded with the purposes of assisting African-American citizens to ensure political, educational, social, and economic equality of rights for all persons and to fight against racial discrimination.  *Id*.  Since its founding, promoting civic engagement has been vital to the NAACP's mission.  *Id.*  The NAACP fulfills this mission by registering voters, educating voters, monitoring the polls, and advocating for policies that ensure the election system is accessible

---

[14]      *See also Am. Civ. Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 792-93 & n.8 (W.D. Tex. 2015) (although Texas law delegated some duties to county voter registrars, the Secretary of State had "the power to enforce the NVRA"); *N.C. State Conf. of the NAACP v. N.C. State Bd. of Elections*, No. 1:16:CV1274, 2016 WL 6581284, at *7-8 (M.D.N.C. Nov. 4, 2016) (rejecting Defendants' argument that County Boards, not them, were proper parties on the basis that state law grants the State Board "general supervision over all elections" and "the NVRA directs every state to identify a chief election officer to ensure that state complies with the NVRA").  The NVRA Official "does not serve as a mere legal adviser to the counties." *Az. Democratic Party*, 2016 WL 6523427, at *6.

and free from discrimination.  *Id.*  Voter registration is key to NAACP's mission of empowering

minority voters because of the barriers the registration process has posed to participation for these

communities. *Id.* ¶ 9.  The NAACP conducted at least 75 voter registration events prior to the 2016

Election and has held numerous registration events since then.  *Id.* ¶ 7.  Beyond assisting individual

voters, including Indiana voters that are at risk of having their Indiana registration canceled as a

result of the passage of SB 442, the Indiana NAACP's organizational mission includes eliminating

racial discrimination in the democratic process, *id.* ¶ 13, including through legal action to enforce

federal voting protections including the NVRA and the Voting Rights Act, *id.* ¶ 12.  The Indiana

NAACP opposes practices that disproportionately burden minority citizens' ability to participate in

elections. *Id.* ¶ 13.

Plaintiff League of Women Voters of Indiana (the 'League') is a nonpartisan, nonprofit

organization founded in 1920.  Declaration of Oscar Anderson ("Anderson Decl") ¶ 5.  It is affiliated

with the national League of Women Voters, founded the same year.  *Id.*  Central to the group's

mission is encouraging informed and active participation of citizens in government, including voter

registration. *Id.* ¶ 6.  Voter registration is particularly important to the League's mission because the

right to vote cannot be exercised if citizens cannot cast ballots because they are not registered.  *Id.* ¶

8.  In addition to its direct assistance in voter registration and voting, including Indiana voters that

are at risk of having their Indiana registration canceled as a result of the passage of  SB 442,  the

League also advocates for policies that make it easier for eligible citizens to register and vote.  *Id.* ¶

19.  The national League strongly supported the enactment and enforcement of the NVRA, including

by testifying before Congress in favor of the bill.  *Id.* ¶ 20.  The League uses the federal voter

registration form created by the NVRA.  *Id.* ¶ 11.  The League supported and continues to support

the statute's aims at increasing the number of eligible citizens who are registered to vote by

providing reasonable, uniform, and nondiscriminatory voting procedures. *Id.* ¶ 10. The League's mission mirrors the NVRA's goals of increas[ing] the number of eligible citizens who register to vote in elections for Federal office" and "enhanc[ing] the participation of eligible citizens as voters in elections for Federal office." 52 U.S.C. §§ 20501(b)(1)-(2).

Voters who have been and are continuing to be registered through the Plaintiffs' voter registration programs are directly vulnerable to the automatic cancellation of their registrations based on Crosscheck results that SB 442 mandates. and thus face imminent likelihood of disenfranchisement.

## **ARGUMENT**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786, 795 (7th Cir. 2013) (*quoting Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). In considering the appropriateness of injunctive relief, the Court employs a sliding-scale; a stronger showing of likelihood of success on the merits diminishes the need to show irreparable harm, and vice-versa. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008).

There is a high likelihood that the removal of the authorization, notice and waiting period provisions in SB 442 will be found to violate the NVRA. It is also highly likely that the manner in which the voter maintenance lists are maintained across counties—coupled with SB 442's overwhelming, if not exclusive, reliance on Crosscheck "matches"—will be found to not be reasonable, uniform, or nondiscriminatory, in violation of the NVRA. While this likelihood of success obviates the need to establish harm, Plaintiffs also establish that Plaintiffs (and Indiana

voters)—and not Defendants—will suffer substantial irreparable harm should Indiana voters be removed from voter rolls without receiving notice of such removal.

## I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

To establish a likelihood of success on the merits for purposes of obtaining a preliminary injunction, Plaintiffs need only "show that [they have] a better than negligible chance of success on the merits of at least one of [their] claims." *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1096 (quotation omitted).  Plaintiffs bring this claim under 42 U.S.C. § 1983 as well as Section 11(b) of the NVRA.  The NVRA provides a private right of action for "a person who is aggrieved by a violation of this chapter . . . ."  52 U.S.C. § 20510(b)(1).  To establish a claim under 42 U.S.C. § 1983, two elements must be satisfied: (1) there was a deprivation of a right secured by the Constitution or the laws of the United States and (2) that deprivation was caused by a person acting under the color of state law.  *See West v. Atkins*, 487 U.S. 42, 48 (1988).

Defendants, acting in their official capacities as Secretary of State and Co-Directors of the Indiana Election Division, have evinced their intention to facilitate the cancellation of registrations through procedures and for reasons not permitted by the NVRA and in dereliction of their duties under state and federal law.  Defendants have admitted to the facts that establish these statutory violations.  As explained below, because these Defendants violated the NVRA acting under color of state law, Plaintiffs have an overwhelming likelihood of success on both their NVRA and § 1983 claims, far exceeding the Seventh Circuit's low threshold of showing some likelihood of success.

### A.   SB 442 Facially Violates the NVRA

1.   <u>SB 442 Removes Provisions Necessary to Comply with the NVRA</u>

Prior to the enactment of SB 442, Crosscheck "matches" provided to county officials were just the starting point for the county official's "determination" of whether a matched voter's Indiana registration would be canceled.  Prior to SB 442, upon receiving Crosscheck matches county

officials were required to make three separate determinations before cancelling an Indiana voter's registration: *first*, "whether the individual . . . identified in the report provided by the NVRA official under this subsection is the same individual who is a registered voter of the county," *second*, "whether the individual . . . registered to vote in another state on a date *following* the date that voter registered in Indiana," and *third*, "whether the individual . . . authorized the cancellation of any previous registration by the voter when the voter registered in another state." Tschumi Decl. Ex. 1 at 10 (Redline of SB 442 Against Its Predecessor Law). If the county official reliably determined that all three conditions were met, the county official was required to "cancel the voter registration of that voter." *Id.*

If the county official determined that only the first two preconditions were met—*i.e.*, the voter was the same individual that had registered in another state and that the out of state registration occurred *following* the date of the Indiana registration, but the voter had not authorized the cancellation of their Indiana registration—the county official was required to "send an address confirmation notice to the Indiana address of the voter" and wait for a response or wait two election cycles before cancelation. *Id.* By including this requirement, SB 442's predecessor law incorporated important NVRA-mandated protections. *See* 52 U.S.C. §20507(d) ("[A] State shall not remove the name of a registrant . . . unless the registrant . . . confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered; or . . . has failed to respond to a notice [and] has not voted . . . in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice."); *A. Philip Randolph Inst. v. Husted*, 838 F.3d 699, 709 (6th Cir. 2016) ("[T]he plain language of subsection (d)(1) provides that **processes for removing voters based on change in residence must incorporate subsection (d)'s**

16

*confirmation notice procedure*." (emphasis added)); *see also N.C. State Conf. of the NAACP v. N.C. State Bd. of Elections*, No. 1:16:CV1274, 2016 WL 6581284, at *7-8 (M.D.N.C. Nov. 4, 2016) ("Where the issue concerns a voter's change of address, . . . the NVRA prohibits the removal of that voter unless the voter confirms in writing that he or she has moved outside of the county or does not respond to a notice *and* has not voted in two federal election cycles.").

SB 442 removes these essential, NVRA mandated, protections and safeguards, and instead *requires* immediate removal of voters who have neither authorized the cancellation of their registrations nor received NVRA-compliant address confirmation notices or a waiting period. The resultant Indiana Code mandates that "the county voter registration office shall cancel the voter registration" of an individual solely upon a county official's decision that (1) "the individual . . . identified in the report provided by the NVRA official under this subsection is the same individual who is a registered voter of the county" and (2) they are "registered to vote in another state on a date following the date that voter registered in Indiana." Ind. Code § 3-7-38.2-5(d). In practice, SB 442 thus directs voter cancellation based solely on receipt of the Crosscheck match—what had merely been the very first step of a multi-step process under the previous law. By expressly removing the requirements of authorization of cancellation or, in the absence of authorization, notice and a waiting period, SB 442 is in direct and clear violation of the NVRA and must be struck down.[15]

2.     A Crosscheck Match Does Not Constitute Authorization to Cancel a Registration

Defendants' suggestion[16] that a Crosscheck match establishes voter authorization to cancel

---

[15] Nor does the availability of the "fail-safe" mandated by the NVRA excuse SB 442's violations of the NVRA. Defendants cannot selectively violate the NVRA provisions that suit them.

[16] *See* Tschumi Decl. Ex. 7 (Letter from Jerome Bonnet, General Counsel, Office of the Indiana Secretary of State, to Myrna Pérez and Sascha Rand, Counsel to Plaintiffs, July 13, 2017); *see also id*. Ex. 8 (Angela Nussmeyer's Response to Plaintiff's First Set of

their Indiana registration is meritless.  A Crosscheck match simply flags that there may be an individual with registration papers in two states, based on bare biographical data.  The mere possibility of such a match cannot amount to authorization by a voter to cancel his or her registration after allegedly changing his or her address, as a confirmation of a voter's address change must come in writing.  52 U.S.C. § 20507(d)(1)(A).

Indeed, Crosscheck is precisely the kind of second-hand information that the NVRA notice and waiting period was designed to accompany.  Far from establishing authorization, Crosscheck matches do not even identify or provide the purported voter registration documents forming the basis for the match.  Nussmeyer Tr. 96:20-25 ("Q. . . . And the file that is submitted to crosscheck is simply a data file; it doesn't include, for example, scanned versions of any voter registration files or underlying documents, does it?  A.  I'm not aware that it does.").  There is therefore no way, based solely on a Crosscheck match, to determine what, if anything, a voter signed.

That a Crosscheck match cannot provide reliable evidence of voter authorization is not a fact lost on Defendants.  As Co-Director Nussmeyer admitted in e-mails produced in this litigation, "it's a violation of state and federal law for a voter registration official to cancel a voter's registration unless they have signed authorization from the voter that they want their registration cancelled. Unless there's a change at the federal level, this is how the process has to play out."  Tschumi Decl. Ex. 10 (Email re: White County – Multi-State Voter List Maint. from Angela Nussmeyer to Suzann Cox, Voter Registration/Election Clerk, White County Clerk's Office, February 4, 2016).[17]

---

Interrogatories, Common Cause Action); *id*. Ex. 9 (J. Bradley King's Response to Plaintiff's First Set of Interrogatories, Common Cause Action).

[17]   Co-Director Nussmeyer likewise advised legislative aides that SB 442 violated the NVRA, explaining that "[c]urrent law requires the county to send a mailer to the matched voter's Indiana address and if returned USPS undeliverable, then the voter is marked inactive and eligible for cancellation after two federal general elections.  This bill would allow the crosscheck match to have their voter registration cancelled without additional outreach from the county voter registration

In fact, Indiana distinguishes the use of crosscheck data from "written request from a voter" in important ways.  For example, the Election Division does not make the Crosscheck data available to counties within 90 days of federal elections in accordance with the NVRA's prohibition on systematic voter removals within 90 days of a federal election.  52 U.S.C. § 20507(c)(2).  The Election Division does not, however, prevent jurisdictions from removing voters within 90 days upon the voter's written request.  Tschumi Decl. Ex. 3 at 29 (Angela Nussmeyer, May 17-18, 2017 Presentation at the IVRA Conference; Voter List Maintenance); *id.* Ex. 4 at 27 (J. Bradley King, November 30, 2017 Presentation at the 2018 Election Administrator's Conference).  As multiple presentations given by the Election Division underscore, "self-reporting" and "Interstate Crosscheck ('Kansas') program" are two different sources of voter list maintenance data.  *Id.* Ex. 11 at 11 (Presentation given by Matthew Kochevar and Patrick Becker re: Preparing for 2018, undated); *id.* Ex. 3 at 11 (Angela Nussmeyer, May 17-18, 2017 Presentation at the IVRA Conference; Voter List Maintenance).

## B. Defendants' Intended Application of SB 442 Is Not Uniform, Reasonable, or Nondiscriminatory

The NVRA requires that any voter list maintenance program be reasonable, uniform and nondiscriminatory.  52 U.S.C. §§ 20507(a)(4), (b)(1).  As administered by Defendants, the voter list maintenance program enacted by SB 442 is none of these.

### 1.   Defendants Have Failed to Implement a Reasonable and Nondiscrimatory Voter List Maintenance System

A "reasonable" voter list maintenance program pursuant to § 20507(a)(4) must be "accurate" and employ "reliable information." *Welker v. Clarke*, 239 F.3d 596, 598-99 (3d Cir. 2001).

---

official.  Our staff believes federal law does not permit the cancellation . . . ." Tschumi Decl. Ex. 27 (Email re: IED D Staff Memos for House Elections from Angela Nussmeyer to Alexus Tucker et al., March 13, 2017).  Despite her admissions that SB 442 violates federal law, Co-Director Nussmeyer has taken the position in this litigation that SB 442 is NVRA-compliant.

Crosscheck data does not, by itself, constitute accurate, reliable data upon which cancellation can be based.  Because county officials intend to process matches and cancel voter registrations on the basis of Crosscheck data alone, without conducting additional research and investigation, their list maintenance practices are not reasonable for a number of reasons.

*First*, while Defendants voluntarily chose to buttress the reliability of the Crosscheck matches by requiring the last four digits of the voter's social security number to be matched along with first name, last name, middle initial, and date of birth, there is no statutory mandate to apply this heightened matching standard (and indeed SB 442 requires matches be passed on to the counties regardless of any matching social security number).  Thus, there is no guarantee that it will continue to be applied, or be applied uniformly, going forward.

*Second*, the "confidence factor" calculation utilized by Indiana awards points when one state's registration contains an entry listing a middle name or suffix and the other contains a blank.  Tschumi Decl. Ex. 7 (Letter from Jerome Bonnet, General Counsel, Office of the Indiana Secretary of State, to Myrna Perez and Sascha Rand, Counsel to Plaintiffs, July 13, 2017).  The determination that a blank suffix is consistent with "Jr." or "Sr." contradicts the purpose of suffixes: to signify that a person and a relative share a name, but are distinct people.  *Junior*, Merriam Webster Dictionary ("[U]sed chiefly to distinguish a son with the same given name as his father."), *available at* https://www.merriam-webster.com/dictionary/junior.  Additionally, contradictory entries result in the award of zero points rather than disqualifying a match, despite the clear suggestion of distinct individuals.[18]  Deposition of Indiana Election Division Co-Director J. Bradley King ("King Tr.")

---

[18]   Defendants have represented that an award of zero points for such a category would cause a match's maximum confidence factor to necessarily fall below 75 points, thereby preventing it from being forwarded to county officials in the first instance.  Nussmeyer Tr. 66:16-67:23.  However, county clerks testified that matches with confidence factors substantially lower than 75 points (or even the 70 points required by the Election Division under SB 442's

50:15-24.[19]

*Third*, as discussed *supra*, the Crosscheck program does not provide the out-of-state registration forming the basis for the alleged match. Therefore, the county officials cannot undertake the review necessary to establish a true match between the Indiana and out-of-state registrant, and are deprived of essential information: the individuals' signatures or entries in "prior address" fields that could evidence Indiana addresses matching those on file. Mowery Tr. 56:19-24 ("Q. Okay. But just so I'm sure I'm understanding correctly, there is no . . . date of registration in the hopper system? A. I don't believe so. I think what's [depicted in Tschumi Decl. Ex. 20 (the Multi-State Voter List Maintenance Step-by-Step)] is what's all there."). Rather, the Election Division forwards *all* matches, irrespective of what registration data formed the basis of the match. Nussmeyer Tr. 101:9-20 ("Q. And so under the new state law, is it correct that the county officials are obligated to determine whether individuals who have been matched through crosscheck register to vote in another state on a date following the date that they registered in Indiana? A. Correct. Q. And the field that they're using to do that is the field for which these definitions have been provided; is that right? A. No. They don't have visibility to this information. It's not provided to them.")

*Fourth*, Crosscheck does not establish "whether the individual . . . registered to vote in another state on a date *following* the date that voter registered in Indiana." Ind. Code § 3-7-38.2-5(d)(2) (emphasis added). Crosscheck does not determine whether the non-Indiana registration post-dates the Indiana registration and may match where ***no date of registration was***

---

predecessor law) have been processed into the Crosscheck hopper for their potential approval. Dooley Tr. 31:7-33:9; Mowery Tr. 73:1-4; Freeman Tr. 28:13-24.

[19] A true and correct copy of the transcript for the February 2, 2018 deposition of J. Bradley King is attached to the Tschumi Decl. at Exhibit 22.

*even provided*.[20]  *See* Nussmeyer Tr. 125:12-18 ("I would argue that the county would have no visibility to when that person was registered above in the other state and the only way they can make that cancellation is if they had the facts in evidence that are not currently provided through the crosscheck data to the county."); King Tr. 24:16-23 ("Q. What rule applies if one or the other state has a blank date of registration field? A. I would assume that that particular voter registration record would be forwarded, and then it would be the subject of additional research by a county voter registration office to determine whether or not the most recent registration date was in Indiana."); Freeman Tr. 23:25-24:4; Tschumi Decl. Ex. 20 at 4 (Multi-State Voter List Maintenance Step-by-Step, Indiana Statewide Voter Registration System).[21]

Nor is Crosscheck's failure to evidence *subsequent* non-Indiana voter registration disclosed

---

[20]  Though SB 442 plainly dictates that the relevant comparator for such a determination is the respective dates of registration of the Indiana and non-Indiana voter registrations, Crosscheck does not collect that data.  The numerous inconsistent definitions used by participating States evidence that most dates represented as dates of registration are not, in fact, dates of registration.  Tschumi Decl. Ex. 19 (2017 Interstate Crosscheck Program Definitions of Date of Registration Spreadsheet); Nussmeyer Tr. 99:5-10 ("The definitions, as I recall, are provided by the state, and they may not—they may reflect different points of the process by which they consider date of registration.  I don't believe Indiana has provided a definition for what registration date means . . . ."); King Tr. 28:15-21 ("Q.  And do the rules for the crosscheck hopper within [the State Voter Registration System] distinguish between states that use a similar procedure to what Indiana uses versus states which may have a completely different definition for what date of registration may mean?  A.  I'm not aware of any such distinction.").

[21]  When confronted with their failure to convey to county officials the entries for Crosscheck's date of registration fields or the fact of blank entries, both Co-Directors spontaneously vowed to make undefined changes to the way matches are presented in the Crosscheck hopper.  King Tr. 77:21-24 ("I don't feel able to give you a detailed explanation of exactly how that would be agreed to in the future."); Nussmeyer Tr. 75:14-76:1 ("The project that most likely will be in flight in the next month or two would be to provide counties the registration date that is offered on the Kansas Secretary of State's—the data that's returned to our state and if such a date is provided from another member's state.  Because there are member states that don't necessarily provide a registration date in that file, as I understand.  It's a very long way of saying we are updating our policies and procedures in the statewide voter registration system to reflect the change in law from last year.").  Any such revision will necessarily fail as a remedy absent reinstating the authorization, notice, and waiting provisions mandated by the NVRA.

to county officials.  Both SB 442 and its predecessor law required county voter registration offices to "determine whether the individual . . . registered to vote in another state *on a date following the date that voter registered in Indiana*."  Ind. Code § 3-7-38.2-5(d)(2) (emphasis added).  The Co-Directors of the Election Division submit Crosscheck matches to county officials as if they satisfy this prerequisite, King Tr. 30:16-25, and never inform county officials of inconsistencies as to the definitions adopted by Crosscheck participant states, Nussmeyer Tr. 101:4-8, 125:12-18; King Tr. 30:16-25.  Thus, county officials are simply left to rely on a Crosscheck match to evidence the subsequence of the non-Indiana voter registration and are not advised that the Crosscheck data does *not* by itself provide a reliable basis upon which they can make the determinations they are being directed to make.  Toschlog Tr. 32:18-25 ("Yes. That's what we're told that ours is the oldest."); Dooley Tr. 76:6-25, 42:9-43:8, 55:11-22, 56:3-57:5; Sheller Tr. 33:12-23; 36:19-37:13; Mowery Tr. 56:19-24, 75:5-76:1; Freeman Tr. 36:13-24; Nussmeyer Tr. 99:18-101:20; King Tr. 30:9-30:25.[22]

*Fifth*, even reliable confirmation—albeit not available from Crosscheck—of a subsequent date of registration outside of Indiana is not a reliable indicator that an Indiana registrant intends to vote outside of Indiana.  A recent study by academics  and statisticians from Harvard, Yale,

---

[22]   Nationwide inconsistencies with respect to dates of registration compound the error caused by the Election Division's assertion to counties that non-Indiana individuals' dates of registration post-date Indiana dates of registration. A recent state-by-state study found that "an implausibly large number of registrants . . . (1 in 50) are listed as registering on January 1st." Tschumi Decl. Ex. 12 (Ansolabehere et al., *The Quality of Voter Registration Records: A State-By-State Analysis* (2010), *available at* https://dataverse.harvard.edu/dataset.xhtml?persistentId=hdl:1902.1/18550). Yet, January 1st is "one of the least likely days  for a registration application to be processed" because government offices are closed. *Id.* at 20. In Indiana, roughly 1% of voters have January 1 registration dates. *Id.* at 23 fig.8.  Five of the six states having more than 5% of voters with January 1 registration dates were Crosscheck participants in 2016. *Compare id.*, *with* Tschumi Decl. Ex. 13 at 10 (Presentation by Rep. Keith Esau to the National Conference of State Legislators (June 15, 2017) (showing Arizona, New York, Massachusetts, Mississippi, and Illinois as participants)), *available at* http://www.ncsl.org/Portals/1/Documents/Elections/Kansas_VR_Crosscheck_Program.pdf)).

Stanford, Penn, and Microsoft found among Iowa Crosscheck matches who cast ballots in 2012 and for which there was additionally a matching social security number, at least 21% of such individuals cast ballots using their *prior* registration.[23]  They then determined that "Crosscheck's proposed purging strategies would eliminate about 300 registrations used to cast a seemingly legitimate vote for every one registration used to cast a double vote."[24]

*Sixth*, the exclusive use of Crosscheck—which necessarily is less reliable when applied to minority voter populations where identical first and last names are more prevalent—leads to discriminatory results.  *See supra* n.5.

### 2.   Defendants Have Failed to Implement a Uniform Voter List Maintenance System

The NVRA's mandate that state voter list maintenance programs be uniform and nondiscriminatory requires that counties across a state may not apply different standards in implementing the program.  H.R. REP. No. 103-9, at 15 (1993)  ("The term 'uniform' is intended to mean that any purge program or activity must be applied to an entire jurisdiction."); *Ass'n of Cmty. Orgs. for Reform Now (ACORN) v. Edgar*, No. 95 C 174, 1995 WL 532120, at *2 (N.D. Ill. Sept. 7, 1995) (uniformity must be ensured from county to county to comply with § 20507(b)(1), which requires the "uniformity and non-discriminatory nature of '[a]ny *State* program or activity to protect the integrity of the electoral process'"); *Project Vote v. Madison Cty. Bd. of Elections*, 1:08-cv-2266, 2008 WL 4445176, at *11-12 (N.D. Ohio Sept. 29, 2008) (granting temporary restraining order "to require a single county to follow the absentee procedures that every other county in the state will be

---

[23]   *Compare*  Goel et al., *One Person, One Vote: Estimating the Prevalence of Double Voting in U.S. Presidential Elections* at 27 (2017), *available at* https://5harad.com/papers/1p1v.pdf ("While the later registration record is more likely to be used to cast a vote, the registration record with an earlier registration date was used to cast a ballot 2,543 times."), *with id.* at 25 tbl.1 (showing 9,429 ballots cast with a "later or unknown reg. date").

[24]   *Id.*

following"); *Az. Democratic Party v. Reagan*, No. CV-16-03618, 2016 WL 6523427, at *6 (D. Az. Nov. 3, 2016) (holding NVRA official has "not only authority, but a duty to ensure that voter registration regulations are administered in a fair and uniform manner[, which] extends to the [NVRA official's] oversight of voter registration as carried out by the counties").

In advising the counties, Co-Directors King and Nussmeyer often receive and respond to counties' inquiries independently, and without consulting one another. Nussmeyer Tr. 19:23-20:24; *see also, e.g.*, Tschumi Decl. Ex. 5 (Email from Angela Nussmeyer to Terri Rethlake). Co-Directors King and Nussmeyer may also disagree on policies and procedures in response to counties' inquiries. *See, e.g.,* Nussmeyer Tr. 21:7-22:3.[25] Because county officials typically reach out to the Co-Director with whom they share political affiliations, *see* Sheller Tr. 13:16-22; Toschlog Tr. 14:1-8; Mowery Tr. 16:16-25; Freeman Tr. 13:2-4, differences in the Co-Directors' interpretations will yield nonuniform implementation of law statewide.

Not surprisingly in light of the minimal to nonexistent guidance county officials received as to how to make their "determinations" concerning Crosscheck matches prior to SB 442, counties were markedly inconsistent in making determinations as to whether to approve matches placed in their hoppers. Among other things, county officials stated that, in making those determinations, they did not review nor request any material outside of the data in the Crosscheck hopper provided to them by the Election Division. Sheller Tr. 30:7-13; Toschlog Tr. 30:20-31:16; Dooley Tr. 29:4-30:24. Three clerks independently suggested that they approve matches on the basis of unusual names—without regard to the prevalence of the name in the other county or state—a transparently nonuniform and likely discriminatory practice. Sheller Tr. 31:10-32:13 (stating she would not cancel

---

[25]   Not only may Nussmeyer and King provide conflicting instructions to counties, but they abdicate responsibility for NVRA compliance by allowing counties to use their discretion in implementing whatever instructions one or the other of the Co-Directors may provide. Nussmeyer Tr. 11:14-12:13, 23:17-23; Mowery Tr. 61:4-62:6.

the registration of an Indiana voter who had a name "too common to assume that it is the same person," but would cancel the registration "if she had a super odd name"); Toschlog Tr. 32:9-13 ("[I]f they have an unusual name . . . but you don't have, maybe, the Social Security number, you might go ahead and accept it if you have the same date of birth and an extremely unusual name."); Dooley Tr. 44:9-45:20 (stating she would match "Nicholette Marcos" but not "John Smith" on the basis of just matching first name, last name, and date of birth).  This exacerbates the potential for discrimination using a dataset already disproportionately likely to match minority voters, as discussed *supra*.

The nonuniformity among counties of the State's voter list maintenance program is confirmed by Defendants' data showing that counties were approving "matches" at markedly different rates, yielding the clear inference that they were applying different criteria.  *See* Tschumi Decl. Ex. 14 ("InterstateCrossCheck Pivot.xlsx" Spreadsheet).  For example, Blackford, Brown, Carroll, Crawford, Decatur, Fulton, Jay, Jennings, Marshall, Martin, Pike, Vermillion, Warren, Washington, and Wells Counties each approved 100% of matches placed by the Election Division into the Crosscheck hopper.  *Id.*  Boone, Clay, Clinton, Dearborn, Dubois, Fountain, Gibson, Greene, Hendricks, Jasper, Johnson, Scott, Spencer, and Steuben Counties each approved more than 99% of matches in the Crosscheck hopper.  *Id.*  Such high approval rates suggest these counties were "rubber stamping" their findings based exclusively on the existence of a Crosscheck match.  On the other hand, other counties were more cautious, clearly applying different standards before approving matches.[26]  Despite possessing documents evidencing nonuniform approval of Crosscheck matches,

---

[26]   *See, e.g.*, Clark County (rejecting 28% of matches); Delaware County (failing to process a single match and leaving 2,062 matches "pending"); Elkhart County (approving 0.2%, rejecting 22%, and leaving 78% pending); Lake County (rejecting 41%); Porter County (approving 48%, rejecting 0.7%, leaving 44% pending, and marking 7% "Research Needed"); St. Joseph County (approving 77%, rejecting 15%, and leaving 8% pending).  *Id.*

the Co-Directors of the Election Division have undertaken no further study.  Nussmeyer Tr. 127:23-

128:1 ("Q.  Beyond providing guidance, do you take any steps to understand what the counties are

doing to make this [cancellation] determination?  A.  No.").

Despite these serious infirmities that undercut the utility and reliability of the Crosscheck

matches, Defendants have not provided the county officials with any instruction or guidance as to

how to implement the law, uniformly or otherwise. The Co-Directors inform the counties that their

direction is advisory and optional, which exacerbates the nonuniformity.  Nussmeyer Tr. 16:14-19

("I would strongly encourage the counties to follow our advice and counsel, but ultimately they're

the ones in control of the voter registration."); King Tr. 32:25-33:9 ("Q. . . . Are they required or do

you expect them to be doing additional research into the confidence factors simply seeing that the

match has reached the confidence factors minimum that's applied for it to be a match?  A.  We

would not—the election division would not require them to do so. ").  In her deposition Co-Director

Nussmeyer conceded that "other than the written guidance that is produced by the election division,

. . . *the level of careful review . . . is left to the county's discretion* . . . ."  Nussmeyer Tr. 153:16-23

(emphasis added).[27] No written guidance, manual, step-by-step instruction, or standard operating

procedure produced thus far in this litigation has offered county officials any direction as to how

they must determine whether the individual "identified in the report provided by the NVRA official

. . . is the same individual who is a registered voter of the county."  Ind. Code § 3-7-38.2-5(d).  In

fact, no produced document states that *any* additional inquiry is even suggested or required.[28]

---

[27]   *See also id.* 73:13-21 ("Q.  But the election division does not provide any formal
guidance on what additional steps, research steps, let's say, if research is needed, that the county
would need to do; is that correct?  A.  Other than directing them to state law to review those
provisions within statute, which would be the subsection, what is it, D1 of [SB 442].").

[28]   *See, e.g.*, Tschumi Decl. Ex. 15 (2018 Indiana Voter Registration Guidebook at 34,
Indiana Election Division); *id.* Ex. 16 (2017 Indiana Election Legislation Summary at 3, Indiana
Election Division); *id.* Ex. 17 (Multi-State Voter List Maintenance Step-by-Step, Indiana

Dooley Tr. 30:12-24, 42:9-43:8; Nussmeyer Tr. 143:3-10, 153:16-23; Sheller Tr. 30:14-21; Toschlog Tr. 30:20-31:16.

This nonuniformity will continue, as county officials have expressed that their standards of review will not change after the enactment of SB 442 and the Election Division will continue to abdicate its enforcement authority going forward. Mowery Tr. 79:4-13 ("Q. Is that careful review any different than the review you conducted prior to the change in this law? A. No."); Sheller Tr. 36:12-18; Toschlog 37:20-38:11; Nussmeyer Tr. 16:14-19; King Tr. 32:25-33:9.  The only thing that will change is the direct consequence of match approvals—automatic cancellation of an Indiana voter's registration. Toschlog Tr. 37:10-14 ("The new procedure is basically if you believe that it's a match, then it's okay . . . to cancel them on the spot."); *see also id.* 33:12-25; Sheller 24:3-12; 35:16-36:7; 40:10-14; Mowery Tr. 78:18-25, 80:3-15.   Moreover, under SB 442, rubber stamping Crosscheck matches will require that "the county voter registration office shall cancel the voter registration of that voter" instead of yielding a mailed notice.  Ind. Code § 3-7-38.2-5(e).

## II.  PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION AND HAVE NO ADEQUATE REMEDY AT LAW

As explained above, SB 442 creates the real and immediate risk of disenfranchisement by depriving voters of the NVRA's safeguards prior to removing their names from the voting rolls, which will irreparably and imminently harm Plaintiffs and those they serve.

First, there are the injuries to voters.  The most obvious one is that affected voters will be deprived of the right to vote, but there are a series of attendant injuries.  Voters removed from the

---

Statewide Voter Registration System (last revised June 21, 2017)); *id*. Ex. 17 (Standard Operating Procedure VRG 58.2 ("Voter List Maintenance")); *id*. Ex. 3 at 21 ( Angela Nussmeyer, May 17-18, 2017 Presentation at the IVRA Conference); *id*. Ex. at 19 (J. Bradley King, November 30, 2017 Presentation at the 2018 Election Administrator's Conference); *id*. Ex. 18 at 12 (Brad King, June 14, 2017 Presentation at the 2017 State Board of Accounts Conference).

rolls will receive no information about upcoming elections, dates, or precinct location (which is frequently subject to change from election to election).  Nussmeyer Tr. 79:10-24 ("Q.  Does the county or the election division send canceled voters any election-related mail?  A. . . . [I]f the county wanted to send a change in polling location, I believe that it would be limited to active and inactive voter, and canceled would not be part of that information."); Toschlog Tr. 34:21-35:4 ("Q. What about if a voter is canceled, do they continue to receive [mailings regarding such things as poll locations and other election-related mailings]? A. No. They receive nothing once they're canceled."); Mowery Tr. 55:11-17 ( "Q. . . . And once a voter's registration is canceled, do they receive mailings with information on polling locations anymore? A. Not if they're canceled. Q. Would they receive any election-related mailings from your office? A. No.").  Additionally, only *registered* voters' records appear on Indiana's online voter portal, indianavoters.com, Nussmeyer Tr. 78:16-19, 79:6-8, which means an affected voter will not be able to look up necessary information online.

Even if an individual whose registration was canceled somehow showed up to vote, the would-be voter would not be able to get a ballot because the name would be missing from the poll book.  Such individuals would be forced to cast a provisional ballot or navigate their county's complex "fail-safe" voting system.[29]

These burdens may create cascading effects that slow down the process of casting ballots for other voters.  The time required of poll workers to handle registration problems and provisional ballots will mean fewer resources are available to keep the voting process running smoothly.

---

[29] The provisional ballot process is extremely onerous, requiring additional time, typically up to an hour.  Anderson Decl. ¶ 28.  The fail-safe process can take even longer than the provisional ballot process.  *Id.*  Next, the voter must take additional steps to get the provisional ballot counted.  That often requires going to a county office that may be hard to reach.  For example, reaching a Lake county office for one resident reliant on public transit required taking two buses and a train, an eight-hour trip.  The office was open only between 8 a.m. and 4:30 p.m.  Bolling-Williams Decl. ¶ 20.

Anderson Decl. ¶ 30.  In some precincts, particularly those with large numbers of minority voters, this creates the risk that voters will be forced to wait in long lines and may leave without voting. Bolling-Williams Decl. ¶ 19.  These cumulative injuries to voters undermine the direct assistance and advocacy Plaintiffs undertake to try to make voting easier and free of discrimination.  Anderson Decl. ¶¶ 6-10, 13, 16-20, 30; Bolling-Williams Decl. ¶¶ 8-19.

These burdens pose an imminent threat to members and constituents of Plaintiff organizations.  Collectively, plaintiffs have more than 6,300 members across the state.  Bolling-Williams Decl. ¶ 5; Anderson Decl. ¶ 7.  Registered voters who are members of these organizations face the risk of being purged.  Plaintiff NAACP's members, the majority of whom are African-American, are disproportionately likely to be purged by Crosscheck or vote at polling locations at which Crosscheck-related problems occur.  Bolling-Williams Decl. ¶¶ 15-16, 18.  Meanwhile, the League considers voter registration integral to its existence, Anderson Decl. ¶ 6, and League members focus on voter registration virtually all the time, *id.* ¶ 15.  For a League member to be purged from the rolls and unable to vote would be particularly alarming.  *Id.* ¶ 24.  The removals are poised to occur mere months before the election, leaving little or no opportunity to correct errors.  *Id.* ¶¶ 24-25; Bolling-Williams Decl. ¶¶ 16-17.

SB 442 also poses irreparable harms to Plaintiffs as organizations.  Both the League and the NAACP focus their efforts on registering new voters in Indiana, including by holding voter registration drives, collecting and delivering completed forms to election officials, and providing information regarding how to register to vote.  These are protected activities.  *See Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1353 (11th Cir. 2005) (holding that voter registration organizations have a protected interest in holding meaningful registration drives).  It would completely defeat the purpose of registering eligible Hoosiers to vote if the state were to turn around

and cancel those voters' registrations, especially right before the election.  Anderson Decl. ¶ 25; Bolling-Williams Decl. ¶ 17.  To be clear, courts have routinely held that interference with an organization's voter registration activities constitutes irreparable harm.  An organization is harmed if the "actions taken by [the defendant] have 'perceptibly impaired' [its] programs." *Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).  "Conduct that limits an organization's ability to conduct voter registration activities constitutes an irreparable injury." *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1350 (N.D. Ga. 2016); *see also Ass'n of Cmty. Orgs. for Reform Now v. Cox*, No. 1:06–CV–1891–JTC, 2006 WL 6866680, at *7 (N.D. Ga. Sept. 28, 2006) (finding that irreparable harm existed where a regulation limited an organization's ability to conduct voter registration drives); *League of Women Voters of Fla. v. Browning,* 863 F. Supp. 2d 1155 (N.D. Fla. 2012) ("[W]hen a plaintiff loses an opportunity to register a voter, the opportunity is gone forever.").

Moreover, if properly registered voters are removed from the registration rolls, it not only undoes Plaintiffs' work, it also creates more to be done.  The new law will require Plaintiffs to expend their limited financial resources and dedicate disproportionate energy to rolling back the illegal effects of the bill.  Anderson Decl. ¶¶ 22, 32-33; Bolling-Williams Decl. ¶¶ 21-23.  They will need to educate voters not only about the risks of being removed without notice and how to check their voter registration, but will also require efforts to educate voters about Election Day procedures if they are missing from the rolls.  This drains valuable time and limited resources the organizations would otherwise be spending registering new voters or educating voters on preexisting registration requirements.

Where, as here, organizations have been forced to divert resources to account for improper removal of voters from voter registration rolls, Courts have recognized irreparable harm:

> By continuing to spend resources on registration efforts between now and Election Day, Organizational Plaintiffs continue to divert resources to voter registration, sacrificing other voter mobilization and voter education efforts.  Such a diversion of resources in response to Defendants' alleged noncompliance 'perceptibly impair[s]' Organizational Plaintiffs' ability to mobilize and educate voters before the General Election, a key piece of their missions.  That Organizational Plaintiffs would have to divert resources in the absence of such relief is enough to satisfy their burden of showing a likelihood of suffering irreparable harm.

*Action NC v. Strach*, 216 F. Supp. 3d 597, 642-43 (M.D.N.C. 2016) (internal citations omitted) (alteration in original).

## III.   THE BALANCE OF THE HARDSHIPS WEIGHS HEAVILY IN FAVOR OF A PRELIMINARY INJUNCTION

While the harm flowing from the *denial* of an injunction is concrete, substantial, and irreparable, the harm caused to Defendants by *granting* an injunction is none of these. "By definition, '[t]he public interest . . . favors permitting as many qualified voters as possible.'" *League of Women Voters of N.C. v. North Carolina*, 769 F. 3d 224, 247 (4th Cir. 2014) (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012)).  Maintaining accurate voter registration lists is both important and prescribed by the NVRA, but Indiana has many more accurate methods for ensuring up-to-date voter rolls that are not challenged by this lawsuit (*e.g.*, using its annual statewide mailer and other notification processes, cancelling registrations based on the voter's death/incarceration/incapacity/written request, and others).  Indiana is free to continue using these and other lawful voter list maintenance activities to keep its voter list current.  Indiana has not yet implemented the new procedures in Indiana Code § 3-7-38.2-5(d)-(e).  King Tr. 24:6-15, 37:14-38:3; Nussmeyer Tr. 93:1-16.  There is no evidence that delaying implementation of this particular list maintenance program pending resolution of this case will result in harm to the state.  And importantly, by incorporating an injunctive remedy into the NVRA, 52 U.S.C. § 20510(b)(2), Congress clearly expressed an intent that any hardships imposed on voters weigh heavily against a State's hardships in complying with the statute.  *See Burlington N. R.R. Co. v. Bair*, 957 F.2d 599,

601-02 (8th Cir. 1992) ("[I]t is not the role of the courts to balance the equities between the parties [where] Congress has already balanced the equities and determined that, as a matter of public policy, an injunction should issue where the Defendant is engaged in, or about to engage in, any activity which the statute prohibits.").  The "balance of equities and public interest factors weigh decidedly in favor of protecting eligible voters who are being removed from the voter rolls and having their registrations canceled . . . , [p]articularly where . . . the voter is often unaware that the registration is being challenged." *N.C. State Conf. of the NAACP v. N.C. State Bd. of Elections*, No. 1:16CV1274, 2016 WL 6581284, at *10 (M.D.N.C. Nov. 4, 2016).

## IV.   PRELIMINARY RELIEF WILL SERVE THE PUBLIC INTEREST

Finally, the public interest heavily favors issuance of a preliminary injunction here. Congress passed the NVRA for the specific purpose of "establish[ing] procedures that will increase the number of eligible citizens to register to vote" and "to ensure that accurate and current voter registration rolls are maintained."  52 U.S.C. § 20501(b).  Citizens, in voting in elections, exercise an important right.  The public has a "strong interest in exercising the fundamental political right to vote." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam) (internal quotation marks omitted). Permitting the impermissible removal of citizens from the voter rolls would prevent citizens from participating in the democratic process.  Thus, "[b]y definition, '[t]he public interest . . . favors permitting as many qualified voters to vote as possible.'" *League of Women Voters of N.C.*, 769 F. 3d at 247 (quoting *Husted*, 697 F.3d at 437).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request entry of an injunction prohibiting enforcement of SB 442.

DATED:  March 8, 2018                    Respectfully submitted,


                                         s/ Sascha N. Rand
                                         Sascha N. Rand
                                         Ellyde R. Thompson
                                         Ellison Ward Merkel
                                         Geneva McDaniel
                                         Alexandre J. Tschumi
                                         QUINN EMANUEL URQUHART &
                                         SULLIVAN, LLP
                                         51 Madison Avenue, 22nd Floor
                                         New York, NY 10010
                                         (212) 849-7000

                                         Myrna Pérez
                                         Jonathan Brater
                                         BRENNAN CENTER FOR JUSTICE
                                         AT NYU SCHOOL OF LAW
                                         120 Broadway, Suite 1750
                                         New York, NY 10271

                                         Trent A. McCain
                                         MCCAIN LAW OFFICES, P.C.
                                         5655 Broadway
                                         Merrillville, IN 46410
                                         (219) 884-0696