# Exhibit 21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


COMMON CAUSE INDIANA,              )
                                   )
                Plaintiff,         )
                                   )Case No. 1:17-cv-3936
        vs.                        )
                                   )
CONNIE LAWSON, in her              )
official capacity as               )
Secretary of State of              )
Indiana, J. BRADLEY KING,          )
in his official capacity as        )
Co-Director of the Indiana         )
Election Division, and ANGELA)
M. NUSSMEYER, in her official)
capacity as Co-Director of         )
the Indiana Election               )
Division,                          )
                                   )
                Defendants.        )


**DEPOSITION OF ANGELA NUSSMEYER**
**FEBRUARY 2, 2018**
**9:00 a.m.**


ASSOCIATED REPORTING, INC.
251 East Ohio Street
Suite 940
Indianapolis, Indiana  46204
(317) 631-0940
associated-reporting.com

```
                 UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF INDIANA
                    INDIANAPOLIS DIVISION


INDIANA STATE CONFERENCE OF )
THE NATIONAL ASSOCIATION FOR)
THE ADVANCEMENT OF COLORED  )
PEOPLE (NAACP) and LEAGUE   )
OF WOMEN VOTERS OF INDIANA, )
                            )
                Plaintiffs,)
                            )Case No. 1:17-cv-02897
          vs.               )
                            )
CONNIE LAWSON, in her       )
official capacity as        )
Secretary of State of       )
Indiana, J. BRADLEY KING,   )
in his official capacity as )
Co-Director of the Indiana  )
Election Division, and      )
ANGELA M. NUSSMEYER, in her )
official capacity as        )
Co-Director of the Indiana  )
Election Division,          )
                            )
                Defendants.)



     THE 30(b)(6) DEPOSITION UPON ORAL EXAMINATION
OF

          A N G E L A  M.  N U S S M E Y E R,

the deponent produced and sworn before me,
Lindsay N. Bola, Notary Public in and for
the County of Hamilton, State of Indiana, taken
on behalf of the plaintiff, at the Indiana
Government Center South, 302 West Washington
Street, Conference Center Room 2, Indianapolis,
Marion County, Indiana, on the 2nd day of February
2018, commencing at approximately nine a.m.,
pursuant to the Indiana Rules of Trial Procedure,
with written notice as to the time and place.
```

1

2

3                      A P P E A R A N C E S

4

5    ON BEHALF OF THE PLAINTIFF COMMON CAUSE INDIANA:

6         Jan Mensz, Esq.
          Stuart C. Naifen, Esq.
7         Matthew Jedreski, Esq.
          ACLU
8         1031 East Washington Street
          Indianapolis, IN 46202
9
          Sophia Lin Lakin, Esq.
10        ACLU
          125 Broad Street
11        18th Floor
          New York, NY 10004
12

13
     ON BEHALF OF THE PLAINTIFFS NAACP and LEAGUE OF
14   WOMEN VOTERS OF INDIANA:

15        Ellison Ward Merkel, Esq.
          Alexandre J. Tschumi, Esq.
16        QUINN EMANUEL
          51 Madison Avenue
17        22nd Floor
          New York, NY 10010
18
          Jonathan Brater, Esq.
19        Myrna Perez, Esq.
          BRENNAN CENTER FOR JUSTICE
20        120 Broadway
          Suite 1750
21        New York, NY 10271

22

23

24

25

1

2

3

ON BEHALF OF THE DEFENDANT INDIANA ELECTION
4       DIVISION:

5            Jefferson S. Garn, Esq.
             Kyle Hunter, Esq.
6            Diana Moers, Esq.
             Kelly Witte, Esq.
7            OFFICE OF THE ATTORNEY GENERAL
             302 West Washington Street
8            IGCS Fifth Floor
             Indianapolis, IN 46204

9

10

11      ON BEHALF OF THE DEFENDANT ANGELA NUSSMEYER:

12           Matthew R. Kochevar, Esq.
             INDIANA ELECTION DIVISION
13           302 West Washington Street
             Suite E204
14           Indianapolis, IN 46204

15

16      ALSO PRESENT:

17           Matt Koressel

18

19

20

21

22

23

24

25

1

2                    I N D E X   O F   E X A M I N A T I O N

3

4                                                            **PAGE**

5        DIRECT EXAMINATION...................    6
         Questions by Mr. Mensz
6
         DIRECT EXAMINATION...................   84
7        Questions by Ms. Merkel

8        CROSS-EXAMINATION....................  155
         Questions by Mr. Garn

9

10

11                 I N D E X   O F   E X H I B I T S

12

13       Plaintiff's Deposition Exhibits

14       1.  Amended Notice of Deposition........    7

15       4.  Interrogatories....................   41

16       5.  Email..............................   49

17       6.  Voter List Maintenance SOP.........   52

18       9.  Confidence Factor Calculation......   64

19       33. Notice of Deposition...............   85

20       34. IVR Crosscheck Program.............   94

21       35. Definitions of Date of Registration.   99

22       36. SVRS...............................  111

23       37. Voter List Maintenance............  129

24       38. Crosscheck Document................  135

25

1              A N G E L A   M.   N U S S M E Y E R,

2         the witness herein, having been first duly

3         sworn to tell the truth, the whole truth and

4         nothing but the truth, was examined and

5         testified as follows:

6    DIRECT EXAMINATION

7    QUESTIONS BY MR. MENSZ:

8    Q.   Good morning.

9    A.   Good morning.

10   Q.   Could you please state your full name for the

11        record.

12   A.   Angela Marie Nussmeyer.

13   Q.   Great.  And, Ms. Nussmeyer, have you been

14        deposed before?

15   A.   Yes.

16   Q.   Okay.  So you're probably familiar with this

17        procedure, but this is basically an ask and

18        answer kind of format.  You know, we can be

19        relatively informal, but you're testifying

20        under oath and there's no judge, but any

21        statement that you make here can be used in

22        court as a sworn statement.

23             If you need to take a break to talk to

24        your attorney or to do anything else, just let

25        me know.  We can accommodate that.  I would

```
 1          just ask that if I just asked you a question

 2          that you finish answering the questions before

 3          you.

 4     A.   Okay.

 5                   (Plaintiffs' Exhibit No. 1 marked for

 6          identification.)

 7     Q.   You have a binder in front of you with the

 8          exhibits.  Just turn to Exhibit 1.  It's under

 9          tab 1.  And I am showing you here what is

10          titled Amended Notice of Deposition.  Why

11          don't you take a second to look it over, if

12          you could, and tell me whether you've seen

13          this notice before.

14     A.   I have seen some form of this notice before,

15          yes.

16     Q.   Okay.  Great.  Well, I will represent to you

17          that it's a request to the secretary of state

18          and the co-directors of the Indiana Election

19          Division in their official capacity.  That's

20          yourself and Mr. King, Bradley King.  Is it

21          your understanding that you are here to

22          testify on behalf of those defendants?

23     A.   It is my understanding I'm testifying on

24          behalf of myself.

25     Q.   No.
```

```
 1              MR. MENSZ:  Well, let's go off the

 2         record for a second.

 3              (A short recess is taken.)

 4    CONTINUED BY MR. MENSZ:

 5    Q.   So I will represent again that this is a

 6         notice of deposition.  This is is what we call

 7         a Rule 30(b)(6) deposition.  We've asked the

 8         defendants in this case to produce someone to

 9         represent them and to testify on their behalf.

10         Is that your understanding you're --

11    A.   Yes.

12    Q.   -- testifying on behalf of the defendants?

13    A.   Yes.

14    Q.   Thank you.  Can you take a look on page 2

15         through 4.  There's a list of paragraphs with

16         topics.  I'll represent these are topics that

17         you've been produced to testify about.  Take a

18         look at those, and tell me if there's any

19         topics there that you are not prepared to

20         testify about.

21    A.   No, there isn't.

22    Q.   I understand that the defendants in this case

23         are also producing another witness,

24         Mr. Bradley King, also to testify.  Is it your

25         understanding that he will be covering any
```

1       topics that you're not covering?

2             I'm sorry.  That was a terrible question.

3       Let me just strike that question.

4                   MR. GARN:  You want to go off the

5       record for a second?

6                   MR. MENSZ:  Yeah.

7                   (A short recess is taken.)

8                   MR. GARN:  Given the unusual or the

9       unique quality of the Indiana Election

10      Division, we are producing two deponents for

11      this because the election division can't act

12      without both acting.  So they will be covering

13      the same topics, there just may be -- there's

14      not a uniform perspective on this, so we are

15      producing both of those deponents for that

16      purpose for the 30(b)(6) designation.

17  CONTINUED BY MR. MENSZ:

18  Q.  Let me ask you this, Ms. Nussmeyer -- I think

19      that makes sense.  Well, as we go through

20      these questions, if you know that there's a

21      topic or a question that you differ from the

22      other co-director, is that something that you

23      can highlight for me?

24                  MR. GARN:  Objection; form.

25  CONTINUED BY MR. MENSZ:

1    Q.   I'll try to restate that.  Are there areas
2         from the topics that I've shown you in the
3         deposition notice that you know that are
4         disagreements with the other co-director?
5    A.   I hesitate to say that there are not
6         disagreements.  What I would say is that we
7         have a framework and state law that we are
8         instructed to follow, and in that we are
9         uniform in our policies and procedures to the
10        counties, at least with respect to written
11        materials that both co-directors have signed.
12   Q.   Okay.  Thank you.  Okay.  Can you tell me what
13        your position is, what your official title is?
14   A.   I am co-director at the Indiana Election
15        Division.
16   Q.   What does the election division do?
17   A.   The election division is a quasi-government
18        agency that works with a four-member
19        commission, which is made of two democrats,
20        two republicans, to handle hearings on
21        campaign finance matters, to certify election
22        equipment.
23             We also partner with the secretary of
24        state's office as members of what we
25        internally call our core team to make

1        decisions on how the statewide voter

2        registration system functions.  And then both

3        co-directors serve as the state's chief voter

4        registration official.

5    Q.  Okay.  And as a chief registration official,

6        what are your responsibilities or duties?

7    A.  As chief voter registration officials, Brad

8        and I would -- what we do, produce manuals and

9        policies and procedures that are shared with

10       the county voter registration officials.  We

11       also work with our partners, our vendor

12       partners, to build, manage, and maintain the

13       statewide voter registration system.

14   Q.  Okay.  In terms of policies and procedures, do

15       those have to be approved by anyone else, or

16       are you and your co-director sort of the final

17       say on what those are?

18   A.  Brad and I, I would say, are the final say as

19       long as there's agreement between the two of

20       us.

21   Q.  Okay.  If there's a disagreement, what

22       happens?

23   A.  If there is disagreement, then whomever is

24       asking the question would use our responses to

25       inform their decision-making.

1    Q.   So let's say a county's asking you a question

2         on a point of law or procedure and you and

3         your co-director disagree, what is the county

4         supposed to do?

5    A.   The county voter registration official is

6         responsible for the voter registration records

7         within their jurisdiction, and they also need

8         to understand what the law is with respect to

9         voter registration records.  And they can use

10        the information our office provided to inform

11        their decision-making about how they were

12        going to approach that individual applicant or

13        voter registration record.

14   Q.   Okay.  So under Indiana Code 3-7-11-1 it

15        states that the NVRA officials -- let me ask

16        this question.  The statute refers to NVRA,

17        the NVRA official.  Are you an NVRA official?

18   A.   Yes.

19   Q.   And in that capacity, the Indiana Code

20        3-7-11-1 states that the NVRA official is

21        responsible for the coordination of Indiana's

22        responsibilities under the NVRA.  Is that your

23        understanding of your responsibility?

24   A.   Yes.

25   Q.   What's your understanding of what that means,

1         the coordination of those responsibilities;

2         what does that entail?

3    A.   In my view, coordinating voter registration

4         activities would mean the infrastructure of

5         the statewide voter registration system and

6         building business rules that comport with

7         federal and state law.

8             It would mean providing advice to

9         counties, but I maintain that the county voter

10        registration official is ultimately

11        responsible for the records within their

12        jurisdiction as our office does not have the

13        ability to add, update, cancel, or remove any

14        voter registration without explicit

15        authorization from the county.

16   Q.   But in terms of NVRA, is it your understanding

17        that you are charged with ensuring compliance

18        with the NVRA in the State of Indiana?

19   A.   To the best of our ability, yes.

20   Q.   What does that mean, to the best of your

21        ability?

22   A.   It means we have 92 counties all with unique

23        individuals who serve in some capacity as

24        voter registration officials.  And those

25        individuals have their own attorneys, and they

1        consult with those attorneys and make the

2        decision with respect to the voter's

3        registration record.

4    Q.  So if you instruct a county official on a

5        course of action that they must take to comply

6        with the NVRA in your view and they ignore

7        that instruction, are there any consequences

8        to that?

9    A.  I'm not aware of any consequences in my time

10       as co-director that have been made at the

11       county level.

12   Q.  Do you have any procedure for enforcing the

13       compliance with NVRA when you believe a county

14       official is not in compliance?

15   A.  I believe we would be within our right to

16       investigate any issue that came before us with

17       respect to the NVRA.  There is, as I recall, a

18       complaint procedure by which folks can submit

19       documentation to our office for our team to

20       investigate.

21   Q.  Okay.  Just by way of background, we've been

22       referring to the NVRA, is it your

23       understanding that NVRA stands for the

24       National Voter Registration Act?

25   A.  Yes.

Q. So what steps do you take to ensure county

compliance with the NVRA, if any?

A. Beyond building the statewide voter

registration system with specific business

rules to guide the county officials down the

right path, we also provide manuals.

    I believe the 2018 voter registration

guidebook was part of the documents we

produced to you -- you probably have copies --

where both co-directors provide some advice

and counsel.

    We also create standard operating

procedures and work with our vendor partner to

create step-by-step procedures for the

statewide voter registration system.  I

believe you have some of those documents as

part of discovery.

Q. What do you mean by advising counsel to the

counties?  What do you mean by that phrase?

A. If a county would call or email, they may ask

am I allowed, for example, to process a name

change on a pollbook, and I would work with my

attorney to find the appropriate statute to

provide to the county so that would inform

their decision-making.

1    Q.   It informs their decision-making, but you

2         don't view your advice and counsel as

3         compulsory; is that correct?

4              MR. GARN:  Objection to form.  You're

5         asking for legal, but go ahead and answer.

6    CONTINUED BY MR. MENSZ:

7    Q.   If you provide what you described as advice

8         and counsel to a county, in your mind is that

9         mandatory?

10             MR. GARN:  Object to the form.

11   A.   No.  I believe it's ultimately up to the

12        county voter registration official to make the

13        decision with respect to the voter's record.

14        My view would be that what we provide to the

15        county by way of advice and counsel is -- how

16        do I say it -- I would strongly encourage the

17        counties to follow our advice and counsel, but

18        ultimately they're the ones in control of the

19        voter registration.

20            Again, our office does not have the

21        ability to make individual changes to

22        registration records.  That is truly coming

23        from the county's work.

24   Q.   Okay.  A few more background questions.  So in

25        your role as co-director, do you report to

```
 1           anyone?

 2    A.     No.

 3    Q.     You don't have any supervisors; is that

 4           correct?

 5    A.     Correct.

 6    Q.     And who appoints you?

 7    A.     We are nominated -- the co-directors are

 8           nominated by their respective state party

 9           chairs.  Those nominations go to the governor,

10           and the governor makes the appointment.

11    Q.     How long is your appointment for?

12    A.     Four years.

13    Q.     Do you have a staff?

14    A.     I have a staff of four; five if you include

15           me.

16    Q.     And can you tell me the names of your four

17           staff members and their positions.

18    A.     Certainly.  Matthew Kochevar, last name is

19           K-O-C-H-E-V-A-R, he is co-general counsel.

20    Q.     Can you also tell me their responsibilities in

21           that role?

22    A.     As co-general counsel of the division, Matthew

23           would consult with his counterpart in the

24           office on topics that relate to Indiana

25           Election Law, which is broader than just voter
```

1     registration activity.

2          I would work with him and seek his advice

3     and counsel on responding to records requests

4     on county inquiries if they were beyond my

5     knowledge of the situation.

6          He also helps with legislation.  We do a

7     lot of legislative tracking, and he works with

8     me on doing that.

9          Patrick Becker, B-E-C-K-E-R, he is my

10    director of special projects.  He primarily

11    handles reprecincting efforts and map and GIS

12    activities within the office, primarily maps.

13    He also does special projects, which is a very

14    large or broad term, I understand, but he

15    would be tasked with helping with legislative

16    activities, if you will, some office

17    management responsibilities, helping to

18    respond to public information requests that

19    are generally basic, asking for lists and

20    such.

21         Abbey Taylor, her first name is spelled

22    A-B-B-E-Y, and T-A-Y-L-O-R is her last name.

23    She is our campaign finance coordinator, and

24    her title sums up what she does.  She manages

25    the campaign finance aspects of the office

```
 1         from our website to consulting with

 2         candidates' campaigns and counties on how to

 3         comply with campaign finance law.

 4              And the fourth person on my team is Kimmie

 5         Hollowell-Williams.  Last name is

 6         H-O-L-L-O-W-E-L-L hyphen Williams,

 7         W-I-L-L-I-A-M-S.  She is our executive

 8         assistant, so she primarily handles office

 9         management responsibilities, payroll and other

10         financial coordination that's required.

11    Q.   Thank you.  You've alluded to this in all your

12         answers, but you communicate directly with

13         county voter registration officials; is that

14         correct?

15    A.   Yes.

16    Q.   If they ask you a question, do they ask it to

17         both you and Mr. King, your other co-director,

18         or do they sometimes consult with you

19         individually?

20    A.   They do both.  Sometimes they will ask for

21         both our opinions; sometimes they will reach

22         out directly to one individual.

23    Q.   And when someone reaches out to you, do you

24         consult with your co-director before you make

25         an answer?
```

1   A.   No, not always.

2   Q.   Are there any policies or procedures that

3        dictate when you're required to consult with

4        your other co-director before giving advice?

5   A.   No.  We're talking about email or phone calls,

6        correct, not materials or guidebooks or such?

7   Q.   Yes.

8   A.   Right.

9   Q.   So just to be clear, so for materials,

10       official materials coming out of the election

11       division, you always consult with Mr. King or

12       whoever the director is; is that correct?

13  A.   Correct.

14  Q.   But if you receive a phone call from a Marion

15       County official, for example, asking a

16       question about voter registration, you do not

17       necessarily have to consult with Mr. King; is

18       that right?

19  A.   Correct.

20  Q.   Do you sometimes?

21  A.   Occasionally, but it is not often.  I will

22       typically consult with my attorney if the

23       information isn't in one of our guidebooks or

24       manuals.

25  Q.   And when you refer to "my attorney," is that

1       an attorney for the election division?

2   A.  It would be Mr. Kochevar.

3   Q.  Mr. Kochevar.  Does Mr. King have his own

4       attorney --

5   A.  He does.

6   Q.  -- that he consults with?

7       Do you ever disagree with your co-director

8       on anything relevant to voter list

9       maintenance?

10  A.  As I said, we have federal and state law to

11      guide much of our decision-making.  I may have

12      my own personal views as those laws are being

13      created, but, generally speaking, he and I are

14      uniform in our policies and procedures.

15      I know we do have one stated disagreement

16      on our purple guidebook that doesn't

17      necessarily relate -- well, it does relate to

18      list maintenance in that if the acknowledgment

19      card -- if I'm remembering the passage

20      correctly -- would come back as undeliverable

21      within the seven-day pending period, that if

22      that person was already registered our team's

23      perspective is that an individual would remain

24      registered at the previous address.

25      I believe Mr. King's stated position is

1          that the registration would be canceled.  But,

2          again, I would refer you to the purple book to

3          get the explicit language if that's...

4     Q.   Okay.  Is that the only disagreement that you

5          are aware of in terms of voter list

6          maintenance?

7     A.   I'm struggling to think of anything else.

8          That doesn't mean it may not come up in the

9          course of our conversations --

10    Q.   Sure.

11    A.   -- today.

12    Q.   That's fine.

13    A.   That's the one that comes to mind.

14    Q.   Okay.  And so on that issue, if the county

15         came to you and asked you a question about the

16         acknowledgment card, would you give your

17         opinion of what you just stated?

18    A.   Yes.  I most likely would find it in the book

19         and point them to the page and allow them to

20         read it.

21    Q.   That election official will also see

22         Mr. King's opinion, and tell me what is that

23         election official is supposed to do?

24    A.   I don't want to speculate what the county

25         official may or may not do.

1      Q.   Okay.

2      A.   I would encourage them to speak to their

3           attorney.

4      Q.   Okay.  But when there's a differing opinion on

5           a point of policy or even law in terms of

6           voter list maintenance with your co-director,

7           is it correct to say that there's no uniform

8           procedure for that county official to follow?

9                     MR. GARN:  Objection to form.

10     CONTINUED BY MR. MENSZ:

11     Q.   That's okay.  You can answer the question.  Is

12          that the difference between --

13                    MR. GARN:  Unless I tell you not to

14          answer.

15     A.   Okay.  All right.  Will you restate the

16          question?

17     Q.   Sure.  If there's a point of policy or law

18          that you and your co-director disagree on and

19          you're approached by a county official on that

20          point, is it correct to say that the election

21          division does not have uniform guidance that

22          they can provide to the county --

23     A.   Correct.

24     Q.   -- is that correct?

25                    I'm going to talk a little bit about the

1        voter registration list.  Can you tell me what

2        your understanding of the voter registration

3        list is?

4    A.  I'm assuming you're talking about the voter

5        file, the statewide voter file, when you say

6        voter list?

7    Q.  Call it that.  The statewide voter file, yeah,

8        what is that?

9    A.  It is a compilation of all the county efforts

10       to record registration applicants in our

11       statewide database, and it provides a number

12       of fields.  I believe that information has

13       been provided to you in documents.

14            I couldn't tell you every field during

15       this deposition.  But if that's something you

16       don't have, I'm happy to find it and provide

17       it to you.

18   Q.  Sure.  When is a voter's record created in

19       this database?  I'll just refer to it as the

20       SVRS, statewide voter registration system.

21   A.  The record is created at the county level.  So

22       when the county would receive a voter

23       registration application, the county would be

24       responsible for entering that information into

25       the system.

```
 1    Q.   Is one of those datapoints that is entered

 2         into the system the date of registration?

 3    A.   Yes.

 4    Q.   And are you familiar with the different

 5         statuses that a voter can have in the SVRS?

 6    A.   If the statuses are active, inactive or

 7         canceled or pending, yes.

 8    Q.   What are those statuses referred to?  What

 9         does each of them mean?

10    A.   Active means that individual is current with

11         their information that is on file with the

12         county.  An inactive voter would be an

13         individual who did not respond to a prescribed

14         mailing.  For example, our statewide postcard

15         mailer or what we commonly call the NCOA

16         mailer.  If an individual did not respond to

17         that mailing, then they would be eligible to

18         be made inactive.  And if the person did not

19         vote over the course of two federal elections

20         at the registration address, then that

21         individual's record would be canceled.

22    Q.   Okay.  And you stated there's a field in the

23         SVRS system for when a voter is registered; is

24         that correct?

25    A.   Yes.
```

1    Q.   Is there a field that indicates when a voter

2         is put on inactive status?

3    A.   I believe so, but I would want to follow up to

4         confirm that.

5    Q.   Sure.  That's fine.  How about for when their

6         voter registration record's canceled, is there

7         a date associated with that in the system?

8    A.   I believe so, yes, but, again, we could

9         confirm that.

10   Q.   Okay.  If a voter's canceled and then

11        re-registers in Indiana, is a new record

12        created or is the original record reactivated?

13   A.   It depends.  It depends on if that individual

14        remained in the county or out of county.

15             For example, if I -- I live in Marion

16        County, and if I moved within Marion County,

17        the Marion County Voter Registration Office

18        would have tracked all of my registration

19        information, but I'm canceled at that previous

20        address even though I remain an active voter

21        in Marion County.

22   Q.   Okay.

23   A.   If I -- Hamilton County's a county just to the

24        north of us.  If I move from Marion to

25        Hamilton County, then my registration in

1          Marion County from the Marion County

2          perspective would be canceled, and in Hamilton

3          County I would be an active voter.

4               But all that information is maintained

5          within the statewide voter registration

6          system.  It's just that Hamilton County now is

7          the voter registration official for my record.

8     Q.   So how does that look in practice?  Are two

9          separate voter registration records created if

10         you move from Marion County to Hamilton?

11    A.   There would be different paper applications,

12         but I believe you're talking about within the

13         statewide --

14    Q.   Right.

15    A.   -- voter registration system.  This may be

16         something I would have to go back and consult

17         or look at the system.

18              There would be a voter registration detail

19         that would chronicle my registration activity.

20         Voter registration detail may not be the

21         specific field name, but it's substantially

22         similar, that would document my different

23         registrations throughout the State of Indiana

24         and the disposition of those.

25              MR. GARN:  Can we go off the record

1      for a minute?

2                      MR. MENSZ:  Sure.

3                  (A short recess is taken.)

4      CONTINUED BY MR. MENSZ:

5      Q.  So in terms of the SVRS system, is there a

6          particular field that you would refer to as

7          the voter registration detail?

8      A.  If it's not specifically that, it would be

9          substantially similar, but it does chronicle a

10         person's registration within the state.  So if

11         I move from one county to another county, that

12         information would be chronicled.

13     Q.  Is that sort of like an open-ended memo where

14         the user of the SVRS system would just type

15         something in, or are there drop-down fields

16         for what we'll just refer to as voter

17         registration detail?

18     A.  I would have to consult with the step-by-steps

19         to --

20     Q.  That's fine.

21     A.  -- be secure in my answer.

22     Q.  Okay.  Do you know at least when they make

23         those records of the different moves, let's

24         say from Marion County to Hamilton record, in

25         that field would there be a date associated

1          with that change?

2     A.   I believe so, yes.

3     Q.   Would that be required by the SVRS system, or

4          is that just the user deciding to put a date?

5     A.   I would have to look at those business rules.

6          I can't speak offhand.

7     Q.   Okay.  That's fine.  Let's look at the

8          scenario when a voter becomes inactive in

9          Marion County and then becomes active again.

10          Is the date of registration, that field in the

11          SVRS system, does that change?

12     A.   I would have to consult with the business

13          rules.  What I can speak to is it's my

14          understanding that if I'm an inactive voter in

15          Marion County and I updated my registration,

16          I've essentially created a new record in

17          Hamilton County and that inactive would drop

18          off because I now canceled at that previous

19          address that was made inactive because I had

20          not confirmed at any -- through the outreach

21          that's done at the county level that I

22          continue to reside at that address.  And so

23          that canceled address in Marion County would

24          be part of that Hamilton County record within

25          the statewide voter registration system.

1    Q.   Okay.  But in terms of a voter staying within

2         Marion County, you don't know whether a new

3         date of registration date would be entered

4         into the SVRS system from inactive to active?

5    A.   I believe it would.  I'm trying to visualize

6         the main landing page.  As I recall, each

7         touch of the system is recorded with a date.

8    Q.   Okay.

9    A.   Whether that is reflected in the new

10        registration date, I can't recall if the

11        voter's original registration date when they

12        were first entered into the system is what

13        stands or if the new registration at the

14        current address is what stands.  I believe

15        it's the latter, but I would want to consult

16        with the business rules to know for certain.

17   Q.   Okay.

18   A.   To be clear, I was not part of the original

19        team that built the statewide voter

20        registration system.  I've been in this role

21        since October 2015.  And so when I say I need

22        to consult the business rules, it's just that

23        I'm not as familiar, perhaps, as others might

24        be.

25   Q.   That's fine.  I appreciate that.  In terms of

1        changing the registration date for a voter who

2        goes -- continue with our example of Marion

3        County -- who goes from inactive to active

4        within the same county, do you have any

5        instruction, do you know of any policies or

6        procedures that you would give to a county

7        official on whether they need to change that

8        registration date in that SVRS system?

9    A.  I suppose it would depend on what you mean how

10       the person goes from inactive to active.  Are

11       they going inactive to active because they

12       voted, or are they going inactive to active

13       because they've moved to a new address and

14       have essentially overridden the inactive

15       status because they are newly registered at a

16       different address?

17   Q.  Let's say they are newly registered at a

18       different address within Marion County.

19   A.  You're asking which date would then be

20       reflected --

21   Q.  In the SVRS system.

22   A.  -- in the SVRS system?  I believe it would be

23       with the new registration record.  Again,

24       that's where I would want to consult our

25       step-by-steps to be 100 percent secure in my

1        answer.

2    Q.   Okay.  Okay.  If that guidance isn't provided

3         in the step-by-steps, is there any other

4         written policy or procedures that you know of

5         that would guide county officials in making

6         that determination of what to do with the date

7         field?

8    A.   It would be, perhaps, in the standard

9         operating procedures, but it likely would be

10        in the step-by-step.  If it wasn't, then that

11        would be something that the co-directors would

12        need to discuss if it was not part of the

13        business rule.

14   Q.   But that's not something that you've consulted

15        with your co-director on at this time; is that

16        correct?

17   A.   During my time as co-director I don't recall

18        doing so, but that does not mean that existing

19        step-by-steps or other documentations that

20        predate me and the co-director that was in my

21        position don't exist.

22   Q.   Okay.  When a voter registration record's

23        canceled, is that record immediately purged

24        from the system, or does it stay in the system

25        for some period of time?

1    A.   No records are --

2                MR. GARN:   Object to form.

3    CONTINUED BY MR. MENSZ:

4    Q.   Let me restate that.   What happens to a

5         canceled registration record once a user says

6         it's canceled?

7    A.   It remains within the statewide voter

8         registration system.

9    Q.   For how long?

10   A.   In perpetuity.

11   Q.   Okay.   So then let me go back to the scenario

12        Marion County voter, his record is canceled,

13        and then that's activated.   Do you know in

14        that scenario, again, what happens to the date

15        of registration?

16   A.   I believe it would be the date that the record

17        was made active, assuming that was likely a

18        result of a new registration application,

19        whether it was confirming their current

20        registration address, following some fail-safe

21        procedures because they have re-registered or

22        updated their registration in some form within

23        Marion County.

24   Q.   You're not aware right now of any formal

25        policies or procedures that would require that

```
1        they change the registration date; is that

2        correct?

3    A.  I'm not aware.  But, again, I have not --

4    Q.  Sure.

5    A.  -- reviewed those step-by-steps.

6    Q.  I understand.  Can you tell me what are the

7        co-director's responsibilities in terms of

8        overseeing voter list maintenance?

9    A.  There are a number of state laws that

10       prescribe certain policies and procedures.  I

11       mentioned one, the statewide voter

12       registration postcard that the legislature

13       requires us to mail now in odd numbered years,

14       so that's prescribed and follows federal law.

15           There are policies and procedures with

16       respect to the county.  If a county wanted to

17       assume their -- if they wanted to send their

18       own postcard, for an example, there are rules

19       and regulations within state law that guide

20       their decision-making.

21           There are -- the interstate crosscheck is

22       another Kansas program is another thing that

23       has been codified.  We have a statute.

24       There's guidance on how to manage voters who

25       die, voters who are imprisoned following
```

1    conviction of a crime, how to handle those

2    registrations.

3        There are -- there's direction on

4    self-cancellation and other topics which I may

5    be forgetting to recall at this moment, but

6    that's -- generally our responsibilities are

7    to build a framework within the statewide

8    registration system that comports with those

9    state laws and follow those laws as

10   prescribed.

11   Q.  Okay.  And then what are the county's

12       responsibilities, as you understand it, with

13       regard to voter list maintenance?

14   A.  The county's responsibilities are to execute

15       voter list maintenance.  Where our office may

16       provide data, for example, the statewide

17       postcard mailer, that process is managed at

18       the state level, and that data then is shared

19       with the counties.  And the counties make the

20       decision to act upon that data depending on

21       the type of list maintenance activity it would

22       be.

23           Counties, for example, have access to a

24       department of health hopper that is populated

25       at a specific cadence -- and I don't recall

1           what that cadence is off the top of my head,

2           but we can certainly get that to you -- where

3           they would go in and make a decision whether

4           or not that individual is, in fact, deceased

5           and if it's the same individual as who is

6           registered to vote.

7     Q.    Okay.  Generally how does the election

8           division provide guidance or training to the

9           counties?

10    A.    Well, we have an annual Election

11          Administrator's Conference that we touch on

12          many topics.  We also have clerk's association

13          conferences three times a year.  We also

14          attend a Voter Registration Association

15          Conference where we might provide some

16          policies and procedures.

17              We, of course, have our voter registration

18          manual.  We have other manuals that are

19          available at counties.  There are

20          step-by-steps that our vendor creates on how

21          to manage the specific steps within SVRS.  We

22          have standard operating procedures.

23              And if a county wanted to participate in

24          training, our vendor does provide a number of

25          online trainings throughout the course of the

1          year.  Our vendor often attends many of the

2          same conferences that we do to provide some

3          guidance in how the system is designed to

4          work.  They don't provide policy guidance, of

5          course.

6               And if a county wants specific hands-on

7          training, they would make the request of the

8          co-directors to send our vendor partner to the

9          county to train them on how to use the

10         statewide voter registration system, but not

11         provide policy guidance.

12    Q.   Thank you for that.  And in terms of your

13         formal written policy and guidance, is there a

14         formal procedure for adopting those?  I'm

15         speaking specifically about policies and

16         procedures related to voter list maintenance.

17    A.   Other than coming together and agreeing on the

18         documentation, there is no prescribed process.

19         For example, we may have a memo that we want

20         to send to the counties where Brad and I would

21         work on drafting something with our attorneys,

22         and we would both sign that memo and

23         distribute it.

24    Q.   And then, again, as you testified before, with

25         regard to the acknowledgment card, if there's

1        an area where you and Mr. King disagree, that

2        would be noted in the policy; is that correct?

3    A.  If they are coming from co-directors, yes,

4        disagreements would be noted in that.

5    Q.  Otherwise, if there's a policy or procedure

6        coming from the election division, that's the

7        election division's policy and procedure; is

8        that correct?

9    A.  Correct.

10   Q.  Does the election division track the number of

11       voters removed as a result of voter list

12       maintenance?

13   A.  There is a canceled voters report that we can

14       generate.  It's not something I often run to

15       track or manage, but there is a report

16       available to us, yes.

17   Q.  Okay.  I'm going to talk more specifically

18       about removal from the voter rolls at the

19       request of a voter.

20   A.  Okay.

21   Q.  What instruction does the election division

22       give the county for when they can remove

23       voters at a voter's request?

24   A.  I would have to look at our purple manual.

25       That generally comes from our statewide voter

```
1          list -- well, at the request of the voter; I
2          apologize.  It would come from -- well, it
3          could come from our statewide voter list
4          maintenance postcard where an individual has
5          returned the postcard and instructed us to
6          cancel the registration.  That would be, in my
7          view, self-cancellation.
8               Self-cancellation might also come from the
9          voter registration form.  As we indicated,
10         when a person updates their registration, even
11         within the State of Indiana, they are
12         authorizing their cancellation at that
13         previous address.
14              And then the NCOA mailer has a
15         substantially similar form to our statewide
16         postcard mailing which would allow a person to
17         cancel their registration due to an update
18         outside the jurisdiction.  And there is a form
19         that the counties may generate out of the
20         statewide voter registration system that can
21         be mailed to the voter for them to complete to
22         cancel their registration.
23    Q.   Okay.  And you referred to the purple book.
24         Can you tell me what that is?
25    A.   The 2018 voter registration manual.
```

1    Q.    Okay.  So the policies and procedures that you

2          give to counties for when they remove voters,

3          is that where all of that would be contained?

4    A.    It would be primarily contained within the

5          purple book -- sorry, 2018 voter registration

6          manual.  Of course, counties can consult the

7          code book for the current biennium.  They

8          would also have access to any SOPs, standard

9          operating procedures, or step-by-steps.

10              The SOPs generally have more policy

11         guidance than the step-by-step would, so the

12         steps on how you actually would do the

13         functions within the system.

14   Q.    Anywhere else where these policies or

15         procedures would be?

16   A.    Beyond a memo stating a policy or procedure

17         from a co-director, I can't -- I don't recall

18         any other locations.

19   Q.    Are there any specific memos that you can

20         recall that state that procedure?

21   A.    For self-cancellation?

22   Q.    For removal of a voter record at the voter's

23         request.

24   A.    That would -- I recall us putting together a

25         memo last year, and there may be others that

1        relate to the statewide voter list maintenance

2        postcard and how counties may use that as a

3        voter registration document and also providing

4        guidance about -- not -- about the 90-day

5        federal freeze period.

6              But I guess there is -- we're starting to

7        do a newsletter that we just started in

8        December of last year that comes from Brad and

9        I which we might touch on specific topics.  I

10       don't recall us touching on what we did.  We

11       talked about the form, a form we have called

12       the VRG-21, which is what the counties submit

13       to our office to confirm they've done their

14       list maintenance activity, and we describe

15       what work can be conducted within the federal

16       freeze period, whether it be self-cancellation

17       by the voter, imprisonment after conviction.

18  Q.   Other than what you stated, are there any

19       other circumstances when a cancellation is

20       made at the request of the registrant?  Why

21       don't I guide you a little bit by showing you

22       an exhibit.

23  A.   Okay.

24             (Plaintiffs' Exhibit No. 4 marked for

25       identification.)

1    Q.   Can you turn to tab 4.  And I'm showing you

2         what is marked as Exhibit 4.  This is titled

3         Angela Nussmeyer's Response to Plaintiff's

4         First Set of Interrogatories.  Are you

5         familiar with this document?

6    A.   I am.

7    Q.   Did you sign this document?

8    A.   I did.

9    Q.   Is it accurate to the best of your knowledge?

10   A.   Yes.

11   Q.   Can you turn to page 5.  There you gave a

12        couple examples of when a cancellation is made

13        at the request of the registrant.  You state

14        that it's non-exhaustive.  So can you tell me,

15        other than what you've already testified to,

16        are there any other circumstances for when a

17        cancellation is made at the request of a

18        registrant?

19   A.   Beyond what I provided testimony on, I cannot

20        think of anything else.  But I still maintain

21        this might be a non-exhaustive list if

22        information's presented before me, but this is

23        my general understanding of what it would mean

24        to have a cancellation made at the request of

25        the registrant.

```
 1              Otherwise, I suspect you could say submits

 2         a signed written document.  It may not

 3         necessarily be the form of the document

 4         created in the registration system for the

 5         county to mail.  I suppose that could be

 6         construed to being a voter submitting

 7         something in writing that is not necessarily

 8         the form, if you will, to the county.

 9    Q.   Okay.  Is it the election division's position

10         that a request from voters to cancel

11         registration be in writing?

12    A.   That's my understanding, yes.

13    Q.   And does that request have to come directly

14         from the voter?

15    A.   That's my understanding, yes.

16    Q.   And does that request to cancel registration

17         have to be signed by the voter?

18    A.   It would need to be executed by the voter.  I

19         suppose it would depend on what you would

20         consider executed, and I honestly am not 100

21         percent certain on this piece where if an

22         email, for example, with an electronic

23         signature would suffice as being executed or

24         if it would need to be an original wet

25         signature.
```

1          I know registration applications, for

2     example, need to have a wet signature, at

3     least for the registration forms.  Online

4     voter registration and BMV are sort of outside

5     of that scope.

6   Q.   So do you have a position on whether an email

7     from a voter requesting a cancellation would

8     be an acceptable voter request for

9     cancellation?

10          MR. GARN:  Objection to form; "You."

11  CONTINUED BY MR. MENSZ:

12  Q.   Sorry, the election division.  Would the

13     election division consider an email from a

14     voter stating that they want their

15     registration canceled sufficient for a county

16     to go ahead and cancel that record?

17  A.   I'm not aware of any stated policy on that

18     from the division.  This is an area where I

19     would, at this moment in time, would consult

20     with my attorney and ask that my attorney

21     consult with his counterpart within the office

22     to see if there was some consensus.

23  Q.   Okay.  Does the election division require,

24     whether it's an email or the actual wet

25     signature, a written request from the voter

```
 1          with the wet signature, does the election

 2          division require the county to actually see

 3          that document before they cancel a voter

 4          registration record?

 5   A.     That would be my advice to the county, yes,

 6          that they would need to have the documentation

 7          in order to justify the cancellation.

 8   Q.     So, for example, if the election division got

 9          a phone call from a state official from

10          another state representing that it has written

11          authorization from the voter to cancel their

12          Indiana record, would that be an acceptable

13          form?

14   A.     The phone conversation between the

15          officials --

16   Q.     Yes.

17   A.     -- no written documentation, I would be

18          hesitant to advise a county that a telephone

19          conversation would suffice for cancellation.

20          I would encourage them to get written

21          documentation so that it can be recorded in

22          the system.

23   Q.     Do you believe that that's required?

24   A.     Written documentation?

25   Q.     Yes.
```

1    A.   I do believe it's required.

2    Q.   Okay.  How about a written letter from the

3         state official from another state that doesn't

4         include any direct documentation from the

5         voter but just states, listen, we have a

6         request from the voter on file; would that

7         suffice?

8    A.   We have statute that speaks to that, and I

9         would want to review that before responding,

10        if that's acceptable.

11             MR. GARN:  Do you want her to look at

12        that?

13   CONTINUED BY MR. MENSZ:

14   Q.   Why don't we look at that statute.

15             MR. GARN:  Let's go off the record.

16             (A short recess is taken.)

17   CONTINUED BY MR. MENSZ:

18   Q.   I'm going to show you a printout of a statute.

19        This is Indiana Code 3-7-43-3.  Is this the

20        statute you're --

21   A.   No.

22   Q.   -- referring to?  No?

23   A.   I'm looking at 3-7-38.2-5(c).

24   Q.   Okay.  That's what I thought.  Okay.  Why

25        don't I -- do you have that in your book?

1   A.   I do I have it in front of me.  Thank you.

2   Q.   Great.  Well, I have it in front of me.  Just

3        going to read it into the record; is that

4        okay?

5   A.   Certainly.

6   Q.   Subsection "C" states that, "The NVRA official

7        shall request a list of registered voters from

8        any other state in which the NVRA official

9        determines there's a reasonable possibility

10       that a significant number of individuals who

11       have registered to vote in Indiana may also be

12       registered to vote in that state."

13            So tell me about the procedure for what

14       the election division does with such a list.

15  A.   So we -- again, how I understand it to be is

16       that states who believe they have Indiana

17       registrations, individuals who are now

18       registered in their state and Indiana, that

19       that information is generally directed to the

20       state election division, and that information

21       then is forwarded on to the county voter

22       registration official to make a determination

23       as to what is to be done.

24            As I recall, we do have a standard

25       operating procedure that outlines what to do

1          when records come from other out-of-state

2          sources.  I am struggling to recall what that

3          stated policy is.  I certainly could pull that

4          documentation and provide it to you.

5     Q.   Okay.  But now that you've looked at this

6          statute, I'll repose the question I stated

7          before.

8               So if an out-of-state official provides

9          the election division with, let's say, a

10         compilation of names and, maybe, other

11         identifying data, does the election division

12         consider that request in the out of state --

13         let me restate the question.

14              So the out-of-state official presents the

15         election division with a compilation of names

16         and other identifying information that it

17         represents have submitted a request to cancel

18         their vote in Indiana, would that list be

19         sufficient to cancel the voter record on the

20         basis of an authorization from the voter?

21         Again, the out-of-state official not sending

22         the actual voter form.

23    A.   Certainly.  I don't know if there is an

24         official policy.  I believe it's stated in

25         that standard operating procedure that I

1          alluded to, and at some point, if we go on

2          break, I can provide it to you --

3    Q.    Okay.

4    A.    -- and bring it down.

5                    (Plaintiffs' Exhibit No. 5 marked for

6          identification.)

7    Q.    Okay.  Can you take a look at Exhibit 5.

8          Sorry, under tab 5.

9    A.    Okay.

10   Q.    So I will represent to you that this was an

11         email that came from Allen County pursuant to

12         an APRA, A-P-R-A, information request.  Take a

13         look at this email.  Tell me, would this be

14         sufficient for the election division to advise

15         removing a voter registration record?

16                    MR. GARN:  Objection; foundation;

17         form.

18   CONTINUED BY MR. MENSZ:

19   Q.    Okay.  Well, I'm going to represent to you

20         that --

21                    MR. GARN:  If you are -- are you just

22         asking about this as a hypothetical?  Because

23         we don't know anything else about this.

24   CONTINUED BY MR. MENSZ:

25   Q.    Right.  Right.  Let's say a county election

1        official wrote directly to a voter asking them

2        to verify that they've moved, would that be

3        sufficient to remove a registration record and

4        the voter responded?  Obviously, the voter did

5        not respond to this email.

6   A.   If the -- well, my advice generally with the

7        counties has been if you're uncertain about an

8        application or any sort of documentation, it's

9        always best to contact the voter and research

10       the issue.

11            If the voter did not respond to this

12       email -- well, if the voter did not respond to

13       this email message, I do not believe this

14       would be sufficient reason to cancel.

15  Q.   Sure.  But let's assume that they did respond

16       in the affirmative that they had moved.

17            MR. GARN:  Objection; foundation.

18       How?  I mean -- okay.

19  CONTINUED BY MR. MENSZ:

20  Q.   Let me --

21            MR. GARN:  Just form objection to all

22       of this.  You can go ahead and...

23  CONTINUED BY MR. MENSZ:

24  Q.   If a county election official wrote to a voter

25       requesting that they verify that they've moved

1        from their registration address and they

2        respond in the affirmative, would that be

3        sufficient basis to remove a voter

4        registration record?

5    A.  What the county would need to know is where

6        their most recent -- where are they most

7        recently registered to vote, in the State of

8        Indiana or, in this example, in Massachusetts.

9        They would need to know the registration date

10       from Marlborough, Massachusetts, and they

11       would need to have documentation in writing

12       from the voter that they would want to cancel

13       their registration.

14           No.  I'm sorry.  Under current state law,

15       actually the county can cancel if they have

16       that registration information from another

17       state that is more current than the Indiana

18       registration.

19           The way the system -- I say the system,

20       SVRS -- is designed is if they received

21       information from the interstate crosscheck

22       hopper, if the individual was identified to be

23       living in Massachusetts, if they approved the

24       match, then an NCOA mailer would be sent to

25       the individual and that the individual would

1       be responsible for responding within 30 days.

2             And if they did not or if the information

3       came back as USPS undeliverable, as defined in

4       Indiana Code 352 -- I can't remember -- I

5       don't recall the section specifically, that

6       that registrant would be put in inactive

7       status.

8             However, under current state law if they

9       were identified as being registered to vote in

10      Massachusetts and the registration date is

11      more current in Massachusetts than it is in

12      Indiana, under our state law that would be

13      sufficient for cancellation and this

14      documentation would not be required under

15      current state law.

16                  (Plaintiffs' Exhibit No. 6 marked for

17      identification.)

18   Q.  Okay.  All right.  I'm going to move on.  I'm

19      going to show you what's marked as Exhibit 6.

20      Maybe this will help a little bit.  And the

21      title's Voter List Maintenance.  Take a second

22      to look at it.  Let me know when you're done.

23                  MR. GARN:  After we finish with

24      Exhibit 6 --

25                  MR. MENSZ:  Sure.

1          MR. GARN:  -- may we take a break?

2          MR.  MENSZ:  Absolutely.  I will try

3     to be quick.

4  A.   You're fine.

5  Q.   I'll direct you to page 2.

6  A.   All right.

7  Q.   I think this is numbered section 7,

8     "Cancellation at the Voter's Request."  Why

9     don't you look that over and let me know when

10    you're done.

11         So let me just ask this.  So is it the

12    election division's position that the voter

13    registration in another state is that voter's

14    authorization to cancel a prior registration?

15 A.   Will you say the question again?

16 Q.   Sure.  Is a voter registration in another

17    state authorization from the voter to cancel

18    an Indiana registration, a prior registration?

19 A.   The way the policy is presented, it appears

20    so, yes.

21 Q.   And that's the position of the election

22    division; is that correct?

23 A.   As documented in this SOP.  The SOP hasn't

24    been updated since I've been co-director.

25 Q.   Do you have any reason to believe that this is

1      incorrect?

2   A.  I know that our previous law for crosscheck --

3       well, the previous law for crosscheck, for

4       example, we would advise the counties to

5       determine where the individual was most

6       recently registered to vote and whether or not

7       that documentation from the other state, for

8       example, authorized cancellation in that

9       previous state.

10          And so if a county were to ask me about

11      that, I would suggest that they determine

12      whether or not their registration form in the

13      previous state or in their current state

14      authorized cancellation at previous addresses,

15      if you will.

16  Q.  Is it your understanding that not all state

17      voter registration forms have an explicit

18      authorization to cancel a prior record?

19  A.  That's my understanding.

20  Q.  Okay.  In fact, I think the motor voter

21      national registration form -- are you familiar

22      with that form?

23  A.  I am.

24  Q.  And is it your understanding that that doesn't

25      have an explicit authorization to cancel a

1       previous record?

2    A.  That's my understanding.

3    Q.  And that form, what I'll call the motor voter

4        registration form, that is a proper voter

5        registration form for any state; is that

6        correct?

7    A.  Correct.

8    Q.  Unless the county official sees the actual

9        voter registration form, they don't know

10       whether the voter explicitly authorized a

11       cancellation of a prior record; is that

12       correct?

13   A.  When you say sees the record, you mean just a

14       blank registration form, correct, not

15       necessarily that person's --

16   Q.  No, that person's record.  Because --

17   A.  In other words, which form did they submit to

18       the state?

19   Q.  Correct.

20   A.  Either the state form, that may or may not

21       authorize cancellation, or the federal form.

22       I think at this point in my -- at this point

23       in my time at the division, I would suggest

24       that they get the individual's voter record to

25       determine if the cancellation was authorized

1          on the form that they submitted to the state.

2     Q.   Okay.  So if an out-of-state official simply

3          represented we have a voter registration form

4          from the voter of such and such date, is it

5          your position that would not be sufficient

6          information for a county official to cancel a

7          voter registration record based on a request

8          from the voter?

9     A.   I would also encourage the county to get

10         original documentation from the other state to

11         ensure that the cancellation was appropriate,

12         and I believe that would be a yes to your

13         question.

14    Q.   Okay.  Thank you.  Okay.  When you refer to

15         the previous law about the crosscheck, are you

16         referring to -- I know you don't have an

17         encyclopedic memory, but let me just throw

18         this out there.  Indiana code 3-7-38.2 --

19    A.   -5.

20    Q.   -- -5.

21    A.   I think it's subsection "D," like David.

22    Q.   "D" like David.  Is that what you're referring

23         to?

24    A.   Correct.

25    Q.   Okay.  When you refer to the previous law, is

1      that the law as it existed before amendment by

2      SEA 442?

3   A.  The law that was prior to July 1, 2017, yes.

4   Q.  Okay.  So the state of the law for that

5      subsection prior to July 1, 2017, that's what

6      you refer to as the prior law; is that

7      correct?

8   A.  Correct.

9   Q.  You wanted a break; sorry.

10  A.  If that's --

11  Q.  That is why we have two people.

12  A.  That's okay.

13          MR. MENSZ:  Let's take a break.  Go

14      off the record.

15          (A short recess is taken.)

16  CONTINUED BY MR. MENSZ:

17  Q.  I'm going to switch gears a little bit and

18      talk about removal due to change in residence.

19  A.  Okay.

20  Q.  So can you tell me what -- hold on one second.

21      Go off the record.

22          (A short recess is taken.)

23  CONTINUED BY MR. MENSZ:

24  Q.  So we were looking at Indiana Code

25      3-7-38.2-5(c).  Is it your understanding that

1        the election division uses the list to refer

2        to registered voters from other states?  Does

3        the election division use those lists for

4        determining a change of residence?

5    A.  The election division does not do anything

6        with those lists.  We're not authorized to

7        change a person's registration record.  That

8        would be a county decision.

9    Q.  Not do anything.  Do you forward those lists

10       on to the counties?

11   A.  Correct.

12   Q.  And do you represent to the counties that

13       these -- what's the purpose of forwarding them

14       on to the counties?

15   A.  To determine whether or not the individual is

16       registered to vote in another state more

17       recently than their Indiana registration.

18   Q.  Would a registration in another state, does

19       the Indiana Election Division consider that a

20       change of residence?

21   A.  That the voter executed a new registration

22       form in the other state at a date that is

23       after their registration date in Indiana;

24       correct?

25   Q.  Correct.

1    A.   Yes.  I believe it would, yes.

2    Q.   Okay.  So in terms of the instruction or

3         guidance that you provide to the counties when

4         you forward these lists --

5    A.   I'm not aware of any instruction or guidance

6         that our office provides to the county other

7         than directly forwarding the information from

8         the other state to the county.

9    Q.   Okay.

10   A.   That's a process that my counterpart and his

11        staff manage.  It's my understanding that they

12        print the information that's provided from the

13        other state, and it's directly sent to the

14        county with no additional policy or guidance

15        documentation with it.

16   Q.   How about under subsection "B" of that

17        statute, I'll represent to you that it

18        instructs the NVRA official to request voter

19        registration data from specific states,

20        Florida, Illinois, Kentucky, Michigan, Ohio.

21   A.   If they are not members of the crosscheck

22        program?

23   Q.   That's correct.  What do you mean by that?

24   A.   If they are part of crosscheck, then we do not

25        have to request this information.  We do not

1         have to request their statewide voter file.

2    Q.   Okay.

3    A.   It's my understanding that these states have

4         been part of crosscheck.  I believe there have

5         been some states that are in the process of

6         dropping out or who have dropped out, but we

7         have not yet received the official list of

8         states that continue with the program into

9         2017.

10   Q.   Okay.  Are you aware about Florida's or

11        Kentucky's status on crosscheck, participation

12        in the crosscheck system?

13   A.   I believe Florida has or is planning to drop.

14        Kentucky I'm not certain.  And I know Illinois

15        there is discussion about them potentially

16        moving out of crosscheck.

17   Q.   If they dropped out of crosscheck, they would

18        be subject to section "D"; is that correct?

19   A.   Correct.

20   Q.   And let me backup.  You stated that you

21        personally are not -- you do not participate

22        in the forwarding along of that information

23        that you receive from out of state to the

24        counties?

25   A.   Me, personally, no.

1   Q.   Why is that?

2   A.   What I would -- if another state sends

3        information and it comes directly to me, I

4        would forward it to the person responsible for

5        printing and mailing the information to the

6        counties, and that would be an employee of

7        Mr. King's.

8   Q.   How did that division of labor come about?

9   A.   I can't speak to that.  That's the established

10       procedure when I started with the division.

11  Q.   Okay.  So let's talk a little bit about

12       crosscheck procedures.  I believe, again,

13       looking at Indiana Code section 3-7-38.2-5(d)

14       as in David, "E" as in Edward, what's your

15       understanding of the crosscheck system and how

16       it works?

17            MR. GARN:  Objection; form.

18  CONTINUED BY MR. MENSZ:

19  Q.   Are you familiar with what I'm referring to

20       when I say the crosscheck system?

21  A.   Yes.

22  Q.   Okay.  And what is the crosscheck system?

23  A.   Crosscheck system is the program that is

24       managed by the Kansas Secretary of State's

25       office to identify potential duplicate

1        registrations in the member states and to

2        communicate that information back to those

3        member states for dissemination.

4    Q.  Who is responsible in Indiana for both

5        providing information to the crosscheck system

6        and receiving information?

7    A.  The statute notes the NVRA official.  We work

8        very closely with our vendors.  We have Quest,

9        which is transitioning to GCR, Incorporated.

10       They're the team that manages the statewide

11       voter registration system infrastructure.

12       They're the database manager, for lack of a

13       more eloquent term.

14            We have a program manager for the

15       statewide voter registration system.  The firm

16       is Baker Tilly, and we have identified point

17       people within Baker Tilly and with Quest/GCR

18       to work with the Kansas Secretary of State's

19       office to provide the data that is requested

20       via the participation guide that is provided

21       to the member states.

22   Q.  Okay.  Have you participated in developing any

23       policies for the election division with regard

24       to its participation in crosscheck?

25   A.  It would depend on what you consider the

1    policies.  We have -- I started in October

2    2015.  At that point Indiana was already a

3    member state, so any business rules or

4    decisions on step-by-step or standard

5    operating procedure would have been made by my

6    predecessor.

7         Since that time we have made some minor

8    adjustments to our -- we have a confidence

9    factor, which the confidence factor is a

10   filtering mechanism, if you will.  And there

11   was some inconsistency between if we called it

12   percentage versus points -- it's actually a

13   point system, not a percentage system -- and

14   some inconsistencies on whether or not

15   crosscheck data had to achieve a point of 70

16   or 75 to make its way to counties.

17        And the core team, which is myself,

18   Mr. King, and a member of the secretary of

19   state's office all agreed upon a 75-point

20   scale for the confidence factor.

21   Q.  I will ask you a few questions about that.

22   But, again, in terms of background, do you

23   provide any instruction to counties on what to

24   do with crosscheck data?

25   A.  There is a step-by-step and I believe an SOP

1          as well that -- no, there's a step-by-step,

2          multi-state step-by-step document that is

3          provided to counties, our proficiency manager

4          with Quest/GCR proficiency management is a

5          fancy way of saying training.

6              We offer -- they offer training on the

7          step-by-step.  But, again, any policy

8          questions would be directed to the election

9          division to respond to, both Mr. King and

10         myself, and, again, it would take both of us

11         to agree that it is a stated policy of the

12         election division.

13             I'm trying to recall if we have done memos

14         in the past for the interstate crosscheck

15         specifically.  I know we have for other voter

16         list maintenance activity.  I don't recall

17         there being a specific memo, but it's possible

18         there is one.

19                 (Plaintiffs' Exhibit No. 9 marked for

20         identification.)

21    Q.    Let's turn to tab 9.

22    A.    Okay.

23    Q.    Look at what's marked as Exhibit 9.  Are you

24         familiar with this document?

25    A.    Yes.

1    Q.   Okay.  You talked a little bit about what the

2         confidence factor -- you referred to the

3         confidence factor.  Can you tell me in your

4         words what that is?

5    A.   Certainly.  So it is a system review of data

6         to determine whether or not a registration

7         record is a potential match or duplicate

8         record.

9              For example, when we were discussing

10        earlier if I move from Marion to Hamilton

11        County, there might -- there would be a

12        confidence factor assigned as to whether or

13        not those two records were the same and if

14        they should be merged, if memory serves.

15             I know that is true for people who are

16        disfranchised from -- maybe disfranchised due

17        to imprisonment after conviction that a

18        confidence factor's provided to them or same

19        thing with BMV records.

20             So the system just looks at these

21        different fields within the database and

22        determines whether or not there is a match.

23        And if there's a match, then those points add

24        up.

25             For BMV records, for example, if we

1        believe there's a matching record that may be

2        merged, the confidence factor would be 50.   In

3        terms of interstate crosscheck, that would be

4        75.

5             So a registration record that is sent by

6        the Kansas Secretary of State's office back to

7        Indiana as a potential duplicate, that

8        individual record would have to achieve a

9        score of 75 points for it to be provided to

10       the counties in what we call a hopper within

11       the statewide voter registration system.

12            And a hopper is our internal term, but

13       think of it as silos of information within the

14       statewide voter registration system that

15       counties access to perform specific duties.

16   Q.  So is it your understanding that a match that

17       you receive from the crosscheck system only

18       needs to match the first name, last name, and

19       date of the birth; is that correct?

20   A.  That's my general understanding.  But I would

21       argue it doesn't -- if that is the only match,

22       first name, last name, date of birth, that

23       gets them to a point score of 25 plus 15,

24       which is 40, plus first name, which would be

25       65, which would not achieve the 75 point score

1        and would not be provided to the county.

2   Q.   Okay.  But the election division would receive

3        matches that do not meet that threshold,

4        whatever it is, point 75?

5              MR. GARN:  Objection; foundation.

6   CONTINUED BY MR. MENSZ:

7   Q.   So why don't you tell me a little bit about

8        how the election division receives information

9        from the crosscheck.

10  A.   So, again, that would be managed by the

11       program managers noted before, Quest/GCR and

12       Baker Tilly.  Once the data is returned from

13       the Kansas Secretary of State's office, there

14       is a database manager with Quest that would --

15       they would receive the full matching file, and

16       then that information would be imported into

17       the statewide voter registration system for

18       the confidence factor to be applied.

19           And only those records that the confidence

20       factor would achieve -- hit a confidence

21       factor of 75 would be eligible to be forwarded

22       on to the county for their review and

23       determination of the outcome.

24  Q.   But in terms of what the vendor receives from

25       crosscheck, do you have any knowledge of what

1       datapoints have to match for them to get, you

2       know, a name and date?

3   A.  I would have to look at the participation

4       guide in our data fields.  At some point I'm

5       assuming that discussion occurred with

6       co-directors and past core team meetings that

7       I may not have been present for given my short

8       tenure --

9   Q.  Okay.

10  A.  -- with the division.

11      But the confidence factor here represents,

12      again, if we were receiving back first name,

13      last name, date of birth, that would not

14      achieve the score necessary.

15  Q.  Let me ask you this, this confidence factor,

16      is that codified in any way in Indiana law?

17  A.  Currently, no.

18  Q.  Is it your understanding that there's

19      legislation that's been produced that would

20      codify it?

21  A.  Yes.

22  Q.  But at the current time this is a policy --

23      the policy of the election division is that

24      before any crosscheck data is forwarded on to

25      the counties, it must meet a 75 point

1     confidence interval; is that correct?

2   A.   Correct.

3   Q.   And one of those factors, I see on the second

4        page of Exhibit 9, discusses full Social

5        Security numbers.  Does Indiana collect full

6        Social Security numbers from voters?

7   A.   No.  There was a time before the statewide

8        voter registration system was built when

9        registration records did contain the full

10       Social Security number, and that information

11       was at the time the registration system was

12       built, brought over from those original older

13       paper records.

14            And over time that information has dropped

15       off, and if memory serves, we've approved a

16       project -- I believe has been completed --

17       that would remove any nine digit Social

18       Security number within the system and only

19       make visible the four digit Social Security

20       number.

21            So the only way a county would have access

22       to a full nine digit Social Security number is

23       if they had a voter who had a voter

24       registration document that is more than 20

25       years old, perhaps, where the full nine digit

1        Social Security number may have been

2        collected.

3    Q.  Okay.  So, again, just looking at the

4        procedure for crosscheck, if the match does

5        meet this confidence interval, it's forwarded

6        on to the county; is that correct?

7    A.  Correct.

8    Q.  And then what's the county supposed to do with

9        that information?

10   A.  So as I mentioned, it goes into a hopper, and

11       a hopper is records that pertain to one

12       specific task, if you will.  I believe you

13       have documentation that we've provided to you

14       that outlines those step-by-steps.

15            So if a record is placed into the

16       crosscheck hopper, what the current operation

17       is is that the county would have three

18       choices, match approve, match reject, or

19       research needed.

20            And the way the current system works is if

21       the county selects match approved, then that

22       would generate what we call an NCOA mailer,

23       which is a document that allows the person to

24       confirm their registration at their current

25       address.  It also allows them to update their

1       registration within the county or to cancel

2       their registration because they've moved out

3       of the jurisdiction.

4            And if the voter does not respond within

5       30 days, that record is eligible for the

6       county to make inactive.  If the voter has a

7       document that is returned as USPS

8       undeliverable for the reasons that are

9       outlined in Indiana Code 352 -- forgive me; I

10      don't know the section heading -- then that

11      person would be eligible to be made inactive.

12      And that person would be eligible for

13      cancellation if they did not vote at the

14      current registration address over a cycle of

15      two federal elections -- two federal general

16      elections specifically.

17           If they select match rejected, that match

18      rejected would send that registration record

19      back into the registration rules with no

20      changes.

21           And if it was research needed, I believe

22      the record would remain in the hopper for the

23      county to do its work to determine whether or

24      not they should approve or reject the match if

25      they wanted to do additional work.

1    Q.  Does the election division provide guidance on

2        how counties should categorize a match, so how

3        they would determine whether to accept a

4        match, reject a match, or conduct more

5        research?

6    A.  The step-by-step provides some of that

7        guidance.  Again, the business rules -- we

8        direct them to the confidence factor.  And if

9        the county believes that that is, in fact, a

10       match based on what is made visible to them on

11       the screen -- they get to see both records, if

12       memory serves -- and if they believe that that

13       is enough information for them to do a match

14       approved, then that would generate the NCOA

15       mailer.

16   Q.  Okay.  So is it your understanding that -- or

17       is it the election division's position that if

18       the match receives a confidence interval of

19       75, that's alone in itself sufficient to

20       cancel the voter registration record?

21   A.  That would be the county's determination to

22       make if that was enough information that they

23       felt comfortable making a match approved,

24       which would generate that NCOA mailer, would

25       allow for confirmation from the voter.

1          With respect to cancellation, the way the

2          hopper currently works, there is no outright

3          way to cancel through that hopper that voter's

4          registration record.

5          The county also does not have visibility

6          to where the most current voter registration

7          is, whether or not their most current

8          registration record is in Indiana or any other

9          state, so the county would need to do some

10         additional due diligence to make that

11         determination which state they were most

12         recently registered to vote in.

13    Q.   But the election division does not provide any

14         formal guidance on what additional steps,

15         research steps, let's say, if research is

16         needed, that the county would need to do; is

17         that correct?

18    A.   Other than directing them to state law to

19         review those provisions within statute, which

20         would be the subsection, what is it, D1 of

21         3-7-38.2-5.

22    Q.   Okay.

23    A.   You'll have to forgive me; there might be

24         something in an SOP that I have not reviewed

25         prior to coming down here.

1     Q.   Okay.  And does the election division provide

2          any guidance on how to determine which

3          registration record is more current?

4     A.   I would -- no.  I would assume -- well, I

5          don't want to assume, but, no.  I mean, most

6          current registration date is pretty

7          self-explanatory in my view.

8     Q.   Okay.  Have you advised any counties in the

9          past on how to make that determination?

10                  MR. GARN:  Objection to form.

11    CONTINUED BY MR. MENSZ:

12    Q.   Sorry.  Do you have personal knowledge of any

13         request from the counties for advice on how to

14         determine which voter registration record

15         would be most current?

16    A.   It's likely a county may have asked either

17         myself or co-director or one of our counsels

18         that question.  I don't recall specific

19         examples, but that doesn't mean none exist.

20    Q.   We alluded to the fact that the subsection "C"

21         and "D" of Indiana Code 3-7-38.2-5 were

22         discussing has changed effective July 1; is

23         that correct?

24    A.   July 1, 2017, yes.

25    Q.   2017, thank you.  Are you aware of any new

1        policies or procedures that have been

2        prolongated by the election division with

3        regard to implementing that amendment?

4    A.  I know that our 2018 voter registration manual

5        was updated to reflect the new -- the revised

6        statute with respect to the cancellation

7        procedure.

8            Currently we are in the process of working

9        with our vendor and with Kansas on the

10       interstate crosscheck data dissemination, if

11       you will.  And we are discussing potential

12       changes to the statewide voter registration

13       system.

14           The project that most likely will be in

15       flight in the next month or two would be to

16       provide counties the registration date that is

17       offered on the Kansas Secretary of State's --

18       the data that's returned to our state and if

19       such a date is provided from another member's

20       state.  Because there are member states that

21       don't necessarily provide a registration date

22       in that file, as I understand.

23           It's a very long way of saying we are

24       updating our policies and procedures in the

25       statewide voter registration system to reflect

1        the change in law from last year.

2    Q.   Okay.

3    A.   But nothing has been released yet.

4    Q.   Other than yourself and Mr. King, who else is

5         involved in that process?

6    A.   That would be our core team, which is both

7         myself, Mr. King, our attorneys, for me

8         Patrick Becker typically attends those

9         meetings, and it would be members of the

10        secretary of state's office working with our

11        vendor partners to build the business rules to

12        make changes to the hopper or any other

13        features of the SVRS.  And it would require

14        all of us to come to agreement for any of

15        those procedures in SVRS to be implemented.

16             MR. MENSZ:  Off the record for a

17        second.

18             (A short recess is taken.)

19   CONTINUED BY MR. MENSZ:

20   Q.   When a voter's registration record is

21        canceled, does the election division require

22        counties to give notice to those voters whose

23        registration's been canceled?

24             MR. GARN:  Objection to form.

25   CONTINUED BY MR. MENSZ:

1    Q.   You can answer the question unless you need

2         clarification.

3    A.   I don't need clarification.  I'm just trying

4         to recall what the procedure would be.  If it

5         came through an NCOA, I'm not certain.

6    Q.   Well, let me be more specific.  If it came

7         from crosscheck and a voter was canceled based

8         on a crosscheck match.

9    A.   It would depend on the cancellation.  Because

10        if the voter was sent notice, the NCOA mailer

11        notice, then the individual would have the

12        ability to respond to that notice to either

13        cancel based on their own self-cancellation or

14        be canceled by way of being made inactive and

15        then canceled after two general election

16        cycles.

17             I don't recall if there's a specific

18        requirement to send notice of disposition to a

19        voter if the registration is canceled.  It's

20        certainly something I can review our policies

21        and procedures for to...

22   Q.   What about if the election division gets --

23        does the election division instruct counties

24        to provide notice at the time the registration

25        is canceled?

```
 1    A.   I would have to review the guidance on the

 2         cancellation step by step.

 3    Q.   If a voter is canceled based on a voter

 4         registration form from out of state that

 5         authorizes the cancellation of a vote record

 6         of a prior registration in Indiana, would that

 7         voter be notified?

 8    A.   I would have to review the policies and

 9         procedures.  I can't speak to that.

10    Q.   Okay.  Does a voter who's on inactive

11         status -- well, let me ask you this.  So is

12         there an online system where voters can see

13         where they're supposed to vote --

14    A.   Yes.

15    Q.   -- where their polling location is?

16    A.   Yes, indianavoters.com is the website where if

17         you are a registered voter in Indiana you can

18         enter your name, date of birth, I think now we

19         can search by credential number.  We just made

20         some improvements to the website.  I don't

21         recall what all of those are.

22              I'm trying to remember if the active or

23         inactive status is displayed to that voter.  I

24         don't recall.  But it's certainly something I

25         can confirm either way and get back to you.
```

1    Q.   Okay.  But if they are on inactive status, do

2         you know whether they can still find their

3         polling location?

4    A.   They're still a registered voter, so they

5         would be able to pull their information.

6    Q.   What if their status is canceled?

7    A.   I don't believe that their information would

8         be made visible.  We can certainly confirm

9         that with our vendor if you'd like us to.

10   Q.   Does the county or the election division send

11        canceled voters any election-related mail?

12   A.   Well, the state election division, the mail

13        that we would be responsible for would be the

14        statewide voter registration mailer, the

15        postcard, and those would go only to active

16        and inactive voters.  I believe that is also

17        true for any county program that the county

18        would choose to implement.

19             I don't -- I believe the system would not

20        send, for example, if the county wanted to

21        send a change in polling location, I believe

22        that it would be limited to active and

23        inactive voter, and canceled would not be part

24        of that information.  But, again, that's

25        something with the business rules we can

1      certainly confirm for you and get back to you.

2                MR. MENSZ:  Okay.  Thank you.  Go off

3           the record for a second.

4                (A short recess is taken.)

5      CONTINUED BY MR. MENSZ:

6      Q.   We're back on the record --

7      A.   May I clarify a point I just made?

8      Q.   Yes.  Sure.

9      A.   I apologize.  The mailers would be sent to

10          active voters only because if you were made

11          inactive, you would be suppressed from that

12          statewide mailing, for example.

13     Q.   Okay.  Are you looking at something that is

14          refreshed your memory?

15     A.   Thank you.  I am.

16     Q.   Do you mind telling us what that is?

17     A.   Certainly.  Mr. Garn has accessed

18          indianavoters.com, and our new interface does

19          confirm that he's registered to vote in Marion

20          County and that his voting status is active;

21          his township is Washington, and he's in Ward

22          21, Precinct 5.

23     Q.   Anything else you want to tell us about

24          Mr. Garn?

25     A.   I tried to be specific as I can.  I didn't say

1          your height, date --

2    Q.    Just a few more questions.  You said that the

3          co-directors do not direct counties on NVRA

4          compliance; is that an accurate representation

5          of your testimony?

6    A.    Instruct compliance?

7    Q.    Let's say when --

8    A.    No.  In my view, the way that we instruct

9          compliance to the counties would be through

10         our manuals, our standard operating

11         procedures, which evolve, our step-by-step

12         materials when we go and attend conferences

13         and put together presentations and

14         PowerPoints.  To me that is providing

15         consultation and guidance as to how best to

16         comply with NVRA.

17   Q.    Okay.  But none of those are mandatory, is

18         that correct, the guidance, the policies and

19         procedures, standard operating procedures?

20   A.    My view would be that our instructions are

21         mandatory, but ultimately the county voter

22         registration official is the chief for that

23         county and they have a responsibility to make

24         decisions that affect the voter registration

25         applicant's information.

```
1    Q.   Okay.  If you suspect an NVRA violation, do

2         you have a process for investigating that?

3    A.   It's my understanding the complaint would be

4         filed on a specific form as provided to our

5         office, and the co-directors would acknowledge

6         receipt of said complaint and would make a

7         determination -- would need to meet with them

8         30 days, if memory serves, to at least respond

9         in some more meaningful way before that

10        complaint could be registered with the court.

11             Is there a formal procedure in place for

12        the co-directors to meet within that 30-day

13        period, I'm not aware of any formal policy or

14        procedure that's been adopted by myself or any

15        predecessor before me.

16   Q.   Can the co-directors themselves initiate the

17        investigation and issue, you know, your

18        findings, or do you have to receive a

19        complaint from the third party?

20   A.   It would need to be a complaint from a third

21        party in my opinion.

22   Q.   Okay.  Then you said --

23   A.   Does that mean -- if I may -- if someone made

24        a call to me saying I don't believe this is

25        being handled appropriately, would I reach out
```

1              to the county to try to correct course,

2              certainly, but I don't recall getting a lot of

3              phone calls or written communication in that

4              way.

5    Q.   Then you mentioned that this could be taken to

6              court.  What does that process look like?  So

7              if you confirm that you believe there has been

8              an NVRA violation by a county official, and

9              you would issue, you said, a report; is that

10             correct?

11   A.   I believe so.  I will be frank and say that I

12             have in my two and a half years with the

13             division there has not been a specific

14             complaint -- well, that we have not -- the

15             co-director, Mr. King and myself, have not

16             specifically investigated an NVRA complaint.

17                  And so I'm unfamiliar with how that

18             procedurally would move forward because I

19             haven't experienced that yet.

20   Q.   Okay.

21   A.   Beyond where we're at today.

22   Q.   So just to be clear, you, in your tenure as

23             co-director of the election division, have

24             never found an NVRA violation at the county

25             level; is that correct?

1              MR. GARN:  Objection; form.

2    CONTINUED BY MR. MENSZ:

3    Q.   You can answer the question.

4    A.   I would have to review any complaints that had

5         been filed over the last two and a half years.

6         It's not been numerous.  Most of our

7         complaints have been more related to polling

8         place accessibility, but I'd have to research

9         our file to review that and get back to you.

10             MR. MENSZ:  All right.  I think we're

11        going to go off the record and take a short

12        break.

13             THE WITNESS:  Okay.

14             (A short recess is taken.)

15   DIRECT EXAMINATION

16   QUESTIONS BY MS. MERKEL:

17   Q.   Good morning again, Ms. Nussmeyer.  We met

18        before.  Just for the record, my name is

19        Ellison Merkel.  I'm from the law firm Quinn

20        Emanuel, and I'll be questioning you on behalf

21        of the plaintiffs in the second matter at

22        issue this morning, the Indiana State

23        Conference of the NAACP and the League of

24        Women Voters of Indiana.  I'd like to start by

25        just showing you --

1    A.   Is this book done?

2    Q.   That book is done.  Put that to the side.  I'd

3         like to start by showing you the 30(b)(6)

4         notice we served in our case, and we'll ask

5         the court reporter to mark as, I guess, start

6         at Exhibit 33, just for the sake of clarity.

7                 (Plaintiffs' Exhibit No. 33 marked

8         for identification.)

9    Q.   Do you recognize this deposition notice?

10   A.   I do.

11   Q.   And if you turn to page 5, you'll see a list

12        of six topics.  Are you prepared to testify as

13        a 30(b)(6) designee with respect to each of

14        those topics?

15   A.   I am.

16   Q.   And what did you do to prepare for your

17        testimony today?

18   A.   I generally reviewed Indiana law and federal

19        law with respect to voter removal programs,

20        reviewed our step-by-step material on how the

21        interstate hopper works, confidence factor, I

22        spoke to our vendor to make sure that I had a

23        good understanding of what it is, how our

24        statewide voter registration works with

25        respect to the county's visibility to that

1          interstate hopper, and had conversations with

2          my attorneys, Mr. Kochevar, and the attorneys

3          with the attorney general's office that are

4          present today.

5     Q.   And did you have any conversations with

6          Mr. King?

7     A.   About this deposition specifically, no.

8     Q.   Yes.  And when you say you spoke with the

9          vendor, which vendor are you referring to?

10    A.   I spoke to Baker Tilly and to Quest/GCR.

11    Q.   And is it correct that Quest is the data

12         management vendor?

13    A.   Yeah.  They're the -- Quest is the database

14         manager, yes.

15    Q.   And what does Baker Tilly do?

16    A.   Baker Tilly is our program manager over the

17         database manager, so they are working to

18         advance projects that the core team agrees to

19         to make enhancements to the system and to work

20         with Quest to build -- well, to scope the

21         projects and to keep them on task and

22         schedule.

23    Q.   And did you speak to anyone in any county

24         offices in preparation for today?

25    A.   I did speak to LaDonna Freeman, who is a voter

1            registration official in Marion County,

2            because I was trying to understand the

3            cancellation process within the statewide

4            voter registration system.

5                 Because as a state user, I don't have

6            visibility to it.  And we have a sandbox

7            environment which is where we can go and view

8            different functionalities within the system,

9            but I don't have permissions.  I don't have

10           permissions to do the work the county does, so

11           I couldn't see how cancellation is done.

12                I don't believe I told her expressly this

13           was in preparation for deposition.  It was

14           just me trying to prepare for today and to

15           answer questions the best that I could.

16    Q.    What information did Ms. Freeman give you?

17    A.    She confirmed that the cancellation -- the

18           manual cancellation process within the system

19           and that they have access to specific

20           drop-down information within the registration

21           system to identify the reason for the

22           cancellation.  And those reasons are on the

23           canceled voter report, which is what I was

24           trying to tie those reasons to what might

25           appear on that report.

1  Q.  Okay.  So can you help me understand what

2      types of reasons might be reflected in that

3      drop-down menu?

4  A.  Certainly.  Deceased, imprisonment following

5      conviction.  I don't have -- I wasn't able to

6      get a step-by-step to actually see all the

7      specific drop-down items, but those are the

8      two that immediately come to mind.  That's

9      certainly something we can work with our

10      vendor to pull together and provide to you.

11  Q.  Do you know if there's an option for selecting

12      a crosscheck match?

13  A.  I believe there's one for interstate

14      crosscheck, but I don't know if that is

15      generated as a result of additional hopper

16      work or if it is a result of going into the

17      individual record and manually changing the

18      status from active to inactive or canceled.

19      That is something that, again, I can work

20      with our vendor to pull together to provide

21      that visibility to you if you'd like it.

22  Q.  Okay.  So just so I have a better

23      understanding, do you mean you're not certain

24      that's something that auto populates or would

25      be filled out by the county?

1   A.   Right.  There are, for example, the department

2        of health hopper, if a match is identified in

3        that department of health hopper and the

4        county cancels through that department of

5        health hopper, it's labeled as deceased where

6        there's a uniform reason for the cancellation.

7            If I, instead, went into Mr. Garn's voter

8        registration record and one of the policies

9        for death notice is that a county can use a

10       published newspaper obituary and that a county

11       could go in and select the reason "other" and

12       give the reason for Indianapolis Star obituary

13       where there isn't a standardized response, but

14       that drop-down menu through that manual

15       process provides a number of different

16       specific standardized messages for

17       cancellation, and that's what I'm unsure what

18       those different fields may be without

19       reviewing that step-by-step documentation.

20  Q.   Okay.  Thank you.  Is there anything else you

21       discussed with Ms. Freeman?

22  A.   Huh-uh.  Well, if I may, just to -- not

23       specifically about this deposition, but two

24       other issues that related to her office that

25       she had asked us to provide statute for,

|    |     |                                              |
|----|-----|----------------------------------------------|
| 1  |     | but...                                       |
| 2  | Q.  | Okay.  Was it related to the voter           |
| 3  |     | registration list maintenance?              |
| 4  | A.  | One related to whether or not a name change  |
| 5  |     | can be affected through pollbook, and I need |
| 6  |     | to provide the statutory site to her so she  |
| 7  |     | can review it and make that determination.   |
| 8  |     | The other relates to how some addresses      |
| 9  |     | within the system are geocoded between the   |
| 10 |     | U.S. Postal Service and our system and how we|
| 11 |     | we can cure that problem for them so they can|
| 12 |     | be assigned to the correct precincts.  So, no,|
| 13 |     | not in my view, but that's everything we     |
| 14 |     | discussed.                                   |
| 15 | Q.  | Okay.  Have you also helped your attorneys   |
| 16 |     | gather documents or other information that you|
| 17 |     | understand to be responsive to document      |
| 18 |     | requests or interrogatories from either of the|
| 19 |     | plaintiffs in these two cases?               |
| 20 | A.  | Correct.  My attorney, Mr. Kochevar, has done|
| 21 |     | most of the compilation work, but we continue|
| 22 |     | to research our communications and other     |
| 23 |     | information and have been providing them on an|
| 24 |     | ongoing basis to my attorney and to our      |
| 25 |     | attorneys with the attorney general's office.|

1   Q.   Okay.  Thank you.  So we've been talking a

2        little bit today about the crosscheck project,

3        and I wanted to know whether you're involved

4        in negotiating with the State of Kansas or,

5        perhaps, the memorandum of understanding that

6        governs that process?

7   A.   I was not.  I was not in my position at the

8        time that the crosscheck was first

9        implemented.

10  Q.   When was the crosscheck first implemented for

11       Indiana?

12  A.   I believe it was 2015.

13  Q.   And is it your understanding that the same

14       memorandum of understanding governs it today

15       that was put in place at that time?

16  A.   I've not seen any corrections in my two and a

17       half years with the division.

18  Q.   Do you know who was the signatory to that?

19  A.   I believe it was my predecessor, Mr. Deckard,

20       D-E-C-K-A-R-D, and Mr. King.

21  Q.   And do you understand the terms of

22       participation in crosscheck to be standardized

23       across all states that participate, or has

24       Indiana negotiated specific terms regarding

25       its participation?

1   A.   I've reviewed the memorandum of understanding.

2        I believe it to be adopted as a standardized

3        approach.  I may be mistaken, but I believe

4        it's a standardized approach with the Kansas

5        Secretary of State's office.

6   Q.   And under current state law, the NVRA official

7        from Indiana is required to send a formatted

8        copy of the state voter file into the

9        crosscheck program by January 15 of each year;

10       is that correct?

11                MR. GARN:  Objection; form.

12  A.   What I understand to be true is that we are

13       provided a participation guide, and that

14       participation guide sets the parameters of the

15       dataset that the Kansas Secretary of State's

16       office wants from our state voter file, and

17       our vendor provides those specific data fields

18       as outlined in the participation guide.

19            So it is not the full voter file; rather

20       it is a specific subset as defined in that

21       participation guide.

22  Q.   And your understanding is that that is what

23       you're obligated to provide by January 15 of

24       each year?

25  A.   That's my understanding; correct.

1    Q.   Was that provided by January 15 of this year?

2    A.   No.

3    Q.   Why is that?

4    A.   There's been a delay with the Kansas Secretary

5         of State's office, and data has not yet been

6         provided to the state until some of their

7         protocols and procedures have been ironed out

8         due to security concerns that have been raised

9         and the public's fear.

10             It's my understanding it may be

11        mid-February before we release that data to

12        Kansas.  I don't believe we have yet received

13        a specific timeline from Kansas Secretary of

14        State's office, but certainly we can confirm

15        that with our vendor who is the direct contact

16        for our agency if you would like.

17   Q.   Thank you.  And the protocols you refer to,

18        those are relating to data security; is that

19        correct?

20   A.   Correct.

21   Q.   In prior years how long does it take between

22        the submission of data to crosscheck program

23        and the receipt back of Indiana's crosscheck

24        file?

25   A.   I'm trying to remember.  I would say if we

1       sent it by January 15 -- again, this is where

2       our vendor may have documentation with

3       specific dates that might be more helpful to

4       my testimony today.  I believe we generally

5       get it a little bit before the federal freeze

6       period, so the 90 days before the election

7       where counties are not permitted to do sort of

8       the inactive to canceled voter removal program

9       protocol.

10          So I would say generally by the first part

11      of February.  But, again, our vendor may have

12      specific dates that we could research and

13      provide to you.

14   Q.  Okay.  Thank you.  Just speaking generally --

15      and it's fine to tell me you don't know -- but

16      it sounds like that's a process of under a

17      month turnaround time; is that right?

18   A.  I would say so, yes.

19              (Plaintiffs' Exhibit No. 34 marked

20      for identification.)

21   Q.  Okay.  So we've handed you a copy of a

22      document that's been marked as Exhibit 34.

23   A.  Okay.

24   Q.  This is a presentation called Interstate Voter

25      Registration Crosscheck Program --

1  A.  Uh-huh.

2  Q.  -- dated June 15, 2017.

3  A.  Okay.

4  Q.  Does this document look familiar to you?

5  A.  I did attend the conference at NCSL.  I know

6      that both the crosscheck program and I believe

7      the folks from ERIC, the Electronic

8      Registration Information Center, presented.

9          I'm not certain I was the best student and

10     paying close attention to what was discussed.

11     I may have been having outside bar

12     conversation with a few folks, but I do recall

13     seeing it.

14 Q.  Okay.  Thank you.  Going to ask you to turn to

15     what I believe is the tenth page in this

16     document.  Unfortunately, they don't have page

17     numbers.  But if you turn past a number of

18     maps of the country, you'll see there's a

19     slide with the header Interstate Crosscheck

20     Data Format.

21 A.  This one here?

22 Q.  Exactly.

23 A.  Perfect.

24 Q.  Thank you.  Is it your understanding that this

25     slide reflects the data that is submitted to

1          the crosscheck program?

2    A.    I would need to compare it against the

3          participation guide to confirm that all fields

4          are present, but it looks like most, if not

5          all, of those fields are present.

6    Q.    And is it your understanding that these are

7          the only fields that will be accepted by the

8          crosscheck program?

9    A.    The fields, again, are outlined in the

10         participation guide.  Without comparing it to

11         this slide, I can't say for certain that the

12         slide represents everything.

13              But it's my understanding that if we

14         submit something outside of what is identified

15         in that participation guide, that it would

16         essentially be sent back to the state to

17         reconfigure and re-send to the Kansas

18         Secretary of State's office.  At least that's

19         the process my vendor has described to me.

20   Q.    Understand.  And the file that is submitted to

21         crosscheck is simply a data file; it doesn't

22         include, for example, scanned versions of any

23         voter registration files or underlying

24         documents, does it?

25   A.    I'm not aware that it does.  But, again, the

1          participation guide would specifically call

2          that out and be of help to you, I believe.

3     Q.   Okay.  And do you know whether when you

4          receive back crosscheck data that the data

5          fields you receive are the same, either that's

6          laid out here or laid out in the participation

7          guide?

8     A.   Correct.  What we send to them is mirrored

9          back to us as I understand.

10    Q.   And looking specifically at the field "Data

11         Registration," I believe that's a field that

12         was discussed a little bit earlier in your

13         testimony, but just wanted to make sure we're

14         clear on this.

15             Is the date of registration that Indiana

16         provides a date that is auto populated within

17         the SVRS based on the last time an entry was

18         manipulate or changed?

19    A.   I know that the dates are visible on the

20         registration record when I go into the

21         statewide voter registration.  What I am

22         unclear about is what date of registration

23         means in this document.  And I can certainly

24         work with our vendors to get some clarity on

25         what actually is pulled through.

1    Q.   Do you know whether in SVRS there's more than

2         one date field?

3    A.   I know that there is a chart that shows kind

4         of the cadence by which a registration has

5         been updated by -- through whatever process.

6         There could be a variety of reasons for

7         updates or -- I just don't know if those

8         dates, those multiple dates were at one time

9         reflected on the registration date on that

10        main screen or if it's the original

11        registration date.  I don't recall.  And,

12        again, that's something that I'm happy to work

13        with our vendor to get some clarity on what's

14        pulled through.

15   Q.   Okay.  Thank you.  Is it correct that you'll

16        also get back a date of registration field

17        from any state in which there's been a voter

18        match?

19   A.   It's my understanding that the date of voter

20        registration field may not always be populated

21        by the other state.

22   Q.   Okay.

23   A.   So there is likely to be blank records within

24        that date of registration, I believe.  Again,

25        that's something I can have my vendor confirm,

```
 1          but I believe that to be true.
 2    Q.    Is it also the case that you may not know what
 3          information that date of registration field
 4          reflects if it's provided by the other state?
 5    A.    The definitions, as I recall, are provided by
 6          the state, and they may not -- they may
 7          reflect different points of the process by
 8          which they consider date of registration.
 9              I don't believe Indiana has provided a
10          definition for what registration date means,
11          and that is part of the reason why I'm
12          uncertain which date, if any, is pulled
13          through our system and want to get clarity
14          from our vendor on that part of the puzzle.
15    Q.    Okay.  Thank you.
16                  (Plaintiffs' Exhibit No. 35 marked
17          for identification.)
18    Q.    So we've handed you a copy of what the court
19          reporter has marked as Exhibit 35.  And do you
20          recognize this document as being definitions
21          of date of registration for the 2017
22          interstate crosscheck --
23    A.    Yes.
24    Q.    -- program?
25              And is this the document you were
```

1          referring to when you said you weren't sure

2          that Indiana had provided a definition for its

3          date of registration field?

4     A.   Yes.

5     Q.   It looks as though several states also have

6          not provided a definition; is that correct?

7     A.   Correct.

8     Q.   When the State of Indiana receives back its

9          crosscheck file and is processing it, does it

10         take into account the differences in

11         definitions that are provided on a

12         state-by-state basis as reflected in this

13         document?

14    A.   The date of registration is not one of the

15         criteria on the competence factor matrix, and

16         I don't know for certain the date of

17         registration would inform the decision-making

18         of the vendor in pulling it through the

19         statewide voter registration system.

20              One of my -- an individual I spoke to last

21         night believes that if the registration date

22         from the other state is more current than

23         Indiana, that that record is pulled through.

24         But he was uncertain about what happens if the

25         fields are blank or null.  And I would want to

1      get some clarity from the database manager on

2      how that information is treated before

3      answering definitively if that's permitted.

4   Q.  Do you know whether this definition, this

5      document, is provided to county registration

6      officials?

7   A.  I don't believe it's part of our step-by-step

8      guide.

9   Q.  And so under the new state law, is it correct

10      that the county officials are obligated to

11      determine whether individuals who have been

12      matched through crosscheck register to vote in

13      another state on a date following the date

14      that they registered in Indiana?

15   A.  Correct.

16   Q.  And the field that they're using to do that is

17      the field for which these definitions have

18      been provided; is that right?

19   A.  No.  They don't have visibility to this

20      information.  It's not provided to them.

21   Q.  Okay.  I think you testified a little bit

22      earlier that that functionality is being added

23      to the SVRS; is that right?

24   A.  It's one that we're discussing and looking to

25      release, but the counties would not have

1          access to the interstate information, one,

2          because we don't have the records back and,

3          two, during federal freeze period that hopper

4          where the interstate crosscheck records are

5          kept are literally frozen.  It's grayed out.

6          They cannot access it.  So any sort of

7          projects that may be in flight would not be

8          released to them until the hopper was made

9          available to them.

10     Q.   Is it your expectation that once the in-flight

11          program is completed that they have access to

12          this data field and once you receive back

13          crosscheck data this date of registration

14          field that's used to make the determination as

15          to whether an individual registered to vote in

16          another state before or after Indiana?

17     A.   The date would be provided.  Myself and

18          Mr. King have not had conversations about how

19          we would direct counties to use that date.

20          Whether or not this date of registration

21          document would be provided in any updated

22          policy or procedures documentation, we've not

23          discussed that.

24     Q.   And have the counties been provided with any

25          guidance as to how to make the determination

1          as to which date reflects a more recent

2          registration?

3     A.   With respect to crosscheck or with respect to

4          any voter list maintenance?

5     Q.   Let's start with crosscheck.

6     A.   We have updated our 2018 voter registration

7          manual to reflect the new law.  The

8          step-by-step documentation we are in process

9          of making updates to, and that's primarily

10         because the functionality of the crosscheck

11         hopper does not permit a direct cancellation

12         from it.

13             As I mentioned previously, the counties

14         have three options, which would be match

15         approved, and it's my understanding that if a

16         county currently selects match approved, that

17         would generate the NCOA notice, which would

18         allow the person to confirm their

19         registration, to update their registration

20         within the jurisdiction, or to cancel their

21         registration.

22             It would be match rejected, which would

23         mean the registration record goes back as is

24         to the statewide voter registration system.

25             Or they can do research needed where the

1        record would remain in the hopper for them to

2        do their due diligence to determine if match

3        approved or match rejected is the best path

4        forward.

5    Q.  So in the instance currently that they choose

6        match approved -- and I apologize; I just want

7        to make sure I understand your testimony

8        properly -- in the instance that they choose

9        match approved, is it your understanding that

10       currently the only result that the system

11       allows is to generate that NCOA mailer?

12   A.  That's my understanding based on conversations

13       with my vendor.

14   Q.  And is that something that the election

15       division is working with the vendors to adjust

16       so that cancellation is possible in that

17       hopper?

18   A.  I have.  I don't know if Mr. King has.  But I

19       had a conversation with my program manager

20       with Baker Tilly yesterday about potential

21       enhancements to the hopper which might include

22       if the match was approved giving the county

23       the option to send the NCOA mailer because

24       they didn't have the information that they

25       felt sufficient to cancel or to do a

1    cancellation.

2         But none of that has been scoped out.  We

3    have not discussed it as a core team to move

4    forward with that project.  It was simply a

5    conversation I had with Mr. Cooper about

6    potential enhancements to statewide voter

7    registration system to comply with the state

8    law.

9  Q.  Okay.  And is it your understanding that under

10    the current functionality when the NCOA mailer

11    is generated, the county has to take

12    additional action to actually mail that form

13    out; is that right?

14  A.  They would need to mail the form out.  And

15    it's my understanding they also need to

16    provide postage, prepaid return, at least

17    that's what the law requires, and the NCOA

18    hopper -- because, again, everything is sort

19    of compartmentalized in silos, and this is

20    where we can provide if there is step-by-step

21    or materials to you that might provide more

22    visibility to this.

23         It's my understanding once the record goes

24    into the NCOA hopper, if the individual does

25    not respond within 30 days, the next available

1        option to the county would be to mark that

2        record as inactive.

3   Q.   Okay.  And let's say that under the current

4        law the county identifies a match approved

5        entry, is there an option for them to then

6        manually cancel through another view of that

7        entry even if it's not within the crosscheck

8        hopper?

9   A.   They would be able to go into the individual

10       voter record to do a manual cancellation.

11       Again, I don't -- I can't speak to all the

12       different drop-down options, but "other" is an

13       option where they can enter their own data

14       field as to why they canceled that person's

15       voter registration record.

16            But, if I might, I would have to -- I

17       would need to talk to the vendor to understand

18       the business rule, the logic behind that.

19       That if the record was in the NCOA hopper

20       because a mailer had been created, if the

21       county user would have the ability to go in

22       and make a change to cancel because those two

23       things may be in conflict from the system's

24       perspective.

25   Q.   Okay.

1  A.  The more likely path would be that the person

2      would reject so the registration record goes

3      back to the original status and then make the

4      manual entry.  But I'm not aware of any policy

5      or any documentation that would address that

6      specific situation.

7          Again, that's where I would talk to our

8      proficiency manager with Quest to determine if

9      that advice has ever been given to a county.

10     I just -- I can't speak firsthand if that has

11     been done in the past.

12 Q.  So if I understood your prior testimony

13     correctly, is it the -- it's not the case

14     currently that the crosscheck hopper would

15     only be populated with individuals who,

16     according to the crosscheck data, have more

17     recently registered in other states?

18 A.  What is populated in that crosscheck hopper

19     are records that have achieved that 75 point

20     minimum on the confidence factor.

21         What is unclear to me, based on my

22     conversation last night with the vendor, is

23     whether or not those records with the

24     registration date that are more current in the

25     other state are the only records moving

```
 1        forward into the database.  And if the field

 2        is left blank or if the registration date

 3        wasn't provided, how those records and if

 4        those records are imported into the system.

 5        And that's where getting clarity from the

 6        database manager would be helpful.

 7   Q.   Okay.  That would be helpful to us, too, so

 8        thank you.

 9             Are counties able to communicate directly

10        with the vendors that you work with on the

11        SVRS system?

12   A.   Yes, we have a help desk.

13   Q.   Do you have an understanding as to what

14        questions they're permitted to address to

15        those vendors?

16   A.   They can address specific questions related to

17        the functionality of the statewide voter

18        registration system.  But if there are policy

19        questions, they will email both co-directors

20        to elicit a response from us.

21   Q.   Does the election division participate in

22        training of the help desk that the vendors

23        provide?

24   A.   No.  Because the help desk provides

25        functionality as to what things you click to
```

1            process an application, just the nuts and

2            bolts of the system, not the actual policy of

3            whether or not to accept a registration.

4    Q.    Okay.  I think a couple time this morning

5          you've referred to terms like business rule

6          and standard operating procedures.  What

7          exactly is your understanding of what a

8          business rule is?

9    A.    The business rules are the logic that is

10         programmed into the statewide voter

11         registration system based on statutory

12         framework.  It's business rules or, if you

13         will, a decision tree.  So if "X" then "Y"

14         happens, we need to make sure there's a

15         business rule to make sure that that "Y"

16         happens so that there is standardization

17         within the registration system.

18              Standard operating procedures are

19         documents that were first created when the

20         statewide voter registration system was

21         implemented.  I believe the last time they

22         were revised was a number of years ago, and

23         we're beginning to go through revisions.  The

24         goal was to do it last year when there were no

25         elections, but we missed that mark and we

```
 1        continue to start revising those standard

 2        operating procedures.  So those SOPs may not

 3        always reflect the current view of the

 4        co-directors or current statute.

 5   Q.   Okay.  And we've talked a little bit about the

 6        purple book for 2018.  Is what that reflects

 7        business rules?

 8   A.   No.  The 2018 voter registration manual is

 9        more of an easier-to-digest format of what

10        state laws requires voter registration

11        officials to do and in some cases where the

12        co-directors have agreed on interpretation of

13        the law that's provided within the

14        documentation.  And then as I alluded to

15        earlier, there's at least one point of

16        disagreement that has been highlighted within

17        that documentation.

18   Q.   So how are counties made aware of business

19        rules and standard operating procedures?

20   A.   The business rules are the functionality of

21        the state, the core team, the state.  The

22        county does not participate in designing logic

23        for the statewide voter registration system.

24            They can certainly send an email to

25        myself, my counterpart, Quest, whomever, and
```

1          say we would like for "X" to do "Y" because we

2          have to go in and do three other steps in

3          between those two things, and if we could

4          bring those two things together.  For them

5          it's more about user interface and not

6          actually policy, the policy standards by which

7          the business rules are created.

8     Q.   Understood.  Is it correct that the business

9          rules actually dictate what the functionality

10         of the SVRS has?

11    A.   Correct.

12    Q.   And so nothing that's set out in a business

13         rule would be left to the discretion of a

14         county --

15    A.   Correct.

16    Q.   -- administrator?  Okay.

17              (Plaintiffs' Exhibit No. 36 marked

18         for identification.)

19    Q.   So you've been handed a copy of what the court

20         reporter has marked as Exhibit 36.  This is a

21         presentation called Indiana Election

22         Administrator's Conference Statewide Voter

23         Registration System dated December 16, 2015.

24         Do you recognize this presentation?

25    A.   Certainly.  It looks like it was presented by

```
 1          one of our vendor partners, not the

 2          co-directors.

 3   Q.     Okay.  Do you know whether you were present

 4          for this presentation?

 5   A.     I was.  It was my first conference as

 6          co-director.

 7   Q.     If you could turn to slide 12.

 8   A.     Okay.

 9   Q.     Exactly, yes.  This is entitled Multi-State

10          Voter List Maintenance, and the subtitle is

11          Interstate Crosscheck Hopper.  Is this a

12          screenshot of the interstate crosscheck hopper

13          within SVRS?

14   A.     At least as of 2015.  I would have to say yes.

15   Q.     You anticipated my next question, which is if

16          you know whether updates have been made to

17          sort of this screen for the interstate

18          crosscheck hopper since this time?

19   A.     I would need to review a screenshot of today

20          versus then.  I know we had made some

21          adjustments again.  This is the screen that if

22          you click on the individual records within the

23          hopper appears on that first landing page

24          screen.  We called it a percentage instead of

25          points, and that adjustment was made.  And,
```

1        again, just provides clarity about whether 70

2        or 75 was the appropriate cutoff, the minimum

3        threshold for crosscheck data to be sent to

4        the county.

5            This screen looks substantially similar to

6        what counties see today, but without looking

7        at them side to side, I hesitate to say it's

8        exactly the same.

9    Q.  Looking at this record, it appears that it

10       shows for both the Indiana voter file and the

11       match state voter file, name, the last four

12       digits of the Social Security number, date of

13       birth, and the resident's address.  Are you

14       aware of -- other than what we discussed as

15       sort of being in flight in providing the date

16       of registration, are you aware of any other

17       fields from the crosscheck file that have been

18       added to the crosscheck hopper?

19   A.  I don't believe so, but I hesitate to say with

20       certainty that nothing else has been added.

21       But this is the meat of what is on that

22       screen, as I can recall.

23   Q.  And I see that at the top it appears that the

24       confidence factor has been auto populated; is

25       that right?

1   A.   Yes.

2   Q.   In order for this record to show up in the

3        hopper, it would require a minimum confidence

4        factor of 75; is that right?

5   A.   Yes.

6   Q.   And the election division has implemented

7        guidance that on a going forward basis under

8        current law that will continue to be the

9        minimum confidence factor applied?

10  A.   Correct.

11  Q.   Why is it that the election division decided

12       to maintain that minimum confidence factor?

13  A.   I was not with the division when the

14       confidence factor was discussed or decided

15       upon as a policy.  The confidence factor of

16       75, that is higher than some of the other

17       hoppers where we think that there are

18       potential matches where records can be merged

19       between county officials, if you will, where

20       the threshold is 50.

21            The 75 points to achieve on confidence

22       factor, as I understand, is in recognition

23       that the dataset that is transmitted from the

24       state to Kansas Secretary of State does not

25       always provide the full picture of data and to

1        avoid, as much as possible, any false

2        positives that might be brought through the

3        hopper if that confidence factor was not

4        scaled to 75.

5    Q.  And is it correct that it's the election

6        division that sets the business procedures

7        that dictate how the confidence factor is

8        calculated?

9    A.  The core team, so that would be the election

10       division and the secretary of state's office

11       makes that decision.

12   Q.  If you turn two pages on this document to

13       slide 14.

14   A.  Okay.  That would be the mailer.

15   Q.  Exactly.  Is this a shot of the NVRA mailer

16       that's generated by the SVRS system?

17   A.  It is, at least as of 2015.  There have been

18       updates since then.

19   Q.  What are the updates that you can recall?

20   A.  Oh, we made some updates to the elections to

21       be more specific.  So every time we move into

22       a new election year, we will drop off the

23       previous elections and add the right dates for

24       the proper elections.

25           There may have been some massaging of

1            language to make the design look a little

2            nicer, read more succinctly.  I believe we've

3            given you a copy of what the current NCOA

4            mailer looks like.  We could do a comparison

5            between the two, but it's substantially

6            similar to what is generated on our system

7            today.

8     Q.     Okay.  And this form shows that effectively

9            three options are provided to the voter,

10           either option one, which is confirming that

11           the above Indiana resident's address is my

12           current address; option two, stating I moved

13           my residence outside the county or State of

14           Indiana; or option three, saying my residence

15           has changed within the county or State of

16           Indiana and providing the new address.  Are

17           those still the three options that are

18           provided to voters?

19    A.     Those are the three options.  I recall a

20           conversation about whether or not including

21           State of Indiana is -- again, this is where I

22           want to review, actually, if I may, if I may

23           consult, which I think is something we

24           provided to you in discovery -- no.  It looks

25           like the current version still includes State

1       of Indiana.

2           I know we've had some conversation about

3       whether or not the leaving "State of Indiana"

4       on that form is appropriate because a county

5       voter registration official wouldn't have the

6       ability to register someone in a different

7       county, but I don't recall if there has been a

8       change.  I don't believe that there has been a

9       substantial change to this form since that

10      conversation.  I think we are still discussing

11      whether or not that is appropriate.

12  Q.  Okay.  Just for the sake of the record, are

13      you looking at the current form now to answer

14      that question?

15  A.  I'm looking at what we provided to you in

16      discovery, which I understand is to be the

17      current form.

18  Q.  Okay.  Is there any tracking that the state

19      does with respect to mailers that are received

20      back from voters?

21           MR. GARN:  Objection; form;

22      foundation.

23  A.  If I may, sorry, I'm going to change my answer

24      to the previous question with respect to if

25      this is the current form.  I don't belive it

```
 1          is because it still calls out 2016 and 2018

 2          elections.  We're pretty confident we asked

 3          our vendor to update for the next cycle, at

 4          least through the 2017 elections, because

 5          there were special elections within the State

 6          of Indiana that would be an eligible election

 7          for a person to vote in.  I don't believe this

 8          is the current version of the form, the NCOA

 9          mailer.

10     Q.   There's a more updated version?

11     A.   I believe there may be a more updated version,

12          and I would like to confirm with our vendor if

13          we could ask -- as a state user I don't have

14          the ability even in a sandbox environment to

15          do the county functionality to create this

16          document, so that's certainly something I can

17          confirm with our vendor.

18     Q.   Just for clarity of the record, even the form

19          that you were referring to that was produced

20          in discovery may be a slightly outdated

21          version of the form --

22     A.   Right.

23     Q.   -- based on your understanding?

24               So going back to my prior question, if I

25          could, has there been any tracking the
```

1     election division does of the mailers that are

2     received back from voters?

3  A.  So if a person responds to the NCOA mailer,

4     one of those criteria, the one, two, or three,

5     that information is, as I understand the NCOA

6     hoppers to be -- again, this is where

7     providing step-by-steps and documentation

8     would supercede my knowledge of the hopper,

9     but it's my understanding they can -- the

10     counties can essentially accept question one,

11     which is the above Indiana residence is my

12     current address, which would have no effect on

13     the voter's registration; it would remove them

14     from the potential of being marked inactive.

15         And that if they moved outside of the

16     county, I believe that would be captured

17     within that hopper, if you will, where that

18     registration would be canceled in that the

19     resident's address would be essentially a

20     voter update where the person would be pulled

21     out of that hopper and not subject to be

22     marked inactive.

23         But if a voter fails to return that

24     document within 30 days, the individual would

25     be marked inactive or their status would be

1          marked inactive in the system.

2      Q.   Okay.  So the responses are tracked to the

3           extent that action may be taken with respect

4           to their entry in SVRS, but you're not aware

5           of any other tracking that's done simply to

6           understand how many forms are returned or what

7           selections are made between the three options?

8      A.   I would have to talk to our development team

9           to know what data fields are collected and how

10          easily that information is teased out of the

11          system.

12              I don't know that there is a current

13          report that we can generate.  We may have to

14          to do what we call an ad hoc report, which is

15          we set the parameters and our vendor pulls

16          together all the data tables to pull together

17          what we need for a more specific number.

18     Q.   Okay.  And it's your understanding generally,

19          though, that these forms are returned to

20          counties with each of the three options being

21          selected by at least some number of voters?

22     A.   By some number of voters.  Or as I mentioned

23          before, they're returned as USPS undeliverable

24          as defined in Indiana law.  Those would be

25          reasons to make that person inactive.

```
 1              But the system, as I understand, is
 2         designed that after that 30-day period if a
 3         person hasn't registered, the counties'
 4         options are to make it inactive, to make the
 5         record inactive.
 6    Q.   So if the individual selects either option one
 7         or option three, the voter's registration will
 8         either be updated or left active?
 9    A.   Correct.
10    Q.   If they select option two or if the mailer is
11         not received or returned undeliverable,
12         they're made inactive; is that correct?
13    A.   If they mark number two, if they've moved
14         their residence outside, they would be
15         canceled.
16    Q.   Okay.
17    A.   And then if it was not returned or marked USPS
18         undeliverable for the definition as prescribed
19         by law, then that person would be made
20         inactive and would be subject to cancellation
21         after not voting in two federal general
22         election cycles.
23    Q.   Under the new state law, no mailer would be
24         generated, so individuals who may have
25         selected one or three would be subject to
```

1          automatic cancellation; is that right?

2                    MR. GARN:  Objection; foundation and

3          form.

4     A.   Under current state law -- let me phrase it,

5          if I might answer it a little differently.

6          The functionality that the county currently

7          has is if a match is approved, an NCOA mailer

8          is generated.

9              I would make the argument that a person or

10         the county did not have full faith and

11         confidence in the registration date from the

12         other state, that they would still be in a

13         position to send the NCOA mailer to that

14         registrant, which would invite the inactive to

15         canceled process, the voter removal process as

16         outlined in federal and state law.

17             If the person -- that's where I'm going to

18         leave it.

19    Q.   State law doesn't require the county to do

20         that though, would it?

21                   MR. GARN:  Objection; form.

22    A.   State law gives the county discretion to

23         determine whether the person was most recently

24         registered to vote in Indiana or in the other

25         state.  If the county voter registration

1        official believes that that individual was

2        registered in the other state after their

3        Indiana registration, they may cancel that

4        person's registration.

5            However, the system functionality as it

6        exists does not provide for that direct

7        cancellation out of the SVRS hopper.  And,

8        again, my view would be that that

9        functionality of generating NCOA mailer should

10       not -- that functionality should not go away

11       because counties should be able to make the

12       decision whether or not cancellation is

13       appropriate.  And if they are not convinced

14       that they have the proper registration date,

15       that they could use the NCOA mailer.

16   Q.  So your intended change to the current SVRS

17       system would be to add a cancellation option,

18       but maintain the option to generate a mailer;

19       is that right?

20   A.  That would be my position.  I haven't

21       discussed it with my co-director.  We have not

22       spoke about the project.  I don't know where

23       the core team would be on any type of project.

24           It would be my position that the county

25       maintain the functionality of sending an NCOA

```
 1        mailer to an individual even if the

 2        registration date in another state reflects a

 3        more current registration than the one in

 4        Indiana; that would be my position.

 5   Q.   And what guidance is provided to the county

 6        officials for determining whether a

 7        registration is more current in Indiana or in

 8        the other state?

 9   A.   If I were asked that question by a county, I

10        would direct them to the statute that says

11        they would need to reach out to the

12        counterpart, their counterpart in the other

13        state, to request documentation that that

14        person is registered in the other state or

15        what the date of registration would be in that

16        other state.

17   Q.   And at the risk of giving you a memory test --

18        and I don't intend to -- are you able to tell

19        me which statute you're referring to?

20   A.   Well, I would look at 3-7-38.2-5(d) and (e)

21        and that would, in my view, still give the

22        county some discretion.

23   Q.   So your advice to the county would be that

24        they reach out to other states to confirm --

25   A.   Because they --
```

125

```
 1    Q.   -- correct date; is that right?
 2    A.   Right.  The counties do not currently have
 3         visibility as to when that person was
 4         registered in the other state.  So if they
 5         were going to do a cancellation, they would
 6         need to collect the facts and evidence to make
 7         that decision to cancel their Indiana
 8         registration.
 9    Q.   But the law doesn't require them to do that;
10         is that right?
11              MR. GARN:  Objection; form.
12    A.   I would argue that the county would have no
13         visibility to when that person was registered
14         above in the other state and the only way they
15         can make that cancellation is if they had the
16         facts and evidence that are not currently
17         provided through the crosscheck data to the
18         county.
19    Q.   Okay.  And once the crosscheck data is updated
20         so that the counties can see the date of
21         registration that's provided in the crosscheck
22         file, are they able to use that data to make a
23         determination as to the date of the
24         registration?
25    A.   We have not made that determination yet as a
```

1     core team.  We just simply ask that the

2     project be scoped simply because we know the

3     crosscheck data -- even if we were in a

4     position to provide it to them today, in two

5     days, three days it would be made gray and

6     they would not have access to it during the

7     federal freeze period.

8          So no updates to policies, procedures, or

9     step-by-steps at this point have been approved

10    by the core team, which is myself, Mr. King,

11    and the secretary of state's office.

12  Q.  Obviously, if the crosscheck data shows a date

13    of registration is incorrect, the counties

14    have no way of knowing that; is that right?

15          MR. GARN:  Objection; form.

16  A.  Again, we have not had conversations as a core

17    team about how to advise counties on if the

18    date field is blank if they should reach out

19    to the other state, so no update of policies

20    or procedures have been discussed by the core

21    team.  We have not, as co-directors, reached

22    accord on any of thoses conversation.

23  Q.  Have you put any policies and procedures in

24    place with respect to tracking what counties

25    are doing to ensure that any canceled

1        registrations reflect a more recent

2        registration in another state?

3    A.  Beyond updating the 2018 voter registration

4        manual, I don't believe we've updated our

5        standard operating procedures at this point

6        because much of them -- many of them are still

7        under review for updates.

8            I don't recall sending -- I don't recall

9        sending any memo out to the counties with

10       respect to interstate crosscheck.  But you

11       mentioned memory test; that would be a test of

12       my memory, and I'd be happy to research our

13       record to see if such a document exists.  I

14       don't believe it does.

15           We do have a legislative summary that is

16       in front of your pink code books where

17       co-directors and their attorneys have reviewed

18       statute and provided our interpretation of the

19       law, and that is agreed-upon language by the

20       co-directors.  So if the counties wanted to

21       refer to that legislative summary, they

22       certainly could.

23   Q.  Beyond providing guidance, do you take any

24       steps to understand what the counties are

25       doing to make this determination?

1    A.   No.  Well, if I may -- I said no.  I don't

2         think this actually specifically answers your

3         question, but we do try to keep tabs on if

4         counties are working on their hoppers, working

5         on projects within their hoppers.  But I

6         don't -- that's not necessarily a push because

7         of the change in the crosscheck law.  It's

8         just some counties don't perform the work in

9         the hoppers, so...

10   Q.   And so what form do those projects to track

11        work in the hoppers take?

12   A.   I believe it's our project manager that has

13        more visibility and our vendor.  So if we

14        wanted to see how, for example, how many death

15        records exist in each county's hopper, we

16        could find that out.

17             I believe we actually have a report that

18        might be generated.  I would have to research

19        as to whether or not such a report exists for

20        us to draw down to view how many crosscheck

21        records, for example, exist in each county.

22        But that's mostly just taking a pulse as to

23        where counties might be with voter list

24        maintenance work, not necessarily to prod them

25        to do work, if you will.

```
1    Q.   And is it correct that that is -- that all of

2         those projects take the form of data analysis

3         based on what's in SVRS rather than any type

4         of understanding of what the counties do

5         outside of SVRS to conduct additional

6         research?

7    A.   Correct.  It's more about looking at the nuts

8         and bolts, what datasets still exist within

9         those hoppers rather than whether or not they

10        are -- what steps they are taking to comply

11        with state law.

12   Q.   Okay.  Thanks.

13             (Plaintiffs' Exhibit No. 37 marked

14        for identification.)

15   Q.   So we handed you a copy of a document the

16        court reporter marked Exhibit 37, which would

17        be a presentation entitled Voter List

18        Management, Data Sources, and SVRS Hoppers,

19        which appears that you gave during the

20        conference on May 17 and 18, 2017?

21   A.   I did.

22   Q.   Did you prepare this presentation?

23   A.   I did.  I prepared it in consultation with my

24        attorney and both co-directors.  We tend to

25        share our presentations with each other so
```

```
 1          that there is accord in what is being

 2          presented to the counties.

 3     Q.   Okay.  So did you take comments from Mr. King

 4          on the presentation?

 5     A.   I feel confident I did.

 6     Q.   Okay.

 7     A.   Pretty certain I did.  I recall -- it's a

 8          memory test -- I'm pretty confident that I did

 9          actually.

10     Q.   Okay.  If you could turn to slide 21 in this

11          presentation, which is entitled Interstate

12          Crosscheck.

13     A.   Yes.

14     Q.   There's a box at the bottom marked with a red

15          explanation point and it states, "After July

16          1, 2017, a change in Indiana law will permit

17          counties to cancel a voter record, matched

18          interstate record, after careful review"; do

19          you see that?

20     A.   Yes.

21     Q.   What is meant by "careful review"?

22     A.   In my view, careful review would be consulting

23          with the other state to determine which

24          registration is more current.  As part of the

25          slide, we do reference statute in the lower
```

1        left corner.

2    Q.   Is it also your understanding that it would

3        require consultation with the other state to

4        either view or receive an out-of-state

5        registration featuring a registration address

6        in Indiana?

7    A.   Yes.

8    Q.   And do you have any understanding as to

9        whether counties are, in fact, requesting that

10       information from other states?

11   A.   I do.  I can speak to something anecdotal,

12       which is before July 1, 2017, I know that

13       counties -- the way the law was phrased

14       before, if the individual was registered to

15       vote in the other state more recently than

16       their Indiana registration, the Indiana

17       registration form authorized cancellation.

18            I do know that some counties, not all,

19       some counties would reach out to the other

20       state to get the information that they needed

21       in order to authorize the cancellation in

22       Indiana.

23            I cannot speak to whether or not all 92

24       counties did that, but I do know that a

25       handful of counties that have voter

1          registration officials who have been in their

2          positions for a long time were doing that due

3          diligence for cancellation in order to do the

4          cancellation.

5     Q.   What is that knowledge based on?

6     A.   Conversations with county registration

7          officials who expressed frustration about

8          having to do all the additional legwork, if

9          you will, to reach out to the other states to

10         make that determination.

11    Q.   So, in part, you know about it because of,

12         perhaps, frustration being expressed by county

13         officials as to having to do that work?

14    A.   Having to do the additional work, yes.

15    Q.   Is it your understanding that those county

16         officials will continue to do that work under

17         the law as changed as of July 1, 2017?

18    A.   That they would need -- in order to do the

19         cancellation, they would still need to make a

20         determination which registration was more

21         recent.

22    Q.   And do you know whether county officials will

23         continue to do investigation by consultation

24         with other states in order to make that

25         confirmation?

```
 1            MR. GARN:  Objection; foundation.
 2   A.   It's hard for me to speculate that all
 3        counties will do that.  What the law would
 4        require is that they would have facts and
 5        evidence that they were registered to vote in
 6        the other state more recently.
 7            And if asked, I would suggest to that
 8        county official that they should reach out to
 9        the other state if they were uncertain if the
10        registration date that they provide to them in
11        the future was accurate before they do a
12        cancellation of the voter's record.
13   Q.   Would your advice be that they would need to
14        see the actual out of state registration?
15   A.   That would be my advice.
16   Q.   Would your advice be that cancellation should
17        only be affected if they see a signature from
18        the voter and the listing of their prior
19        registration address in Indiana?
20   A.   I would want to see something executed in
21        writing from the voter.
22   Q.   But a prior registration address wouldn't be
23        required in your view?
24   A.   What do you mean a prior registration address?
25   Q.   For example, if their registration in the new
```

1        state indicated an address in the new state

2        and signed an authorization but didn't list

3        their prior Indiana address where they had

4        previously been registered, would that be

5        sufficient in your view?

6    A.   If they did not include that prior

7        registration address?  I think that would be

8        sufficient in my view if the voter was

9        registered in the other state more recently

10       than their Indiana registration.

11   Q.   Is that advice that you have provided to any

12       county registrars since this new law took

13       effect?

14   A.   I'm certain I've been asked questions about

15       crosscheck or voter list maintenance as it

16       relates to how a registration should be

17       canceled.  I don't recall if anything

18       specifically came about because of the new

19       change in law.  That doesn't mean I didn't.

20            But I hope you can appreciate I get a lot

21       of emails and questions about various aspects

22       of election and voter registration law, so I'm

23       hard-pressed to say definitively that I have

24       done that, although it would not be out of the

25       realm of possibility that I have.

1   Q.   Is that advice documented anywhere in any of

2        the guidance or other documents that are

3        provided to counties?

4   A.   From the election division?

5   Q.   Yes.

6   A.   And that advice would be the written

7        cancellation or --

8   Q.   The advice that we just discussed regarding

9        how to determine whether a registration is

10       more recent in another state.

11  A.   I'm not sure that it has been documented how

12       to determine what type of record would be

13       needed from that other state.  In my view, the

14       law requires registration to be made in the

15       other state, and that is fairly

16       self-explanatory.

17  Q.   And when you say that, again, you're referring

18       to the 3-7-38.2-5?

19  A.   Correct.

20  Q.   Thank you.  Is careful review something that

21       you expected county officials were doing even

22       prior to the law change on July 1, 2017?

23  A.   Yes.

24            (Plaintiffs' Exhibit No. 38 marked

25       for identification.)

```
1    Q.   So we handed you a copy of a document the

2         court reporter has marked as Exhibit 38, which

3         I can represent to you was produced to us with

4         a file name of Interstate Crosscheck

5         (inaudible) Document SLSX.  I apologize it's a

6         little bit unwieldy to look at.

7              I'm wondering if this is a document that

8         you recognize in substance or helped your

9         counsel to gather for purposes of this case?

10   A.   I know my counsel gathered this document.  I

11        did not pull the document together.  I believe

12        it was done with the assistance of our vendor.

13   Q.   And is it your understanding that this

14        document reflects results pulled from the SVRS

15        system related to use of the interstate

16        crosscheck hopper?

17   A.   I believe so, yes.

18   Q.   And is this something that would have been

19        pulled as part of some of the projects you

20        talked about in terms of reviewing work that's

21        done by the county officials in the hoppers?

22   A.   This actually would, I believe, is pulled from

23        our vendor through what we call an ad hoc

24        report, which is not -- which would be

25        something that they would pull from specific
```

1        data fields that were being requested.

2    Q.  Okay.  So it's your understanding that this

3        was pulled for purposes of this litigation?

4                MR. GARN:  Object.

5    A.  I don't believe it was.  I believe this was

6        part of core team conversation that we had

7        sometime in 2016 or 2017 -- sometime in 2017.

8        Because I think the conversation related to

9        where the confidence factor should be adjusted

10       to, whether it should be 70 or 75, if memory

11       serves.  And this was showing where those

12       crosscheck results would fall at the different

13       confidence point factors.

14   Q.  Understood.  Looking at the match approved

15       totals, without asking you to kind of survey

16       the entire document, does it surprise you to

17       see that there are numerous counties marking

18       99 to 100 percent of matches in the hopper as

19       match approved?

20   A.  Match approved would indicate to me they're

21       sending NCOA mailer to the registrant to allow

22       them to respond, to confirm the registration,

23       update their registration, or cancel their

24       registration.

25   Q.  And so it doesn't surprise you to see that

```
 1            they're doing that with either 100 percent or

 2            close to 100 percent of the matches that are

 3            generated?

 4    A.      No.

 5    Q.      Do you have an understanding as to how

 6            frequently counties use the research needed

 7            function within the hopper?

 8    A.      I don't.

 9    Q.      Has the election division done anything to

10            track whether that tool is being used?

11    A.      From time to time we might ask for our vendor

12            to give us updates on -- our project

13            manager -- updates on certain activities

14            happening within individual hoppers.  So it

15            may be possible in the past we would be made

16            aware of research needed.

17    Q.      Have you done anything to confirm whether

18            careful review is being utilized before 99 to

19            100 percent of matches were approved by

20            certain of the counties listed here?

21                    MR. GARN:  Objection; foundation.

22    A.      Again, for a match approved the county is

23            approving the sending of an NCOA mailer that

24            allows the individual to confirm their Indiana

25            registration, if they want their Indiana
```

1        registration canceled due to a move, or if

2        they want to update the registration within

3        the jurisdiction, which gives the voter notice

4        and allows the voter to cast a valid ballot at

5        any election between when the NCOA mailer was

6        released to the voter and the end date being

7        the second federal general election.

8    Q.  Okay.  Thanks.  In the period 2015 through

9        2017 when crosscheck matches like these were

10       listed as match approved and the NCOA mailer

11       was sent, those matches would elicit

12       crosscheck mailers that may never have been

13       returned; correct?

14   A.  Correct.

15   Q.  And the protocol there would be to move those

16       voters to inactive status --

17   A.  Correct.

18   Q.  -- pending two general elections in which they

19       didn't vote?

20   A.  Any election with the end date being the

21       second federal general election.

22   Q.  Okay.  And so some of those registrations

23       would still be pending cancellation today; is

24       that right?

25   A.  For which years?

1    Q.   For, I guess, 2015 through 2017.

2    A.   Yes.  Because 2015, the second general

3         election would be November 2018.

4    Q.   Right.  Is it your understanding that after

5         the passage of SB-442 those pending

6         cancellations can be immediately effectuated?

7    A.   No.  The voter status is inactive.

8    Q.   And so it's not your understanding that those

9         voters would be canceled in the system as a

10        result --

11   A.   Correct.

12   Q.   -- of SB-442?

13   A.   Correct.

14   Q.   Is that --

15   A.   Because the inactive process has originated

16        and has begun, the clock is ticking on those

17        two federal election cycles, and if a person

18        were to be found to be registered to vote in

19        another state, they -- well, I will leave it

20        as I don't believe the business rules would

21        permit a cancellation of that voter's

22        registration record if they were already

23        marked inactive.

24   Q.   And that's the case even if they showed up as

25        registered more recently in another state in

1        the crosscheck hopper?

2    A.   I would need to talk to our vendor about

3        how -- what the logic is between those two

4        hoppers if that person was marked inactive.

5    Q.   Is it your understanding that currently as the

6        SVRS functions, the county official could not

7        go in and cancel that voter's registration

8        because that process has begun?

9    A.   Again, I would have to understand the

10       functionality between the crosscheck hopper

11       and how it treats inactive voters.  And I

12       don't have an answer for you today, but it's

13       certainly something I can work to provide an

14       answer to you.

15            But I don't view the law -- my position

16       would be I don't view the law that if a person

17       is marked inactive they could be then

18       subsequently canceled as a basis of the

19       crosscheck.  But I also haven't discussed that

20       with my attorney, so maybe I should strike

21       that.

22   Q.   He's taking careful notes.  He might be

23       clarifying something.

24            Just referring back to Exhibit 38, would

25       you expect these match approved totals to

```
 1          change under the new law which does not

 2          require mailers to go out when a more recent

 3          match is identified in crosscheck?

 4     A.   At this point in time I would be hard-pressed

 5          to say that this table would change because

 6          currently under the crosscheck hopper there is

 7          no way to do that direct cancellation as we

 8          discussed.

 9              And so I -- it's hard for me to speak to

10          whether or not a county would make a decision

11          to still send an NCOA mailer to the individual

12          registrant or if they had the facts and

13          evidence if they would cancel outright out of

14          the interstate hopper.  So I really hate to

15          speculate about what the county determination

16          may be.

17     Q.   Is it your understanding that the standard for

18          careful review remains unchanged with the

19          passage of SB-442?

20     A.   I would maintain that careful review would be

21          that the county collect the facts and evidence

22          they need in order to comply with state law to

23          cancel a person's registration.

24     Q.   So it remains unchanged under SB-442?

25     A.   My position is that it remains unchanged, but
```

1           I don't speak for my other co-director or for

2           the core team.

3     Q.    And are any standards for that careful review

4           laid out in guidance that's provided to

5           counties?

6     A.    Other than the step-by-step and any existing

7           SOP and the manuals and presentations that

8           have been provided to you in discovery, I'm

9           not sure that that standard has been set out

10          explicitly.

11    Q.    Okay.  Okay.

12    A.    As I noted, we have not released information

13          for the 2018 version of interstate crosscheck,

14          and we are in the process of at least

15          preliminarily discussing improvements to the

16          step-by-step and potential functionality

17          changes to the hopper.

18    Q.    So you expect a new step-by-step to go out at

19          some point in the near future?

20    A.    If there's consensus between the co-directors,

21          yes, I would like to see there be a new

22          step-by-step.

23    Q.    Just in terms of understanding what format

24          this step-by-step takes, is that a document

25          that's emailed out to the counties?  How do

1        they receive that step-by-step guidance?

2    A.  It can be released in a number of ways, but we

3        have a portal within our statewide voter

4        registration system that relates to training

5        and that documentation for the step-by-steps,

6        those are updated by our vendor typically with

7        consultation with the core team, the SOPs,

8        standard operating procedures document, those

9        are also available on the county portal.

10       Counties have access to webinar trainings,

11       and so our proficiency manager does do

12       training for crosscheck.  And if -- I don't

13       recall if dates have yet been scheduled.  We

14       may be, obviously, delaying that training

15       based on our agreement not to release data

16       until after July 1 of this year.  And then any

17       past recorded training sessions that were

18       available online would be accessible by county

19       users.

20   Q.  Is the portal you're referring to within SVRS?

21   A.  It is.

22   Q.  Okay.  Indiana has what's known as a fail-safe

23       procedure for voting on election day; is that

24       right?

25   A.  Correct.

1    Q.   How does that work?

2    A.   There are a number of them.  Do you want me to

3         recite them all?

4    Q.   Let's talk about -- no, I'm sorry.  I'll

5         definitely phrase a better question.

6              If a voter is canceled out of the SVRS

7         system and then shows up in their polling

8         place on election day, what option do they

9         have for voting?

10   A.   Certainly.  And to be clear, a person with a

11        canceled registration status is not removed

12        from the system.  The individual's record

13        remains, and that's important because of this

14        fail-safe procedure.  Which if I went into my

15        polling location on election day and my name

16        was not on the poll list, the poll workers are

17        instructed to contact their voter registration

18        official to determine why that individual may

19        be off of the poll list.

20             Often times it is an error on behalf of

21        the county voter registration official, and

22        what we call a certificate of error is issued

23        and that person is permitted to cast a regular

24        ballot.

25             If it is determined that my registration

1       was canceled, then I as the voter would

2       essentially sign what we call the form VRG

3       4/12, which is a voter registration document.

4       And I would affirm that I continue to reside

5       at that registration address and I am

6       permitted to vote a regular ballot.

7           And that guidance is also in the 2018

8       voter registration manual as well with the

9       added emphasis that even if I told the county

10      voter registration official to cancel my

11      registration, if I came back to that polling

12      location and insisted that I continue to

13      reside there and completed that VRG 4/12 form,

14      that I would be permitted to vote there.

15  Q.  Is it correct that if a certificate of error

16      is issued that no VRG 4/12 form is needed?

17  A.  I would have to look at the policies and

18      procedures for the other fail-safes.  I know

19      the certificate of error number's typically

20      recorded in the poll list -- well, it's

21      recorded within the statewide voter

22      registration system.  I know some counties

23      will handle it slightly differently where they

24      want the individual to also complete the voter

25      registration document so that there is --

1          there's several that -- one of the

2          documentations would make its way back to the

3          voter registration official to make that

4          update, if you will.

5               For the different fail-safes there are

6          different form requirements, which is largely

7          the VRG 4/12.  I just don't recall for every

8          fail-safe when that VRG 4/12 is applicable.  I

9          can certainly consult my manual and state it

10          for the record if that's helpful.

11    Q.    I don't think that's necessary right now, but

12          I do want to focus on how determination is

13          made that a cancellation was done in error.

14    A.    So I misspoke.  Well, perhaps I conflated

15          things.  If a person -- sometimes a person is

16          an active registered voter who is just

17          mistakenly left off of the poll list or let's

18          say I am registered voter and I got my

19          registration postmarked on the statewide voter

20          registration deadline and the county didn't

21          receive it until two days before the election,

22          under law they have to process my

23          registration.  And so -- well, let me not say

24          two days.  Let's say eight days due to the

25          pending period.  At that point the poll list

1    may have already been printed.

2         And so in that instance a certificate of

3    error would be issued because my name was

4    missing from the poll list, but I'm an active

5    or an inactive registered voter and it was

6    just a mistake by the county official.

7         In the instance of a canceled voter, the

8    voter registration official would have

9    visibility that my registration was canceled.

10   And in that case, if I am the voter, I would

11   affirm that my registration address remains

12   the same, that I continue to reside there, I

13   would complete that VRG 4/12 voter

14   registration form and be permitted to vote a

15   regular ballot and my registration would be

16   restored.

17   Q.   And is it correct that whether or not it's an

18        error is determined by calling the county

19        office on election day?

20   A.   Correct.

21   Q.   So does the polling place have a process in

22        place for reaching out to that county official

23        and getting an answer on that?

24   A.   That would be up to the county policy and

25        procedures.  I know that in our presentations

```
 1            and guidance to the county voter registration

 2            officials, that the poll workers have a way to

 3            communicate with an individual at the election

 4            board or at the voter registration office in

 5            order to make those determinations.

 6    Q.      So is specific guidance provided to the county

 7            registrars as to how to provide that support

 8            on election day?

 9    A.      That support can be -- it's hard to prescribe

10            to a county what the support might be because

11            every county is in a different position with

12            respect to having access to a hotline.  Each

13            county sets its own policies and procedures as

14            to how that would be handled.  Our guidance

15            has been that the county have some level of

16            support to the poll worker on election day.

17    Q.      And is any guidance or mandate provided to

18            county registrars as to how poll workers are

19            trained in contacting them?

20    A.      All inspectors are required to go through

21            training for election day, and the form of

22            that training is dictated by the county.

23            There is not an election division mandate that

24            I'm aware of that requires a specific hotline

25            to be established for poll workers to be able
```

```
 1            to reach out to the county official, for

 2            example.

 3       Q.   Just so I'm clear, if a county registrar was

 4            contacted and the voter in question was

 5            showing up as canceled in the system, then no

 6            certificate of error would be issued; is that

 7            right?

 8       A.   I believe that is correct.

 9       Q.   So at that point the voter would be required

10            to fill out a form affirming their status as a

11            registered voter?

12       A.   Correct.  And I can confirm with our vendor if

13            a certificate of error would be created in the

14            statewide voter registration system.  In that

15            instance it's my understanding there would not

16            be need for a certificate of error, but I can

17            obviously confirm that and provide that

18            information back to you.

19       Q.   What is done with the VRG 4/12 form once it's

20            filled out on election day?

21       A.   It should be secured by the poll workers and

22            returned with their election materials to be

23            given to their voter registration official.

24       Q.   And what does the voter registration official

25            do with it?
```

```
 1    A.   They would process the registration in the

 2         statewide voter registration system.

 3    Q.   And does that mean they would update the voter

 4         as active voter based on their --

 5    A.   As active --

 6    Q.   -- voting?

 7    A.   -- yes.

 8    Q.   Is it possible for someone who attempts to

 9         vote through the VRG 4/12 form to be

10         challenged on election day?

11    A.   Yes.

12    Q.   How does that work?

13    A.   It would be a credentialed challenger within

14         the polling location that would have

15         information that the person was not residing

16         at the address they claim to reside.  You'll

17         have to forgive me; I'm terrible with our form

18         numbers.  I believe it is the PRE 4 affidavit,

19         which it instigates the provisional ballot

20         processing where the challenged voter or the

21         challenger completes their affidavit, the

22         challenged voter completes their affidavit,

23         the challenged voter fills out a provisional

24         ballot which is sealed within the PRO 2

25         envelope -- again, forgive me if I'm not
```

```
1        getting the form numbers exactly right -- but

2        the PRE 4, I believe, is the name of the

3        affidavit that both the challenged individual

4        and the challenger completes, and the PRO 2 is

5        the affidavit that the challenged voter signs

6        to say that I have completed my ballot and

7        this is my signature; that I've done this in

8        front of poll workers essentially.

9    Q.  And is it correct, does the challenger need

10        simply to fill out and affirm the form or do

11        they need to have other information supporting

12        the challenge?

13   A.  I would have to review the law on that.  I'm

14        sorry.  It's been a little removed from my

15        memory as to what would be the requirement on

16        challenging the voter.  I believe they have to

17        have some level of facts or evidence and,

18        obviously, fill out that affidavit, and then

19        the county election board would have a

20        provisional ballot hearing where both parties

21        would be invited to come provide testimony.

22   Q.  And so the challenged voter would not be able

23        to cast a regular ballot on election day;

24        correct?

25   A.  If they were challenged due to residency
```

1      requirement, they may also be challenged

2      because they lack ID, for example.  They

3      didn't have the right state ID to be able to

4      cast their ballot.  There are a few other

5      reasons on the challenged affidavit that the

6      individual might be challenged on that is

7      outside of residency, if you will.

8                  MS. MERKEL:  Maybe we can take a

9      break here and circle up and try and get done

10     in the next few minutes.  I just want to make

11     sure we've covered everything we need to

12     cover; is that okay?

13                 THE WITNESS:  Fine.

14             (A short recess is taken.)

15     CONTINUED BY MS. MERKEL:

16  Q.  So, Ms. Nussmeyer, other than written guidance

17      that is produced by the election division,

18      whether in the purple book or standard

19      operating procedures or otherwise, the level

20      of careful review that's done before a voter's

21      registration is changed in the SVRS is left to

22      the county's discretion; is that right?

23  A.  Correct.

24  Q.  And do you know sitting here today if all

25      counties are following the procedures that you

1        advise as far as completing a careful review

2        before making changes to voter status?

3                  MR. GARN:  Objection.

4   A.   I can't --

5                  MR. GARN:  Just object to form.

6   A.   I can't speculate.

7   Q.   So you don't know for an exact that they are?

8   A.   Correct.

9   Q.   In fact, can you say how many counties are

10       following the procedures you outlined?

11                 MR. GARN:  Objection.

12  A.   I can't.

13                 MR. GARN:  Form.

14  A.   I cannot.

15  Q.   Part of the purpose of the crosscheck program

16       is to identify any instances that may occur of

17       double voting; is that right?

18                 MR. GARN:  Objection to form.

19  A.   I was not in the office at the time the

20       memorandum of understanding was executed or

21       for the reasons behind joining crosscheck.  I

22       can say -- so my firsthand knowledge as to

23       that's why Indiana, for example, chose to join

24       crosscheck, I can't speak to that.

25            I can say based on my own personal

1          knowledge of reading news and reading websites

2          that that is, as I understand, one of the

3          intended reasons behind the crosscheck

4          program.

5     Q.   And so, in fact, running the crosscheck

6          program should allow you to identify instances

7          in which two votes have been cast; right?

8                    MR. GARN:  Objection to form.

9     A.   I believe it would allow a state to do so.

10    Q.   Are you aware of any instance during your time

11         as co-director of identified double voting?

12    A.   Nothing has been brought to my attention as

13         co-director that I can recall with respect to

14         double voting by way of the interstate

15         crosscheck list.

16                   MS. MERKEL:  Okay.  Thank you very

17         much.  I have no further questions.

18                   MR. MENSZ:  We're good.

19                   MR. GARN:  I just have a couple.

20    CROSS-EXAMINATION

21    QUESTIONS BY MR. GARN:

22    Q.   Thank you.  First of all, you were asked

23         several questions about when someone goes to a

24         polling place and tries to vote and there's a

25         challenge.  Do you remember that?

1    A.   I do.

2    Q.   Is that something, the exact procedures for

3         challenging someone's vote at a polling place,

4         is that something you prepared for today?

5    A.   No.

6    Q.   That wasn't one of the topics that had been

7         identified that you were going to be talking

8         about, is it?

9    A.   Correct.

10             MR. GARN:  No further questions.

11        Signature.

12             AND FURTHER THE DEPONENT SAITH NOT.

13

14        _____

15                  ANGELA M. NUSSMEYER

16

17

18

19

20

21

22

23

24

25

```
 1            STATE OF INDIANA     )
                                   )   SS:
 2            COUNTY OF HAMILTON   )

 3

 4       I, Lindsay N. Bola, Notary Public in Hamilton
         County, Indiana, do hereby certify that the deponent
 5       was by me sworn to tell the truth in the aforementioned
         matter;
 6       That the deposition was taken on behalf of the
         plaintiffs at the time and place heretofore mentioned
 7       with counsel present as noted;
         That the deposition was taken down by means of
 8       Stenograph notes, reduced to typewriting under my
         direction and is a true record of the testimony given
 9       by said deponent and was thereafter presented to the
         deponent for signature.
10       I do further certify that I am a disinterested
         person in this cause of action; that I am not a
11       relative or attorney of any of the parties  or
         otherwise interested in the event of this action and am
12       not in the employ of the attorneys for the respective
         parties.

13

14       IN WITNESS WHEREOF, I have hereunto set my hand and
         affixed my notarial seal this  _____day of February
15       2018.

16

17

18       _____
         Lindsay N. Bola, Notary Public
19

20       County of Residence:  Hamilton

21       My Commission Expires:  March 16, 2024

22

23

24

25
```

Jan Mensz, Esq.
Stuart C. Naifen, Esq.
Matthew Jedreski, Esq.
ACLU
1031 East Washington Street
Indianapolis, IN 46202

NOTICE OF DEPOSITION FILING

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

COMMON CAUSE INDIANA,

          Plaintiff,

                  Case No. 1:17-cv-3936

     vs.

CONNIE LAWSON, in her
official capacity as
Secretary of State of
Indiana, J. BRADLEY KING,
in his official capacity as
Co-Director of the Indiana
Election Division, and ANGELA
M. NUSSMEYER, in her official
capacity as Co-Director of
the Indiana Election
Division,

          Defendants.


     In compliance with the Indiana Rules of
Procedure, Rules of the Industrial Board or Federal
Rules of Procedure, pursuant to Indiana Supreme Court
order dated 10-1-86, you are hereby notified of the
filing by Counsel for the plaintiffs of the deposition
of Angela M. Nussmeyer taken on February 2, 2018.

                     _____
                       (Date of Filing)
    cc:  Mr. Jefferson Garn

ASSOCIATED REPORTING, INC.
251 East Ohio Street, Suite 940
Two Market Square Center
Indianapolis, Indiana 46204