Exhibit 22

```
                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF INDIANA
                    INDIANAPOLIS DIVISION



INDIANA STATE CONFERENCE OF )
THE NATIONAL ASSOCIATION FOR)
THE ADVANCEMENT OF COLORED  )
PEOPLE (NAACP) and LEAGUE   )
OF WOMEN VOTERS OF INDIANA, )
                            )
              Plaintiffs,)
                            )Case No. 1:17-cv-02897
         vs.                )
                            )
CONNIE LAWSON, in her       )
official capacity as        )
Secretary of State of       )
Indiana, J. BRADLEY KING,   )
in his official capacity as )
Co-Director of the Indiana  )
Election Division, and      )
ANGELA M. NUSSMEYER, in her )
official capacity as        )
Co-Director of the Indiana  )
Election Division,          )
                            )
              Defendants.)
```

**DEPOSITION OF J. BRADLEY KING**
**FEBRUARY 2, 2018**
**1:30 p.m.**

ASSOCIATED REPORTING, INC.
251 East Ohio Street
Suite 940
Indianapolis, Indiana  46204
(317) 631-0940
associated-reporting.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


COMMON CAUSE INDIANA,          )
                               )
                Plaintiff,     )
                               )Case No. 1:17-cv-3936
        vs.                    )
                               )
CONNIE LAWSON, in her          )
official capacity as           )
Secretary of State of          )
Indiana, J. BRADLEY KING,      )
in his official capacity as    )
Co-Director of the Indiana     )
Election Division, and ANGELA)
M. NUSSMEYER, in her official)
capacity as Co-Director of     )
the Indiana Election           )
Division,                      )
                               )
                Defendants.    )



    THE 30(b)(6) DEPOSITION UPON ORAL EXAMINATION
OF
          J.  B R A D L E Y  K I N G,

the deponent produced and sworn before me,
Lindsay N. Bola, Notary Public in and for
the County of Hamilton, State of Indiana, taken
on behalf of the plaintiff, at the Indiana
Government Center South, 302 West Washington
Street, Conference Center Room 2, Indianapolis,
Marion County, Indiana, on the 2nd day of February
2018, commencing at approximately 1:30 p.m.,
pursuant to the Indiana Rules of Trial Procedure,
with written notice as to the time and place.

1

2

3                         A P P E A R A N C E S

4

5   ON BEHALF OF THE PLAINTIFFS NAACP and LEAGUE OF
    WOMEN VOTERS OF INDIANA:
6
         Ellison Ward Merkel, Esq.
7        Alexandre J. Tschumi, Esq.
         QUINN EMANUEL
8        51 Madison Avenue
         22nd Floor
9        New York, NY 10010

10       Jonathan Brater, Esq.
         Myrna Perez, Esq.
11       BRENNAN CENTER FOR JUSTICE
         120 Broadway
12       Suite 1750
         New York, NY 10271
13

14
    ON BEHALF OF THE PLAINTIFF COMMON CAUSE INDIANA:
15
         Jan Mensz, Esq.
16       Stuart C. Naifen, Esq.
         Matthew Jedreski, Esq.
17       ACLU
         1031 East Washington Street
18       Indianapolis, IN 46202

19       Sophia Lin Lakin, Esq.
         ACLU
20       125 Broad Street
         18th Floor
21       New York, NY 10004

22

23

24

25

```
 1

 2

 3

 4    ON BEHALF OF THE DEFENDANT INDIANA ELECTION
      DIVISION:
 5
          Jefferson S. Garn, Esq.
 6        Kyle Hunter, Esq.
          Diana Moers, Esq.
 7        Kelly Witte, Esq.
          OFFICE OF THE ATTORNEY GENERAL
 8        302 West Washington Street
          IGCS Fifth Floor
 9        Indianapolis, IN 46204

10

11
      ON BEHALF OF THE DEFENDANT J. BRADLEY KING:
12
          Dale R. Simmons, Esq.
13        INDIANA ELECTION DIVISION
          302 West Washington Street
14        Suite E204
          Indianapolis, IN 46204
15

16

17

18

19

20

21

22

23

24

25
```

1

2                    I N D E X   O F   E X A M I N A T I O N

3

4                                                                          **PAGE**

5        DIRECT EXAMINATION...................   6
         Questions by Ms. Merkel
6
         DIRECT EXAMINATION...................  54
7        Questions by Mr. Mensz

8        CROSS-EXAMINATION...................  73
         Questions by Mr. Garn
9
         REDIRECT EXAMINATION.................  76
10       Questions by Ms. Merkel

11

12

13                    I N D E X   O F   E X H I B I T S

14

15       Plaintiff's Deposition Exhibits

16       1.  Amended Notice of Deposition........  54

17       15. Email...............................  60

18       26. Letter..............................  68

19       33. Notice of Deposition................   6

20       38. Crosscheck Document.................  74

21       39. Voter List Maintenance..............  47

22

23

24

25

```
 1

 2                       J.   B R A D L E Y   K I N G, the

 3              witness herein, having been first duly sworn

 4              to tell the truth, the whole truth and nothing

 5              but the truth, was examined and testified as

 6              follows:

 7      DIRECT EXAMINATION

 8      QUESTIONS BY MS. MERKEL:

 9      Q.   Mr. King, good afternoon.  We met off the

10              record.  But just for the record, my name is

11              Ellison Merkel.  I'm from the law firm Quinn

12              Emanuel, and I will be questioning you on

13              behalf of the plaintiffs in the Indiana State

14              Conference of the NAACP and the League of

15              Women Voters of Indiana matter.  Could you

16              please state your name for the record.

17      A.   My name is J. Bradley King.

18      Q.   And, Mr. King, I'd like to show you a document

19              that's previously been marked as Exhibit 33.

20              If you don't mind taking a moment to review

21              the document which is titled Notice of

22              Deposition to Defendants Pursuant to Rule

23              30(b)(6) and letting me know if you recognize

24              this document.

25      A.   Yes.  I recognize the document.
```

1    Q.   And, in particular, if you take a look at the

2         six topics that are listed on page 5 of the

3         document, is it your understanding that you've

4         been designated to testify as a 30(b)(6)

5         witness on behalf of the defendants with

6         respect to these six topics?

7    A.   That is my understanding.

8    Q.   Thank you.  What did you do to prepare for

9         your deposition today?

10   A.   I reviewed a number of documents and

11        presentations prepared by the election

12        division, including the Indiana Election Code

13        statutes, our presentations to county voter

14        registration and election officials, and

15        miscellaneous correspondence in our office and

16        communicated with my own general counsel in

17        this regard.

18   Q.   And who is the general counsel you're

19        referring to?

20   A.   I'm referring to Dale Simmons, who's present

21        in the room.  I also on some technical matters

22        consulted with our state's program manager,

23        firm named Baker Tilly Virchow Krause, and

24        their staff who provide us contractual support

25        for the administration of the statewide voter

```
 1        registration system.

 2   Q.   And when you consulted with that program

 3        manager, did you do so in conjunction with

 4        Ms. Nussmeyer?

 5   A.   No.  I did so separately.

 6   Q.   Do you have a contact that you typically speak

 7        with at Baker Tilly?

 8   A.   Seth Cooper is the primary individual.

 9   Q.   Do you know whether he's also the primary

10        contact for Ms. Nussmeyer and her staff?

11   A.   I do not.  I know that often times we

12        communicate together with Mr. Cooper.

13   Q.   Other than Mr. Simmons, who you mentioned, who

14        else works on your staff at the election

15        division?

16   A.   I have four employees in total; three in

17        addition to Mr. Simmons.  Michelle Thompson

18        serves as campaign finance coordinator.  Lori

19        Clark serves with regard to precinct matters

20        principally, but occasionally on voter

21        registration issues.  And then Candie

22        Metcalfe, M-E-T-C-A-L-F-E, serves as

23        administrative assistant.

24   Q.   Mr. King, when were you first appointed as

25        co-director of the election division?
```

1   A.   In February of 2002.

2   Q.   And by whom were you appointed?

3   A.   I was appointed by Governor O'Bannon, younger

4        Frank O'Bannon.

5   Q.   When were you most recently reappointed?

6   A.   That would have been in 2014 towards the end,

7        and it would have been by then Governor Pence.

8   Q.   And so is your present term due to expire

9        toward the end of 2018?

10  A.   Yes.  Our terms are four-year terms that

11       coincide with that of the secretary of state

12       of Indiana, which would be through

13       December 31, 2018.

14  Q.   At some point during your tenure as

15       co-director did Indiana begin to participate

16       in the interstate voter registration

17       crosscheck program, which I'll also call

18       crosscheck for the sake of convenience, if

19       that's okay with you?

20  A.   Yes; that's correct.

21  Q.   When was that?

22  A.   The memorandum of understanding was executed

23       by myself and my counterpart as co-director at

24       the time Trent Deckard, on July 1, 2013.

25  Q.   Was that a memorandum of understanding that

1        you negotiated?

2    A.  I would not describe it as negotiation.  The

3        memorandum of understanding had been in place

4        with several other states for many years.  We

5        reviewed the terms and signed the memorandum

6        without discussions about the substance that

7        you would find during a typical negotiation.

8    Q.  So is it your understanding that all of the

9        states who participate in the crosscheck

10       program are doing so subject to common terms

11       as reflected in that MOU?

12   A.  I would say yes, but with the understanding

13       that Clause 3 of the memorandum of

14       understanding explicitly recognizes that the

15       states will administer the program in

16       accordance with their own laws and

17       regulations.

18   Q.  Crosscheck is a general voter list maintenance

19       program that allows officials from a variety

20       of different states to submit voter lists and

21       try to identify duplicate registrations; is

22       that right?

23   A.  That's correct.

24   Q.  And why was it that Indiana first signed on to

25       the MOU to participate in the crosscheck

```
 1            program?

 2    A.      Indiana had received information regarding the

 3            existing crosscheck program for several years

 4            following its initial adoption both at

 5            national conferences of state election

 6            officials and in review of trade articles, I

 7            would call them.

 8                 We had some initial discussions between

 9            the individual who then served as co-director,

10            Pamela Testa, about participation in the

11            Kansas program.  And those discussions

12            continued intermittently for roughly the

13            period 2008 through 2013.

14    Q.      And why did you come to make the decision to

15            participate in 2013?

16    A.      The decision was not made by the co-directors.

17            We were unable to reach agreement with regard

18            to participation, and the Indiana General

19            Assembly enacted legislation in 2013 that

20            required Indiana to enter into the memorandum

21            of understanding for the crosscheck program.

22                 Mr. Deckard and myself acted in an

23            administerial capacity to follow the dictates

24            of that statute.

25    Q.      And was it your position that Indiana should
```

1    participate or should not participate in the

2    crosscheck program prior to that legislation

3    being enacted?

4            MR. GARN:  Objection to form; "you."

5    Can you clarify who "you" is.

6    CONTINUED BY MS. MERKEL:

7    Q.   I'm referring to Mr. King.

8    A.   My position was, yes, that Indiana should

9         participate in this memorandum of

10        understanding that enabled us to participate

11        in the crosscheck program.

12   Q.   And Mr. Deckard felt differently prior to the

13        enactment of the legislation or took a

14        different position?

15   A.   That was the understanding from my discussions

16        with him, yes.

17   Q.   Do you speak with officials from other states

18        regarding the operation of the crosscheck

19        program?

20   A.   Yes.

21   Q.   And how often do you do that?

22   A.   Periodically, but not regularly.  It typically

23        occurs in the context of association meetings

24        of our own organization and national

25        associations of state election directors and

| | | |
|---|---|---|
| 1 | | sometimes at conferences presented by federal |
| 2 | | entities such as the US Election Assistance |
| 3 | | Commission, but not on a daily or weekly or |
| 4 | | monthly basis. |
| 5 | Q. | Have you ever advocated for changes or |
| 6 | | improvements to the way that the crosscheck |
| 7 | | program operates? |
| 8 | A. | No, I don't believe so. |
| 9 | Q. | And so what is the topic of discussion when |
| 10 | | you discuss the crosscheck program with |
| 11 | | election officials from other states? |
| 12 | A. | Typically the participation by specific |
| 13 | | states. Some states have joined the program |
| 14 | | and subsequently not participated. New ones |
| 15 | | have joined as well. We discuss the |
| 16 | | functioning of the crosscheck program mainly |
| 17 | | with regard to issues that have arisen in |
| 18 | | public debate regarding reliability of the |
| 19 | | data, also comparison to ERIC program, which I |
| 20 | | would call a competing program for data |
| 21 | | sharing. That would be the context of the |
| 22 | | discussions. |
| 23 | Q. | Okay. Now, Indiana also has its own voter |
| 24 | | registration system called the statewide voter |
| 25 | | registration system; is that right? |

```
1    A.   That's correct.

2    Q.   Is it okay if I refer to that as SVRS for

3         today's purposes?

4    A.   Please so.

5    Q.   Was SVRS created during your tenure?

6    A.   Yes.

7    Q.   And was it created as a result or a direction

8         in Indiana state law or for some other reason?

9    A.   It was created at the direction of federal

10        law, the Help America Vote Act, which required

11        the states that provide for voter registration

12        to have a statewide interactive voter

13        registration database no later than January 1

14        of 2006.  Indiana's SVRS was implemented in

15        December of 2005.

16   Q.   And is it correct that it's the responsibility

17        of the election division to ensure Indiana's

18        compliance with that federal provision?

19   A.   Yes; that's correct.  The co-directors, myself

20        and Ms. Nussmeyer, are jointly designated as

21        the National Voter Registration Act officials,

22        and part of our duties include the statewide

23        voter registration system's maintenance and

24        operation.  And when I refer to NVRA, I'm

25        referring to a separate piece of legislation,
```

1        the National Voter Registration Act of 1993.

2    Q.  Thank you.  And the election division, in

3        part, operates the SVRS through contracting

4        with vendors who provide services for the

5        SVRS; is that right?

6    A.  That's correct.

7    Q.  And who are the vendors who provide those

8        services?

9    A.  The vendors who provide the service are

10       primarily Quest Information Systems, which is

11       now a subsidiary of GCR, recently acquired by

12       them.  Quest Information Systems was involved

13       in the initial construction and development of

14       SVRS in the period leading up to December 2005

15       and has provided support and enhancement since

16       then.

17           I also mentioned earlier Baker Tilly

18       Virchow Krause, which performs the role of

19       program manager, in essence, helping the

20       election division manage the work performed by

21       Quest/GCR.

22   Q.  What steps does the election division take to

23       ensure that those vendors comply with the

24       NVRA?

25   A.  We receive reports from the vendors,

```
1         particularly with regard to Baker Tilly, in

2         ensuring that the system is functioning

3         properly.  We examine instances of reported

4         system delays or other problems that come to

5         us from Baker Tilly and then bring them

6         forward to Quest/GCR for explanation or

7         resolution.

8    Q.   And is it correct that it's the election

9         division's responsibility to set business

10        rules that dictate how the SVRS operates?

11   A.   Yes; that's correct.  Within the framework of

12        federal law and state law, we administer the

13        system with the consent of the secretary of

14        state, and so there's a third party involved

15        in the establishment of business rules

16        generally.

17   Q.   Who are the primary users of the SVRS?

18   A.   The principal users would be the county voter

19        registration offices in each of Indiana's 92

20        counties.  That being said, the statute that

21        establishes the statewide voter registration

22        system requires Indiana voters to have access

23        to information regarding their own voter

24        registration and others to have access to some

25        or all of the information in the statewide
```

1           voter registration system.

2       Q.  And how do they access that information?

3       A.  The county voter registration offices have a

4           direct link in realtime to the state's voter

5           registration system records and do so in the

6           normal course of business in their offices.

7           It's also possible for voters or voter

8           registration applicants to register online.

9           So those would be the primary methods of

10          contact.

11      Q.  Voters can't directly access the SVRS, can

12          they?

13      A.  They cannot access the database beyond, again,

14          establishing their own record, if one exists,

15          and establishing the location of their polling

16          place.  But, no, not information regarding

17          other individuals or other points.

18      Q.  And does the election division itself have

19          access to the database system?

20      A.  Yes.

21      Q.  And is the election division able to override

22          actions taken by county officials within that

23          base?

24      A.  The election division could potentially do so,

25          but would not in some cases be able to without

1            changes in the system software and programming

2            to permit them to do that.

3                 On occasion the state will act as the

4            authorized agent of a county to perform a

5            large batch job, but that's always upon prior

6            county authorization.

7    Q.    Is it correct that the vendors can only take

8            instruction as to changes to the system from

9            the election division and not from the

10           counties themselves?

11   A.    That's correct.  Counties are encouraged to

12           offer suggestions or to report problems.  But

13           with regard to changes to the systems, those

14           are first reviewed and approved by the

15           co-directors and a designee of the secretary

16           of state to determine if they are desirable to

17           implement and what the cost and time

18           requirements would be to do so.

19   Q.    So by what year was the SVRS up and running?

20   A.    It was functional in December of 2005.

21   Q.    And when Indiana decided to participate in the

22           crosscheck program, has it done so using data

23           that was extracted from SVRS?

24   A.    Yes.

25   Q.    And it also filters and analyzes any

1          crosscheck data received back from that

2          program in SVRS; is that correct?

3    A.    The system is used for that purpose, yes.

4    Q.    Is it correct that it's your staff's

5          responsibility to actually do the work of

6          gathering files to participate in the

7          crosscheck program?

8    A.    Not as I understand your question.

9    Q.    Okay.  Let me see if I can rephrase it a

10         little bit.  In a given year when Indiana's

11         preparing to provide its file to the

12         crosscheck program, what steps does it take to

13         get that file ready?

14   A.    We coordinate with Baker Tilly as our program

15         manager to capture the data required for the

16         crosscheck program by taking, I might call, a

17         photograph of the system's data on a

18         particular date specified in statute as

19         January the 15th.  Baker Tilly then on our

20         behalf forwards that information to the

21         designated person for the crosscheck.

22   Q.    Who's the designated person for crosscheck?

23   A.    The secretary of state of Kansas.

24   Q.    Is there someone on your staff primarily

25         responsible for coordinating with Baker Tilly

```
1        on that project?

2   A.   That would be, in fact, the co-directors,

3        Ms. Nussmeyer and myself.

4   Q.   And the specific data that is provided with

5        respect to each Indiana voter is defined by

6        the terms of the crosscheck program; is that

7        right?

8   A.   That is correct.

9   Q.   So any data that Indiana maintains on a voter

10       that's not defined within the parameters of

11       the crosscheck program would not be provided

12       to the secretary of state of Kansas; is that

13       right?

14  A.   That is correct.  There are 16 fields, I

15       believe, that are designated in the memorandum

16       of understanding.  There are -- there's

17       additional information in the statewide voter

18       registration system such as the party

19       affiliation choice a voter makes in a primary

20       that is not included in the material provided

21       in the crosscheck.

22  Q.   I think you mentioned there are 16 fields

23       designated in the MOU.  Have those fields been

24       up since Indiana first signed the MOU?

25  A.   I don't recall specific revisions, but I do
```

1      recall some provisions were adjusted in the

2      last three to five years.

3  Q.  How are those adjustments reflected?

4  A.  Well, they would have been reflected in the

5      communications from Kansas with regard to

6      coordinating submission of the file in a

7      particular calendar year.

8  Q.  Does Kansas provide a crosscheck participation

9      guide that outlines all of that detail?

10 A.  Yes, it does.

11 Q.  And is it your understanding that the

12     crosscheck participation guides contain

13     definitions for each of the 16 fields that are

14     being uploaded?

15 A.  I think they contain descriptions.  I don't

16     think they rise to the level of definitions in

17     every case, but some description is provided.

18 Q.  And, in fact, the states participating in the

19     program may have different definitions with

20     respect to some of these fields; is that

21     right?

22 A.  That is correct.

23 Q.  When the interstate crosscheck file is

24     received back from the secretary of state of

25     Kansas, how is it processed?

1   A.   The file is received by the Quest Information

2        Systems/GCR and then processed in accordance

3        with procedures that we've set up

4        administratively and then distributed to the

5        appropriate county for their review and any

6        possible action.

7   Q.   And is one of those administrative processes

8        you set up a requirement that the match

9        reflected in the crosscheck file meet a

10       certain confidence factor?

11  A.   Yes; that's correct.

12  Q.   And what is that confidence factor that's

13       required?

14  A.   The confidence factor is composed of a number

15       of different data pieces for each record that

16       are assigned a numerical value.  It currently

17       is a 75 point factor total for a particular

18       record to be forwarded.  That has changed

19       somewhat from previous years.

20  Q.   What was the requirement in previous years?

21  A.   70.

22  Q.   Okay.  When was that change made?

23  A.   Change was made within the last year.

24  Q.   Do you recall more specifically when the

25       change was put into practice?

1    A.   It would not have been put into practice, as I

2         recall, for the 2017 submission.  It was

3         certainly put into practice in the sense that

4         the co-directors reached agreement that that

5         would be the confidence factor threshold used

6         for the 2018 submission.

7    Q.   Understood.  So when the 2017 file was

8         processed, a 70 point confidence factor was

9         the applicable standard?

10   A.   I believe that's right.

11   Q.   And so you anticipate that when the 2018 file

12        is processed, this 75 point confidence factor

13        will apply; is that right?

14   A.   Yes; that's correct.

15   Q.   And is there a rule in place either previously

16        or for 2018 that a match will only be

17        forwarded if the date of registration for the

18        matched file is later in time in the other

19        state than it is for Indiana?

20   A.   Yes; I believe that's correct.

21   Q.   Okay.  So let me break down my compound

22        question, if I could.

23   A.   Okay.

24   Q.   Is that a rule that was in place in prior

25        years?

1    A.    I don't know that that was in place

2          consistently in all prior years.  I think our

3          initial submission would have been in 2015.  I

4          do believe it was separated out in terms of

5          the subsequent voter registration date.

6    Q.    And so when a county registration official

7          pulled up the crosscheck hopper in SVRS, the

8          only matches they would see would be ones

9          where the date of registration in the other

10         state was subsequent to the date of

11         registration as reflected in Indiana's --

12   A.    I believe that's correct; yes.

13   Q.    And is that the anticipated procedure as well

14         for 2018?

15   A.    Yes; I believe so.

16   Q.    What rule applies if one or the other state

17         has a blank date of registration field?

18   A.    I would assume that that particular voter

19         registration record would be forwarded, and

20         then it would be the subject of additional

21         research by a county voter registration office

22         to determine whether or not the most recent

23         registration date was in Indiana.

24   Q.    How would a county registration official go

25         about determining whether the registration

1        date in Indiana was, in fact, prior or

2        subsequent to the other state?

3              MR. GARN:  Objection; foundation.

4   CONTINUED BY MS. MERKEL:

5   Q.   You can go ahead and answer.

6   A.   Oh.  The SVRS contains information regarding

7        the Indiana voter registration date which is

8        set forth in statute and would be reflected

9        for the consideration of the county voter

10       registration office.

11  Q.   And when the SVRS reflects a particular voter

12       registration date, is that the date in which

13       the voter originally registered to vote in

14       Indiana?

15  A.   It would reflect the date of that particular

16       voter registration record, the current

17       registration record.  If an individual had

18       been registered in Indiana previously and then

19       subsequently that registration was canceled

20       for whatever reason and the voter

21       re-registered, the date that would be

22       reflected in SVRS as the most recent

23       registration would be that second transaction.

24            In some cases there would be a record of

25       the previous registration that was in effect

```
 1        but then canceled with the intervening period.

 2   Q.   That would be a separate record; is that

 3        right?

 4   A.   I'm not sure I follow what you mean by

 5        separate record.  It would be distinguished

 6        because it would show the date of the first

 7        registration, the date that the record was

 8        canceled, and then in the same individual's

 9        file, if I use that terminology, the

10        subsequent registration would be shown with

11        that registration date.

12   Q.   So are there multiple potential date fields

13        within the SVRS for a given individual voter?

14   A.   There could be.

15   Q.   And how does Indiana go about identifying

16        which date field should be pulled for

17        crosscheck purposes?

18   A.   With regard to -- are you referring now to

19        Indiana voter registration dates?

20   Q.   Yes.  Specifically Indiana's file when it

21        uploads or when it populates a date of

22        registration field for a particular voter,

23        what defines which date will be used to

24        populate that field?

25   A.   I think I understand your question, so I'll
```

1      tend to be responsive here.  When an

2      individual's record is pulled up, the entirety

3      of the information about that individual's

4      voter registration history that's associated

5      with that record is made available.

6  Q.  So is there a rule that dictates, for example,

7      just continuing with the example you had given

8      of a voter where it may show initial

9      registration, subsequent cancellation, and

10     then a more recent registration, is there a

11     rule that the most recent in time registration

12     date would be pulled?

13 A.  It would certainly, yes, it would show up as

14     part of the existing voter registration record

15     for that individual.

16 Q.  So my question is if there's only one date

17     field that can be provided in the crosscheck

18     file, would it be the original date of

19     registration prior to cancellation or will it

20     be the most recent date of registration?

21 A.  My understanding it would be the most recent.

22 Q.  And what about an example where an individual

23     has simply updated their voter file because

24     they moved within the state; they've never

25     been canceled, but rather they just changed

1       addresses and notified the election division?

2   A.  I believe it would be the most recent voter

3       registration record that reflects the

4       transaction you described.

5   Q.  So the date effectively which they moved would

6       become their new date of registration; is that

7       correct?

8   A.  That's my understanding.

9   Q.  Is it your understanding that different states

10      who also participate in the crosscheck program

11      may use a different method to determine what

12      date populates that date of voter registration

13      field?

14  A.  Yes; that's correct.

15  Q.  And do the rules for the crosscheck hopper

16      within SVRS distinguish between states that

17      use a similar procedure to what Indiana uses

18      versus states which may have a completely

19      different definition for what date of

20      registration may mean?

21  A.  I'm not aware of any such distinction.

22  Q.  So regardless of what definition a particular

23      state applies to the date of registration

24      field, if the other state's date of

25      registration is subsequent in time to the

1       Indiana date, then that will show up as a

2       match in the crosscheck hopper; is that right?

3                   MR. GARN:  Objection; foundation.

4    A.  Sorry, can I ask you to repeat that?

5    Q.  I think I'm just trying to restate your prior

6        answer to make sure I've got it correctly.

7            The crosscheck hopper will only show a

8        match, if I understand you correctly, if the

9        date of registration for the other state is

10       subsequent in time to the date of registration

11       in the Indiana field; is this correct?

12                  MR. GARN:  Objection.  You're using

13       the term hopper.  Just make sure we're clear

14       on what you mean there.  Are you talking about

15       the hopper, or are you talking about what's

16       going to the counties?

17                  MS. MERKEL:  Well, that's certainly a

18       great line of questioning, so maybe I'll

19       establish that first.

20   CONTINUED BY MS. MERKEL:

21   Q.  So my understanding was that the crosscheck

22       hopper is the date the group of matching

23       records from the crosscheck program that

24       becomes available to the counties; is that a

25       misunderstanding?

1   A.   I think it's a misphrasing, perhaps.

2        Typically hopper is not a statutory term.

3        Hopper is an administrative term.  And we

4        ordinarily use it to describe features of SVRS

5        that are available to particular county users.

6        I would not use the term hopper to describe

7        the entirety of the data received by the state

8        from the crosscheck program.

9   Q.   Okay.  So that's consistent with my

10       understanding.  So is it correct that the

11       crosscheck file is received from Kansas and

12       that some processing goes on before records

13       are moved into the crosscheck hopper that's

14       made available to the counties?

15  A.   That is correct.

16  Q.   And so is one of those steps in that

17       processing a sorting out of records where the

18       match reflects a subsequent date of

19       registration to the one for the Indiana

20       record?

21  A.   That's my understanding; yes.

22  Q.   Okay.  And is it correct that that filtering

23       is done without regard to what definition of a

24       date of registration the other state applies?

25  A.   Yes.

1    Q.   Okay.  Thank you.  Now, once a county official

2         receives a record into the crosscheck hopper,

3         what options do they have available to them in

4         terms of taking action on that voter's

5         registration status?

6    A.   They have a number of different options.  They

7         are not required to take any immediate action

8         or any action with regard to a specific

9         record.  They can mark it for further

10        research, which can go on indefinitely.  They

11        can also reject the match or they can accept

12        the match.

13   Q.   What is required in order for a county

14        registrar to accept the match?

15   A.   The county registrar would need to examine the

16        voter registration record data and make a

17        determination that the individual described in

18        the data received from Kansas was the same

19        individual described in the Indiana SVRS.

20   Q.   How would they go about making that

21        determination?

22   A.   They would apply the confidence factors set

23        forth in material that we provided to the

24        voter registration offices and make that

25        determination.

| | |
|---|---|
| 1 | That being said, the confidence factor, |
| 2 | even if it was the maximum possible, does not |
| 3 | require the county to act in a particular way |
| 4 | with regard to that record.  The county can |
| 5 | still use information it has independently of |
| 6 | the Kansas submission to determine if, in |
| 7 | fact, the two records were for the same |
| 8 | individual. |
| 9 | Q.   And so it's within the discretion of the |
| 10 | county registrar to do more investigation or |
| 11 | not before taking action on that -- |
| 12 | A.   That's correct. |
| 13 | Q.   -- voter? |
| 14 | And it's correct, isn't it, that the |
| 15 | record before even making it into the county |
| 16 | hopper has met a certain confidence factor -- |
| 17 | in 2018 it will be a confidence factor of 75; |
| 18 | is that right? |
| 19 | A.   That is correct. |
| 20 | Q.   So there's nothing that obligates them to do |
| 21 | additional research into the confidence factor |
| 22 | that that record shows, is there? |
| 23 | MR. GARN:  Objection; form. |
| 24 | A.   Sorry, could you repeat it? |
| 25 | Q.   Sure.  Let me reask it in a better way.  Are |

1        they required or do you expect them to be

2        doing additional research into the confidence

3        factors simply seeing that the match has

4        reached the confidence factor minimum that's

5        applied for it to be a match?

6    A.  We would not -- the election division would

7        not require them to do so.  We don't have the

8        authority to require them to perform that

9        work.

10   Q.  Do you provide them with guidance or set

11       policies with respect to what additional work

12       they need to do?

13   A.  Not in the sense of rules beyond -- I

14       shouldn't use the term rules.  Not beyond

15       guidance with regard to what make up the

16       confidence factors and providing the greatest

17       possible flexibility for them to see if they

18       wish to consider a match further based on the

19       particular confidence factors that make up the

20       score.

21   Q.  So in order for a match to be marked match

22       approved, there's nothing further that you

23       would guide or direct a county registrar to do

24       beyond performing that the confidence factor

25       is, in fact, the minimum required for it to

1      make its way into the hopper?

2                  MR. GARN:  Objection; form.

3   A.  There's nothing specific with regard to

4       generic requirements.  We would, in general,

5       advise them to exercise caution and prudence

6       and to resolve any doubts or uncertainties

7       based on the information they have.

8   Q.  What steps would you advise them to take if

9       they, indeed, had doubts about the information

10      in front of them?

11  A.  To rely upon the knowledge that they

12      personally have or that's readily available.

13      So that if, for example, they happen to be

14      personally familiar with the individual, they

15      may have information that the individual has,

16      in fact, moved to another state and now they

17      have information that in addition to simply

18      changing residence, it appears that

19      individual's registered there.  But,

20      obviously, that would not be true in every

21      case with every record.

22  Q.  Can you give me other examples of information

23      that you might consider readily available?

24  A.  I think readily available would be information

25      regarding street addresses.  If, for example,

1        a building has been demolished and is no

2        longer available to be used as a residence,

3        that would be something they might be very

4        familiar with.

5   Q.   Would you advise county registrars to reach

6        out to the state in which there had been a

7        match to confirm that voter's registration

8        information?

9   A.   We would certainly make that as a suggestion

10       for them to consider in specific cases where

11       they felt it was useful and warranted.

12  Q.   And your understanding would be that it would

13       be warranted where they had reason to doubt

14       the data, but not in every case where a match

15       was yielded from the crosscheck process?

16  A.   I would think that's correct.

17  Q.   Is it your expectation that county registrars

18       would approve the vast majority of matches

19       yielded in the crosscheck hopper?

20            MR. GARN:  Objection; foundation and

21       form.

22  A.   I would say no because of the description of

23       vast majority.  I think the information that I

24       have leads me to understand that at this point

25       the number that might be canceled is, in fact,

1       a relatively small number.  That is by no

2       means a high percentage of the number that

3       goes to counties and their hopper.  I think

4       that, if anything, they exercise additional

5       prudence with regard to the information that

6       comes from the crosscheck.  I have to say

7       that's my impression as opposed to an

8       empirical analysis.

9    Q. I think you anticipated my next question,

10      which is whether you ever do any work to

11      examine what percentage of matches are being

12      approved by the county registrars?

13   A. No, no, not that I recall.

14   Q. What is your understanding of the result when

15      a match is designated match approved by a

16      county registrar in the SVRS system; what

17      happens next?

18   A. The statute enacted by the general assembly

19      effective July 1, 2017, Senate Enrolled Act

20      42, provides that in the case where an

21      individual is determined to be the same person

22      that's reflected in the Indiana voter

23      registration record, that the county voter

24      registration office may cancel the Indiana

25      registration based on the registration in the

1           other state.

2     Q.    When you say determine to be the same person,

3           does that mean their records are matched to a

4           confidence factor of 75 in the crosscheck

5           hopper?

6     A.    Yes, with regard and additionally the

7           information I referred to in the earlier

8           responses that might be available to the

9           county.

10    Q.    So readily available information that they may

11          draw upon if they have any doubts as to the

12          validity of the match?

13    A.    Correct.

14    Q.    And so is it your expectation that when the

15          2018 crosscheck file is run, that to the

16          extent that matches are identified within the

17          hopper and confirmed by the county registrars,

18          those registrations will be canceled

19          immediately?

20                MR. GARN:  Objection; form.

21    A.    The phrase immediately -- my response would

22          take into account the period under federal

23          law, the 90 days preceding a primary or

24          general election when voter list maintenance

25          activity is prohibited for the most part.  And

1         so not in terms of anything that would occur

2         during that 90 days.  Outside of that 90-day

3         period, yes.

4    Q.   Is it your understanding that county

5         registrars can execute that cancellation

6         within the crosscheck hopper?

7    A.   They can -- I don't know if I can literally

8         answer that as being within the crosscheck

9         hopper.  They have received their own data in

10        a hopper and would then use other functions of

11        statewide VR system to alter the status of

12        that registered voter canceled.

13   Q.   Understood.  In that instance when they alter

14        the status to canceled, will any type of

15        mailer be generated to notify that voter?

16   A.   There is no requirement for such a notice.

17   Q.   Is there any provision within SVRS for such a

18        notice to be generated automatically if the

19        county elects that process?

20   A.   No.  There is not a procedure within SVRS to

21        generate that notice.  The county could

22        undertake to do so on its own initiative, but

23        there's not an SVRS feature.

24   Q.   To the extent -- I think we discussed a little

25        bit earlier that to the extent that a date

1          file is missing from one or the other --

2          sorry, a date of registration datapoint is

3          missing from one or the other state in a given

4          match, that it would be the county registrar's

5          obligation to research to determine additional

6          information about when the date of

7          registration might be; is that an articulate

8          description of your testimony?

9    A.    I believe it's -- yeah, I believe that's

10         essentially correct that the county voter

11         registrar would need to make that

12         determination.

13   Q.    And what steps would you expect the county

14         registrar to be taking in order to identify

15         the date of registration?

16   A.    If the date of voter registration is not

17         available, then I would expect the county

18         voter registrar to contact the appropriate

19         state or local official in the other state, an

20         item which is addressed in the MOU, to obtain

21         whatever information is possible.

22   Q.    And what information would you expect them to

23         receive from the state official with respect

24         to that record?

25   A.    That's difficult to answer because of the

1         variety of organizations each state has and

2         their laws for conducting voter registration

3         information release.

4  Q.  Well, maybe, let me --

5  A.  I was going to say in Indiana, for example, we

6         are prohibited from releasing some information

7         at the state level, but the county voter

8         registration office can release nonetheless.

9  Q.  What information would be sufficient for the

10        county registrar to receive from another state

11        in order to conclude that this registration in

12        the other state was subsequent to the Indiana

13        registration?

14            MR. GARN:  Objection; foundation.

15  A.  I think it could take many acceptable forms.

16        I would expect it to be a written

17        communication that documents the information.

18        Beyond that, I think the written communication

19        could take many types of forms from the

20        appropriate official in the other state.

21  Q.  Okay.  So if the official simply wrote an

22        email identifying the date of registration for

23        a given voter's record, that would be

24        sufficient?

25  A.  Yes.

1    Q.   It wouldn't be a requirement that before

2         confirming the match that the county

3         registrar, for example, received a copy of the

4         voter registration from the other state; is

5         that right?

6    A.   That is correct.

7    Q.   And beyond crosscheck, does Indiana

8         participate in other data exchanges with other

9         states regarding voter registration status?

10   A.   Yes.  With regard to information on deceased

11        voters, the Steve and Eve programs as they're

12        often abbreviated by their acronyms, provides

13        information about deceased individuals in

14        other states who may be registered in Indiana.

15             We are also making arrangements to obtain

16        the Social Security death master file, which,

17        of course, is a national compilation regarding

18        deceased voters.

19   Q.   And to the extent that an Indiana voter moves

20        out to another state and provides their prior

21        registered address in Indiana to the new state

22        in which they register, does Indiana receive

23        communications from the other state officials

24        about that change in registration?

25   A.   Often times.

1    Q.   And what form does that communication take?

2    A.   It takes a variety of forms.  It can be a

3         printout from a county voter registration

4         office that identifies the individuals who've

5         indicated an address somewhere in Indiana or a

6         specific address in Indiana.  It can take the

7         form of a copy of the individual's new voter

8         registration record.  And it can also come as

9         a compilation made at the state level that

10        lists that information.  Can also take the

11        form of emails from an individual at the

12        county or in some states municipal level

13        regarding that voter registration activity.

14   Q.   Is that information received at a state level

15        here in Indiana, or is it received by the

16        county registrars?

17   A.   We're only aware of what we receive here at

18        the state.  I am sure that -- well, I can

19        speak to the fact that in some cases I've had

20        an inquiry from a county who's received

21        something directly from a local official in

22        another state.

23   Q.   Okay.  And what kind of inquiries have you

24        received from county officials in that regard?

25   A.   Just asking why they received it since they

1           ordinarily would get it from the state.

2     Q.    Okay.  And what actions does the state take

3           when it receives those communications?

4     A.    Advises the county voter registration office

5           to examine the communication and see if they

6           have any questions regarding the source or the

7           accuracy of the information before they

8           proceed.

9     Q.    And so the counties are given discretion to

10          cancel or not cancel the registrations based

11          on their own investigation of the information

12          received from other states?

13    A.    That would be correct.

14    Q.    Is there any guidance provided to the counties

15          in making that determination by the election

16          division?

17    A.    Not guidance beyond, again, the importance of

18          exercising prudence and ensuring that the

19          information is accurate.

20    Q.    I'd like to go back a little bit in time.

21          We've talked a lot about the date of

22          registration field in the SVRS, and I just

23          wanted to confirm who is responsible for

24          inputting the data that appears in these

25          fields?

1    A.   That would be the county voter registration

2         office in each of the 92 counties.

3    Q.   Is that a field that's manually input, or is

4         it automatically updated when another change

5         is made to the registration?

6    A.   It's manually inputted, as I recall.  There

7         might be some cases where the process is

8         automatic.  I'm considering the instance of an

9         online voter registration, but even in that

10        case the registration is not effective until

11        the county voter registration office has

12        conducted a process that involves mailing a

13        notice of the voter to confirm their address.

14        So I think even in that case it would require

15        a manual entry of the date.

16   Q.   Is any guidance provided to the counties as to

17        how they would go about filling in that date

18        field?

19   A.   Beyond compliance with the Indiana statutes

20        that govern it, no.

21   Q.   And is there a specific sort of interpretation

22        or guidance as to the meaning of the Indiana

23        statutes that the election division provides?

24             MR. GARN:  Objection to form;

25        foundation.

1    A.    Yes.   The Indiana Election Division through

2          the voter registration guidebook and other

3          sources calls the attention of county voter

4          registration offices to the laws that govern

5          when a registration in Indiana becomes

6          effective.

7              And there are some scenarios that are

8          addressed that can effect that date, such as

9          an individual personally returning an

10         acknowledgment notice that they received in

11         the mail prior to the deadline set by statute

12         for the USPS to return the notice as

13         undeliverable, but essentially we direct them

14         to follow the statutes.

15   Q.    And is there any place other than the

16         guidebook that we would look to see what

17         guidance is provided to them?

18   A.    We provide the means that the circuit court

19         clerks, who in most counties are the county

20         voter registration office, and in the other

21         counties a separate board of registration,

22         regular information regarding the registration

23         process including that part of the process.

24         We publish those PowerPoints and conference

25         presentations on our website as long as

1          they're current.

2     Q.   To the extent that a crosscheck match was

3          confirmed in, for example, 2015, is it the

4          case that an NCOA mailer would be generated

5          for that voter to potentially confirm, either

6          reconfirm their Indiana registration or

7          confirm they had moved out of the district?

8     A.   Yes.  That would be correct with regard to

9          2015 because it's prior to the July 1, 2017,

10         effective date of SEA-442.

11    Q.   In the event that the voter did not respond to

12         that mailer, they would be placed on inactive

13         status; is that correct?

14    A.   That's correct.

15    Q.   And in that event they would be left inactive

16         until the expiration of two federal elections

17         in which they did not vote?

18    A.   Or a period of both, yes.

19    Q.   And at that time their registration would be

20         canceled; is that right?

21              MR. GARN:  Objection; form.

22    A.   Yes.  Their voter registration record would be

23         canceled following that second federal general

24         election.

25    Q.   And so there are some inactive registrations

1      currently pending in Indiana where that

2      deadline hasn't elapsed, but the countdown

3      clock has begun effectively; is that right?

4   A.   That's correct.

5   Q.   Does the passage of SB-442 allow for those

6      registrations to be canceled or will they be

7      allowed to finish out the countdown clock?

8   A.   No.   In my opinion it would not effect

9      inactivations made under the prior statute

10     before its amendment by 442.

11  Q.   So look, again, at the instance in which a

12     match is confirmed where the date of

13     registration in another state is subsequent to

14     the date of registration in Indiana, is that

15     process also done without regard to whether

16     the registration from any other state provides

17     for written authorization of cancellation of

18     their prior registration?

19  A.   Yes.

20          MS. MERKEL:   We've been going about

21     an hour.   Can we take a quick break and we'll

22     try and really condense what we have left

23     before we turn it over to these guys, if

24     that's okay with you.

25          (A short recess is taken.)

```
1    CONTINUED BY MS. MERKEL:

2    Q.   Mr. King, I'd like to hand you a document that

3         we'll ask the court reporter to mark as

4         Exhibit 39.

5                   (Plaintiffs' Exhibit No. 39 marked

6         for identification.)

7    Q.   This is a presentation entitled Voter List

8         Maintenance Data Sources and SVRS Hoppers, and

9         it lists J. Bradley King, co-director, and

10        Matthew Kochevar, co-general counsel as the

11        presenters; do you see that?

12   A.   Yes, I do.

13   Q.   Do you recall giving this presentation?

14   A.   Yes.

15   Q.   And did you participate in preparing this

16        PowerPoint?

17   A.   Yes, I did.

18   Q.   Can you turn to slide 8 in this document,

19        which has a heading of Confidence Factor.

20   A.   Yes.

21   Q.   So we discussed earlier that in order to make

22        its way into the crosscheck hopper a

23        crosscheck match has to have a confidence

24        factor of 75 for 2018 purposes; is that right?

25   A.   That's correct.
```

```
1    Q.   And does this slide lay out the points that

2         are assigned to various matches for purposes

3         of calculating the confidence factor?

4    A.   It does.

5    Q.   In the event that one of these factors isn't

6         an exact match, but rather doesn't conflict,

7         are points awarded or not?

8    A.   Yes.  In some cases if there's no conflict,

9         points are awarded.  One example would be with

10        regard to middle name.  If middle name is not

11        mentioned in either record, there is no

12        conflict and there would be confidence points

13        awarded.

14   Q.   In the event that a middle name is contained

15        in one record but no middle name is contained

16        in the other record, would the points be

17        awarded?

18   A.   I believe so.  I believe that the only

19        variation would be if the record contained an

20        initial that conformed.  So if the middle name

21        were Robert, for example, in record one and

22        the middle name was given as R., then in that

23        case, yes.

24            In a case of an exact match of no name or

25        the same name would be the three cases where
```

1              the confidence factor would be awarded.

2        Q.   Let's take an example of last four digits of

3              the Social Security number.  If one entry had

4              the last four digits specified and the other

5              entry was blank as to those digits, would

6              points be awarded?

7        A.   No.  Because there would be no match.

8        Q.   And if both entries were blank, would the

9              points be awarded?

10       A.   No.

11       Q.   Okay.  Are there any entries here other than

12             middle name where points are awarded if both

13             entries are blank?

14       A.   I believe suffix.

15       Q.   Okay.  And in the event that -- let's take an

16             example of if the middle name is actually

17             different, so they don't match, so let's say

18             it's, you know, James Robert Smith and James

19             Paul Smith, would that disqualify a record

20             altogether or simply lead to no award of the

21             five points for middle name?

22       A.   It would not disqualify a record altogether,

23             but lead to the assignment of zero points in

24             the confidence factor system.

25       Q.   So if the individual could otherwise get to 75

1        points, the conflict in one field would not be

2        enough to disqualify that record; is that

3        right?

4    A.  That is correct.

5    Q.  We spoke a little bit about the 90-day freeze

6        period prior to federal elections.  Are there

7        instances in which a voter registration can be

8        canceled in that 90-day freeze?

9    A.  Yes, there are.

10   Q.  What are those instances?

11   A.  Those instances are spelled out in 52USC2072,

12       I believe.  They are the death of the

13       registrant, the incarceration of the

14       registrant following conviction, which varies

15       according to state laws, and then also

16       incanformity of subsection "D" of that

17       provision.

18   Q.  What does subsection "D" cover?

19   A.  Subsection "D" covers two different points.

20       One is the 90-day mailer, and the other is

21       where the individual has changed residence to

22       another state.

23   Q.  And in the instance where the individual has

24       changed residence, do they need to

25       affirmatively request that their registration

1          be canceled in the prior state in order for

2          the cancellation to take effect in the 90-day

3          freeze period?

4     A.   Let me clarify -- I may have mislead you with

5          that last answer.  The type of cancellation

6          contemplated under SEA-442 could not take

7          place during the 90-day freeze period.

8     Q.   Okay.  If a county were to, nonetheless,

9          cancel a registration as a result of the

10         SEA-442 process during that 90-day freeze

11         period, what action could the election

12         division take?

13    A.   The election division has the authority to

14         receive complaints with regard to violations

15         of both the National Voter Registration Act

16         and the Help America Vote Act and to make

17         investigative reports to the Indiana Election

18         Commission, a separate administrative body,

19         and then that body has the ability to, among

20         other things, refer matters to prosecutors, to

21         give instruction to county voter registration

22         offices; that would be the process.

23    Q.   And so the state wouldn't have the ability to

24         take any action unless a complaint was filed?

25              MR. GARN:  Objection; form;

1           foundation.

2     A.    I don't know what the basis of the state would

3           be to take action unless it had evidence

4           before it which would ordinarily take the form

5           of a complaint.

6     Q.    Has the election division issued any formal

7           instructions to the counties with respect to

8           conducting these cancellations within the

9           90-day freeze?

10    A.    Yes.  We've emphasized repeatedly that the

11          90-day freeze period is to be strictly

12          followed and spelled out the exceptions to the

13          general rule with regard to the cancellation

14          of records in that 90-day freeze.  I think we

15          address that topic almost every time we have a

16          conference or meeting with county voter

17          registration officials.

18    Q.    Have any formal instructions been provided in

19          connection with SB-442 with regard to those

20          cancellations?

21    A.    We provided the legislative summary, which

22          sets forth our agreed understanding of what

23          SEA-442 provides to the counties and indicated

24          the impact of the legislative change.

25    Q.    And when you say our agreement, do you mean

1    the agreement of two co-directors?

2  A.   Yes; that's correct.

3         MS.   MERKEL:   Okay.   Mr. King, I have

4    no further questions, so I'll turn it over to

5    the other plaintiff.

6  DIRECT EXAMINATION

7  QUESTIONS BY MR. MENSZ:

8  Q.   Good afternoon, Mr. King.

9  A.   Good afternoon.

10  Q.   I know I introduced myself off the record, but

11    my name is Jan Mensz, and I'm counsel for

12    Common Cause Indiana in a separate but related

13    litigation that you're here for today.  I will

14    ask you to -- I placed a binder before you

15    that has some marked exhibits.  I'd ask you to

16    open to the first tab.  And I'm showing you

17    what is marked as Exhibit 1.  It's titled

18    Amended Notice of Deposition; do you see that

19    document?

20         (Plaintiffs' Exhibit No. 1 marked for

21    identification.)

22  A.   Yes, I do.

23  Q.   And I would direct you to page 2 through 4.

24    There are a number of paragraphs there that

25    describe the topics which you have been

1          designated to testify on today.  Is that your

2          understanding of why you're here today?

3     A.   Yes; that's correct.

4     Q.   Take a second to look at those topics and let

5          me know if there are any that you are not

6          prepared to talk about.

7     A.   No.  I've reviewed the document.  I'll be

8          prepared to respond as best I can.

9     Q.   Great.  Appreciate it.  I have just a few

10         questions in addition to what the other

11         parties have asked you.

12              There's a separate requirement under

13         Indiana Code 3-7-38.2-5 that's under

14         subsection "B" and "C."  Are you familiar with

15         these subsections?  I can just represent to

16         you that it instructs the NVRA officials to

17         request voter registration data from certain

18         states on an annual basis --

19    A.   Yes.  I'm familiar with those --

20    Q.   -- separate and apart from crosscheck.

21    A.   Yes; that's correct.

22    Q.   Is that your understanding?

23    A.   Yes; that's correct.

24    Q.   And is there any formal procedure with how the

25         election division uses that information that

1        it receives?

2    A.  No, there is not until recently.  The states

3        that are listed were participants in the

4        crosscheck program.  Florida ceased to

5        participate, and I understand just from a

6        conversation that Kentucky will no longer

7        participate in the future.  And so we've not

8        at this point utilized those sections because

9        of the coverage of the crosscheck program.

10   Q.  Okay.  I understand subsection "C" allows you

11       to request data in addition to those five --

12   A.  That is correct.

13   Q.  -- specific states.  Do you ever request data

14       from other states outside of the crosscheck

15       system under subsection "C"?

16   A.  We have not done so.  In my recollection the

17       co-directors, since the enactment of that

18       provision, have not identified any particular

19       state to contact.

20   Q.  Have you received data, maybe voluntarily,

21       from other states that you have not requested

22       under subsection "B" or "C"?

23   A.  Certainly we would receive information from

24       Florida, for example, in the ordinary course

25       of business when they'll transmit voter

1            registration records based on an individual's

2            identifying Indiana or an Indiana address as a

3            previous registration.

4       Q.   What kind of data would they send you?

5       A.   It would vary considerably.  I believe in the

6            case of Florida we receive a report from the

7            state level office that once a month contains

8            a listing of literally dozens of individuals

9            who've indicated a previous Indiana

10           registration who've since registered in

11           Florida.

12      Q.   Okay.  Are there any other states other than

13           Florida that you're aware of that voluntarily

14           provide Indiana with that type of data?

15      A.   Yes, yes, I would.

16      Q.   What states?

17      A.   I would be -- I would say with the exception

18           of North Dakota, which has no voter

19           registration law, that we receive periodically

20           that type of information from every state in

21           territory out of the 55 that conduct elections

22           minus North Dakota.

23      Q.   Okay.  And you said that data can take many

24           different forms.  I assume one of those forms

25           might be they'll forward you an entire voter

```
 1            registration form, perhaps, from the other

 2            state; is that correct?

 3     A.     That's correct.

 4     Q.     But they might also just send you a summary,

 5            maybe a list of datapoints to identify a voter

 6            that that state, let's say Florida, has

 7            identified as having a prior registration in

 8            Indiana; is that correct?

 9     A.     Yes; that's correct.

10     Q.     And what does the Indiana Election Division do

11            with that data?  Does it pass it on directly

12            to the counties, or does it do its own

13            analysis first?

14     A.     It does no analysis beyond what's necessary to

15            transmit to the county.  For example, if an

16            individual indicates simply Indiana, we would

17            analyze our own statewide VR system to see if

18            there might be a potential individual listed

19            and then forward that on to the county where

20            they were previously registered leaving it to

21            the county to make the determination if it is,

22            in fact, the same person.

23     Q.     For example, if you had Joe Smith Indiana and

24            that was the only information you received

25            from Florida, you might look up Joe Smith,
```

1       find out that there's a Joe Smith in

2       Bartholomew County, and forward that

3       information to that county; is that correct?

4   A.  That's correct.

5   Q.  Then leave it up to the county to make the

6       determination of whether this is an out of

7       state registrant with prior registration in

8       Indiana?

9   A.  That's correct.

10  Q.  Is there any criteria that you use to sort of

11      filter that data before you send it on to the

12      county?  So, for example, if you -- let me use

13      a concrete example.

14          Is any of this data subject to the

15      confidence intervals you use for crosscheck

16      data?

17  A.  No.

18  Q.  Is there any reason you would not forward data

19      that you've been able to tie to a county that

20      you received from out of state, is there any

21      reason you wouldn't forward that to a county?

22              MR. GARN:  Objection; form.

23  A.  I can think of no reason.

24  Q.  Okay.

25  A.  Assuming, again, we could find --

```
1    Q.   Right.

2    A.   -- a record.

3    Q.   Yeah.  Right.  I assume -- again, let's go

4         back to our example of Joe Smith Indiana, how

5         would you look up that record?  Would you just

6         search the SVRS for a Joe Smith?

7    A.   Yes; that's correct.

8    Q.   Okay.  I assume if you had other datapoints

9         for that person that you would use that data

10        also to identify county?

11   A.   Certainly.  Certainly.

12   Q.   I think you answered this already, but do you

13        forward it along with any guidance, any advice

14        to the county on how to deal with this type of

15        data that you received outside of the

16        crosscheck system?

17             MR. GARN:  Objection to form.

18   CONTINUED BY MR. MENSZ:

19   Q.   So you received Joe Smith Indiana -- again,

20        using our example -- is there any guidance

21        that you provide to the county in how they may

22        go about determining whether that's a prior

23        registrant in Indiana?

24   A.   No, not specifically on that point.  Just the

25        general information provided in our VR
```

```
 1          guidebook.

 2                   (Plaintiffs' Exhibit No. 15 marked

 3          for identification.)

 4    Q.    Okay.  I'm going to jump ahead to Exhibit 15

 5          in that binder or tab 15.

 6    A.    Uh-huh.

 7    Q.    There you will see what is marked as Exhibit

 8          15.  I'll represent to you that this is a

 9          email that we received as part of a discovery

10          request from counsel for the Indiana Election

11          Division and Secretary of State.  Do you see

12          the subject line and this was an email sent

13          from Jerry Bonnet; is that your --

14    A.    Yes, I see that.

15    Q.    Do you see where it says that at the top of

16          page 1?

17    A.    Yes, I do.

18    Q.    Have you seen this email before?  I don't

19          think you're in the senders.

20    A.    I was not copied on that.  I was not in the

21          office at that particular point, I think.

22    Q.    Okay.  Just going to ask you about one of the

23          representations that Mr. Bonnet makes in this

24          email.  If you go to the top of page 2, the

25          first full sentence states, "Indiana's SVRS
```

1          system also maintains a record of every

2          individual determination and action taken by a

3          voter registration board, which includes the

4          basis for the voter registration board's

5          determination."  Do you see where it says

6          that?

7     A.   I do.

8     Q.   You do?

9     A.   I do.

10    Q.   Sorry.  Didn't catch that.  And I guess the

11         part of that that I'm interested in is the

12         basis for the voter registration board's

13         determination.  Well, first, let me ask you,

14         do you belive that's an accurate statement?

15    A.   Generally, yes, I believe it is.

16    Q.   Okay.  And where in the SVRS system would a

17         voter registration board record the basis for

18         the action taken by the board?  Let's say they

19         canceled the voter registration record, where

20         would they record the basis for that?

21    A.   They would record that in a field that's

22         associated with the individual's voter

23         registration record.  As I recall, there is,

24         what we might call, a comments field where

25         information unique to that particular

1          transaction can be recorded or also

2          information indicating whether, say, a

3          cancellation took place with regard to the

4          expiration of the inactive period.

5     Q.   Okay.  So if the voter registration board, the

6          county voter registration board gets a

7          crosscheck match and it does its own

8          investigation, would they record the

9          additional information they received in that

10         box?

11    A.   I would --

12    Q.   Go ahead.

13    A.   I would say I would assume that depends on the

14         nature and complexity of the information.  I

15         would not know if it's done uniformly.

16    Q.   So, for example, I think you gave this example

17         earlier, if the voter registration board gets

18         a crosscheck match, but because they're

19         familiar with the individual and they know

20         they're actually still residing at their

21         former address, they might reject the match?

22    A.   Uh-huh.

23    Q.   Is that correct?

24    A.   That's correct.

25    Q.   And would they record that data, their

1        rational for that, in that field?

2    A.  They are not required to do so for the

3        purposes of rejection in that case.  And they

4        could, but I would have no way to state that,

5        yes, they do in each case.

6    Q.  Same would apply if they accepted the match

7        and they did that on the basis of additional

8        information that they found, they may record

9        that, but they're not required to; is that

10       correct?

11   A.  That's correct.

12   Q.  You talked a little bit about the vendor that

13       I think you referred to as Quest.  I think you

14       testified that Quest develops the SVRS system;

15       is that correct?

16   A.  That's correct.

17   Q.  And is still primarily responsible for

18       administering it; is that correct?

19   A.  Yes; that's correct.

20   Q.  We talked a little bit about what I believe

21       you referred to as NCOA mailers or

22       notification mailers that go out periodically.

23       Are you familiar with what I'm referring to?

24   A.  I believe, yeah, the National Change of

25       Address --

1    Q.   Mailers?

2    A.   -- mailers.

3    Q.   When those are sent, who's responsible for

4         physically preparing those mailings?

5    A.   That would be the county voter registration

6         office.

7    Q.   Okay.  How about the -- I think on odd years

8         there's a statewide mailing that goes out; is

9         that correct?

10   A.   Yes.  Until recently it was in even years, but

11       the law's been changed so that henceforth it

12       will be in odd numbered years.  That's a

13       statewide mailing to all active voter

14       registration record addresses.

15   Q.   Who handles those mailings?

16   A.   The state handles that particular mailing.

17   Q.   Is Quest responsible for that, or do you have

18       a vendor that does that?

19   A.   We had a separate vendor, Election Systems &

20       Software, prepare that mailing.  I'm not sure

21       I should technically use the term

22       subcontractor, but in cooperation with Quest

23       and the state, ES&S performed that statewide

24       mailing.

25   Q.   But for mailings that are conducted under

1          IC 3-7-38.2-2 for the NCOA -- let's use, for

2          example, the NCOA, those mailings are handled

3          by the county?

4     A.   That's correct.

5     Q.   You talked a little bit about investigating

6          NVRA complaints, and I believe you stated that

7          you need a -- let me ask you this.  Do you

8          require a complaint from a third party before

9          you can initiate an investigation into an NVRA

10         violation?

11    A.   The short answer would be yes.

12    Q.   Okay.

13    A.   The statute provides the procedure modeled on

14         the Federal National Voter Registration Act in

15         dealing with complaints.

16    Q.   And is there any procedure for which if the

17         election division itself receives information

18         or uncovers information on its own of an NVRA

19         violation, can the election division initiate

20         an investigation?

21    A.   The general statutes govern all types of

22         investigation.  The state level do not provide

23         investigative authority to the election

24         division.  They instead require referral to

25         the Indiana Election Commission in most cases,

1      and so, no, there's not a statutory

2      authorization beyond the one spelled out in

3      3-7 for NVRA complaints.

4   Q.   So if you personally learned that a county was

5      removing voters from the rolls based on

6      crosscheck or 90 days prior to an election,

7      what would you do in that situation?  What can

8      you do?

9   A.   We would immediately contact the county and

10     say do you understand that you appear to be

11     engaged in an activity that violates federal

12     and state law with regard to the

13     administration of NVRA and would consult with

14     county voter registration officials to see if

15     there was a misunderstanding.

16         And if a violation had, in fact, occurred,

17     try to identify remedial action they could

18     take to correct it.

19  Q.   So if they just simply ignored you and

20     continued to remove voters, how would you

21     enforce the guidance or the instruction that

22     you provide to them?

23  A.   We lack the enforcement authority outside of

24     that NVRA complaint procedure that I

25     referenced where it goes to the Indiana

1    Election Commission, which does have the

2    ability to pursue enforcement remedies.

3  Q.   Is there a limit on how long that a commission

4    can take to complete that process?

5  A.   The Indiana statute sets forth some time

6    limitations with regard to that.  They are, as

7    I recall, in the 90-day time period after a

8    matter gets to the commission.  But, perhaps,

9    of more practical importance, the federal NVRA

10   provides that within 120 days of an election

11   that a complainant is not required to go

12   through the state process, but can proceed

13   immediately to litigation.

14        MR. MENSZ:  Okay.  Go off the

15   record for a little bit and see if my

16   colleagues have anymore questions.

17        (A short recess is taken.)

18  CONTINUED BY MR. MENSZ:

19  Q.   Mr. King, can you turn to tab 26.  Showing you

20   what's marked as Exhibit 26.

21        (Plaintiffs' Exhibit No. 26 marked

22   for identification.)

23  A.   Yes.

24  Q.   And you'll see at the top it's -- well, if you

25   turn to the last page, you'll see that it

1           appears to be from Jerold Bonnet, general

2           counsel for the Indiana Secretary of State.

3           Do you see where it says that on the fifth

4           page?

5   A.   Yes, Jerry Bonnet.

6   Q.   Bonnet, I'm sorry.  Have you seen this letter

7           before?

8   A.   I believe so, yes.

9   Q.   Okay.  And at the very bottom of page 5,

10          again, it cc'd the Indiana Election Division?

11  A.   Yes.

12  Q.   Is that why you saw it because you were cc'd

13          on this letter?

14  A.   Yes; I think so.

15  Q.   I'm going to direct you to page 4.  It's the

16          first full paragraph and the last sentence in

17          that paragraph.

18              Before I do that, let me just represent to

19          you what this letter is.  It is a response to

20          a written complaint that Common Cause issued

21          to the secretary of state concerning their

22          implementation of the National Voter

23          Registration Act; is that your understanding

24          of what this letter is?

25  A.   Yes.

1    Q.   Let me go back to page 4, the paragraph I

2         referred to.  I'm just going to read the

3         sentence to you.  It says, "The Indiana

4         General Assembly and Indiana's NVRA officials

5         have adopted the position that a voter

6         registration application, signed and affirmed

7         under the penalty of perjury, constitutes the

8         registrant's authorization to cancel previous

9         registrations."  Do you see where it says

10        that?

11   A.   I do.

12   Q.   Do you agree with that position?

13   A.   Yes.

14   Q.   Is that the position of the Indiana Election

15        Division?

16   A.   I would assume so without consulting with

17        Co-director Nussmeyer, yeah.

18   Q.   Has Co-director Nussmeyer ever given you a

19        contrary interpretation what constitutes a

20        voter authorization to cancel?

21   A.   She has not indicated she would disagree with

22        the sentence you pointed out there.

23   Q.   Do you, in making that determination that a

24        voter registration application constitutes

25        voter authorization, is it your position that

1          in order to cancel an Indiana registration

2          based on an out of state registration,

3          subsequent out of state registration, are you

4          required to see the actual form?

5     A.   No.

6     Q.   Would it be enough that an out of state

7          official represented to you that such a form

8          exists?

9     A.   Yes.

10    Q.   So your position is that a county can cancel

11         that voter registration record without seeing

12         the actual form, the actual voter registration

13         form from the out of state registration?

14    A.   That is correct.

15    Q.   That's the position of the Indiana Election

16         Division?

17              MR. GARN:   Objection; form;

18         foundation.

19    A.   I think I can say that has been the practice

20         of the Indiana Election Division since the

21         enactment of NVRA, and I don't know of any

22         specific difference that Co-director Nussmeyer

23         conveyed about this general statement.

24    Q.   Okay.  Do you consider a crosscheck match to

25         be an authorization from the voter to cancel

1    their voter registration record?

2  A.   In the case you described, yes.

3  Q.   Well, how about prior to SEA-422, would you

4       consider a crosscheck match to be voter

5       authorization to cancel a prior registration?

6            MR. GARN:  Object to form.

7  A.   Under the language of 442, that authorization

8       would have been limited to the case spelled

9       out in the stricken language in 442 and not to

10      all cases as would apply after July 1, 2017.

11 Q.   Right.  Even though Indiana required a

12      notification to be sent out on a crosscheck

13      match, this is this procedure prior to July 1;

14      is that correct?  I'm sorry.  That wasn't

15      really a question.  Let me ask that again.

16           Prior to July 1 if Indiana received a

17      crosscheck match, they'd have to send out a

18      notification letter before cancellation and

19      wait two election cycles?

20 A.   Yes; that's correct.

21 Q.   And that was the case even though your

22      position then, as I understand it is now, is

23      that that crosscheck match constituted voter

24      authorization to cancel a prior registration;

25      is that correct?

1    A.   Yes.  My view is that it did authorize the

2         cancellation of the prior registration.

3         However, the language previously in Senate

4         Bill 442, in my opinion, it imposed an

5         additional requirement beyond the National

6         Voter Registration Act and HAVA to require the

7         inactivation process.

8              MR. MENSZ:  I don't think we have any

9         other questions.

10             MR. GARN:  I have a couple.

11   CROSS-EXAMINATION

12   QUESTIONS BY MR. GARN:

13   Q.   You were asked a couple times several

14        questions about date of registration as it

15        relates to information that goes from

16        crosscheck to the counties; do you remember

17        those questions?

18   A.   I do.

19   Q.   And in that line of questions you were asked

20        whether there was any sifting that took place

21        at the state level in terms of if the

22        registration in the other state was subsequent

23        to the Indiana registration; is that right?

24   A.   That's right.

25   Q.   Do you know, are you certain that sifting has

1       taken place in the past?

2   A.  No.  I should clarify and, perhaps, correct

3       that to say that we had discussed the sifting

4       process, and I believe the election division

5       has the consensus we will do so going forward.

6       I'm not certain that we have engaged in the

7       sifting process during the previous years.

8   Q.  You were also asked some questions about voter

9       list maintenance activities that take place

10      during that 90-day freeze period; do you

11      remember that?

12  A.  Yes.

13  Q.  Is it your understanding that at the county

14      level for crosscheck information, is that

15      information disabled during that 90-day freeze

16      period?

17  A.  Yes.

18  Q.  What does that mean?

19  A.  That means if a county attempted to access the

20      hopper to perform the cancellation function

21      for those crosscheck records, that they would

22      be prevented by the system from doing so.

23  Q.  Okay.  I'm going to show you what -- long time

24      ago we designated -- someone designated as

25      Exhibit 38.  I think this was NAACP.  You

1    weren't asked about that.  Have you seen this

2    document before?

3  A.  I have.

4  Q.  You were asked a couple questions about

5    whether the division has undertaken any

6    activity to look into what the counties are

7    doing with their crosscheck information; do

8    you remember that question?

9  A.  Yes.

10  Q.  That report that you're looking at there, do

11    you remember if that had anything to do with

12    that kind of activity to see what the counties

13    were doing in terms of crosscheck information?

14  A.  Sorry.  Repeat that question.

15  Q.  That document there, was that prepared, in

16    part, for the election division to monitor or

17    report or look into what is happening at the

18    county level with the crosscheck information?

19  A.  Yes.

20  Q.  Okay.  And from what you recall, was that

21    report prepared because of the litigation or

22    because of something else?

23  A.  No.  It was an ordinary report prepared as

24    part of implementation of the crosscheck

25    process.

1    Q.   So to be clear, you don't recall that being

2         part of preparation for --

3    A.   Yes; that's correct.

4    Q.   -- litigation?

5              MR. GARN:  Okay.  Thank you.  No

6         further questions.

7              MS. MERKEL:  Just a few follow-up

8         questions within that scope.

9    REDIRECT EXAMINATION

10   QUESTIONS BY MS. MERKEL:

11   Q.   The document you were just looking at, is that

12        produced regularly?

13   A.   No.   That is not a regularly scheduled report

14        or document that we prepare.

15   Q.   Do you recall when that report was produced?

16   A.   I don't know.  I don't believe it's dated.

17   Q.   Do you recall the purpose for which it was

18        produced?  And when I say produced, I mean

19        generated.

20   A.   I think it's stated to note with regard to

21        each county the number of active and inactive

22        voters for which matches had been approved and

23        or rejected to essentially indicate whether

24        counties were performing activity.

25   Q.   And do you recall whether any follow-up

1      actions were taken as a result of the results

2      in that report?

3  A.  I'm not prepared to say specifically with

4      regard to this report since I'm not sure about

5      the date.  I would say in our normal course of

6      business we would contact a county if we saw

7      that no activity was being performed to see if

8      there was a reason that prevented work from

9      being done.

10 Q.  And, sorry, just one more question on the

11     sifting process.  I think we discussed that

12     you've agreed going forward that there will be

13     sifting based on the date of registration

14     that's applied to the crosscheck matches; is

15     that right?

16 A.  That's correct.

17 Q.  What will be done as part of that sifting

18     process with respect to an entry where the

19     date of registration is blank?

20 A.  The specifics will be determined by the

21     co-directors, myself and Ms. Nussmeyer.  So I

22     don't feel able to give you a detailed

23     explanation of exactly how that would be

24     agreed to in the future.  I want to try to be

25     responsive, but...

```
1    Q.   No.   I appreciate that answer.   So the

2         parameters that you've agreed to is that there

3         will be some sifting to identify when the

4         registration in the other state is subsequent

5         to the Indiana registration, but the format

6         that that sifting will take has not been

7         worked out; is that correct?

8    A.   I believe that's correct; yes.

9              MS. MERKEL:   Thank you very much.

10             MR. MENSZ:   That's it.   Done.

11             MR. GARN:   Signature.

12             AND FURTHER THE DEPONENT SAITH NOT.

13

14         _____

15                   J. BRADLEY KING

16

17

18

19

20

21

22

23

24

25
```

```
 1        STATE OF INDIANA       )
                                 )   SS:
 2        COUNTY OF HAMILTON     )

 3

 4        I, Lindsay N. Bola, Notary Public in Hamilton
      County, Indiana, do hereby certify that the deponent
 5    was by me sworn to tell the truth in the aforementioned
      matter;
 6        That the deposition was taken on behalf of the
      plaintiffs at the time and place heretofore mentioned
 7    with counsel present as noted;
          That the deposition was taken down by means of
 8    Stenograph notes, reduced to typewriting under my
      direction and is a true record of the testimony given
 9    by said deponent and was thereafter presented to the
      deponent for signature.
10        I do further certify that I am a disinterested
      person in this cause of action; that I am not a
11    relative or attorney of any of the parties  or
      otherwise interested in the event of this action and am
12    not in the employ of the attorneys for the respective
      parties.

13

14        IN WITNESS WHEREOF, I have hereunto set my hand and
      affixed my notarial seal this  _____day of February
15    2018.

16

17

18      _____
        Lindsay N. Bola, Notary Public
19

20      County of Residence:  Hamilton

21      My Commission Expires:  March 16, 2024

22

23

24

25
```

Ellison Ward Merkel, Esq.
Alexandre J. Tschumi, Esq.
QUINN EMANUEL
51 Madison Avenue
22nd Floor
New York, NY 10010


                    NOTICE OF DEPOSITION FILING

                 UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF INDIANA
                     INDIANAPOLIS DIVISION

INDIANA STATE CONFERENCE OF
THE NATIONAL ASSOCIATION FOR
THE ADVANCEMENT OF COLORED
PEOPLE (NAACP) and LEAGUE
OF WOMEN VOTERS OF INDIANA,
                        Plaintiffs,
                                    Case No. 1:17-cv-02897
          vs.
CONNIE LAWSON, in her
official capacity as
Secretary of State of
Indiana, J. BRADLEY KING,
in his official capacity as
Co-Director of the Indiana
Election Division, and
ANGELA M. NUSSMEYER, in her
official capacity as
Co-Director of the Indiana
Election Division,

                        Defendants.

     In compliance with the Indiana Rules of
Procedure, Rules of the Industrial Board or Federal
Rules of Procedure, pursuant to Indiana Supreme Court
order dated 10-1-86, you are hereby notified of the
filing by Counsel for the plaintiffs of the deposition
of J. Bradley King taken on February 2, 2018.

                              _____
                               (Date of Filing)
     cc:  Mr. Jefferson Garn

              ASSOCIATED REPORTING, INC.
             251 East Ohio Street, Suite 940
                Two Market Square Center
                Indianapolis, Indiana 46204