Exhibit 23

```
                    UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF INDIANA
                       INDIANAPOLIS DIVISION


COMMON CAUSE INDIANA,          )
                               )
                  Plaintiff,   )
                               )Case No. 1:17-cv-3936
           vs.                 )
                               )
CONNIE LAWSON, in her          )
official capacity as           )
Secretary of State of          )
Indiana, J. BRADLEY KING,      )
in his official capacity as    )
Co-Director of the Indiana     )
Election Division, and ANGELA)
M. NUSSMEYER, in her official)
capacity as Co-Director of     )
the Indiana Election           )
Division,                      )
                               )
                  Defendants.  )
```

          THE VIDEO DEPOSITION UPON ORAL EXAMINATION OF


                B E T H A N Y   S H E L L E R,

the deponent produced and sworn before me,
Lindsay N. Bola, Notary Public in and for
the County of Hamilton, State of Indiana, taken
on behalf of the plaintiff, at the office of
Associated Reporting, Inc., 251 East Ohio Street,
Suite 940, Indianapolis, Marion County, Indiana, on
the 28th day of February 2018, commencing at
approximately 10 a.m., pursuant to the Indiana
Rules of Trial Procedure, with written notice as to
the time and place.


                    ASSOCIATED REPORTING, INC.
                      251 East Ohio Street
                           Suite 940
                   Indianapolis, Indiana  46204
                         (317) 631-0940
                     associated-reporting.com

1

2                          A P P E A R A N C E S

3

4     ON BEHALF OF THE PLAINTIFF:

5          Kate Kennedy, Esq.
           DAVIS WRIGHT TREMAINE
6          1201 Third Avenue
           Suite 2200
7          Seattle, Washington 98101

8

9

      ON BEHALF OF THE DEFENDANTS:
10
           Jefferson S. Garn, Esq.
11         Diana Moers, Esq.
           OFFICE OF THE ATTORNEY GENERAL
12         302 West Washington Street
           IGCS Fifth Floor
13         Indianapolis, IN 46204

14

15

16

17    ALSO PRESENT:

18         Jason D'Angelo
           Jonathan Brater(via video)
19

20

21

22

23

24

25

I N D E X   O F   E X A M I N A T I O N

**PAGE**

DIRECT EXAMINATION.....................   5
Questions by Ms. Kennedy

CROSS-EXAMINATION.....................   41
Questions by Mr. Garn


I N D E X   O F   E X H I B I T S


Plaintiff's Deposition Exhibits
(Previously Marked)

3.   Indiana Code 52 USCA 20507........   21

4.   Step-by-Steps.....................   25

6.   Indiana Code 3-7-38.2-5...........   35

1              THE VIDEOGRAPHER:  We are on record

2      for the deposition of Bethany Sheller in the

3      matter of Common Cause Indiana vs. Connie

4      Lawson, et al. taken in the US District Court,

5      Southern District of Indiana, Civil Action No.

6      1:17-cv-3936.

7              Today is February 28, 2018, and the time's

8      approximately 10:01 in the morning.  We're at

9      the offices of Associated Reporting located at

10     251 East Ohio Street, Suite 940, in

11     Indianapolis, Indiana.  Will counsel please

12     identify themselves for the record.

13              MR. GARN:  Jefferson Garn for the

14     Attorney General's Office for the defendants.

15              MS. MOERS:  Diana Moers.

16              MS. KENNEDY:  This is Kate -- oh,

17     sorry.  Go ahead.

18              MS. MOERS:  Diana Moers for the

19     Attorney General's Office for the defendants.

20              MS. KENNEDY:  And this is Kate

21     Kennedy from Davis Wright Tremaine for the

22     plaintiff, and I'm in Seattle, Washington.

23              THE VIDEOGRAPHER:  Would the court

24     reporter please swear in or affirm the

25     witness.

```
 1              B E T H A N Y   S H E L L E R, the

 2        witness herein, having been first duly sworn

 3        to tell the truth, the whole truth and nothing

 4        but the truth, was examined and testified as

 5        follows:

 6   DIRECT EXAMINATION

 7   QUESTIONS BY MS. KENNEDY:

 8   Q.   Good morning, Ms. Sheller.  As I mentioned,

 9        I'm Kate Kennedy, and I'm the attorney for the

10        plaintiff in this matter.  Have you ever had

11        your deposition taken before?

12   A.   No.

13   Q.   Okay.  So just a couple points which I'll

14        share with you which will help the process run

15        smoothly.  Essentially, I'm just going to be

16        asking you questions, and you can respond

17        freely.  If you are -- if there's objections,

18        you may continue answering unless you're

19        directed specifically not to answer the

20        question.

21            I expect this will take about two hours.

22        If at any time you need a break, just let us

23        know.  We can accommodate that.  I only ask

24        that you finish answering whatever question is

25        pending before we go out for a break.
```

```
 1              The other key point to remember, and this
 2         is especially relevant when we have a video
 3         dep like this, is that the court reporter
 4         there is transcribing our answers, so it's
 5         helpful for her if we don't talk over each
 6         other.  So I will do my best to make sure I
 7         pause after you're done talking in case
 8         there's a lag, and if you could just do the
 9         same, that will give us a clean record.
10    A.   Okay.
11    Q.   And then the other point to remember is that
12         since this is being transcribed, a nod of your
13         head isn't recorded, so we need verbal answers
14         for everything.
15    A.   Okay.
16    Q.   Thank you very much.  So I'd like to
17         initially -- can you tell me a little bit
18         about what preparation you did for this
19         deposition, if any?
20    A.   Yes.  I went over conference notes that we had
21         got back in May of 2017, and I went over -- I
22         skimmed over the case.  It was, like, 18 pages
23         or something.  And talked to my clerk and
24         talked to Jeff a little bit and our attorney,
25         Mike Howard.
```

1    Q.   Okay.  Great.  So what I'm interested in

2         knowing through this deposition is a little

3         bit about your position, what your office

4         does, how you interact with Indiana Election

5         Division, and then how you all process the

6         crosscheck data.

7              So we can start by, if you would, tell me

8         your title at the Hamilton County Voter

9         Registration Board.

10   A.   It's voter registration deputy.

11   Q.   Okay.  And could you describe what this

12        position entails.

13   A.   It entails doing all the registering of

14        voters, canceling, sending out any

15        notifications to them.  It involves working

16        with candidates to give them information.

17        Specifically I work with the republican

18        candidates.  And just anything that the

19        election's office might need, help with as

20        well.

21   Q.   And how long have you held this position?

22   A.   Seven and a half years.

23   Q.   Did you work in the office in a different

24        position prior to becoming the deputy?

25   A.   I was at the sheriff's office before that.

```
 1    Q.   Okay.  Do you have a team of individuals that
 2         you work with or do you work autonomously?
 3    A.   Yes, we do -- well, with our positions, I
 4         was -- we were board members up until last
 5         September, and our commissioners dissolved our
 6         board.  I was the republican.  Patricia
 7         Toschlog was the democrat.  We both have an
 8         assistant, which still remain.  Everything --
 9         everything has remained the same except we
10         report to the clerk now instead of our
11         parties, although we still work closely with
12         our parties.
13    Q.   And do you supervise anybody or --
14    A.   Well, I guess our assistant -- my assistant,
15         Beth Hayes.
16    Q.   Okay.
17    A.   Yeah.  And, technically, I guess I'm still in
18         charge of her even though we're all under the
19         clerk now.
20    Q.   I see.  But there's no -- there's no other
21         individuals?  You don't have --
22    A.   No.
23    Q.   -- a team of staff?  Okay.
24    A.   No.
25    Q.   Understood.  Great.  And then you mentioned
```

```
 1        Ms. -- I'm afraid I'm going to mispronounce

 2        her name -- Toschlog.

 3   A.   Toschlog.

 4   Q.   Toschlog.  And how long have you worked with

 5        her?

 6   A.   The whole time I've been there; seven and a

 7        half years.

 8   Q.   Okay.  And how -- can you describe that

 9        working relationship for me?

10   A.   Well, we've had our -- because of the

11        political side of it, we've had our

12        differences, but for the most part we get

13        along fine.

14   Q.   And let me see if I can be a little bit more

15        specific.  In your office do you delegate

16        duties to Ms. Toschlog and some that you carry

17        out, or do you work together to carry out all

18        the responsibilities of the office?

19   A.   Well, not all the responsibilities, but the

20        majority of them we split.  Like when we do

21        registrations, I do "A" through "L" -- pardon

22        me.  She does "A" through "K."  I do "L"

23        through "Z."

24            When -- in the morning she prints all the

25        registrations.  In the afternoon I print all
```

1          the registration cards to go out.  You know,

2          we just kind of split that way.

3              And then as far as our candidates, she's

4          the democrat.  She works with the democrat

5          candidates.  I work with republican candidates

6          to get them voter information when they're

7          running or any political action committee that

8          needs the information or whatnot.

9     Q.   Okay.  So let me ask you a couple follow-up

10         questions with respect to that.  If you're

11         processing registrations, and I think you said

12         you do "L" through "Z" --

13    A.   Right.

14    Q.   Do you do that autonomously, or do you confer

15         with Ms. Toschlog in processing those

16         registrations?

17    A.   There is an occasion every once in a while if

18         we have something odd come up that we will

19         talk to each other about it.  But for the most

20         part we just do our own and that's it unless

21         one of us is absent, and then we do each

22         other's work.

23    Q.   Okay.  And since you're working pretty much

24         autonomously in carrying out those

25         responsibilities, do you have -- are you in

```
 1          agreement on all relevant points, on all
 2          relevant issues that may come up in processing
 3          those registrations?
 4     A.   I would say yes.
 5     Q.   Are you aware of any points of difference that
 6          you and Ms. Toschlog have?
 7     A.   I can't think of any about registering people,
 8          no.
 9     Q.   How about with respect to canceling voters?
10     A.   No.
11     Q.   Okay.  And let me just ask one follow-up
12          question there.  When you are canceling voter
13          registrations, do you similarly divide duties
14          by alphabet with Ms. Toschlog, or how do you
15          divide that load of work?
16     A.   No.  Really, some of the cancelations are done
17          by our assistants.  Like, say, we get
18          transfers in the hopper or department of
19          health or department of corrections, those are
20          just -- those are done by our assistants, and
21          it's according to who's there that day because
22          they -- some days one of them's there, some
23          days another one's there.
24              As far as the crosschecks, we divide those
25          and do them.  Not necessarily by "A" through
```

1          "K"  and "L" through "M" on those because, you

2          know, they come in a batch.  And so we just

3          split them, hey, I'm going to do the 700, you

4          do the 7 -- you know, the next 700, something

5          like that.

6              And then as far as canceling, if somebody

7          calls or something and wants to have a

8          cancelation sent to them, a cancelation form

9          or something, it's whoever answers the phone

10         call that sends them the forms.  And then, of

11         course, they usually will email it back and

12         then we'll just go ahead and cancel them.

13             It's -- we're not so strict on that where

14         we get upset with each other if you were to

15         do -- if she was to do one of my Ls or

16         something, you know.

17    Q.   Sure.  I understand.  Let me -- one follow-up

18         question.  You mentioned when you divide up

19         the crosscheck duties, so those -- any

20         cancelation that you did through the

21         crosscheck process, you would not delegate

22         that to your assistant --

23    A.   No.

24    Q.   -- is that correct?

25    A.   No.  We have not done that.  We've done those

```
 1           ourself.  And we haven't done any cancelations

 2           through them yet, but just --

 3   Q.   Understood.

 4   A.   Just sent out the NCOAs.

 5   Q.   Okay.  Thank you.  So I understand that we

 6           have -- Indiana has county election boards and

 7           then there is the statewide Indiana Election

 8           Division --

 9   A.   Yes.

10   Q.   -- correct?

11   A.   Yes.

12   Q.   Okay.  And within the election division

13           there's co-directors Angela Nussmeyer and Brad

14           King?

15   A.   Yes.

16   Q.   Do you interact with Ms. Nussmeyer or Mr. King

17           in carrying out your responsibilities for

18           Hamilton County?

19   A.   Yes.  I frequently interact with Brad King

20           because he's on the republican side.  So I've

21           just always dealt with him and as well as Dale

22           Simmons, his assistant.

23   Q.   Is it Dale Simmons or Dell Simmons?  I just

24           couldn't make --

25   A.   Dale, D-A-L-E.
```

1  Q.  Okay.  Thank you.  So let me ask you a couple

2      questions about your interactions with

3      Mr. King and Mr. Simmons.  Are those typically

4      by telephone or in writing?

5  A.  Both.  I do emails and I call him.  If I feel

6      like I need an answer for something right

7      away, a clarification, I call him.  If I don't

8      need it immediately, then I'll usually email

9      him so he has time to get back with me.

10 Q.  And are these issues that you would contact

11     Mr. King or Mr. Simmons about after you had

12     discussed the potential issue with

13     Ms. Toschlog --

14 A.  Not always.

15 Q.  -- or reach out to them independently?

16 A.  Not always.  Because sometimes it would be

17     just something that comes up that I'm not sure

18     of the law or -- and I need clarification.

19     And sometimes I'll contact him before I

20     discuss it with her.  But I would say that

21     there's never been a time that we've -- that I

22     discussed something with him that was

23     nonpolitical that I haven't discussed it with

24     her and then we worked it out.

25          You know, some things we've had to work

1    out or -- I can't even think of anything right

2    now, but we have had disagreements and we've

3    had to work them out, decide who's going to do

4    what or which way we're going to do something.

5  Q.  Well, you anticipated my next question.  And

6    so just to clarify, if you have a discussion

7    with Mr. King or Mr. Simmons, even if you

8    don't talk to Ms. Toschlog prior to the

9    discussion, if it's something relevant to the

10    application of a law you would then discuss it

11    with her after you had spoken with --

12  A.  Yes, definitely.

13  Q.  -- the Indiana Election Division?

14  A.  Yes, definitely.

15  Q.  Great.  And before carrying out any action

16    related to that, you would reach a consensus

17    with Ms. Toschlog?

18  A.  Yes.

19  Q.  Okay.  And then you mentioned sometimes you

20    have these contacts with the Indiana Election

21    Division by telephone.  Do you record -- do

22    you have any written record of the notes of

23    those calls, or do you record that information

24    anywhere?

25  A.  I believe our county records some of our

1      calls, but I don't know if they record them

2      all.  I don't know.

3  Q.  Okay.  Okay.  So I'd like to talk a little bit

4      now about any training or guidance that you

5      receive from the Indiana Election Division.

6      And just for the record, I may sometimes call

7      them IED, and that's who I'm referring to.

8  A.  Okay.

9  Q.  So could you tell me a little bit about that

10     training and guidance that they provide you?

11 A.  Okay.  We get emails from them fairly

12     frequently from Angie and Brad.  And, of

13     course, Matthew and Dale sometimes are

14     involved in those emails as well.

15         And we listen to them when we go to our

16     conferences.  We typically have two a year.

17     One is the -- with our state voter

18     registration, and the other is the one that

19     Indiana Election Division puts on usually in

20     December.  And just about all four of them

21     will speak at those and give us in any updates

22     to laws or something that they feel like

23     counties might not be doing correctly, and

24     we'll -- then they give us sheets to look at

25     to take back with us that usually details,

 1          maybe, in an outline what they discussed.

 2     Q.   Okay.  And then quickly you mentioned Matt,

 3          and just for clarification, I understand that

 4          Matt is Ms. Nussmeyer's second in command

 5          essentially?

 6     A.   Yes.

 7     Q.   Okay.  So when you receive this training from

 8          the IED, is the guidance that they provide you

 9          there mandatory for you in your office?

10     A.   Yes.  If they tell us that a statute or a law

11          has changed, then we will change the way we do

12          something in the office.  Every once in a

13          while they'll say this is up to your county

14          for interpretation, you know, on a couple

15          things.  And they will tell us if they

16          disagree on something as well, if the two

17          sides disagree, so...

18     Q.   Do you have any recollection of where they

19          would tell you that something's up to a

20          county's discretion?  Can you give me an

21          example of that?

22     A.   Let me think.  There's been something fairly

23          recently.  I can't think of what it is right

24          now.

25     Q.   Okay.  If it comes to you --

1    A.   Yeah.  I'll tell you if it comes to me.

2         There's been something fairly recently that we

3         had to make a decision on, but I can't

4         remember what it was now.

5    Q.   Sure.  And then you also mentioned that at

6         times Mr. King and Ms. Nussmeyer may take

7         different positions on issues; is that

8         correct?

9    A.   Yes.

10   Q.   Do you have any examples that you can give me

11        of that?

12   A.   There's one in our voter registration book,

13        and I don't remember what that one is.  No, I

14        can't really give you any -- not off the

15        top --

16   Q.   Okay.

17   A.   -- of my head.  I would have had to known

18        ahead of time to look it up.

19   Q.   So in an instance like that where there's

20        differing direction from Mr. King and

21        Ms. Nussmeyer, what do you do?

22   A.   Well, Pat and I would discuss it.  And if we

23        could not come to an agreement on which way to

24        do something, then we would take it before our

25        election board.  There's one thing, I think,

```
 1          we had to maybe take before our election board
 2          one time.  Typically we can come to agreement
 3          on how to do the procedure.
 4    Q.    And in that instance, would you create a
 5          written policy for your county to ensure that
 6          if the issue came up again it was resolved in
 7          the same manner?
 8    A.    No.  We don't have anything written except for
 9          what Indiana Election Division gives us in our
10          voter registration books or on our computers,
11          something like that.
12    Q.    Okay.  So going -- turning back to the
13          training and guidance that you received from
14          the IED, so you mentioned that you would
15          periodically get emails that, perhaps, are --
16          there's two conferences a year that you would
17          attend.  How about written guidance, written
18          direction, manuals, for example, that they may
19          provide you?
20    A.    No.  I mean, aside from what we get at the
21          conferences, we don't get anything in the
22          mail, per se.  Just emails.
23    Q.    Okay.  Let me ask you about a couple specific
24          documents that I see.  There's a voter
25          registration guidebook.
```

```
1    A.   Yes.

2    Q.   Are you familiar with it?

3    A.   Yes.  We get that at the conferences.  We

4         always get our new updated one at the

5         conference in December.

6    Q.   Okay.  So it's issued annually or updated

7         annually?

8    A.   Yes.  Every year except the year that there's

9         no election, sometimes they don't issue a new

10        one on that year.

11   Q.   I see.  And is the information in that

12        guidebook mandatory?

13   A.   Yes.

14   Q.   Compliance with that information?

15   A.   Yes.

16   Q.   And then I also understand that there are some

17        standard operating procedures that are issued

18        by the IED?

19   A.   Yes.  And we can look those up on our computer

20        at any time, you know, if we need to refer

21        back to something.

22   Q.   Okay.  And are those mandatory?

23   A.   Yes.

24   Q.   And then I also understand that there are what

25        I term step-by-steps?
```

1    A.   Yes.

2    Q.   You're familiar with those?

3    A.   Yes.

4    Q.   And are those mandatory?

5    A.   Yes.

6    Q.   So I'd like to turn and talk a little bit

7         about the National Voter Registration Act,

8         which I'll call the NVRA.  Are you familiar

9         with this --

10   A.   Yes.

11   Q.   -- statute?

12   A.   Yes.

13   Q.   Law, okay.  And just to make sure we're all on

14        the same page, if we could introduce that as

15        an exhibit.  It's 52 USC 20507.

16             So if you would just glance over that, and

17        I'm specifically interested in subsection "D"

18        which starts on page 3 and runs to page 4.

19   A.   Okay.

20   Q.   Okay.  Do you refer to this statute ever in

21        performing your duties in the prior county?

22   A.   This is how we do perform the removing of

23        people and NCOAs in the past, yes.

24   Q.   Great.  So then is your process that unless a

25        voter directly confirms in writing that he or

```
 1         she has changed a residence, you send an NCOA

 2         to that voter?

 3                    MR. GARN:  Objection; form.

 4   A.    If -- say that again.  If you --

 5   Q.    Sure.  Sure.  So would you agree that unless

 6         your office receives confirmation in writing

 7         from the voter, so from an Indiana voter they

 8         send you confirmation in writing that they

 9         have changed their residence, absent that

10         circumstance would you send one of those NCOA

11         mailers to that voter?

12   A.    Yes.  We have done that in the past, yes.

13   Q.    Okay.  And would you immediately cancel that

14         voter's registration?

15   A.    You mean if they have sent us something in

16         writing or if they --

17   Q.    If they have not sent you something in

18         writing.

19   A.    Well, it's according to what procedure, what

20         type of canceling I'm doing.  For NCOA they

21         have to sign it.  When those are returned

22         for -- I mean, we cancel people from different

23         hoppers, department of correction, department

24         of health, as well as -- I mean, it's

25         according to what kind of canceling you're
```

1        talking about.  We do get things from --

2   Q.   Okay.

3   A.    -- Indiana -- the election division from

4        other states that have people that have

5        registered in other states that we do cancel.

6   Q.   Okay.  So let's talk about that for a little

7        bit.  If you get a notice from another state

8        that an individual had canceled their Indiana

9        registration, would you send them an NCOA

10        mailer?

11   A.   It's according to what it is.  Because the

12        ones that we get from Indiana Election

13        Division, we're supposed to cancel them if

14        they send us that.

15   Q.   Okay.

16   A.   But if, say, we get a registration card back,

17        we're going to send them an NCOA and we wait

18        for a response.  If we don't get that

19        response, we follow the guidelines of putting

20        them inactive, you know.  And if they're

21        inactive for two general elections, then we

22        cancel them.  But with the new law that was

23        made in July for the crosscheck, when those

24        came through if we matched them, we would

25        cancel them.  Since the law has changed we've

1      never done that yet because we've not gotten

2      any crosschecks since the law changed.

3   Q.  Understood.  So with this crosscheck if you

4      received an indication that you determined was

5      a match, you would immediately cancel that

6      voter?

7   A.  Yes.

8          MR. GARN:  Objection; form.

9   CONTINUED BY MS. KENNEDY:

10  Q.  And without sending them the NCOA mailer?

11  A.  Yes.  Because that's the way the law states

12      now.

13  Q.  Okay.  Just bear with me for one moment,

14      please.  So speaking about crosscheck -- and

15      let's back up just a little bit.  If you

16      could, describe to me the hopper system as you

17      understand it.

18  A.  Okay.  When we get the crosscheck hopper, it

19      will just tell us how many are in the hopper.

20      We click on the hopper, pull it up, it gives

21      us a percentage that it's matched.  Used to it

22      was supposed to be matched to at least 70

23      percent for us to get them.  As of July of

24      2017, it's 75.

25          It will give us a name, address, date of

1    birth.  If they have the last four digits of

2    the Social Security number, it will give us

3    that.  And then when you press on that and

4    bring up one individual person, it tells where

5    they're registered now.  Like, say, it was

6    Memphis, Tennessee or wherever, and then at

7    the bottom it will give you our registration,

8    and then it will highlight what matches.

9         So if the name matches, the date of birth

10   matches, if the Social matches, and then we

11   have the options down at the bottom to either

12   remove them -- well, now it will be cancel

13   them.  You know, before we could have sent

14   them an NCOA or just removed them or research.

15   We can hit research needed and research them

16   further.

17 Q.  Okay.  That is very helpful.  And I think,

18   perhaps, as we go through that, it might be

19   useful to look at what I have as the

20   step-by-step voter list maintenance process.

21   So that's -- if we could mark that as an

22   exhibit.  And it's IN006283.

23 A.  Yes.  I looked at this yesterday.  I pulled it

24   it up and looked at it yesterday.

25 Q.  Great.  So aside from this step-by-step, do

1      you receive any specific training or guidance

2      on the crosscheck process?

3   A.  We -- right before we started doing the

4      crosscheck, which I don't remember exactly

5      when that was -- I know we got some at the

6      beginning of 2016 -- we got online training,

7      what they refer to as catcalls or something

8      like that, and -- where somebody from Quest

9      will kind of train us on how to do the

10     computer part of it.

11         They don't necessarily tell us what to do

12     as far as law.  They just go by what Indiana

13     Election Division tells them, and then they

14     train us how to do it computer-wise.  So we

15     would have had that training.

16         Now, I can honestly say I can't remember

17     it, but typically anything new that comes up

18     that's going to come through our computer, we

19     have the training.

20  Q.  Okay.  So there's a Quest training.  Do you

21     recall anything specific from IED regarding

22     this process?

23  A.  No, just the -- I looked up where we had

24     gotten information on it at conferences and

25     where they kind of would explain it at

| | |
|---|---|
| 1 | conferences.  It was kind of a simple process, |
| 2 | so they didn't go over it a lot.  It just -- |
| 3 | you know, it just made sense the way they did |
| 4 | it because we -- that's how we do other NCOAs |
| 5 | and things. |
| 6 | Q.  Okay.  So if we could turn to page 3 of that |
| 7 | exhibit and just look at some screenshots. |
| 8 | Are these accurate depictions of what you see |
| 9 | when you interface with the hopper? |
| 10 | A.  Yes.  That's exactly what we see. |
| 11 | Q.  Okay.  So if we turn, I guess, now to page 4, |
| 12 | I have a couple questions there.  Again, are |
| 13 | these accurate depictions of what you see? |
| 14 | A.  Yes. |
| 15 | Q.  Okay.  So in the screenshot on top, on the |
| 16 | lower right-hand corner of that there's a |
| 17 | column that says "R."  Do you see that?  This |
| 18 | is the upper screenshot at the top of the page |
| 19 | of the lower right-hand corner of that |
| 20 | screenshot. |
| 21 | A.  I don't see an "R."  On page 4? |
| 22 | Q.  Page 4, yeah.  So if you look at the list of |
| 23 | names -- yes, please go ahead, Jeff. |
| 24 | MR. GARN:  Would you mind if I point |
| 25 | that out?  I think she means right there. |

```
 1    A.   Oh, okay.

 2    Q.   Thank you.  Do you know what that "R"

 3         signifies?

 4    A.   I don't.  I never even paid any attention to

 5         that.

 6    Q.   Okay.  This is a mystery to me, and I haven't

 7         been able to track it down yet either.

 8              Okay.  So moving on from that, we'll talk

 9         about the screenshot on the lower portion of

10         that page.

11    A.   Okay.

12    Q.   Okay.  So let's say you click on Ms. Adkins'

13         name, is this the screen that would appear?

14    A.   Yes.

15    Q.   Okay.  Is there any other data that is

16         available to you through crosscheck for

17         Ms. Adkins other than what we're seeing on

18         this screen?

19    A.   No, not through the actual crosscheck hopper.

20         Now, if we wanted to go back and pull them up

21         and get more from our information, we could do

22         that.  But, no, that's what they give us.

23    Q.   And if you needed to -- or if you wanted to

24         pull up that other information, where would

25         you get that from?
```

1    A.   We could do a voter search and pull up the

2         voter.  It's really not going to -- it's

3         really not going to help very much because the

4         information they give you, you would have to

5         match it to, you know, the Tennessee

6         information that's given here, and that's all

7         the information they give you.  So, really, I

8         don't ever recall pulling up a voter when I

9         was researching this or I don't even recall

10        doing the action of research needed.  I would

11        just do one or the other, either send them the

12        NCOA or delete them from the interstate

13        crosscheck hopper.

14   Q.   Okay.  And if you deleted somebody from the

15        interstate crosscheck hopper, what does that

16        signify?

17   A.   It just would not send them the NCOA.  Now

18        that the law's changed, it just would not

19        cancel them.  And it will put a little comment

20        in there on their page under "Comments" that

21        they have been deleted from the interstate

22        crosscheck.

23   Q.   And let me, I guess, clarify.  So if you

24        delete somebody from interstate crosscheck,

25        does that signify match approve or much

```
 1            reject?

 2    A.    Match reject if you --

 3    Q.    I see.

 4    A.    -- yes, remove them.

 5    Q.    So they remain on the Indiana voter rolls?

 6    A.    Yes.

 7    Q.    Okay.  And so I think I understand you saying

 8          that when you are evaluating -- and let's say

 9          Ms. Adkins, she's the example on this

10          screenshot -- to determine whether there's a

11          match, you would just look at the data that

12          appears here that we can see; is that correct?

13    A.    Yes.

14    Q.    Okay.  And I think you answered this before,

15          but I just want to clarify.  Do you receive

16          any official guidance from the IED on how to

17          determine whether there is a match?

18    A.    On the -- where they tell us how to do it,

19          they had just told us that it's up to us to

20          determine whether it's a match or not.  So I

21          do it like I do any other matches.

22              Like, for the transfers, we have to

23          determine if those are -- and, like, say, last

24          week I did some transfers, there's some of

25          them -- I recall one of them, particularly,
```

1        from Marion County that they wanted us to

2        transfer to them.  I could not see a match

3        good enough to where I thought I could

4        transfer a person.

5             And, you know, that happens every once in

6        while and you will make a mistake every once

7        in a while, but for the most part, if you

8        follow certain guidelines in matching people,

9        it will be correct.

10   Q.   And so those guidelines that you're referring

11       to, are those internal to you and your office

12       or are they statewide guidelines?

13   A.   I'd say they're probably internal to our

14       office.  I would think that most counties

15       would do it the same way, but, you know, when

16       they -- when you're determining yourself on

17       matching a name, like this Kimberly Adkins, I

18       would match her because everything matches,

19       including her Social Security number.  Now,

20       for Kimberly Adkins, if I did not have her

21       Social Security number, I would not match her.

22       I would delete her because her name is too

23       common.  Even though her birth date matches,

24       her name is too common to assume that that is

25       the same person.

1    Q.   Okay.

2    A.   Now, if she had a super odd name, you know,

3         like if it was a really odd name and only the

4         date of birth matched, I would match them.

5         That's about the only time that I will match

6         somebody with only a birth date is if their

7         name is so different that I think, oh, nobody

8         else would have that name and have the same

9         date of birth probably, too, otherwise --

10   Q.   Right.

11   A.   -- we'd have to have the same Social Security

12        number.  If they have the same Social Security

13        and date of birth, I'm going to match them.

14   Q.   Okay.  Do you know if Ms. Toschlog has the

15        same procedures for identifying matches?  Is

16        that something you discuss?

17   A.   Yes, we have --

18   Q.   Two questions there.

19   A.   -- discussed that.  Not particularly with the

20        crosscheck, maybe, we didn't discuss it.  But

21        when I first started working there, we

22        discussed transfers and things like that,

23        matching people who have died, you know.

24            And we just want to be sure that it's the

25        right person, so we go to all lengths to try

```
 1          to make sure that they are the right person

 2          before we were to cancel somebody.

 3    Q.    And so you and Ms. Toschlog have discussed how

 4          you go about determining these matches; is

 5          that --

 6    A.    Yes.

 7    Q.    Do you have that written anywhere in your

 8          office --

 9    A.    No.

10    Q.    -- to refer to?  No?

11    A.    No.

12    Q.    Okay.  Let me see, do you assume that if

13          Ms. Adkins is populated -- and we'll just use

14          Ms. Adkins for an example since she's on this

15          screenshot.  If Ms. Adkins' data is in the

16          crosscheck hopper, do you assume that her

17          Indiana registration predates her Tennessee

18          registration?

19    A.    Yes.

20    Q.    Do you do any additional follow-up to confirm

21          that?

22    A.    No.

23    Q.    Okay.

24    A.    I mean, before we would have sent the NCOA.

25          But now that the law's changed, no, we
```

1       wouldn't do any follow-up.

2    Q.  Okay.  And I think I know the answer to this

3        question.  I just want to confirm.  When

4        you're looking at Ms. Adkins, do you take any

5        steps to determine whether she canceled her

6        Indiana registration when she presumably

7        registered to vote in Tennessee?

8    A.  No.

9    Q.  Okay.  So I understand that you said that you,

10       obviously, want to make sure that this is the

11       same person, but can you be certain that these

12       two individuals are a match based on that

13       research or that analysis?

14   A.  I think I can be certain if the name, date of

15       birth, and Social Security matches, yes.

16   Q.  And just to confirm, it's the last four of the

17       Social Security number on the crosscheck;

18       correct?

19   A.  Right.

20   Q.  Okay.  And you've talked a couple times about

21       the NCOA mailer that was sent out prior to --

22       that you sent out prior to the change in the

23       law.

24   A.  Yes.

25   Q.  Okay.  Could you turn to page 6 of this

1    exhibit, please.  Is this a copy of that

2    mailer?

3 A.  Yes, it is.

4 Q.  Okay.  I just wanted to confirm that.  Sorry.

5    Just bear with me a moment, please.

6        With the change in the law -- and I

7    understand that law to be Indiana Code

8    3-7-38.2-5.  And perhaps we should mark that

9    as an exhibit or introduce it from yesterday's

10   exhibits, that's fine, too, if that's easier,

11   for Ms. Sheller.

12       Just take a moment to review this and then

13   once you're ready, I can proceed with the

14   questions.

15 A.  Okay.

16 Q.  Okay.  Great.  So just to confirm, my

17   understanding is that for subsection "D" of

18   this statute and subsection "E," if you

19   identify a match, you would immediately cancel

20   the voter under the new law; is that correct?

21           MR. GARN:  Objection; form.

22 A.  Yes.

23 Q.  Okay.  And in canceling the voter, would you

24   send an NCOA mailer?

25 A.  No.

```
 1    Q.   Would you wait two federal election cycles?

 2    A.   No.

 3    Q.   Okay.  Have you received any direction or

 4         instruction from the Indiana Election Division

 5         regarding how to analyze those two questions,

 6         D1 and D2 in this law?

 7    A.   No.  I don't think so.

 8    Q.   Okay.  Do you plan to change how you address

 9         those two questions from how you analyzed them

10         prior to the change in the law?

11    A.   Do I plan to -- what do I plan to what now?

12    Q.   Sure.  Let me rephrase it.  When you are

13         looking at -- when you're making the

14         determination identified in subparagraphs D1

15         and D2, are you going to make those

16         determinations in the same way that you did

17         prior to this change in the law?

18    A.   Yes.

19    Q.   Okay.  So in looking at a crosscheck, an

20         individual identified in crosscheck like

21         Ms. Adkins, Kimberly Adkins, do you do any

22         analysis regarding the date of registration of

23         those individuals?

24    A.   No.

25    Q.   Okay.
```

1    A.   Because they're not supposed to come to us

2         unless the Indiana Election Division has

3         gotten information that they were registered

4         in another state after being registered in our

5         state.

6    Q.   Are you aware of any mandatory practice

7         required by the IED regarding how to analyze a

8         date of registration?

9    A.   No.

10   Q.   Okay.  And have you received any training from

11        the IED on how to identify a date of

12        registration?

13   A.   No.

14   Q.   Okay.

15   A.   Now, we have received training on other

16        matching processes.  So if you're a voter

17        registration official, you better know how to

18        do that before you ever get to crosscheck.

19        Because there's so much matching that we do,

20        that I'm assuming that IED would think they

21        know how to match people because they do it

22        every day.  We do it every day, so, you know,

23        in other aspects of our job.

24   Q.   Sure.  Absolutely.  I think I'd like to move

25        away from crosscheck and talk about a couple

```
1              other procedures.

2    A.   Okay.

3    Q.   And so as I understand it, periodically

4              Indiana may receive lists from other states

5              regarding -- let me -- let's look at the

6              statute.  If we can look at that Exhibit 6,

7              subsection "B."

8    A.   Okay.

9    Q.   Okay.  Do you ever receive voter registration

10             information from, say, Florida, Illinois,

11             Kentucky, Michigan, or Ohio or other states

12             outside of crosscheck?

13   A.   Yes.  You mean written reports, written lists,

14             yes.

15   Q.   Yeah.

16   A.   Yes.

17   Q.   And what do you do if you receive something

18             like that, you receive a written list?

19   A.   We get them from Indiana Election Division,

20             and so we cancel them.  If we get a list from

21             Florida, which we do fairly -- I don't know

22             about all the states.  My assistant is

23             typically the one who does the canceling of

24             this.  And if she matches them and she is

25             very -- she does the same way we do.  She
```

```
 1          makes sure that she is sure that it's that

 2          person, then she will cancel them.  And she

 3          will mark who she cancels and put it in the

 4          day's work.

 5     Q.   Okay.  And then would she send out the NCOA

 6          mailer in connection with that to the Indiana

 7          address of that voter?

 8     A.   No.

 9     Q.   Okay.  And why not?

10     A.   Well, because the Indiana Election Division

11          has sent them to us.  And I have addressed

12          that before with Indiana Election Division,

13          and they said if we receive a report from

14          them, the Indiana Election Division, then it

15          is a good report and you can cancel the

16          people.

17     Q.   Okay.  And then so you also would not wait

18          that two federal election cycles?

19     A.   No.

20     Q.   Is that correct?

21     A.   Right; that's correct.

22     Q.   Okay.  When you posed that question to the

23          IED, do you recall specifically doing that?

24          Do you know if it was done over the phone or

25          in writing?
```

```
 1    A.   No.  I don't recall which.  I can look back
 2         and try to find it.  Sometimes I print off the
 3         emails if I did it by email.
 4    Q.   Okay.  Are you aware of other circumstances in
 5         which you would cancel a voter registration
 6         without sending a mailer?
 7    A.   Just from death, from department of
 8         corrections, from sheriff's office lists,
 9         those type of things we would.
10    Q.   Okay.  So with the -- with this new law, that
11         3-7-38.2-5, if you had a match under
12         subsection "D" there, you would cancel the
13         voter without sending a mailer; correct?
14    A.   Correct.
15    Q.   And if you received a list from the Indiana
16         Election Division of a match from another
17         state like Florida, as we just discussed, you
18         would cancel those voters without a notice; is
19         that correct?
20    A.   Yes.
21    Q.   And then you also mentioned the department of
22         corrections, if the voter died, if you've
23         heard something from the sheriff's office,
24         those instances you would cancel without
25         notice; is that correct?
```

| | |
|---|---|
| 1 | A.   Yes, if we determined that they were a match. |
| 2 |        MS. KENNEDY:  Okay.  I think that |
| 3 |      that's actually all the questions I have, |
| 4 |      Ms. Sheller, so thank you very much.  Not sure |
| 5 |      if there's any follow-up questions. |
| 6 |        MR. GARN:  Just a few. |
| 7 | CROSS-EXAMINATION |
| 8 | QUESTIONS BY MR. GARN: |
| 9 | Q.   As you know, I'm Jeff Garn, and I'll keep this |
| 10 |      short, I promise. |
| 11 | A.   That's all right. |
| 12 | Q.   You were asked a few questions about whether |
| 13 |      certain things you get from the election |
| 14 |      division are mandatory or not.  And you said |
| 15 |      they were mandatory.  Can you explain a little |
| 16 |      bit what you mean by mandatory? |
| 17 | A.   Well, if it's an interpretation of the law, |
| 18 |      which is mainly the things we get from them is |
| 19 |      if the law has changed, and they will give us |
| 20 |      an interpretation of that and we want to |
| 21 |      follow the law in our office.  So if they say |
| 22 |      that's how the law interprets, we do that.  We |
| 23 |      do whatever it is. |
| 24 | Q.   If -- has there ever been an instance where |
| 25 |      if -- that you know of where the guidance was |

```
 1          not followed where the election division or

 2          someone else from the state compelled certain

 3          action by the county officials?

 4    A.    And we didn't follow what they said?

 5    Q.    Yes, yes.

 6    A.    No.

 7    Q.    Okay.  In passing -- and this is just for the

 8          record and you might have mentioned it -- but

 9          when you said you got something from Quest,

10          Quest was on the phone, what's Quest?

11    A.    Quest is the people who -- the company who

12          handles our computer, our statewide computer

13          system.  So we work with them very closely.

14              They'll do any training that's new on

15          our -- anything having to do with the

16          statewide voter registration system

17          computer-wise.

18    Q.    Okay.  I am not sure the number, but the

19          step-by-step -- I think it's the one right at

20          the top.

21    A.    This one.

22    Q.    If you could look at page 4 of that.

23    A.    Okay.

24    Q.    And that -- is that correct that's a picture

25          of a hopper?
```

```
 1    A.   Yes.

 2    Q.   And you were asked whether that was accurate

 3         or not?

 4    A.   Yes.

 5    Q.   You haven't seen the hopper for crosscheck

 6         since the law has been passed; is that --

 7    A.   No, we have not.

 8    Q.   -- correct?

 9    A.   I haven't seen it since 2016.  We didn't even

10         get any in 2017.

11    Q.   So you're not sure how it will look when it's

12         actually active; is that right?

13    A.   Right.

14              MR. GARN:  I don't have any other

15         questions.

16              MS. KENNEDY:   No follow-up.  Thank

17         you so much, Ms. Sheller.

18              THE WITNESS:  Thank you.

19              THE VIDEOGRAPHER:  This concludes

20         testimony.  It's now 10:53.

21              AND FURTHER THE DEPONENT SAITH NOT.

22         _____

23                    BETHANY SHELLER

24

25
```

```
1              STATE OF INDIANA      )
                                     )  SS:
2              COUNTY OF HAMILTON    )

3

4         I, Lindsay N. Bola, Notary Public in Hamilton
        County, Indiana, do hereby certify that the deponent
5       was by me sworn to tell the truth in the aforementioned
        matter;
6              That the video deposition was taken on behalf of
        the plaintiff at the time and place heretofore
7       mentioned with counsel present as noted;
               That the video deposition was taken down by means
8       of Stenograph notes, reduced to typewriting under my
        direction and is a true record of the testimony given
9       by said deponent and was thereafter presented to the
        deponent for signature.
10             I do further certify that I am a disinterested
        person in this cause of action; that I am not a
11      relative or attorney of any of the parties  or
        otherwise interested in the event of this action and am
12      not in the employ of the attorneys for the respective
        parties.

13

14        IN WITNESS WHEREOF, I have hereunto set my hand and
        affixed my notarial seal this  _____day of March
15      2018.

16

17

18      _____
        Lindsay N. Bola, Notary Public
19

20         County of Residence:  Hamilton

21         My Commission Expires:  March 16, 2024

22

23

24

25
```

Kate Kennedy, Esq.
DAVIS WRIGHT TREMAINE
1201 Third Avenue
Suite 2200
Seattle, Washington 98101

NOTICE OF DEPOSITION FILING

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

```
COMMON CAUSE INDIANA,        )
                 Plaintiff,  )
                             )Case No. 1:17-cv-3936
         vs.                 )
CONNIE LAWSON, in her        )
official capacity as         )
Secretary of State of        )
Indiana, J. BRADLEY KING,    )
in his official capacity as  )
Co-Director of the Indiana   )
Election Division, and ANGELA)
M. NUSSMEYER, in her official)
capacity as Co-Director of   )
the Indiana Election         )
Division,                    )
                 Defendants. )
```

     In compliance with the Indiana Rules of
Procedure, Rules of the Industrial Board or Federal
Rules of Procedure, pursuant to Indiana Supreme
Court order dated 10-1-86, you are hereby notified
of the filing by Counsel for the plaintiff of the
deposition of Bethany Sheller taken on February 28,
2018.

                      _____
                         (Date of Filing)


cc:  Mr. Jefferson Garn


            ASSOCIATED REPORTING, INC.
         251 East Ohio Street, Suite 940
            Two Market Square Center
            Indianapolis, Indiana 46204