## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| **INDIANA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (NAACP) and LEAGUE OF WOMEN VOTERS OF INDIANA,** | ) ) ) ) ) ) |
| **Plaintiffs,** | ) ) |
| **v.** | ) **Case No.: 1:17-cv-02897-TWP-MPB** |
| | ) |
| **CONNIE LAWSON, in her official capacity as Secretary of State of Indiana, et al.,** | ) ) ) ) |
| | ) |
| **Defendants.** | ) |

### DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Indiana State Conference of the National Association for the Advancement of Colored People (NAACP) and League Women Voters of Indiana (collectively, Plaintiffs), brought this lawsuit because they believe, mistakenly, that the newly enacted Indiana law does not conform to the National Voter Registration Act ("NVRA"). Plaintiffs ask this Court to take the extraordinary step of striking down an Indiana law, but cannot point to one person who might be harmed by this law. In light of this glaring hole in its argument, and the fact that the challenged Indiana law conforms to the NVRA, NAACP's request for a preliminary injunction should be denied.

The NVRA is the result of compromise. The law requires that states both ensure that voters are reasonably given the opportunity to vote and maintain correct and up-to-date voter registration lists. Indiana strikes a balance between these two

1

requirements. When Indiana has been alleged to have run afoul of the NVRA in the past, it was because too many people were on the voter registration rolls who were not supposed to be. In 2006, Indiana was subject to a consent decree to correct this oversight. *United States v. Indiana, et al.,* Case No. 1:06-cv-01000-RLY-TAB (S.D. Ind.).

Now, after taking steps to improve the voter registration rolls, Indiana is sued because Indiana takes into account the NVRA as a whole. In addition to complying with the NVRA's voter registration opportunity requirements, Indiana, as part of its efforts to make reasonable efforts to conduct voter list maintenance programs, has begun to participate in cooperative efforts with other states. But again, Indiana is being accused of running afoul of the NVRA. Our federal system of running elections provides states with a certain amount of flexibility in implementing election laws. The Constitution itself gives states a central role in executing elections. Common Cause seeks to impose a structure—requiring perfect, lockstep uniformity—on Indiana and its county election officials that does not exist in the text of the NVRA or Indiana law. For this reason, Common Cause asserts that Indiana Code Section 3-7-38.2 5 violates the NVRA. But Congress, through statutory and legislative history, has stated that when a state discovers that an individual registered in their state has subsequently registered in another state, the registrants' prior registration can be cancelled without delay. Indiana has gone to great lengths to insure that it is both actively and justifiably removing those from its rolls who are no longer qualified to vote. But as a failsafe, Indiana provides a simple process for any individual who may have been mistakenly removed to still vote.

Indiana's voter list maintenance program complies with the NVRA, and Plaintiffs'

request for a preliminary injunction should be denied.

### Statutory and Factual Background

Plaintiffs filed its motion for preliminary injunction on March 9, 2018, alleging

that Indiana Code Section 3-7-38.2-5 does not comply with the NVRA. Plaintiffs

specifically allege that Indiana Code Section 3-7-38.2-5(d) and (e) do not comply with

the NVRA because of changes made to the mandatory steps county clerks must take for

cancel voter registrations.[1] This cancellation issue, as alleged by Plaintiffs, centers

around the implementation of the State of Kansas's Crosscheck System ("Crosscheck

System"), whereby numerous participating states send their voter registration rolls to

the Office of the Kansas Secretary of State, which compiles the data, determines which

individuals may be registered in more than one state, and then sends a record of those

"matches" back to states' NVRA officials. In Indiana, the NVRA officials are Brad King

and Angela Nussmeyer of the Indiana Election Division ("Co-Directors").

Under the recently amended version of Indiana Code Section 3-7-38.2-5(d)(1), the

Co-Directors will apply a set of "confidence factors" to the data received before any

information is sent to the counties. The confidence factors are a point system listed in

Indiana Code Section 3-7-38.2-5(d)(1). Any data set which receives a confidence factor of

75 points or higher will then be sent to the county official to make the appropriate

determination. The data reaches the county officials through a "hopper" which is an

---

[1] Since Plaintiffs have filed their complaint, Indiana Code Section 3-7-38.2-5 has been amended, and the two subsections challenged by Plaintiffs have been added to and expanded into three subsections (d), (e), and (f). See P.L. 116-2018, Sec. 3, eff. March 15, 2018.

administrative term used to describe the Statewide Voter Registration System ("SVRS") features available to the counties. (Ex. 1, King Dep. 30:2-5). Upon receipt of the information from Indiana's NVRA official, "the county voter registration office shall determine whether the individual: (1) identified in the report provided by the NVRA official under subsection (d) is the same individual who is a registered voter of the county; and (2) registered to vote in another state on a date following the date that voter registered in Indiana." I.C. § 3-7-38.2-5(e). The plain language of this statute requires the county voter registration office, not the NVRA official, to make these determinations before the office may cancel a voter's registration. I.C. § 3-7-38.2-5(f). It is important to note that no data has been sent to the county hoppers yet under this system, which became effective March 15, 2018. I.C. § 3-7-38.2-5; (Ex. 2, Declaration of J. Bradley King, Co-Director of the Indiana Election Division ("King Decl.") at 2; Ex. 3, Declaration of Angela M. Nussmeyer, Co-Director of the Indiana Election Division ("Nussmeyer Decl.") at 2; Ex. 4, Sheller Dep. 12:17-25, 13:1-4, 43:5-13; Ex. 5, Toshlog Dep. 45:23-25, 46:1-8; Ex. 6, Freeman Dep. 46:20-25, 47:1-2). The Co-Directors have not yet provided any specific direction as to how the newly amended statute should be implemented by the county officials. (Ex. 2, King Decl. at 2; Ex. 3, Nussmeyer Decl. at 2).

## I.    Introduction

The Indiana Election Division is a bi-partisan government agency that serve as the state's chief voter registration officials, or NVRA registration officials. The election division partners with the Indiana Secretary of State's office to make decisions on SVRS, which became active in December of 2005. "The Indiana SVRS is built with specific

business rules which are updated to be in compliance with federal and state law and seek to lead county officials down the right path when conducting voter registration updates." (Ex. 3, Nussmeyer Dep. 16:1-6). Under Indiana Code Section 3-7-11-1, the Co-Directors, who serve as the NVRA officials, coordinate Indiana's compliance with the NVRA.

Congress passed the NVRA with the express purposes of "establish[ing] procedures that will increase the number of eligible citizens who register to vote in elections for federal office [and] to ensure that *accurate and current voter registration rolls are maintained.*" 42 U.S.C. § 1973gg(b)(1),(4) (emphasis added). While in the past purges of voting rolls have been used to discriminate, Congress mandated voter roll maintenance to insure accuracy. H.R. REP. 103-9, at 2 (1993) U.S.C.C.A.N. 105, 106; *see also* S. Rep. No. 103-6, at 18 (1993); see also H.R. Rep. No. 103-9, at 15 (1993).

Indiana has enacted legislation in its efforts to maintain a streamlined, efficient, and accurate voter registration system. Since May 5, 2015, for example, there have been two changes to Indiana Code Section 3-7-38.2-5. First, Senate Enrolled Act 442 ("SEA 442"), which went into effect on July 1, 2017, specifically permits a county official to cancel voter registration if he or she determines that the person identified in the report provided by the NVRA official is the same individual who is a registered voter of the county and that the person registered to vote in another state on a date following the date that voter registered in Indiana. Ind. Code § 3-7-38.2-5.

Then, the Indiana General Assembly enacted House Enrolled Act 1253 ("HEA 1253"), which went into effect on March 15, 2018. HEA 1253 added confidence factors to

5

Indiana Code Section 3-7-38.2-5(d). That is, the General Assembly codified the Election Division's policy of providing only those registrations that meet certain match criteria.

## II.    Confidence factors as applied by the NVRA officials

Under the current version of Indiana Code Section 3-7-38.2-5(d), the Election Division must scrutinize the report it receives from Crosscheck System before that information is passed on to the counties. Specifically, Indiana Code Section 3-7-38.2-5(d) requires that the "first name, last name, and date of birth of the Indiana voter [be] identical to the first name, last name, and date of birth of the voter registered in the other state," and if those requirements are met, then the information is considered under statutory confidence factors:

> (2) A comparison of the records indicates that there is a confidence factor that the records are for the same individual resulting from the accumulation of at least seventy-five (75) points based on the following criteria:
>
> (A) Full Social Security number: 40 points.
> (B) Last four (4) digits of Social Security number: 10 points.
> (C) Indiana driver's license or identification card number: 50 points.
> (D) Date of birth: 25 points.
> (E) Last Name: 15 points.
> (F) First Name: 15 points.
> (G) Middle Name: 5 points.
> (H) Suffix: 5 points.
> (I) Street Address 1: 10 points.
> (J) Zip Code (first five (5) digits): 5 points.

Not only will the data have to match the exact first name, last name, and date of birth of a voter registered in another state or county, but the data will *also* have to reach confidence factors of at least 75 points of the criteria listed above before it will even be given to the counties for consideration for cancellation.  Once the data meets this

criteria, it is sent to the county officials to make the further determinations set out in Indiana law. But "[e]ven if confidence factors are the maximum possible, it does not require that the county act in a particular way in regard to that record. The county can use information it has independently of the Kansas submission to determine if, in fact, two records which match are the same person." (Ex. 1, King Dep. 32:1-8).  Plaintiffs have pointed to no voter registrations that would make it to the counties, much less pointed to any voter registrations that incorrectly identify voters as having moved when they have not. In addition, voter registration cancellations under Indiana Code Section 3-7-38.2-5 must come from the county level. I.C. § 3-7-38.2-5(f). "[T]he co-directors do not have the ability to add, update, cancel, or remove any voter registration without explicit authorization from the county."  (Ex. 7, Nussmeyer Dep. 14:9-15).

*Uniformity among counties*

The Co-Directors keep counties apprised of voter registration laws in several ways: an annual Election Administrator's Conference; bi-annual clerk's association conferences; a Voter Registration Association conference, which is attended by the co-directors; a published voter registration manual; and other manuals which are available to the counties. In addition, Quest, the vendor who administers the SVRS, creates a step-by-step manual to operate certain functions within the SVRS and provide standard operating procedures to the counties. Counties may also attend online trainings by the vendor throughout the course of the year. (Ex. 7, Nussmeyer Dep. 37:10-25, 38:1-5).

The most recent voter registration manual contains policies and procedures which are given to the counties as guidance. In addition, the counties can access all of

the Standard Operating Procedures and step-by-step guidance online. (Ex. 7, Nussmeyer Dep. 40:4-13). If other issues arise, the Co-Directors communicate with the counties via memo or a newsletter which started in December of 2017. (Ex. 7, Nussmeyer Dep. 41:6-9). "The election division provides several steps of a framework which is prescribed by federal and state law and it is up to the counties to execute that data." (Ex. 7, Nussmeyer Dep. 34:9-25, 35:1-10, 35:14-22).

### III.    Cancellation procedures after SEA 442

At this juncture, no "matches" are in the hoppers and none will have the time to make it to before the upcoming election. (Ex. 2, King Decl. at 2; Ex. 3, Nussmeyer Decl. at 2). For that reason, county officials have no "matches" from the Crosscheck System to consider at this time. (Ex. 4, Sheller Dep. 12:17-25, 13:1-4, 43:5-13; Ex. 5, Toshlog Dep. 45:23-25, 46:1-8; Ex. 6, Freeman Dep. 46:20-25, 47:1-2). If, after the above criteria are met, a county official cancels a voter's registration, it is important to note that, while voter's registration is removed from the rolls, the voter remains in the Indiana voter system and can still vote. (Ex. 8, Mowery Dep. 85:2-8). In fact, Indiana has procedures which ensure any person arriving at a polling place on the date of an election will, in some way, be allowed to vote. "If a voter is challenged on the day of voting, they fill out an affidavit and their vote is sealed. The affidavit affirms that they have filled out their ballot and that is their signature, etc." (Ex. 7, Nussmeyer Dep. 153:1-8). Indiana has provisional voting laws for example, which dictate: "The envelope must permit a member of a precinct election board to indicate whether the voter has been issued a provisional ballot as the result of a challenge based on the voter's inability or

declination to provide proof of identification." Ind. Code § 3-11.7-2-3. There are simply no facts to support that removal of a voter from the registration rolls will result in that voter being unable to cast a ballot.

## ARGUMENT

**Preliminary injunction standard**

While a court may exercise the "very far-reaching power" of a preliminary injunction, such power should never "be indulged in except in a case clearly demanding it." *Roland Mach. Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 389 (7th Cir. 1984) (internal quotations and citation omitted).

A court should consider several factors when a party seeks a preliminary injunction: the moving party must show a likelihood of success on the merits, no adequate remedy at law, and irreparable harm if the court does not grant the preliminary injunction. *Reid L. v. Illinois State Bd. of Educ.,* 289 F.3d 1009, 1020–21 (7th Cir.2002). After considering these factors, a court should balance any irreparable harm that an injunction would cause to an opposing party, adjusting the calculus depending on the party's likelihood of success. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of America, Inc.,* 549 F.3d 1079, 1086 (7th Cir.2008). This harm must be real and a court may only award relief "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008) (*citing Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997)). The court should also consider the public interest, including the interests of any nonparties to the litigation. *Girl Scouts of Manitou Council, Inc.,* 549 F.3d at 1100.

## PLAINTIFF CANNOT DEMONSTRATE
## A LIKELIHOOD OF SUCCESS ON THE MERITS

**I.     Plaintiffs lacks standing to bring claims that Indiana's Voter List Maintenance Law allegedly violates the NVRA.**

The Seventh Circuit has characterized standing as "an essential and unchanging part of the case-or-controversy requirement of Article III." *DH2, Inc. v. U.S. S.E.C.*, 422 F.3d 591, 596 (7th Cir. 2005. Specifically, "the elements [that] must [be] show[n] are: (i) an injury in fact, which is an invasion of a legally protected interest that is concrete and particularized and, thus, actual or imminent, not conjectural or hypothetical; (ii) a causal relation between the injury and the challenged conduct, such that the injury can be fairly traced to the challenged action of the defendant; and (iii) a likelihood that the injury will be redressed by a favorable decision." *Id.* at 596.

Plaintiffs lack an injury in fact. In order to establish an injury in fact Plaintiffs must show an invasion of a legally protected interest that is concrete and particularized. This cannot be a conjectural or hypothetical invasion of their interest; it must be an actual or imminent injury. Because Plaintiffs fail to satisfy the first element of the test for standing, they lacks standing to bring this lawsuit.

### A.  Plaintiffs lack standing in their own right.

Plaintiffs' decision to expend its time and effort to as a result of amendments contained in SEA 442 is not a harm for the purpose of establishing standing. Plaintiffs claim they will need to devote staff and time and resources to ameliorate the effects of SEA 442 by re-registering voters, conducting training sessions aimed at educating

voters; and that it will have to spend a greater portion of time educating and monitoring volunteers on SEA 442's effects. Dkt. 1 at 4-5.

Plaintiffs have not alleged, much less proven, any direct injury to itself. To the extent that the injury claimed is resources Plaintiffs has expended or will expend in the future, this does not qualify as injury in fact and therefore cannot extend standing. Plaintiffs assert that, as a result of SEA 442, it will, under undefined circumstances in the future, be required to divert unspecified resources to various outreach efforts. This also is not enough to confer standing. *Indiana Democratic Party v. Rokita*, 458 F.Supp.2d 775, 816 (S.D.Ind. 2006), *aff'd sub nom. Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008) (holding that such imprecise and speculative claims concerning potential future actions do not convey standing).

To the extent that Plaintiffs have already expended resources connected with SEA 442, "such efforts have ... uncovered no identifiable persons who will be unable to vote, no evidence of racial discrimination," etc. *Id.* In addition, the claimed injury suffered by Plaintiffs are entirely of its own making because any reallocation of resources would be initiated at its sole and voluntary discretion. *Id.* (holding that such optional programming decision does not confer Article III standing on a plaintiff); *see also Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp.*, 28 F.3d 1268, 1276 (D.C.Cir.1994)(stating that this particular harm is self-inflicted: it results not from any actions taken by [defendant], but rather from [plaintiff's] own budgetary choices).

Finally, if Plaintiffs' claim for standing in its own right were accepted, this would eviscerate the standing doctrine: "[i]f an organization obtains standing merely by expanding resources in response to a statute, then Article III standing could be obtained through nothing more than filing a suit." *Id.* at 817.

### B.  Plaintiffs lack standing to represent its members

NAACP also points out that the majority of its approximately 5,000 members are residents of Indiana who are registered to vote in Indiana. ECF 1 at 3. And the League claims that the vast majority of the approximately 1,100 members are residents of Indiana who are registered to vote in Indiana. ECF 1 at 4. Yet, while Plaintiffs point out the number of members who live and vote in Indiana, it never proves that it has standing on behalf of its members or sufficiently proves harm to any of its individual members.

The United States Supreme Court has held that an association has standing on behalf of its members only when "its members would otherwise have standing to sue in their own rights." *Pennell v. City of San Jose*, 485 U.S. 1, 7 (1988)(citing *Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). But Plaintiffs do not have standing on behalf of its members here.

To the extent Plaintiffs, by stating that its members live and vote in Indiana, suggests standing on behalf of its members, this assertion fails.  As this court has explained, a plaintiff organization does not have standing if "[it] has not alleged, much less proven that any of [its] members or directors either suffered an injury or was threatened with immediate injury to the extent that the member or director would be

able to make out a justiciable case had he brought suit himself." *Indiana Democratic Party*, 458 F.Supp.2d at 817 (citing *Hope, Inc. v. Du-Page County, Ill.*, 738 F.2d 797, 814 (7th Cir. 1984)).

Because Plaintiffs have failed to sufficiently allege or demonstrate that their individual members have standing, it cannot have standing as its members' representative.

### C.  Plaintiffs lack expanded representational standing

Plaintiffs also cannot claim standing by virtue of its general efforts to serve the public. To the extent Plaintiffs attempt to establish standing by adopting as members all the individuals it purports to serve, this approach has been explicitly rejected by the Seventh Circuit. In *Hope, Inc. v. DuPage County, Ill.*, the Seventh Circuit held: "The Supreme Court has not seen fit to extend representational capacity standing to entities other than associations which actually represent interests of parties whose affiliation with the representational litigant is that of membership with the representative or substantial equivalent of membership. We likewise decline to further extend representational standing." *Hope*, 738 F.2d at 814.  *See also Indiana Democratic Party*, 458 F.Supp.2d at 818 (holding that an organization cannot unilaterally expand its representational capacity to include all the individuals it serves).  Accordingly, Plaintiffs cannot have standing on behalf of the public in a representational capacity.

### D. Even if Plaintiffs were able to assert standing, it has not made the requisite showing to substantiate its entitlement to standing.

Plaintiffs' assertion of standing under any of these theories fail because there is no actual or imminent harm that any voter in Indiana will be prevented from voting in

any upcoming election. Defendants have stipulated that they will not implement the procedures that are the subject of this lawsuit before July 1, 2018 and accordingly no voters will have their registrations cancelled until after July 1, 2018. (Ex. 2, King Decl. at 2; Ex. 3, Nussmeyer Decl. at 2). Plaintiffs have also not provided any admissible evidence of any individual, not just members or individuals they serve, who will not be able to vote because their registration has been cancelled. And again even if a voter registration is cancelled, the individual is still permitted to vote. Consequently, no actual or imminent harm exists.

Plaintiffs lack injury in fact and therefore cannot meet the standing test articulated by the Seventh Circuit. And neither the text of the NVRA nor any Supreme Court precedent has expanded that private right of action in 42 U.S. Code § 1973gg–9 to organizational plaintiffs. Therefore, this case should be dismissed for Plaintiffs' failure to assert standing.

Even if there were a harm, the cancellation of voter registrations comes from county election official and neither the Co-Directors nor the Secretary of State are able to cancel these registrations under Indiana Code Section 3-7-38.2-5. For this reason, there is no traceability to named Defendants.  This is yet another reason why Plaintiffs cannot establish standing.

But even if Plaintiffs were able to establish standing, their claims fail on the merits.

**II.     Indiana Code Section 3-7-38.2-5 conforms to the requirements of the National Voter Registration Act.**

Indiana Code Section 3-7-38.2-5 does not violate the NVRA. When making a facial challenge[2] to a statute, the plaintiff must "show that 'no set of circumstances exist under which the Act would be valid.'" *Ohio v. Akron Center for Reproductive Health*, 497 U.S. 502, 514 (1990) (*quoting Webster Reproductive Health Services*, 492 U.S. 490, 524 (1989) (O'Connor, J., concurring)). The "mere possibility" that a rare or worst-case scenario that may never occur is "plainly insufficient to invalidate [a] statute on its face." *Akron*, 497 U.S. at 514. A reviewing court must resort to "every reasonable construction" in order to save a statute's validity. *Hooper v. People of State of California*, 155 U.S. 648, 657 (1895). Here, a plain reading of both Indiana Code Section 3-7-38.2-5 and 52 U.S.C. § 20507 shows that Indiana Code Section 3-7-38.2-5 complies with all the requirements set out in the NVRA.

As in the present case, "in any case concerning the interpretation of a statute the 'starting point' must be the language of the statute itself." *Lewis v. United States*, 445 U.S. 55, 60 (1980). This case requires consideration of both Indiana Code Section 3-7-38.2-5 and 52 U.S.C. § 20507.

Plaintiffs make a facial challenge to Indiana Code Sections 3-7-38.2-5(d) and -5(e). NAACP Dkt. 1 at 19. Subsection (d) provides that Indiana's NVRA official must participate in the Crosscheck System. I.C. § 3-7-38.2-5(d). Indiana and a number of other states share their voter registration lists with the Kansas Secretary of State's office, which then produces a record of potential matches in voter registration records that are

---

[2] NAACP claims this is a facial challenge. Dkt. 1 at 19.

distributed to the states. (Ex. 2, King Decl. at 2; Ex. 3, Nussmeyer Decl. at 2). Upon receiving a record from the Crosscheck System of a possible match with a voter registration in Indiana and another state, Indiana's NVRA official provides all of the information obtained to the appropriate county voter registration office. I.C. § 3-7-38.2-5(d); *see also* (Ex. 2, King Decl. at 2; Ex. 3, Nussmeyer Decl. at 2). Only information with a predetermined level of reliability, that is, after it has passed the "confidence factor" hurdle, is passed on to the county voter registration office. I.C. § 3-7-38.2-5(d).[3] Upon receipt of the information from Indiana's NVRA official, a county voter registration official is required to "determine whether the individual: (1) identified in the report provided by the NVRA official under subsection (d) is the same individual who is a registered voter of the county; and (2) registered to vote in another state on a date following the date that voter registered in Indiana." I.C. § 3-7-38.2-5(e). The plain language of this statute requires the county voter registration office to make these two explicit determinations before the office may cancel a voter's registration. I.C. § 3-7-38.2-5(f).

Removal of an individual from Indiana's voter registration rolls under Indiana Code Sections 3-7-38.2-5(d) and -5(e) is permissible under at least two different subsections of 52 U.S.C. § 20507. The act of registering to vote in another state may be considered: (1) a request for removal from the voter roll in their previous state of

---

[3] As explained above, effective March 15, 2018, the expanded reliability standard which were previously established in practice by the Indiana Election Division are now codified in Indiana Code Section 3-7-38.2-5(d).

residence under 52 U.S.C. § 20507(a)(3)(A); or (2) a confirmation in writing that the registrant has changed residence under 52 U.S.C. § 20507(d)(1)(A).

One of the express purposes of the NVRA is to "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(4). "States are required to conduct a general program that makes a reasonable effort to remove names of ineligible voters from the official lists…." S. Rep. No. 103-6, at 18 (1993); *see also* H.R. Rep. No. 103-9, at 15 (1993). Accordingly, 52 U.S.C. § 20507 provides that the name of a registrant may be removed from the official list of eligible voters under four circumstance: (1) at the request of the registrant; (2) for reason of criminal conviction or mental incapacity under state law; (3) the death of the registrant; or (4) a change in residency of the registrant. 52 U.S.C. § 20507(a)(3)(A)–(C), (a)(4)(A)–(B). The first and fourth circumstances may be applied here. When a registrant requests that their name be removed from the rolls, no other process is required before the registration is cancelled. 52 U.S.C. § 20507(a)(3)(A). Likewise, when a registrant "confirms in writing that the registrant has changed residence…," that voter's registration may be cancelled without any additional process. 52 U.S.C. § 20507(d)(1)(A).

### A. The act of registering in another state is a request to cancel your registration in a previous jurisdiction.

By registering to vote in another state, an individual requests that their name be removed from the voter rolls in their previous state of residence. When it passed the NVRA, Congress recognized that when an individual registers to vote in another state that action is a request to have that individual's name removed from the voter rolls of

her previous state of residence. Identical language appears in both the Senate and House Report when this law was passed that, when discussing Section 8, subsection (a) of the NVRA, states: "A 'request' by a registrant would include actions that result in the registrant being registered at a new address, such as registering in another jurisdiction or providing a change-of-address notice through the drivers license process that updates the voter registration." S. Rep. No. 103-6, at 31; H.R. Rep. No. 103-9, at 14–15. Congress clearly understood registration in another state as a request to remove a voter's name from the voter rolls of their previous jurisdiction of residence.

Here, the plain language of Indiana Code Section 3-7-38.2-5(e) requires a county voter registration office in Indiana to determine that an individual registered in their county has registered in another state before they remove that individual's name from the voter registration rolls. Thus, on its face, Indiana Code Section 3-7-38.2-5 requires a request from the registrant, in the form of registration in another state, before the registrant's name is removed from the official voter roll. This is obviously in compliance with 52 U.S.C. § 20507(a)(3).

Even if this Court could not rely on the clear express intent of Congress, as set out in the Senate and House Reports, practice and common sense dictate that by registering in another state an individual is requesting the removal of their name from the voting rolls of their previous place of residence. On every voter registration form in all of the states that participate in the Crosscheck System the registrant provides an address or place of residence and affirms in writing that they are a resident of that

state.[4] It is illegal for individuals to provide false information on a voter registration form. In addition to state laws that make it illegal to file false voter registration information, *see, e.g.*, Ind. Code § 3-14-3-1.1, federal law makes it illegal and punishable by fines and up to five years in prison for providing false information, such as address, on a voter registration or for voting more than once. 52 U.S.C. § 10307(c), (e). Indeed, the NVRA also requires that states provide registrants with information about the penalties for the submission of a false voter registration application. *See* 52 U.S.C. § 20507(a)(5)(B).

In addition to the clear requirement that an individual is a resident of the state in which they are registering and the disclosed penalties for lying, many of the states that participate in Crosscheck System make the registrant affirm that the listed residence is their only legal residence or that they do not claim the right to vote in any other jurisdiction.[5]

---

[4] *See, e.g.*, Arizona Voter Registration Form, https://www.azsos.gov/sites/azsos.gov/files/voter_registration_form.pdf; Oklahoma Voter Registration Form, http://www.okdhs.org/OKDHS%20PDF%20Library /OklahomaVoterRegistrationApplicationDHSWeb_afs_03222016.pdf; Missouri Voter Registration Form, https://www.sos.mo.gov/cmsimages/ElectionGoVoteMissouri /register2vote/Adair.pdf; Louisiana Voter Registration Form, https://www.sos.la.gov /ElectionsAndVoting/PublishedDocuments/ApplicationToRegisterToVote.pdf (all from websites last visited April 11, 2018).

[5] *See, e.g.*, Colorado Voter Registration Form, https://www.sos.state.co.us/pubs/elections/vote/ VoterRegFormEnglish.pdf; Mississippi Voter Registration Form, http://www.sos.ms.gov/Elections-Voting/Documents/Voter_Registration.pdf; South Carolina Voter Registration Form, https://www.scvotes.org/files/VR_Blank_Form.pdf (all form websites last visited April 11, 2018). In fact, some states make it explicit that registering in their state cancels any previous registration. See, e.g., Michigan Voter Registration Form, https://www. michigan.gov/documents/MIVoterRegistration_97046_7.pdf (requiring voter to certify that "I authorize the cancellation of any previous registration."); North Carolina Voter Registration Form, https://www.ncsbe.gov/Portals/0/Forms/ NCVoterRegForm06W.pdf (requiring voter to agree "if I am registered elsewhere, I am canceling that registration at this time[.]"); Virginia Voter Registration Form, https://www.elections.virginia.gov/Files/Forms/VoterForms/VoterRegistrationApplication.pdf; South Dakota Voter Registration Form, https://sdsos.gov/elections-voting/assets/VoterRegistrationFormFillable.pdf (requiring a voter to "authorize cancellation of my

It is documented and commonly understood that the act of registering to vote in another state is a request to be removed from the voter registration rolls of your previous state of residence. Moreover, Congress explicitly stated that the act of registering in another state is a request to be removed from the voter registration rolls of the previous jurisdiction under 52 U.S.C. § 20507(a)(3)(A). S. Rep. No. 103-6, at 31; H.R. Rep. No. 103-9, at 14–15. Because Indiana Code Section 3-7-38.2-5 requires that a voter's registration in another state is confirmed before removing the registrant from Indiana's voter rolls, the statute is in clear compliance with the NVRA.

Indiana Code Sections 3-7-38.2-5(e) and -5(f) require an Indiana county voter registration office to make these two explicit determinations before the office may cancel a voter's registration. First, the registration office must determine that the individual from the Crosscheck report is an individual registered in that county.  I.C. § 3-7-38.2-5(e)(1). The confidence factors act as a prophylactic measure to prevent questionable records from reaching the county voter registration office. *See* I.C. § 3-7-38.2-5(d). Once the county voter registration office confirms that the records relate to the same individual, the statute requires that registration office to determine whether that individual registered in the other state on a later date than their Indiana registration. I.C. § 3-7-38.2-5(e)(2). The plain language requires that the county voter registration office determine that an individual registered in another state after their Indiana registration. This confirms that a registrant has requested removal from the registrant's

---

previous registration, if applicable."); Indiana Voter Registration Form, https://forms.in.gov/download.aspx?id=9341 (all form websites last visited April 11, 2018).

previous state's, in this case Indiana's, official voter rolls. 52 U.S.C. 20507(a)(3)(A) does not require any additional process before the voters registration is removed. Indiana Code Section 3-7-38.2-5 complies with the requirements of the NVRA.

### B. Alternatively, Indiana's Voter List Maintenance Program Satisfies the NVRA's Writing Requirement for Confirming Residency Changes.

Plaintiffs make much of the fact that the NVRA requires confirmation of a residency change "in writing" or notice and waiting to confirm such residency change. Plaintiffs PI Memo at 14–18, Dkt. 41. But this flouts the point that the NVRA, 52 U.S. Code § 20507(a)(3)(A), permits a State to remove voters without any notice when it is requested by the voter. See *Supra* Part II.A. To the extent that a county election official is unable to determine that the voter requested to be removed, Indiana Code Section 3-7-38.2-5 complies with § 20507(d)(1)'s written confirmation requirement.

Congress enacted multiple requirements under Section 8 of the NVRA, 52 U.S.C. § 20507. The plain language of Section 20507(d)(1)(A)-(b) allows for removal from a voter list when an individual "confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction."

Plaintiffs' argument seemingly suggests that the NVRA requires both written confirmation and a waiting period in which the voter does not vote in the jurisdiction during the next two federal election cycles. Plaintiffs PI Memo at 16–17, Dkt. 41. But that is not the case. Importantly, the language of the statute is clearly disjunctive with its use of "or," so the waiting period for two federal election cycles is not applicable when an individual confirms in writing the change of residency. See 52 U.S.C. § 20507(d)(1)(A).

Indeed, the waiting period for the next two federal election cycles is *only* applicable when the election official mails a notice to the individual and the voter fails to respond to it with specific content prescribed by the statute. Given that these two provisions each have separate meanings, Plaintiffs' narrow understanding of the NVRA and suggestion that the notice and waiting period is always required contravenes the language of NVRA Section 8. See 52 U.S.C. § 20507(d)(1)(A).

If the Court determines, despite the Congressional reports, that a subsequent out-of-state registration is not a request from voters under in 52 U.S.C. § 20507, it is necessary to determine what satisfies the statute's "in writing" confirmation requirement—an issue left unanswered by other courts. The language of the NVRA itself does not otherwise expand on its meaning "in writing" in this section or what can satisfy it—presumably affording state election officials discretion in implementing such provisions.

### 1. Out-of-state voter registration forms are written confirmation of voter's residency change.

Registering to vote as a resident of another state is undeniably a written confirmation of a change of residence. Significantly, Indiana Code Section 3-7-38.2-5(d) provides that Indiana's NVRA officials must participate in the Crosscheck System. As explained above, upon receiving a record from the Crosscheck System of a possible match with a voter registration in Indiana and another state, Indiana's NVRA officials provides all of the information obtained to the appropriate county election official.  I.C. § 3-7-38.2-5(d). Such matches are determined by other states sharing their voter

22

registration lists with the Crosscheck System. Importantly, a voter's completion and filing of an out-of-state voter registration form serves as written confirmation by the voter of their change in residency. Because these forms provide reliable and written confirmation of a residency change, they satisfy the "in writing" requirement of 52 U.S.C. § 20507(d)(1)(A).

This interpretation is consistent with Congress's other efforts to ensure voters are only able vote once and that the voter registration process serves a significant role in recording accurate information related to an individual's residency and eligibility to vote in a given states and districts. *See, e.g.,* Help America Vote Act, 52 U.S.C. § 21083 ("The State election system shall include provisions to ensure that voter registration records in the State are accurate and are updated regularly[.]"). Congress imposed the criminal penalties on "[w]hoever knowingly or willfully gives false information as to his name, address or period of residence in the voting district for the purpose of establishing his eligibility to register or vote, or conspires with another individual for the purpose of encouraging his false registration to vote or illegal voting[.]" 52 U.S.C. § 10307(c). Surely, it cannot follow that a state is prohibited from relying on the signed assertions of an individual voter as to their current residency when filing such forms with false information would constitute a federal crime for the individual.

While Congress was explicit about what a writing is in other circumstances, it has left it open here in 52 U.S.C. § 20507(d)(1)(A). Here, state election officials are afforded the ability to make such determinations. Such autonomy by state election officials is also reaffirmed by the NVRA's legislative history. In enacting this law,

23

Congress recognized that states will differ in how they implemented certain writing requirements. For example, under Section 5 that incorporated voter registration into the drivers licensing process in states, Congress recognized that electronic means for executing certain written requirements would be sufficient to satisfy the NVRA. S. REP. 103-6, 6-7 (recognizing "in some jurisdictions, the [motor vehicle licensing] application process is fully computerized" and "[i]t will be sufficient for purposes of the requirement of a written declination if the signature of the applicant on the final document produced during the transaction incorporates by reference all questions which are asked of the applicant, including any declination question.").

Additionally, the plain language of the NVRA provides that States conduct a voter maintenance program "that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters[.]" In other contexts related to state actors, courts have noted that, while courts may enforce reasonableness standards, the use of the term "reasonable" indicates the state entity's entitlement to deference. *Wright v. City of Roanoke Redevelopment & Hous. Auth.*, 479 U.S. 418, 430 (1987). Some courts have looked to the phrase "reasonable efforts" and identified it as a "flexible standard that leaves much to the discretion of the states," *Norman v. Johnson*, 739 F. Supp. 1182, 1187 (N.D. Ill. 1990) *abrogated by Suter v. Artist M.*, 503 U.S. 347 (1992)("our examination of it leads us to conclude that Congress was concerned that the required reasonable efforts be made by the States, but also indicated that the Act left a great deal of discretion to them."). Given the text of the NVRA, states are afforded discretion in implementing such programs.

**2. County election officials must still determine whether the voter in the report is the same as the voter registered in the county and whether the out-of-state registration is from a later date than the Indiana registration.**

While Indiana Code Section 3-7-38.2-5(d) requires Indiana's NVRA official to participate in the Crosscheck System, it also provides that county election officials make two separate determinations before removing someone from the voter rolls. There is nothing that prohibits a county election official from obtaining a copy of the other state's voter registration form or alternatively providing some other notice. Plaintiffs contend that the information provided in the Crosscheck hopper "does not provide the out-of-state registration forming the basis for the alleged match." NAACP PI Memo at 21, Dkt. 41. But what information will be provided in the hopper has not been determined yet so Plaintiffs are merely speculating what will be included in the Crosscheck hopper. (Ex. 4, Sheller Dep. 12:17-25, 13:1-4, 43:5-13; Ex. 5, Toshlog Dep. 45:23-25, 46:1-8; Ex. 6, Freeman Dep. 46:20-25, 47:1-2). Rather than recognizing this point, Plaintiffs rely only on what they expect to be in the Crosscheck hopper despite no evidence of information will be available in the hopper for county election officials. Indeed, some county election officials have testified that in the past the actual registration documents from the other states were available for review. (Ex. 5, Toshlog Dep. 41:4-17, 41:21-25, 42:1-6; Ex. 6, Freeman Dep. 27:7-23; Ex. 8, Mowery Dep. 73:19-25, 74:1-18).

***

The act of registering to vote in another state may be considered either: (1) a request for removal from the voter roll in their previous state of residence under 52

U.S.C. § 20507(a)(3)(A); or (2) a confirmation in writing that the registrant has changed residence under 52 U.S.C. § 20507(d)(1)(A).  Here, a plain reading of both Indiana Code Section 3-7-38.2-5 and 52 U.S.C. § 20507 shows that Indiana Code Section 3-7-38.2-5 complies with all the requirements set out in the NVRA. Given this is a facial challenge to a statute, Plaintiffs have failed to show that no set of circumstances exist under which Indiana Code Section 3-7-38.2-5 would be valid.

### III. Indiana's actions with respect to the Crosscheck System are uniform, reasonable, and nondiscriminatory.

#### A. Indiana's Voter List Maintenance Law is Reasonable

As explained above, Indiana Code Sections 3-7-38.2-5(e) and -5(f) require an Indiana county voter registration office to make these two explicit and independent determinations before the office may cancel a voter's registration.  The county registration official must determine that the individual from the Crosscheck System hopper is an individual registered in that county, I.C. § 3-7-38.2-5(e)(1), and whether that individual registered in the other state on a later date than their Indiana registration.  I.C. § 3-7-38.2-5(e)(2).  Yet, even if Indiana Code Section 3-7-38.2-5 did not require county election official to make the independent determinations, the Full Faith and Credit Clause of the Constitution of the United States would permit these county election officials to rely on other State's records regarding voter registration. Accordingly, Indiana Code Section 3-7-38.2-5 complies with the NVRA.

The Full Faith and Credit Clause requires that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other

State." U.S. Const. art. IV, § 1. The Supreme Court "differentiates the credit owed to laws (legislative measures and common law) and to judgments." *Baker by Thomas v. Gen. Motors Corp.*, 522 U.S. 222, 232 (1998). While "[t]he Full Faith and Credit Clause does not compel 'a state to substitute the statutes of other states for its own statutes dealing with a subject matter concerning which it is competent to legislate[,]'" *Sun Oil Co. v. Wortman*, 486 U.S. 717, 722 (1988) (quoting *Pac. Emp'rs Ins. Co. v. Indus. Accident Comm'n*, 306 U.S. 493, 501(1939)), a court "may be guided by the forum State's 'public policy' in determining the law applicable to a controversy. *Baker by Thomas*, 522 U.S. at 233.

But with regards to the Constitution's use of the term "records" in the Full Faith and Credit Clause, "there is no easy consensus" what degree of faith and credit are due to them. Shawn Gebhardt, *Full Faith and Credit for Status Records: A Reconsideration of Gardiner*, 97 Cal. L. Rev. 1419 (2009). "Neither the Supreme Court nor Congress has defined what records are, nor have they explained what level of faith and credit records should be accorded." *Id.* But coordination and reliance on reports between the federal government and the states and among the states is routine within a system balanced on the principles of federalism.

Here, even if county voter registration officials were not to consider additional evidence, they should be permitted to rely on another state's official records. Other states' official voter registration lists are the official records that are the basis of the Crosscheck System. Consequently, they certainly should be afforded a presumption of validity and reliability. And even the list of "matches" provided to individual states by the Crosscheck System is an official record of the Kansas Secretary of State. Given that

these are executive branch records of sovereign states, the Full Faith and Credit Clause affords them deference and a presumption of validity. "As a result [of the lack of precedent], the activities of two out of three branches of our state movements—the judicial and legislative branches—are ensured a relatively uniform level of deference and respect. But the deference accorded to activities of our state executives, embodied in records, is in limbo." *Gebhardt* at 1420. Such official representations by State governments deserve the same deference under the text of the Full Faith and Credit Clause as any judgment or statute.

**B. Indiana's Voter List Maintenance Law is Uniform and Nondiscriminatory**

Plaintiffs misunderstand the uniformity requirement of 52 U.S.C. § 20507(b)(1). The NVRA provides that:

> Any State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office . . . shall be uniform . . . .

52 U.S.C. § 20507(b)(1). Indiana law meets this requirement, and Defendants are not in violation of the uniformity provision.

Indiana law *requires* county election officials to determine whether the voter in the report is the same as the voter registered in the county *and* that the foreign registration is from a later date than the Indiana registration. Ind. Code § 3-7-38.2-5(d). Further, if the county election official makes such a determination, county voter registration office *shall* cancel that voter registration. *Id.* § 3-7-38.2-5(e). This law applies uniformly to all counties, state-wide. Further, it uses mandatory language; the requirements of Indiana Code Section 3-7-38.2-5(d) and (e) are not discretionary. (Ex. 7,

Nussmeyer Dep. at 10:8-10, 22:10-11 )(testifying that Defendants "have a framework and state law that [they] are instructed to follow, and in that they are uniform in [their] policies and procedures to the counties.").

Regardless of county officials' other testimony in this case, they all testified that they followed the law, in that they: (1) determine whether the voter in the report is the same as the voter registered in the county; (2) determine whether the foreign registration is from a later date than the Indiana registration, and (3) if so, cancel the voter registration. (*See*, *e.g.*, Ex. 4, Sheller Dep. at 41:15-23 (testifying that she follows the laws and considers them mandatory); Ex. 8, Mowery Dep. at 15:17-22 (testifying that the election code is binding)).

Naturally, the determination is going to be different with each individual voter record. So any variableness is due to the individual voter record and the natural consequence of a need to give a different consideration for each record. Accordingly, inconsistent methods of "determination" among county voter registration officials do not cause Indiana's voter registration list maintenance law to lose its uniform character. Plaintiffs complain that there is no "guidance, manual, step-by-step instruction, or standard operating procedure[.]" Plaintiffs PI Memo at 27, Dkt. 41. Contrary to Plaintiffs' argument, nothing in the NVRA requires Defendants to provide detailed instruction to county voter registration officials about how to make match determinations.

Yet, Plaintiffs cannot point to anything within the NVRA or relevant case law that imposes a duty on Defendants to train county officials. Further, the fact that the Co-

29

Directors may not always agree on how to "determine" a match has no effect on the uniform application of the law requiring county officials to *make that determination*. The bare statistics that Plaintiffs provide to try to demonstrate that Indiana's voter list maintenance law is non-uniform is not evidence of such. Plaintiffs make assumptions about how different counties determine matches based on the rates at which those matched are confirmed. Plaintiffs PI Memo at 26 – 27, Dkt. 41. This is pure conjecture, as there is no actual evidence about what actions are actually taken by the listed counties.

Courts that have found non-uniformity in a state's voter list maintenance activity have done so because a state-required program or activity applies only to a certain class of voters. *See, e.g., Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 707 (N.D. Ohio 2006) (finding violation of NVRA uniformity requirement where state law directed voters to disclose if they were aided in filling out registration cards by a person "compensated" to do so, in that the law would in effect only apply to voters who were so aided).

Plaintiffs cite three cases to support its position that the Indiana law is not uniform, all of which are inapposite. In *Association of Community Organizations for Reform Now (ACORN) v. Edgar*, No. 95 C 174, 1995 WL 532120 (N.D. Ill. Sept. 7, 1995), the relevant law authorized—but did not require—local authorities to require new voter applicants to fill out an address verification form before a registration would become effective. *Edgar*, 1995 WL 532120, *1. Quite differently, the Indiana law contains affirmative requirements that are necessary for NVRA compliance and all deponents testified that they fulfill those requirements.

30

In *Arizona Democratic Party v. Reagan*, No. CV-16-03618, 2016 WL 6523427 (D. Ariz. Nov. 3, 2016), the issue before the court was whether only the county voter registration officials could offer the relief the plaintiffs sought–that is, whether the secretary of state could guarantee that county officials would abide by the registration deadline. *Reagan*, 2016 WL 3523427, *6. In that case, there was evidence that at least one county did not comply with the state law requiring registration to end on a certain date. *Id.* at *2. In contrast, all of the testimony Plaintiff elicited from county officials in the present case confirms that they follow the Indiana law and make the determinations. *Reagan* did not address whether the state NVRA official had a duty to ensure county officials all followed the law through the same activities.

Finally, Plaintiff cites *Project Vote v. Madison Cnty. Bd. of Elections*, No. 1:08-cv-2266-JG, 2008 WL 4445176 (N.D. Ohio, Sept. 29, 2008). This case addresses an entirely different section of the NVRA–namely absentee voting. The state adopted "no-fault absentee voting," allowing absentee voting if the voter was registered at least 30 days prior to requesting the absentee ballot. *Project Vote*, 2008 WL 4445176, *3. Thereafter, the secretary of state issued a Directive that a newly registered voter could obtain an absentee ballot immediately. At least one county announced it would not follow the Directive, but would follow the statutory 30-day waiting period instead. *Id.* The court simply found, while assessing the requirements for a TRO, that it would be in the public interest for every county to apply the Directive. *Id.* at *11.

Plaintiffs does not and cannot provide any case law to demonstrate that courts have interpreted the uniformity requirement in the manner it requests. For this reason,

it has not met its burden to demonstrate that it is likely to succeed on the merits of its challenge to the uniformity of the Indiana program.

## PLAINTIFF HAS NOT DEMONSTRATED IRREPARABLE HARM

In order to prevail on a motion for a preliminary injunction, Plaintiffs must establish that the denial of such an injunction will result in irreparable harm. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "'Irreparable' in the injunction context means not rectifiable by the entry of a final judgment." *Walgreen Co. v. Sara Creek Prop. Co.*, 966 F.2d 273, 275 (7th Cir. 1992) (citations omitted). Here, for the reasons provided above, the provisions of Indiana Code Section 3-7-38.2-5 challenged by Plaintiffs comply with the NVRA. Accordingly, neither Plaintiffs nor any voter is facing the denial of their rights or any such irreparable harm.

Indiana's compliance with the NVRA through Indiana Code Section 3-7-38.2-5 cannot be said to cause irreparable harm when "States are required to conduct a general program that makes a reasonable effort to remove names of ineligible voters from the official lists…." S. Rep. No. 103-6, at 18 (1993); *see also* H.R. Rep. No. 103-9, at 15 (1993). Most important, the removal of a voter's registration from the Indiana rolls does not prevent the voter from voting in an election. Indiana's Alternative Voting Procedures, Ind. Code Section 3-7-48-5, ensure any person arriving at a polling place on the date of an election will be allowed to vote. Importantly, this is *not* a provisional ballot but rather a fail-safe under 52 U.S.C. 20507(e)(3) and it provides "a voter . . . may vote in the precinct where the voter formerly resided (according to the voter registration record) if the voter makes an oral or a written affirmation to a member of the precinct election

32

board that the voter continues to reside at the address shown[.]" I.C. § 3-7-48-5(b).
Thus, "[i]f a voter is challenged on the day of voting, they fill out an affidavit and their
vote is sealed. The affidavit affirms that they have filled out their ballot and that is their
signature, etc." (Ex. 7, Nussmeyer Dep. 153:1-8).

Also, as a practical matter, Indiana has not yet been provided any Crosscheck
report from which the Election Division or county officials could possibly take any
action.  And for the purposes of the upcoming 2018 election, no voter will be denied the
opportunity to vote. At this juncture, no "matches" will have the time to make it to the
county hoppers before the 2018 primary election. (Ex. 2, King Decl. at 2; Ex. 3,
Nussmeyer Decl. at 2). If, after the required criteria are met, a county decides to cancel a
voter's registration, the voter will still remain in the Indiana voter system and can still
vote despite their registration being cancelled. (Ex. 8, Mowery Dep. 85:2-8). Plaintiffs
have not identified any individual voters who have been removed from the voter
registration list or is in imminent danger of being removed from the list that results in
irreparable harm.

Furthermore, a mere possibility that that a unlikely worst-case scenario may
occur does not amount to the sort of irreparable harm that justifies a preliminary
injunction—especially not where Plaintiffs are bringing a facial challenge.

**PUBLIC POLICY AND THE BALANCE OF EQUITIES FAVOR THE STATE**

A plaintiff "must show that the probability of success on the merits is sufficiently
high—or the injury from the enforcement of the order sufficiently great—to warrant a
conclusion that the balance of error costs tilts in favor of relief."  *Ill. Bell Tel. Co. v.*

*WorldCom Techs., Inc.*, 157 F.3d 500, 503 (7th Cir. 1998). When the party opposing the motion for preliminary injunction is a political branch of government, the restraint for issuing such an injunction is particularly high due to public policy considerations, as "the court must consider that all judicial interference with a public program has the cost of diminishing the scope of democratic governance." *Id.* Indeed, "the government's interest is in large part presumed to be the public's interest." *United States v. Rural Elec. Convenience Coop. Co.*, 922 F.2d 429, 440 (7th Cir. 1991).

A preliminary injunction here would thwart Congress's specific goals of "protect[ing] the integrity of the electoral process" and ensuring "that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b). The public interest is best served by allowing the Indiana election law to operate free of "federal judicial micromanagement." *See Stevo v. Keith*, 546 F.3d 405, 409 (7th Cir. 2008) (citing *Crawford v. Marion Cnty. Election Board*, 472 F.3d 949, 954 (7th Cir. 2007), affirmed 553 U.S. 181 (2008)). When the party opposing the motion for preliminary injunction is a political branch of government, the restraint for issuing such an injunction is particularly high due to public policy considerations, as "the court must consider that all judicial interference with a public program has the cost of diminishing the scope of democratic governance." *Id.*

Defendants' implementation of Indiana Code Section 3-7-38.2-5 serves the public interest because it serves Indiana's interest in clean voter registration rolls that accurately reflect the current registration status of each voter. Defendant has a compelling interest in ensuring and administering fair and honest elections, particularly

in ensuring the integrity of the voter registration rolls. In *Crawford*, the Supreme Court specifically recognized "the legitimacy [and] importance of the State's interest in counting only the votes of eligible voters," 553 U.S. at 165, and the State's "broad interests in protecting election integrity." *Id*. at 200.

Moreover, as Defendants have shown, removal of a voter from the Indiana rolls does not prevent her from voting in an election. Thus, the issuance of a preliminary injunction in this case is an unnecessary restraint on Congressional intent. The public interest is best served by clean voter registration rolls that accurately reflect the current registration status of each voter.

Lastly, as a matter of federalism here, it is also important that the court afford Defendants and Indiana law a presumption of validity in order to ensure protection of States' full authority under the Elections Clause, U.S. Const. art. I, § 4, to enact comprehensive election laws. *Smiley v. Holm*, 285 U.S. 355, 366 (1932); *see also Storer v. Brown*, 415 U.S. 724, 730 (1974) ("[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."). Indiana's discretionary legislative authority over elections is important because no "election law could have been framed and inserted in the Constitution, which would have been always applicable to every probable change in the situation of the country[.]"  The Federalist No. 59, at 379 (Alexander Hamilton) (Modern Library Coll. ed. 2000).

## CONCLUSION

The Court should deny the Motion for Preliminary Injunction.

35

Respectfully submitted,


CURTIS T. HILL, Jr.
Attorney General of Indiana
Attorney No. 13999-20


_s/ Jefferson S. Garn_
Jefferson S. Garn
Section Chief, Administrative and
Regulatory Enforcement Litigation
Attorney No. 29921-49

Diana Moers Davis
Deputy Attorney General
Attorney No. 28302-82

Kelly S. Thompson
Deputy Attorney General
Attorney No. 21846-49

Kyle Hunter
Deputy Attorney General
Attorney No. 30687-49

Matthew R. Elliott
Deputy Attorney General
Attorney No. 34000-49

Office of the Attorney General
302 W. Washington St.
IGC-South, Fifth Floor
Indianapolis, IN 46204-2770
Phone: (317) 234-7119
Email: jefferson.garn@atg.in.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on April 12, 2018, a copy of the foregoing was filed electronically using the Court's CM/ECF system, sending notice to the following party who may access this filing using the Court's system:

Trent A. McCain
Trent@McCain.Law

Myrna Pérez
myrna.perez@nyu.edu

Jonathan Brater
Jonathan.brater@nyu.edu

Sascha N. Rand
Ellyde R. Thompson
Geneva McDaniel
Alexandre J. Tschumi
sascharand@quinnemanuel.com

 *s/ Jefferson S. Garn*
Jefferson S. Garn
Section Chief, Administrative and Regulatory
Enforcement Litigation

Office of the Attorney General
Indiana Government Center South
302 W. Washington St., 5th Floor
Indianapolis, IN   46204
Phone: (317) 234-7119
FAX:   (317) 232-7979
Email:  Jefferson.Garn@atg.in.gov