UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| INDIANA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (NAACP) and LEAGUE OF WOMEN VOTERS OF INDIANA, <br><br> Plaintiffs, <br><br> v. <br><br> CONNIE LAWSON, in her official capacity as the Indiana Secretary of State; J. BRADLEY KING, in his official capacity as Co-Director of the Indiana Election Division; ANGELA NUSSMEYER, in her official capacity as Co-Director of the Indiana Election Division, <br><br> Defendants. | Docket No. 1:17-cv-02897-TWP-MPB <br><br><br> **HEARING REQUESTED** |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Sascha N. Rand
Ellyde R. Thompson
Ellison Ward Merkel
Geneva McDaniel
Alexandre J. Tschumi
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

Myrna Pérez
Jonathan Brater
BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271

Trent A. McCain
MCCAIN LAW OFFICES, P.C.
5655 Broadway
Merrillville, IN 46410
(219) 884-0696

## TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................................1

ARGUMENT .......................................................................................................................2

I.    PLAINTIFFS HAVE AN OVERWHELMING LIKELIHOOD OF SUCCESS ON THE MERITS .................................................................................................................2

    A.    A Crosscheck "Match" Does Not Satisfy Either Of The Exceptions Allowing For Immediate Removal Based On Change In Residence ......................3

        1.    A Crosscheck Match Is Not A "Request" Or "Confirmation" ...................3

        2.    A Crosscheck Match Is Not A Proxy For A "Request" Or A "Confirmation" ........................................................................................4

        3.    Theorizing That County Registration Offices Will "Get It Right" Does Not Warrant Deviation From The NVRA ........................................8

    B.    Defendants' Application Of SB 442 Violates The NVRA's Requirements That Voter List Maintenance Be Reasonable, Uniform, And Nondiscriminatory ..........................................................................................9

    C.    Plaintiffs Have Standing In Their Own Right And To Prevent Their Members' Imminent Future Injury .......................................................................11

        1.    Plaintiffs Have Standing In Their Own Right Because SB 442 Will Perceptibly Impair Their Organizational Mission .....................................13

        2.    Plaintiffs Have Standing To Represent Their Members, Who Are At Direct Risk Of Removal...........................................................................15

II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION ...................................................................................16

    A.    SB 442 Will Cause Imminent And Irreparable Harm..........................................16

    B.    The Harm Threatened Cannot Be Cured By Indiana's Implementation Of Fail-Safe Requirements...........................................................................................17

III.    THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST BOTH WEIGH HEAVILY IN FAVOR OF A PRELIMINARY INJUNCTION.........................20

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### Cases

*A. Philip Randolph Inst. v. Husted*,
  838 F.3d 699 (6th Cir. 2016),
  *petition for cert. granted*, No. 16-980 (argued Jan. 10, 2018) .................................. 12

*Am. Civil Rights Union v. Phila. City Comm'rs*,
  No. 16-1507, 2016 WL 4721118 (E.D. Pa. Sept. 9, 2016) .................................... 12

*Arcia v. Fla. Sec'y of State*,
  772 F.3d 1335 (11th Cir. 2014) .......................................................... 2, 3, 12, 15, 16

*Ariz. Democratic Party v. Regan*,
  No. CV-16-03618, 2016 WL 6523427, at *6 (D. Ariz. Nov. 3, 2016) .................................. 10

*Babbit v. United Farm Workers Nat'l Union*,
  442 U.S. 289 (1979) ........................................................................ 11

*Bellitto v. Snipes*,
  221 F. Supp. 3d 1354 (S.D. Fla. 2016) .................................................... 12

*Charles H. Wesley Educ. Found. v. Cox*,
  408 F.3d 1349 (11th Cir. 2005) ...................................................... 15 n.11

*Common Cause of Colo. v. Buescher*,
  750 F. Supp. 2d 1259 (D. Colo. 2010)................................. 12, 13, 14 n.9, 15 & n.11

*Common Cause v. Kemp*,
  714 F. App'x 990 (11th Cir. Mar. 12, 2018)........................................ 12 n.8

*Common Cause/Ga. v. Billups*,
  554 F.3d 1340 (11th Cir. 2009) .................................................. 14 n.10

*Crawford v. Marion Cty. Election Bd.*,
  472 F.3d 949 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008) ...................................... 14

*Elrod v. Burns*,
  427 U.S. 347 (1976)........................................................................ 16

*Fla. State Conference of the NAACP v. Browning*,
  522 F.3d 1153 (11th Cir. 2008) .......................................................... 16

*Frank v. Walker*,
  196 F. Supp. 3d 893 (E.D. Wis. 2016)........................................................ 16

*Harkless v. Brunner*,
  545 F.3d 445 (6th Cir. 2008) .............................................................. 10

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982)........................................................................ 13

*Ind. Democratic Party v. Rokita*,
  458 F. Supp. 2d 775 (S.D. Ind. 2006) ................................................ 14, 15

*Judicial Watch, Inc. v. King*,
  993 F. Supp. 2d 919 (S.D. Ind. 2012) ............................................... 12, 13

*League of Women Voters of Fla. v. Browning*,
  863 F. Supp. 2d 1155 (N.D. Fla. 2012) .................................................. 16

*League of Women Voters of N.C. v. North Carolina*,
  769 F. 3d 224 (4th Cir. 2014) ................................................................ 20

*League of Women Voters of the U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) .................................................................. 13

*United States v. Missouri*,
  535 F.3d 844 (8th Cir. 2008) ....................................................... 8 n.3, 10

*N.C. State Conference of the NAACP v. N.C. State Bd. of Elections*,
  No. 1:16CV1274, 2016 WL 6581284 (M.D.N.C. Nov. 4, 2016) ............. 14 n.10, 20

*N.C. State Conference of the NAACP v. N.C. State Bd. of Elections*,
  283 F. Supp. 3d 393 (M.D.N.C. 2017) ................................................. 12

*Nat'l Council of La Raza v. Cegavske*,
  800 F.3d 1032 (9th Cir. 2015) ....................................................... 14 n.10

*Obama for Am. v. Husted*,
  697 F.3d 423 (6th Cir. 2012) ................................................................ 20

*Pennsylvania v. W. Virginia*,
  262 U.S. 553 (1923) .............................................................................. 11

*Project Vote v. Blackwell*,
  455 F. Supp. 2d 694 (N.D. Ohio 2006) .................................................... 9

*United States v. Rural Elec. Convenience Coop. Co.*,
  922 F.2d 429 (7th Cir. 1991) ................................................................ 20

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) .............................................................................. 11

*U.S. Student Ass'n Found. v. Land*,
  585 F. Supp. 2d 925 (E.D. Mich. 2008) ................................................ 12

*Vill. of Bellwood v. Dwivedi*,
  895 F.2d 1521 (7th Cir. 1990) .............................................................. 13

## Statutory Authorities

42 U.S.C. § 1973gg-9(b) ....................................................................... 15 n.11

52 U.S.C. § 20501 ..................................................................................... 1, 20

52 U.S.C. § 20507 ................................................................................. 4, 7, 11

Ind. Code § 3-7-38.2-5 .............................................................................. 1, 8

Ind. Code § 3-7-48-5 ................................................................................................................ 17

Ind. Code § 3-7-48-7.5 ............................................................................................................. 18

**Legislative Materials**

S. Rep. No. 103-6 (1993) ............................................................................................................ 1

**Additional Authorities**

Confirm, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/confirm ......... 4 n.1

Request, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/request .......... 4 n.1

Plaintiffs, the Indiana State Conference of the National Association for the Advancement of Colored People (NAACP) and League of Women Voters of Indiana, respectfully submit this reply memorandum of law in further support of their motion for injunctive relief barring implementation of the noncompliant aspects of Indiana's amended voter registration statute— Indiana Senate Enrolled Act 442, 120TH GEN. ASSEMBLY, 1ST REG. SESS. (Ind. 2017), amending Indiana Code Section 3-7-38.2-5 ("SB 442"), and enjoining Defendants' administration of a voter list maintenance program that is not "reasonable," "uniform," or "nondiscriminatory" in violation of the National Voter Registration Act, 52 U.S.C. §§ 20501–20511 ("NVRA"). Plaintiffs further submit this reply memorandum to respond to Defendants' baseless assertions concerning Plaintiffs' standing.

## INTRODUCTION

Defendants' opposition underscores the noncompliant nature of SB 442. To defend an amendment designed to remove critical protections mandated by the NVRA, Defendants are forced to ignore core requirements of the NVRA. As detailed in Plaintiffs' opening brief ("Open. Br.," Dkt. No. 41) the NVRA provides that a voter can be removed for change of residency only "if the voter *notifies the registrar* of such a change or has *failed to respond to a notice* sent by the registrar *and* has failed to vote or appear to vote in *two Federal general elections following date of the notice*." S. Rep. No. 103-6, at 19 (1993) (emphasis added). These NVRA protections are not satisfied by merely establishing—as Defendants purport to do through a Crosscheck "match"— that some unspecified action may have been undertaken at an unspecified time by an Indiana voter in another state. The Crosscheck "match" trumpeted by Defendants in their opposition is neither a "request" to cancel a voter's prior registration nor a "confirmation" of residency change. It is, at most, a first step that potentially identifies a person taking some sort of action in another jurisdiction. *See* Open. Br. 15–17. Nor, moreover, does Defendants' blind, aspirational, reliance

1

on county election officials render SB 442 reasonable, uniform, and nondiscriminatory.  As detailed in Plaintiffs' opening brief (*see* Open. Br. 24–28), the county election officials do not receive uniform guidance or instruction as to procedures.  Moreover, they have varying and inaccurate views about what a Crosscheck match means and what follow up procedures they must utilize to satisfy their obligations under federal and state law.  They will thus, under SB 442, be forced to make arbitrary, inconsistent, and discriminatory removal determinations.

Recognizing these core weaknesses in their merits arguments, Defendants start off their opposition with an attack on Plaintiffs' standing.  There Defendants ignore settled precedent establishing organizational standing where, as here, a law has perceptibly impaired an organization's core mission.  *See*, *e.g.*, *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341–42 (11th Cir. 2014).  Defendants' alternative suggestion that Plaintiffs cannot establish an injury, or irreparable harm, on ripeness grounds is equally meritless.  That no voter has *yet* been harmed— which is the very purpose of the injunctive relief sought by Plaintiffs—does not avert the imminent irreparable harm threatened by Defendants' implementation of SB 442 without the core protections afforded by the NVRA.

## ARGUMENT

### I.    PLAINTIFFS HAVE AN OVERWHELMING LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiffs have an overwhelming likelihood of success on the merits.  SB 442 facially violates the NVRA by providing for the immediate cancellation of voters based on change of residence, without a request or confirmation in writing from the voter and without a notice or waiting period.  *First*, Crosscheck matches do not constitute either a voter "request" or voter "confirmation" permitting removal of a voter under the NVRA.  *Second*, even if a database "match" of some sort were, *arguendo*, legally capable of serving as a reliable proxy for a "request"

or a "confirmation," Crosscheck matches cannot serve as such a proxy.  As detailed in Plaintiffs' opening brief, the inherent limitations in Crosscheck matches present an unacceptably high risk of mistaken and arbitrary voter removal.  *See* Open Br. 19–24.  Nor does House Enrolled Act 1253 ("HEA 1253")—and its effort to enhance the match of "identity"—address these inherent limitations.

### A.    A Crosscheck "Match" Does Not Satisfy Either Of The Exceptions Allowing For Immediate Removal Based On Change In Residence

The NVRA is clear:  jurisdictions cannot immediately cancel voters based on a change of residency absent voter confirmation without both (1) notice and (2) a waiting period prior to removal.  Defendants correctly assert that the NVRA includes two limited exceptions.  A voter's registration can be canceled (1) "at the request of the registrant"; and (2) if the registrant "confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered."  *See* Brief in Opposition ("Opp. Br.") at 17–26.  But Defendants are incorrect that a Crosscheck "match" is the equivalent of a voter's request or confirmation.

### 1.    *A Crosscheck Match Is Not A "Request" Or "Confirmation"*

In order to remove a voter immediately, a jurisdiction must receive a cancellation request submitted *by the registrant*—not a purported proxy for such a request inferred from a database match.  *Cf. Arcia*, 772 F.3d at 1346 (the NVRA permits "removals based on individualized information at any time ... because this type of removal is usually based on individual correspondence or rigorous individualized inquiry, leading to a smaller chance for mistakes").  Moreover, as the Department of Justice has explained, removal at the request of the registrant requires first-hand information:

> A "removal at the request of the registrant" under the NVRA involves *first-hand information* from a registrant that can originate in at least three ways:  1) a registrant requesting to remove his or her name from the voting registration list, 2) a registrant completing and returning a notice card indicating an address change outside the

3

jurisdiction, or 3) a registrant submitting a new application registering to vote a second time in a new jurisdiction, and providing information regarding the registrant's prior voter registration address on the new application, which the State can treat as a request to cancel or transfer his or her prior registration.

Brater Decl. Ex. 1 (Dep't of Justice, *The National Voter Registration Act of 1993 (NVRA)*, https://www.justice.gov/crt/national-voter-registration-act-1993-nvra) (emphasis added) (Question 31). While Defendants are correct that an *application* in another state could, under the right circumstances, potentially include a legally sufficient request by a registrant to be de-registered in their prior State, Indiana's Crosscheck match cannot by itself serve as a proxy for a registrant's first-hand affirmative request as required by § 20507(a)(3)(A).

Nor is a Crosscheck match a "confirmation" that a voter has moved pursuant to § 20507(d)(1)(A) of the NVRA. Section 20507(d)(1)(A) expressly requires "confirm[ation] *in writing [from the registrant]* that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered." 52 U.S.C. § 20507(d)(1)(A) (emphasis added). Putting aside the unreliable nature of the inferences that Indiana purports to draw from its Crosscheck matches, as with requests to de-register, Crosscheck matches are not an affirmative confirmation *in writing and from the registrant*.[1]

>    2.    A Crosscheck Match Is Not A Proxy For A "Request" Or A "Confirmation"

Even if, *arguendo*, second-hand database matches could be used to satisfy the NVRA's first-hand "request" and "confirmation" exceptions (which they cannot), Indiana's Crosscheck

---

[1]    Defendants altogether ignore that the common-sense definitions of both words require affirmative intentional action by the requesting or confirming party. *See* Request, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/request (defining "request" as "the act or an instance of asking for something") (last visited Apr. 19, 2018); Confirm, *id.*, https://www.merriam-webster.com/dictionary/confirm (defining "confirm" as "to give approval to") (last visited Apr. 19, 2018).

procedure is unable, given its inherent limitations, to serve as a such a proxy.  To utilize a Crosscheck match as a proxy for a request or confirmation, an election official must infer at a minimum that:  (i) the individual identified by Crosscheck is the same individual registered in the jurisdiction; (ii) the individual actually registered to vote in another state (*see* Open. Br. 21–22 & n.20); (iii) the individual's out-of-state registration postdated the voter's activity in Indiana (*see* Open. Br. 21–22); and (iv) the voter affirmatively signed a document relinquishing his or her right to vote in Indiana (*see* Open. Br. 21, 23–24).  Indiana's Crosscheck match fails to provide any basis, let alone a reliable basis, upon which an election official can infer that a voter requested or confirmed that his or her Indiana registration be canceled.

*First*, Crosscheck does not reliably establish that a matched individual actually registered in another state.  Open. Br. 21–22.  For the data field "Date_of_Registration," the Crosscheck Participation Guide instructs state officials that "[t]his field should contain, if possible, the date of the most recent voter-initiated change."  Tschumi Decl. Ex. 2, Dkt. No. 42-2, at 7 (2017 Crosscheck Participation Guide).  Participating states feeding their information into the Crosscheck program, however, use a myriad of different definitions for this field, many of which are not dates of registration.  Tschumi Decl. Ex. 19, Dkt. No. 42-19 (2017 Interstate Crosscheck Program Definitions of Date of Registration Spreadsheet).  In fact, 13 of the 31 participating states in 2017, *including Indiana*, do not even detail what their "Date_of_Registration" field means or how it is populated, while others do not even populate the field.  *Id.*; Nussmeyer Tr. 98:19–21 ("It's my understanding that the date of voter registration field may not always be populated by the other state.").

*Second*, because a Crosscheck match does not provide any additional information about what action occurred in the other jurisdiction—and fails to use uniform "Date_of_Registration"

field definitions across states (*see* Open. Br. 21)—a Crosscheck match fails to establish whether the out-of-state action postdates or predates the Indiana voter action.

Defendants attempt to sidestep Crosscheck's failings by asserting that voter registration forms in the states that participate in the Crosscheck System require the registrant to provide an address and affirm in writing that he is a resident of that state and that "many of the states that participate in Crosscheck System make the registrant affirm that the listed residence is their only legal residence or that they do not claim the right to vote in any other jurisdiction." Opp. Br. 19. While that may be, a Crosscheck match does not provide an Indiana election official with first-hand evidence that an individual even signed a registration form, let alone what sort of affirmation the form may have included (if any) and whether it was legally sufficient to serve as an NVRA compliant request or confirmation.

Crosscheck is, accordingly, unable to reliably establish that (i) the "matched" voter actually signed a registration application (as opposed to taking any one of the myriad other actions that could cause the "Date_of_Registration" field to update in a Crosscheck-participant state); (ii) that the voter did so after registering or taking some other voter action in Indiana; and also (iii) that the registration form contained a legally sufficient statement affirmatively authorizing cancellation of previous registrations. Unless backstopped by the protection of the NVRA's notice-and-waiting period, use of Crosscheck matches alone will create a serious risk that voters will be mistakenly or arbitrarily removed.

It is exactly this concern—mistaken removal—that animates the NVRA's requirement that there be a notice-and-waiting period absent a first-hand irrefutable request or confirmation from the voter for de-registration. Indeed, the NVRA expressly provides that Postal Service Data— which like Crosscheck data suggests, at most, only a *possible* change of residency—is not

sufficiently reliable to support removal absent the protections of a notice-and-waiting period. *See* 52 U.S.C. § 20507(c)(1) (requiring a registrar to "use[] the notice procedure described in subsection (d)(2) to confirm the change of address" where "change-of-address information [is] supplied by the Postal Service"). As Co-Director Nussmeyer stated, "[I]t's a violation of state and federal law for a voter registration official to cancel a voter's registration *unless they have signed authorization from the voter* that they want their registration cancelled." Tschumi Decl. Ex. 10, Dkt. No. 42-10 (Email from Angela Nussmeyer to Suzann Cox, Voter Registration/Election Clerk, White Cnty. Clerk's Office, (Feb. 4, 2016)) (emphasis added).

Defendants place great weight on their "confidence factors," now codified by the passage of HEA 1253. But stricter "identity" matching criteria are not a substitute for the NVRA's mandated protections. Congress determined that absent an affirmative request or confirmation the state must utilize notice-and-waiting-period procedures. Indiana is not free to substitute its judgment for Congress' because it thinks it has a reliable identity matching methodology.[2] Reliably matching an individual through Crosscheck does nothing to confirm the individual actually moved out of Indiana, intends to vote in another jurisdiction, or authorized cancellation of his or her Indiana registration.

---

[2]  Even HEA 1253's "enhanced" matching criteria does not give users the ability to reliably confirm the match. As of 2017, out-of-state social security numbers were not provided by Crosscheck. Local Indiana officials would instead only see a "masked" four digit number comprised of special characters. *See* Brater Decl. Ex. 2 (Email from Bryan A. Caskey, Kan. Dir. of Elections, to Angela Nussmeyer & Bradley King, et al. (Feb. 27, 2017)) ("[T]he Kansas Secretary of State's office has decided to move forward this year with a plan to no longer include other state's SSN4 when providing information back to the states.").

3.   *Theorizing That County Registration Offices Will "Get It Right" Does Not Warrant Deviation From The NVRA*

Conceding that the Crosscheck matches do not constitute "requests" and "confirmations," Defendants next attempt to defend SB 442 by asserting that county voter registration officials are the ones required to "determine whether the individual:  (1) identified in the [Crosscheck match] provided by the NVRA official under subsection (d) is the same individual who is a registered voter of the county; and (2) registered to vote in another state on a date following the date that voter registered in Indiana."  Opp. Br. 16 (citing Ind. Code § 3-7-38.2-5(e)); *Id.* at 20–21, 26. Defendants cannot defend SB 442 (and Crosscheck) by aspirationally claiming that county officials will go out and make the very determinations Defendants know local officials have been (and will be) relying on Crosscheck to make.  *See* Open. Br. 20–24 (cataloguing inferences county officials improperly draw from Crosscheck matches).[3]  Further, nowhere does SB 442 or any other part of the Indiana Code obligate the county registration officials to make their determinations based on first-hand evidence secured from the voter or other jurisdiction's election offices or provide any uniform procedures to ensure that any such decisions are made based on reliable sources of evidence and in a uniform and nonarbitrary fashion.[4]

---

[3]  This is also an impermissible attempt to "delegate the responsibility to conduct a general program to a local official and thereby avoid responsibility if such program is not reasonably conducted," *United States v. Missouri*, 535 F.3d 844, 850 (8th Cir. 2008), as set forth in more detail *infra* p. 10.

[4]   Defendants' related last-ditch argument—that they have not determined what information will be included in the Crosscheck hopper—fares no better.  *See* Opp. Br. 25. Defendants do not (and cannot) dispute that Crosscheck itself does not provide the other state's voter registration form.  Nussmeyer Tr. 96:20–97:9.

B.    **Defendants' Application Of SB 442 Violates The NVRA's Requirements That Voter List Maintenance Be Reasonable, Uniform, And Nondiscriminatory**

As set forth in Plaintiffs' opening brief (Open. Br. 19–28), the lack of uniform training and the inconsistent inferences drawn by county officials from Crosscheck matches renders Indiana's voter maintenance program unreasonable, arbitrary, and discriminatory.[5]  Unable to defend the arbitrary implementation of Indiana's voter maintenance roll procedures, Defendants argue that while application of the law in practice may be arbitrary, the provisions of the law are, themselves, uniform and nondiscriminatory.  *See* Opp. Br. 28.  This is no defense.  Pursuant to the NVRA, SB 442 must provide for a uniform and nondiscriminatory voter roll maintenance process in practice.  *See Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 703 (N.D. Ohio 2006) (voter registration practice that created "barriers" to registration are not uniform because they "do not apply to everyone in the process").[6]  Far from ensuring uniformity, SB 442 will exacerbate the

---

[5]    The lack of uniformity in SB 442 is exemplified by the Co-Directors' differing and contradictory interpretations of what procedures it actually requires.  For example, Co-Director King stated, "The county can … use information it has independently of the [Crosscheck file] to determine if, in fact, the two records were for the same" voter but "it's within the discretion of the county registrar to do more investigation or not before taking action …," King Tr. 32:4–12, and that it would be sufficient to cancel based on an email from an official in another state to confirm the date of registration in that state.  King Tr. 40:9–25.  In sharp contrast, Co-Director Nussmeyer testified that she would "encourage the county to get original documentation from the other state to ensure that the cancellation was appropriate" and that it "would not be sufficient" if "an out-of-state official simply represented we have a voter registration form from the voter of such and such date."  Nussmeyer Tr. 56:2–13.  Only one of these two implementations would ensure compliance with the NVRA, yet Indiana's program appears to permit implementation by either method.

[6]    Defendants' separate appeal to the Full Faith and Credit Clause of the U.S. Constitution (Opp. Br. 26) is meritless and borders on specious.  *First*, Defendants themselves all but concede that there is no basis for the argument.  Opp. Br. 27 ("[T]here is no easy consensus what degree of faith and credit are due to them." (quotation omitted))  Thus, at best, Defendants' argument is that the Court should extend application of the Full Faith and Credit Clause beyond the boundaries of current caselaw to shield state election law from the NVRA on the basis that state records are purportedly at issue.  *Second*, Crosscheck matches themselves do not purport to "include" the other state's records.  Indeed, that is one of the key infirmities with Crosscheck.  What is being relied

9

discriminatory and arbitrary nature of Indiana's maintenance of its voter rolls by removing the NVRA's notice-and-waiting-period protections, creating barriers to registration and voting that will vary from county to county and voter to voter.

Defendants next argue that the NVRA does not require them to issue detailed instructions to county voter registration officials about how to make match determinations nor require compliance with those instructions. *See* Opp. Br. 29, 31. To the contrary, that is *exactly* what the NVRA requires of the state NVRA official. In *Arizona Democratic Party v. Reagan*, the district court held that an NVRA official has "not only authority, but a duty to ensure that voter registration regulations are ***administered*** in a fair and uniform manner[, which] extends to the [NVRA official's] oversight of voter registration as carried out by the counties." *Ariz. Democratic Party v. Regan*, No. CV-16-03618, 2016 WL 6523427, at *6 (D. Ariz. Nov. 3, 2016) (emphasis added). Likewise, the Eighth Circuit has held that "[u]nder the NVRA's plain language, [a State] may not delegate the responsibility to conduct a general program to a local official and thereby avoid responsibility if such program is not reasonably conducted." *United States v. Missouri*, 535 F.3d 844, 850 (8th Cir. 2008); *accord Harkless v. Brunner*, 545 F.3d 445, 452 (6th Cir. 2008) (concluding that Ohio's chief election official, was responsible for "implementation and enforcement" of the NVRA). Yet that is precisely what Indiana is attempting to do here.

Although the evidence makes clear that county officials are not "administer[ing]" and "conduct[ing]" SB 442 in a reasonable and uniform manner, and indeed are in some instances administering it in a blatantly discriminatory fashion, Indiana's NVRA officials—the Co-Directors—are responsible for taking action to ensure the State's compliance with the law. Absent

---

upon in a Crosscheck match is an unreliable inference of what the match "means" (*see supra* pp. 4–5) and not a review of a State's actual "record."

a coherent policy requiring counties to obtain signed voter registration forms and evaluate them for voter identity, subsequence of registration, and affirmative authorization of prior registration cancellation, the arbitrary and countless inferences that different county officials could draw from the Crosscheck match leaves the maintenance of Indiana's voter rolls under SB 442 inherently unreasonable, discriminatory, and non-uniform in violation of 52 U.S.C. § 20507(a)(3), (b)(1).

### C.   Plaintiffs Have Standing In Their Own Right And To Prevent Their Members' Imminent Future Injury

Consistent with their approach on the merits, Defendants' assertion that Plaintiffs lack standing is also untethered to the facts or the law.  Perhaps most egregiously, Defendants argue that Plaintiffs lack standing because "no voters will have their registrations canceled until after July 1, 2018."  Opp. Br. 14.  The very purpose of a preliminary injunction designed to preserve the status quo is that it be filed before injury has occurred.  *See Babbit v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) ("[A plaintiff] does not have to await the consummation of threatened injury to obtain preventive relief." (quoting *Pennsylvania v. W. Virginia*, 262 U.S. 553, 593 (1923))).  Indeed, Plaintiffs' preliminary injunction application was necessitated by Defendants' refusal to stipulate that no matches would be processed under SB 442 before the Court had the opportunity to rule on the legality of SB 442.  While Defendants did ultimately consent to defer implementation of SB 442 until July 1, 2018, and the briefing schedule for this motion was specifically crafted to allow for a ruling before that implementation began (Brater Decl. at ¶ 2), come July 1, 2018, *all* Indiana voters are at risk of being illegally removed from Indiana's voter rolls, based on unreliable data and second-hand inferences.  It is black-letter law that such "imminent future injury" may establish standing.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 495 (2009).  This injury is, moreover, directly traceable to Defendants' conduct, as they are responsible for implementing SB 442 and coordinating the state's compliance with the NVRA,

11

*supra* p. 10.  Absent intervention of this Court, this injury will occur when voters are removed as early as July 1.[7]

Lawsuits brought by nonprofit and civic organizations challenging voter-purge practices are commonplace.  No fewer than eight courts have expressly held that nonprofit groups have standing to bring purge suits. *See, e.g.*, *A. Philip Randolph Inst. v. Husted*, 838 F.3d 699, 712 n.6 (6th Cir. 2016), *petition for cert. granted*, No. 16-980 (argued Jan. 10, 2018); *Arcia*, 772 F.3d at 1341; *N.C. State Conference of the NAACP v. N.C. State Bd. of Elections*, 283 F. Supp. 3d 393, 402 (M.D.N.C. 2017); *Bellitto v. Snipes,* 221 F. Supp. 3d 1354, 1362–63 (S.D. Fla. 2016); *Am. Civil Rights Union v. Phila. City Comm'rs*, No. 16-1507, 2016 WL 4721118, at *4 (E.D. Pa. Sept. 9, 2016) (declining to dismiss on statutory standing grounds); *Judicial Watch, Inc. v. King*, 993 F. Supp. 2d 919, 924–25 (S.D. Ind. 2012); *Common Cause of Colo. v. Buescher,* 750 F. Supp. 2d 1259, 1271 (D. Colo. 2010); *U.S. Student Ass'n Found. v. Land*, 585 F. Supp. 2d 925, 944–45 (E.D. Mich. 2008).  Still more have implicitly found standing by allowing cases to proceed to the merits.[8]

---

[7]  Defendants suggest Plaintiffs are "merely speculating" as to the manner of implementation of SB 442, suggesting that Defendants may be able to implement the law in an NVRA compliant manner.  If Defendants wish to proffer a specific implementation of the law that complies with the NVRA, the case could very well be dispensed with.  Indeed, in Plaintiffs' initial letter to Defendants in May 2017, Plaintiffs offered to work with defendants to "ensure the state meets it obligations under the NVRA."  Brater Decl. Ex. 3, at 4 (Letter from Myrna Pérez and Sascha N. Rand to Connie Lawson (May 25, 2017)).  As it stands, however, all available evidence suggests Defendants intend to proceed with an unlawful implementation of the law.

[8]  *See, e.g.*, *Common Cause v. Kemp*, 714 F. App'x 990 (11th Cir. Mar. 12, 2018) (per curiam); *Voter Integrity Project NC, Inc. v. Wake Cty. Bd. of Elections*, 5:16-cv-00683 (E.D.N.C. filed July 18, 2016) (settled after denial of motion to dismiss).

1.    *Plaintiffs Have Standing In Their Own Right Because SB 442 Will Perceptibly Impair Their Organizational Mission*

"An independent basis for organizational standing exists when a defendant's conduct makes it difficult or impossible for the organization to fulfill one of its essential purposes or goals." *Buescher*, 750 F. Supp. 2d at 1269. Both Plaintiffs count among the core aspects of their missions voter registration, increasing the number of registered voters in Indiana, increasing voter participation, and keeping voters informed. Anderson Decl. ¶¶ 5–6; Bolling-Williams Decl. ¶¶ 6, 9. These goals will be directly and perceptibly impaired by Defendants' effort to purge voters from the Indiana rolls without allowing those voters appropriate protections. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) ("If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact."); *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) ("An organization is harmed if the 'actions taken by [the defendant] have 'perceptibly impaired' the [organization's] programs." (alterations in original) (quoting *Havens*, 455 U.S. at 379)); *accord Vill. of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir. 1990) ("*Havens* makes clear, however, that the only injury which need be shown to confer standing on a fair-housing agency is deflection of the agency's time and money from counseling to legal efforts directed against discrimination."); *Judicial Watch, Inc.*, 993 F. Supp. 2d at 924–25 ("[I]f True the Vote's ability to carry out its mission of cleaning up voter registration rolls has been 'perceptibly impaired' by the Defendants' alleged statutory violation, True the Vote has suffered injury."). As a concrete example, one court has found that the mere fact that voter registrations submitted by Plaintiff organizations were canceled by the challenged rule was sufficient to establish organizational injury-in-fact. *Buescher*, 750 F. Supp. 2d at 1270. Where, as here, Plaintiffs have solicited many thousands of voter

13

registration forms in Indiana in recent years, such an injury-in-fact is virtually assured as a result of SB 442's implementation.[9]  Anderson Decl. ¶¶ 8–11, 23, 25; Bolling-Williams Decl. ¶¶ 7–8, 17.

Defendants contend that Plaintiffs nonetheless lack standing because their claimed injuries are speculative and "are entirely of its [sic] own making because any reallocation of resources would be initiated at its [sic] sole and voluntary discretion."  Opp. Br. 11.  In making this argument, Defendants simply ignore settled caselaw holding that the perceptible impairment of Plaintiffs' organizational missions by SB 442 is sufficient to confer standing.[10]  Moreover, while Defendants rely heavily on the district court decision in *Indiana Democratic Party v. Rokita*, 458 F. Supp. 2d 775 (S.D. Ind. 2006), the Seventh Circuit overturned the district court's ruling on organizational standing.  *See Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd* 553 U.S. 181 (2008) ("The Democratic Party ... has standing to assert the rights of those of its members who will be prevented from voting by the new law.").  Notably, there the Seventh Circuit observed that standing was conferred just by compelling a party (there, the Democratic Party) "to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote" and that "[t]he fact that the added cost has not been estimated

---

[9]  Contrary to Defendants' suggestion, Opp. Br. 13, it is unnecessary for this Court to find representational standing on behalf of non-members for purged voters to constitute injury. Organizational plaintiffs are injured *in their own right* when voters they register are purged. *See Buescher*, 750 F. Supp. 2d at 1269.

[10]  Courts have repeatedly held that if an organization "actively involved in voting activities … would divert resources from its regular activities to educate and assist voters in complying with the statute," the organization has suffered "an injury sufficient to confer standing to challenge the statute." *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009); *accord Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040 (9th Cir. 2015); *N.C. State Conference of the NAACP v. N.C. State Bd. of Elections*, No. 1:16CV1274, 2016 WL 6581284, at *9 (M.D.N.C. Nov. 4, 2016).

and may be slight does not affect standing, which requires only a minimal showing of injury." *Id.* Likewise, here, SB 442 will compel Plaintiffs to divert resources they would otherwise use for other organizational activities in order to combat the effects of SB 442, including by educating voters about the effects of the purge and re-registering voters who have been improperly removed. Anderson Decl. ¶¶ 28, 31–33; Bolling-Williams Decl. ¶¶ 21–23.[11]

> 2. *Plaintiffs Have Standing To Represent Their Members, Who Are At Direct Risk Of Removal*

Defendants contend that Plaintiffs also lack standing to sue on behalf of their members, who live and vote in Indiana, because those members must have standing themselves, and Plaintiffs have "not alleged, much less proven that any of [their] members or directors either suffered an injury or was threatened with immediate injury." Opp. Br. 12–13 (quoting *Rokita*, 458 F. Supp. 2d at 817). For the reasons set forth below, Plaintiffs' members are threatened with immediate injury by the implementation of SB 442, which cannot be cured by Indiana's "fail-safe" voting programs. *Infra* Section II. This is sufficient to confer associational standing. *See Arcia*, 772 F.3d at 1341 ("The three organizational plaintiffs also represent a large number of people … who face a realistic danger of being identified in the Secretary's removal programs …."); *see also Buescher*, 750 F. Supp. 2d at 1271 ("Any burden on the right to vote, even if it is no more than the cancellation of a voter's records in violation of the NVRA, constitutes an injury-in-fact for

---

[11] For the same reasons, Defendants' suggestion that Plaintiffs lack a private right of action to enforce the NVRA simply disregards the significant body of caselaw holding that Plaintiffs have such a right. *Buescher*, 750 F. Supp. 2d at 1268 ("Because the NVRA's provisions are consistent with an intent to encourage and facilitate organized voter registration programs, I agree that organizations whose core functions include the registration of new voters and the protection of voter rights are 'persons' within the meaning of 42 U.S.C. § 1973gg-9(b) such that any prudential standing concerns to their ability to seek enforcement of the NVRA may be said to have been abrogated by Congress."); *see also Charles H. Wesley Educ. Found. v. Cox*, 408 F.3d 1349, 1353–54 (11th Cir. 2005) (finding NVRA protects organization's right to conduct voter registration drives).

standing purposes."). "When the alleged harm is prospective, [courts] have not required that the organizational plaintiffs name names because every member faces a probability of harm in the near and definite future." *Fla. State Conference of the NAACP v. Browning*, 522 F.3d 1153, 1160 (11th Cir. 2008). Indeed, the Eleventh Circuit's decision in *Arcia* is instructive. There the Eleventh Circuit found standing to challenge a voter purge *that, as here, had not yet occurred*: "[T]he process of matching voters across various databases creates a foreseeable risk of false positives and mismatches based on user errors, problems with the data-matching process, flaws in the underlying databases, and similarities in names and birthdates." *Arcia*, 772 F.3d at 1342.

## II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION

### A.    SB 442 Will Cause Imminent And Irreparable Harm

For the reasons set forth above, Defendants cannot cure SB 442's removal of the NVRA's notice-and-waiting period. If SB 442 is implemented, counties will cancel Indiana voter registrations based on inferences drawn from flawed data, absent any direct communication with or from the voter, and based on inconsistent instructions and procedures. There can be no serious question that barring injunction, registrations will be canceled arbitrarily, incorrectly, and illegally and voters' right to vote will be impaired. Courts give enormous weight to allegations that a voter's right to vote has been impaired in examining irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Frank v. Walker*, 196 F. Supp. 3d 893, 917 (E.D. Wis. 2016), *appeal docketed* No. 16-3052 (7th Cir.). Moreover, there is no way to redress a voter's disenfranchisement; once the opportunity to vote in a given election is denied, it is gone forever. *E.g.*, *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012).

Defendants argue that there is no irreparable harm because "as a practical matter, Indiana has not yet been provided any Crosscheck report from which the Election Division or county

officials could possibly take any action" and "[a]t this juncture, no 'matches' will have the time to make it to the county hoppers before the 2018 primary election." Opp. Br. 33. As described above, the briefing schedule for this motion was specifically crafted to allow for a ruling before that implementation began for the *general* election in November. *Supra* p. 11; Brater Decl. ¶ 2. It is therefore no accident that at this time there are not "any individual voters who have been removed from the voter registration list." Opp. Br. 33. Yet virtually *every* Indiana voter is at risk of being illegally removed from Indiana's voter rolls, based on unreliable data and second-hand inferences, once implementation of SB 442 begins. This is precisely the threatened harm that Plaintiffs' motion seeks to prevent.

### B. The Harm Threatened Cannot Be Cured By Indiana's Implementation Of Fail-Safe Requirements

Notwithstanding the clear threatened harm to Indiana voters if SB 442 is implemented, Defendants further argue that no actual harm will result because any erroneously canceled voters will be able to take advantage of the State's "fail-safe" voting provisions to cast a ballot. Opp. Br. 32–33. The fail-safe purports to allow wrongly canceled registrants who find themselves omitted from the registration lists to cast ballots upon oral or written affirmation of their continued residency at the address of their prior registration. Defendants' argument ignores that (1) fail-safe voting protections are an *additional, independent safeguard* set out in the NVRA that cannot be used to cure violations of other provisions of the NVRA, and (2) there are substantial limitations inherent in the operation of fail-safe provisions.

*First*, the "fail-safe" is a creature of federal law, not a special protection implemented in Indiana to mitigate the harms of illegal list maintenance. The reference to the "fail-safe" in the Indiana Code is simply a codification of the NVRA's "fail-safe" requirement. *See* Ind. Code § 3-7-48-5. The NVRA provides a "fail-safe" as an *additional* safeguard and mandates its availability

*in addition to* the confirmation, notice, and waiting requirements that apply specifically to protect voters removed on the basis that they have moved out of the jurisdiction. Defendants cannot claim there is no irreparable harm from their failure to comply with one set of NVRA requirements (confirmation, notice, and waiting period), simply because SB 442 does not strip voters of an additional NVRA mandated protection. By Defendants' logic, all protections under the NVRA would be optional, so long as state law includes the "fail-safe" already required by the NVRA.

*Second*, a qualified voter who has been removed from the registration rolls faces significant risk that he or she will be denied their right to vote because poll workers incorrectly apply the "fail-safe." Purportedly, when a voter arrives at the polls to discover that his or her registration has been canceled, poll workers are instructed to contact their voter registration office to determine why that voter is not on the poll list. If it is determined that the registration was canceled, then the voter may use the "fail-safe." Nussmeyer Tr. 146:15–151:7. But counties set their own guidelines as to how they provide support on election day, with counties providing inconsistent support, *id.* at 149:6–150:2, and the Election Division's 2016 submission to the U.S. Election Assistance Commission's Election Administration & Voting Survey demonstrates that poll workers are requiring improperly canceled registrants to vote by provisional ballot, rather than by "fail-safe." *See* Brater Decl. Ex. 4, at Column 499 (2016 EAVS Submission ("Provisional Ballots Rejected Comments")) (rejecting provisional ballot where "voter was cancelled per state voter list maintenance project"); Anderson Decl. ¶ 28.

*Third*, despite Defendants' suggestion that voters using the "fail-safe" need not use provisional ballots, these voters are still subject to challenges on the basis of residency, which will force the voter to cast a provisional ballot. Ind. Code § 3-7-48-7.5; Nussmeyer Tr. 151:8–153:7. A voter who has had to publicly navigate the fail-safe process due to a wrongful Crosscheck

cancellation on the basis of residency may be subject to heightened scrutiny from would-be challengers.

*Fourth*, the "fail-safe" process places additional burdens on the voter that may cause him or her to opt not to vote. As an initial matter, canceled voters will not receive notification of their canceled registrations, and will not receive election-related information (including the location of their polling place) from the state, which may depress turnout. Nussmeyer Tr. 79:6–80:1. Additionally, typical voters are not required to make declarations under penalty of perjury and threat of prosecution and do not have to expend the time to go through the fail-safe process. A voter also may not have available the information necessary to respond to a poll worker's challenge. Voters have declined to vote upon wrongly being offered provisional ballots. Brater Decl. Ex. 4, at Column 499 (2016 EAVS Submission ("Provisional Ballots Rejected Comments")) ("Voter, who was erroneously purged, declined to cast provisional ballot after process to create provisional ballot started"). Moreover, even once a provisional ballot is cast, significant burdens to exercising the right to vote remain; in 2016, in Indiana, 21 percent of provisional ballots were counted and 79 percent were rejected. Brater Decl. Ex. 5, at 27 tbl.3 (*The Election Administration and Voting Survey: 2016 Comprehensive Report*).

These burdens inevitably create cascading effects that slow down the process of casting ballots for other voters. The time required of poll workers to handle registration problems and provisional ballots will mean fewer resources to keep the voting process running smoothly. Anderson Decl. ¶ 30. In some precincts, particularly those with large numbers of minority voters, this creates the risk that voters will be forced to wait in long lines and may leave without voting. Anderson Decl. ¶¶ 18–19. Voters, including Plaintiffs' members and those they seek to assist in registering and voting, will thus suffer irreparable harm if the implementation of SB 442 is not

19

enjoined.

### III.   THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST BOTH WEIGH HEAVILY IN FAVOR OF A PRELIMINARY INJUNCTION

Defendants argue that the balance of hardships and the public interest both weigh against granting a preliminary injunction, largely on the basis that the government should be afforded deference "as a matter of federalism" and that "the government's interest is in large part presumed to be the public's interest."  Opp. Br. 34–35 (quoting *United States v. Rural Elec. Convenience Coop. Co.*, 922 F.2d 429, 440 (7th Cir. 1991)).   One of the chief cases that Defendants cite, however, correctly holds that "we do not believe that comity and federalism should be considered 'public interest' factors that militate against the issuance of an injunction."   *Rural Elec.*, 922 F.2d at 440.   Balancing the public's general interest in ensuring that "accurate and current voter registration rolls are maintained"—the only concrete interest that Defendants claim to defend, Opp. Br. 34 (quoting 52 U.S.C. § 20501(b))—against its particularized interest in ensuring that qualified voters are permitted to vote and are not illegally and unwittingly removed from the voter rolls causes the balance of hardships and the public interest to tip decidedly in favor of Plaintiffs.  *League of Women Voters of N.C. v. North Carolina*, 769 F. 3d 224, 247 (4th Cir. 2014) ("By definition, '[t]he public interest ... favors permitting as many qualified voters as possible.'" (alteration in original) (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012))); *N.C. State Conference of the NAACP*, 2016 WL 6581284, at *10 ("[T]he balance of equities and public interest factors weigh decidedly in favor of protecting eligible voters who are being removed from the voter rolls and having their registrations canceled ....  Particularly where ... the voter is often unaware that the registration is being challenged."); *see also* Open Br. 32–33.

DATED:  April 19, 2018                Respectfully submitted,

*/s/ Sascha N. Rand*

Sascha N. Rand
Ellyde R. Thompson
Ellison Ward Merkel
Geneva McDaniel
Alexandre J. Tschumi
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

Myrna Pérez
Jonathan Brater
BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271

Trent A. McCain
MCCAIN LAW OFFICES, P.C.
5655 Broadway
Merrillville, IN 46410
(219) 884-0696

<u>**CERTIFICATE OF SERVICE**</u>

I hereby verify that on this 19th day of April 2018, a copy of the foregoing was filed electronically with the Clerk of this Court.  Service of this filing will be made on all ECF-registered counsel by operation of the Court's filing system.  Parties may access this filing through the Court's system.

<u>/s/ Sascha N. Rand</u>

Sascha N. Rand
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
sascharand@quinnemanuel.com