UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


| | |
|---|---|
| INDIANA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (NAACP) and LEAGUE OF WOMEN VOTERS OF INDIANA, | ) ) ) ) ) |
| Plaintiffs, | ) Cause No. ) 1:17-cv-02897-TWP-MPB ) Indianapolis, Indiana |
| vs. | ) **May 2, 2018** ) 9:06 a.m. |
| CONNIE LAWSON, in her official capacity as the Indiana Secretary of State; J. BRADLEY KING, in his official capacity as Co-Director of the Indiana Election Division; ANGELA NUSSMEYER, in her official capacity as Co-Director of the Indiana Election Division, | ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

--------------------------------

| | |
|---|---|
| COMMON CAUSE INDIANA, | ) |
| Plaintiff, | ) Cause No. ) 1:17-cv-03936-TWP-MPB ) Indianapolis, Indiana |
| vs. | ) ) |
| CONNIE LAWSON, in her official capacity as the Indiana Secretary of State; J. BRADLEY KING, in his official capacity as Co-Director of the Indiana Election Division; ANGELA NUSSMEYER, in her official capacity as Co-Director of the Indiana Election Division, | ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

**Before the Honorable**
**TANYA WALTON PRATT**

OFFICIAL REPORTER'S TRANSCRIPT OF
PRELIMINARY INJUNCTION HEARING


**For Plaintiffs NAACP and**           Myrna Perez, Esq.
**League of Women Voters:**            Jonathan Brater, Esq.
                                       Brennen Center for Justice
                                       Suite 1750
                                       120 Broadway
                                       New York, NY  10271

                                       Ellison Sylvina Ward Merkel, Esq
                                       Sascha N. Rand, Esq.
                                       Quinn Emanuel Urquhart
                                        & Sullivan, LLP
                                       22nd Floor
                                       51 Madison Avenue
                                       New York, NY  10010

**For Plaintiffs Common**              Matthew Jedreski, Esq.
**Cause Indiana:**                     Davis Wright Tremaine, LLP
                                       Suite 2200
                                       1201 Third Avenue
                                       Seattle, WA  98101

                                       Sophia Lin Lakin, Esq.
                                       American Civil Liberties Union
                                         Foundation, Inc.
                                       18th Floor
                                       125 Broad Street
                                       New York, NY  10004

                                       Jan P. Mensz, Esq.
                                       ACLU of Indiana
                                       1031 East Washington Street
                                       Indianapolis, IN  46202

                                       Stuart C. Naifeh, Esq.
                                       DEMOS
                                       4th Floor
                                       80 Broad Street
                                       New York, NY  10004

**APPEARANCES:   (Continued)**

For Defendants:                    Jefferson S. Garn, Esq.
                                   Diana Lynn Moers Davis, Esq.
                                   Kelly Suzanne Thompson, Esq.
                                   David Ray Thompson, Esq.
                                   Kyle Hunter, Esq.
                                   Aleksandrina Penkova Pratt, Esq.
                                   Indiana Attorney General
                                   Fifth Floor
                                   Indiana Government Center South
                                   302 West Washington Street
                                   Indianapolis, IN  46204


Court Reporter:                    David W. Moxley, RMR, CRR, CMRS
                                   United States District Court
                                   46 East Ohio Street, Room 340
                                   Indianapolis, Indiana  46204


                    PROCEEDINGS TAKEN BY MACHINE SHORTHAND
              TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION

1               (In open court.)

2          THE COURT:  Good morning, everyone.  We are on the

3    record for two cases, under two case numbers.  The matters are

4    the Indiana State Conference for the National Association for

5    the Advancement of Colored People, and League of Women Voters

6    of Indiana, versus Connie Lawson, in her official capacity as

7    Indiana Secretary of State; J. Bradley King, in his official

8    capacity as codirector of the Indiana Election Division;

9    Angela Nussmeyer, in her official capacity as codirector of

10   the Indiana Election Division, and that case number is

11   1:17-cv-2897.

12          Our second case is Common Cause Indiana versus

13   Connie Lawson, in her official capacity as Indiana Secretary

14   of State; J. Bradley King, in his official capacity as

15   codirector of the Indiana Election Division; Angela Nussmeyer,

16   in her official capacity as codirector of the Indiana Election

17   Division, and that case number is 1:17-cv-3936.  And we are

18   here this morning for a hearing on both of the plaintiffs'

19   motions for preliminary injunctive relief.

20          And we'll begin by having counsel state your names

21   for the record and introduce all of those at your table.  And

22   who's the lead counsel?  We'll start with the plaintiffs'

23   table, so whoever has a microphone.

24          MS. PEREZ:  Myrna Perez on behalf of the League of

25   Women Voters and the NAACP.  I've got at counsels' table with

1  me my colleague from the Brennan Center, Jonathan Brater; and

2  two colleagues from Quinn Emanuel, Ellie Merkel and Sascha

3  Rand.  I'd also like to note that I have a client

4  representative, Mr. Oscar Anderson, from the League.

5           THE COURT:  Okay.  Thank you.

6           MR. JEDRESKI:  Good morning, Your Honor.  Matt

7  Jedreski from Davis Wright Tremaine on behalf of Common Cause.

8  With me at counsel table is Sophia Lakin from the ACLU.  Also

9  here on behalf of Common Cause is Jan Mensz from ACLU Indiana

10 and Stuart Naifeh from DEMOS.  And, as well, we have Bill

11 Groth on behalf of Common Cause; and our client

12 representative, Julia Vaughn.

13          THE COURT:  Okay.  Good morning.

14          All right.  And at our defendants' table?

15          MR. GARN:  Good morning, Your Honor.  I'm Jeff Garn.

16 I'm here for all the defendants in both cases.  I'm here with

17 Diana Moers, Kelly Thompson, Aleksandrina Pratt, and Kyle

18 Hunter.  And we're all with the Attorney General's office.

19          THE COURT:  Good morning.

20          MR. GARN:  Good morning.

21          THE COURT:  And for the record, our court reporter

22 is David Moxley.

23          And, lawyers, the Court, for the record, has

24 thoroughly read all of the briefing on the issues.  And, in

25 fact, I was at the Seventh Circuit Conference, annual

1  conference, and drove back yesterday with my law clerk.  And

2  all the way back from Chicago, we talked about this case, so

3  I'm very familiar with your arguments and the briefing.

4          And I'm telling you that, because I'm not going to

5  give you a time limit.  You all can have the understanding

6  that the Court is familiar with the issues.  I do have some

7  questions, and I'll just let you give your argument at your

8  leisure, but not too much leisure.

9          And am I correct that there will be no live

10  witnesses?

11          MS. PEREZ:  That is correct.

12          THE COURT:  Okay.  All right.  So would someone come

13  up and talk to me about your order of proof and how we're

14  going to proceed today?

15          MS. PEREZ:  Good morning, Your Honor.  Myrna Perez

16  from the NAACP and the League of Women Voters.  This case has

17  not been formally consolidated, but, nonetheless, Mr. Jedreski

18  and I have tried to work something out to avoid repetition.

19  And we would propose that I handle the majority of the

20  argument with respect to the notice and waiting period and

21  that he would handle the uniformity argument, and, obviously,

22  will handle the specific objections that were lobbed at our

23  individual clients.

24          THE COURT:  Okay.  Very good.  All right.

25          And so, lawyers, you're going to rely on the

1 exhibits that are already in the record; am I correct?

2          MR. GARN:  Would you like us to formally move to

3 have those entered?

4          THE COURT:  Why don't we do that for the record.

5          MR. GARN:  Okay.  Then the defendants would move to

6 move the exhibits that were the briefing exhibits into the

7 record for the purposes of this preliminary injunction.

8          THE COURT:  Any objection?

9          MS. PEREZ:  We have no objections.

10          THE COURT:  All right.  And all of the defendants'

11 exhibits are admitted into evidence for the purpose of this

12 hearing without objection.

13          The same motion on behalf of the plaintiffs?

14          MS. PEREZ:  That is correct, Your Honor.

15          THE COURT:  And --

16          MR. JEDRESKI:  Yes, Your Honor, the same for Common

17 Cause.

18          THE COURT:  And no objection?

19          MR. GARN:  No objection.

20          THE COURT:  And so all of Plaintiffs' -- each of the

21 plaintiffs' exhibits that have been offered through your

22 briefing are admitted into evidence for the purposes of this

23 hearing.

24          So I believe you can come on up to the lectern and

25 we can get started.

1          MS. PEREZ:  Yes, ma'am.  We have one final piece of

2     housekeeping.  On behalf of all of the parties, may we use

3     laptops?

4          THE COURT:  You may.

5          MS. PEREZ:  Thank you.

6          Your Honor, given your familiarity with the record,

7     I am going to skip a long introduction and just merely start

8     off by saying that Plaintiffs have an overwhelmingly

9     likelihood of success on the merits, because the law being

10    challenged, SB 442, enacted in April of 2017 and tweaked in

11    March of this year, is a flagrant violation of the NVRA.

12         One of the things that I would like to do is provide

13    a brief overview about what the NVRA is, because

14    notwithstanding the logic of its principles and its elegance

15    in its solutions and problem solving, it's not the

16    organizational model of clarity.  So the NVRA sets forth

17    obligations and prohibitions on election administrators at the

18    state and local level with respect to how voter rolls are to

19    be maintained and cleaned.  This happened because, prior to

20    the NVRA, there had been a persistent problem with the way

21    election administrators were cleaning their rolls.

22         And of specific concern, and the legislative history

23    makes this plain, there was a particular issue about how

24    election administrators handled people who had moved.  So

25    Congress set forth procedures and practices for handling

1   residents who have moved depending on whether or not election

2   administrators had firsthand evidence of whether or not they

3   moved or whether or not they instead had to rely on secondhand

4   evidence or some sort of inference.

5           And you can see this in the NVRA text, because it

6   sets forth a general prohibition that says that election

7   administrators may not remove a voter from the list based on a

8   presumed move unless the voter is given a notice and a waiting

9   period of two federal elections.  And that's unless a

10  statutory carve-out applies.

11          So one of the things that we'd like to do is just

12  walk through the NVRA.  And I know that Your Honor is familiar

13  with this, but this will actually make my merits argument go

14  really fast, and I think it will just help when you see it all

15  together.

16          So the first thing you have on your screen, Your

17  Honor, is the purpose.  I'll give you a second to take a look

18  at it.

19          The purposes reflect that Congress was concerned

20  both about access to the ballot box and integrity of the

21  ballot box.  And you can see these dual purposes throughout

22  the text and that there are protections for voters, but there

23  are also obligations imposed upon election officials.  I'd

24  like to highlight for the Court that expanding voter access is

25  the first two principles.  Now, this is important, because the

1  statutory provisions need to be construed in a way that honors

2  all of these principles, but Congress determined that these

3  two were the leading ones.

4         I'd then like to turn to the part of the NVRA that

5  lists out the acceptable grounds for removal from the rolls,

6  and this is on the screen.  One of them, and you'll notice

7  early that it's highlighted in A, is a request of the

8  registrant, but you'll also notice that subparagraph C

9  actually covers two additional scenarios found in the

10  paragraph below, in 4, which we've also put on the screen.

11  That's death and change of residence.  I raise this, Your

12  Honor, to underscore the fact that the NVRA makes a textual

13  distinction between request of the registrant and changes of

14  address.

15         I'd then like to move on to some of the obligations

16  on election administrators.  Those of us in the business

17  sometimes call this the reasonable effort provision.  Indiana

18  does not have to aggressively remove people on these grounds,

19  it just has to make a reasonable effort to clean the rolls.

20  But one of the things it does do is forewarn the readers that

21  there are a number of procedures to follow when conducting

22  their reasonable effort to remove people on account of

23  residency changes.  You can see that it specifically -- if you

24  don't mind returning back -- you can see that it -- wait, back

25  on yet -- that it is -- references subsections B, C, and D.

1   So you know -- the reader knows that coming, there are a lot

2   of obligations it needs to follow when it is conducting its

3   general effort to remove voters from the rolls.

4          Then I'd like to move to the uniformity and

5   nondiscriminatory requirements.  The one thing I'd like to

6   highlight for the Court is that this is an affirmative

7   command, "shall be."

8          The next section I'd like to run through is how

9   movers are to be treated.  Again, prior to the NVRA, there

10  were a number of problems with purges on account of movers, so

11  Congress laid out in detail what was permissible.  You can see

12  on screen that a notice and waiting period is required here,

13  and that is in Section B., unless there is a statutory

14  carve-out, which we will get to in a moment.

15         And I also want to note how declarative it is.  It

16  is, "shall not remove," and then it also has, "unless."  There

17  are no qualifiers here, like, "a reasonable effort."  It -- I

18  did put on the screen, so that there's no confusion, that as

19  to what is referenced in subparagraph 2, it's just a notice,

20  but that's not at issue in this case.  I just didn't want you

21  to think that I was leaving out an important part.

22         The next part I want to go through is what we

23  sometimes call the "national change of address" example.  Now,

24  this section of text provides an example to states of one way

25  a state can meet its reasonable effort to remove voters who

1  have changed address.  I'd like to point out that this method

2  requires the notice and waiting period.  And, again, that

3  makes logic and sense given what the NVRA was trying to do and

4  what the NCOA is, the national change of address is.  It's not

5  firsthand evidence of a move.  At best, it's an inference that

6  someone has moved.

7          I'd then like to move on to the 90-day rule, or what

8  we call the 90-day rule.  This text forbids systematic

9  removals within the 90 days before an election of certain

10 kinds of purges.  Now, again, back to the logic and elegance

11 of the NVRA.  This is sensible, because we don't want having

12 these systematic purges happening so close to an election,

13 where voters don't have the time or the ability or the

14 knowledge to get this thing corrected.

15         So what is important about this text, Your Honor, is

16 that it lays out that removals for the request of the

17 registrant, among others, is not subject to this blackout

18 period of 90 days, but it does not exempt removals for change

19 of address from the 90-day blackout period, which is 4(B).

20 You'll notice that 4(B) is not listed in that section.  I'm

21 going to explain, Your Honor, that Defendants apply the 90-day

22 blackout period to the Crosscheck process.

23         Next is the procedure for a person who didn't

24 actually return the card and the election administrators

25 wrongfully thought they moved.  Indiana calls its operation of

1   this provision, Your Honor, its fail-safe, and you read a lot

2   about this in the briefing.

3           And finally is the designation of the chief state

4   election official.  This makes clear that the chief state

5   election official is to be responsible for coordination of

6   state responsibilities under the NVRA.

7           So, taken together, we reached the conclusion that

8   Indiana, like other states, is required, under the NVRA, to

9   provide a notice and waiting period before removing voters who

10  they believe have moved unless one of the statutory carve-out

11  applies.  But, as we outlined in our briefs, this is not just

12  our interpretation, Your Honor, this is also consistent with

13  the DOJ's interpretive guidance.  And I have on screen for you

14  the particular provision that reinforces our reading.

15          I will say, and I don't think that Defendants will

16  disagree, that the notice and waiting period applies to most

17  changes of addresses, but what is at dispute is whether or not

18  this applies to Crosscheck.  I'd first like to point out that

19  Indiana does not disagree that the voters who will be affected

20  by Crosscheck are movers.  In fact, we've got correspondence

21  on screen for you from Mr. Bonnet, who is responding to our

22  NVRA inquiry about the process, and he makes plain that the

23  Crosscheck process is about identifying Indiana residents who

24  move out of the state.  And, Your Honor, the entirety of this

25  letter has been submitted.

14

1        So they're not disputing our reading that the NVRA

2   has notice and waiting period requirements, but they're

3   attempting to escape liability for what we believe is a

4   blatant NVRA violation by trying to dress up this Crosscheck

5   process into one of the two statutory carve-outs.  Neither of

6   these carve-outs apply to Crosscheck and would be

7   inappropriate to shoehorn Crosscheck into.

8        The first carve-out, Your Honor, is on the screen.

9   It's 52 U.S.C. 20507(d)(1)(A).  The NVRA does not allow

10  removal on the basis of change of address without notice and

11  waiting period unless the registrant confirms in writing.  So

12  I think it's clear, from the statutory setup, that the

13  confirmation that is referenced is classically understood to

14  refer to the response to the notice that's referenced above it

15  in Section B.

16       The jurisdiction is supposed to send out a notice

17  when they believe that someone has moved, and the voter could

18  then respond by saying, "Yes, I moved," or, "No, I didn't."

19  If the voter responds, "Yes," then the voter has confirmed

20  that he or she has moved.

21       But we don't have to agree on whether or not that is

22  exclusively what could be a confirmation in writing, Your

23  Honor.  We could say that it's something different.  But it

24  still wouldn't make sense to equate Crosscheck to this,

25  because there are three elements in that phrase, Your Honor.

1   The first is registrant.  I'll let you look at that screen

2   again.  The confirmation must come from the voter to whom the

3   record belongs.  It's not another source.

4          Now, what is Crosscheck data?  It's extracted from

5   the registration filed by one state; manipulated into the

6   desired format; sent to a second state, which is Kansas, which

7   runs the program; and then sent to third state, and in this

8   case it's Indiana; and then they pass it on to counties.

9          The second operative word in that carve-out is

10  "confirmation," which means to give approval to.  We've got a

11  definition that we provided in the papers.  This is an active

12  act.

13         And then, finally, the last operation, Your Honor,

14  is in writing, which is self-explanatory.  The confirmation

15  must be written in any form.

16         And I will just say that Crosscheck doesn't meet any

17  of these criteria.  It doesn't come from the registrant.  It

18  comes from a database that was built by uploading snippets

19  from other databases.  It's not a confirmation, because the

20  voter does not see the Crosscheck results and can't confirm

21  that it happened; and it's not in writing from the voter.

22         I'll then move on to the second carve-out, Your

23  Honor, which is U.S.C. 2057(a)(3)(A), which says an election

24  administrator can remove a record at the request of the

25  registrant.  And you can see that on screen for use.  Again,

1  there are a couple of components that are operative.  The

2  first is registrant.  And like I said before, it must be from

3  the registrant --

4           THE REPORTER:  I'm sorry.  Can you slow down?

5           MS. PEREZ:  I sure can.  Sorry.  I'm from Texas, and

6  we speak fast.

7           Crosscheck is not from the registrant.  A request is

8  also the act or instance of asking for something.  And, Your

9  Honor, this definition was already provided in the record.

10          But, beyond this plain meaning, beyond these

11  dictionary definitions, we have seen requests of the

12  registrant interpreted to mean firsthand evidence.  For

13  example, the DOJ guidance, Your Honor, which we have on screen

14  for you, and we did submit, says, "A 'removal at the request

15  of the registrant' under the NVRA involves firsthand

16  information from a registrant."

17          I will note that this lawsuit is the first time

18  we've actually heard Indiana officials describe the Crosscheck

19  process as equivalent to a request of the registrant for

20  removal.  I want to put on screen some of the PowerPoint

21  presentations given by one of the defendants, Ms. Nussmeyer,

22  when she was providing guidance at an earlier time about

23  Crosscheck.  You can see that the voter request here is listed

24  as self-reporting.  It's on a different line from Crosscheck.

25          But there's other reasons to believe, Your Honor,

1   that calling the Crosscheck process a request from the

2   registrant is merely a post hoc litigation defense.  Both

3   codefendants draw, Your Honor -- testified during their

4   depositions that Crosscheck removals could not happen during

5   the 90-day process, the blackout period.  I have on screen for

6   you the relevant deposition excerpt from Ms. Nussmeyer, and

7   the second one from Mr. King.  And both of the records, in

8   their entirety, Your Honor, have been submitted.

9          And, on top of that, you can see in their own

10  guidance.  Right now I have on screen for you instructions

11  that are being given to election officials for using the

12  interstate Crosscheck data to remove voters.  We have

13  highlighted at the bottom that this task is to be completed by

14  February 2nd, 2016.  Why is that date relevant?  It was 90

15  days before the primary that was held on May 3rd, 2016.

16         But we do know, Your Honor, that NVRA permits

17  removals of the request of the registrant during the blackout

18  period.  We saw this earlier, and it's back on the screen for

19  you again, that requests for removals are exempted from the

20  90-day blackout period.  And the State's guidance also says

21  the same thing.  It says that removals at the request of the

22  registrant are permitted within 90 days.

23         And this is also a portion of the training that was

24  given to election administrators by one of the defendants,

25  Ms. Nussmeyer.  She says that removals within 90 days are

18

1   permitted at the request of the registrant.  So if Defendants

2   really thought that a Crosscheck flag was a request to remove

3   a registrant, Your Honor, they would allow Crosscheck removals

4   to happen at any time, because requests for removals, if

5   they're properly done, can happen at any time.  But Defendants

6   don't.  They hold off on Crosscheck removals during the 90-day

7   blackout period.

8          Just to provide some context, I want to look briefly

9   at something that, at least according to the DOJ guidance,

10  could be fairly construed as a request for removal, and this

11  is a registration form in another state with a prior address.

12  Here's Michigan, which was put into the record by Defendants.

13  Look at what it has.  It has a voter providing his or her

14  exact prior address, so the voter is affirmatively saying, "I

15  used to live somewhere else."  It has a voter's signature.  It

16  also gives the voter a notification that its prior

17  registrations will be canceled.  Crosscheck doesn't do that.

18         But the statute, Your Honor, the NVRA, does give us

19  an analogue to cross-check, and that is the U.S. Postal

20  Service national change of address database.  Again, that was

21  the example states gave when they needed to know what sort of

22  things would be permissible as a removal on the basis of a

23  change of address that would then have to be subject to the

24  notice and waiting period requirement.

25         So, like Crosscheck, no firsthand information, not

19

1  from the voter.  Like Crosscheck, it doesn't provide

2  sufficient information indicating what the voter intended to

3  happen.  Like Crosscheck, no voter signature.  Like

4  Crosscheck, the election administrator can't see the original

5  job come in.  And, like Crosscheck, NCOA removals cannot

6  happen during the 90-day blackout period, Your Honor, and we

7  think this is highly relevant.

8         What the NVRA does say, Your Honor, is that removals

9  based on NCOA data must be accompanied by the notice and

10  waiting period before removal.  And that's on screen, Your

11  Honor.  You can see the reference there.  And that makes

12  sense.  Again, the logic of the NVRA, NCOA data is, at best,

13  an inference that someone has moved.  It's not firsthand

14  information.

15        So given this textual argument, that we believe is

16  plain, what Indiana is essentially trying to do is say they

17  don't have to abide by these commands to provide a notice and

18  waiting period when using Crosscheck, because they believe

19  that their process is going to be accurate enough to not have

20  to provide these protections.  I would say, in the first

21  instance, that Indiana and all of its powers still cannot

22  substitute its judgment for Congress as to what protections

23  are required.  Congress made plain that these protections were

24  necessary.

25        But, in any event, Crosscheck data is not accurate

1   and not used in a reliable way.  Now, Mr. Jedreski will cover

2   this in greater detail and he will delve deep into the point

3   system that got codified, but I will say that before it got

4   codified, and now that it has been, there still remains a lot

5   of ways, Your Honor, that Crosscheck can get it wrong.  I have

6   on screen for you, Your Honor, an e-mail from Defendant

7   Nussmeyer to legislators acknowledging that the data isn't

8   perfect of Crosscheck.  And that information is in the record,

9   the whole site.

10          One of the things that makes Crosscheck problematic,

11  Your Honor, is that going forward, the election administrators

12  won't even have a partial Social Security number.  They won't

13  even have any way of specifically identifying which person was

14  there.  And we know this from an e-mail, Your Honor, that's

15  now on screen.  This is sent out by Bryan Caskey, who was the

16  elections director of Kansas, which operates Crosscheck.  And

17  he makes plain that they're not even giving partial Social

18  Security numbers.

19          It also, Your Honor, doesn't have a date of

20  registration in another state.  Why does this matter?  Because

21  a Crosscheck match cannot know whether or not someone appeared

22  on two states because someone moved into Indiana or they moved

23  out of Indiana.  And, obviously, if they moved into Indiana,

24  it would be entirely inappropriate to remove them.

25          And the counties can't use Crosscheck to

1   independently verify the data.  They can't look under the

2   hood, make sure that nobody incorrectly entered something,

3   make sure that there wasn't some sort of typo or smudge

4   writing, or someone couldn't decipher someone's chicken

5   scratch.  They have to accept, basically, that what Crosscheck

6   is telling them is correct.

7            And I put on screen for you just some snippets of

8   depositions -- again, all of them are in the record for you --

9   in which they essentially say they just have to accept it as

10  true.  I lifted up three of them, Your Honor, but there's also

11  a record of a whole bunch more that were there, and we will

12  give Your Honor a copy of these exhibits if that's helpful.  I

13  think it might be at this point.

14           So what does Indiana say?  Well, they say, again,

15  they don't have to worry about making mistakes because they're

16  going to get it right, because they have this fail-safe.  They

17  have this fail-safe for voters who have been wrongly --

18  wrongly purged.  But that doesn't actually solve their problem

19  legally or mitigate the actual harm.  As I pointed out

20  earlier, the fail-safe is already required by the NVRA.  I

21  have you on the screen the NVRA's fail-safe and the Indiana

22  fail-safe.  I'll let you spend a moment with both of them.

23  They're effectively the same.  In fact, Indiana's law

24  expressly says that it's incorporating 20507(e)(3), which is

25  the NVRA's fail-safe.

1          Now, Congress clearly didn't think that provision

2    standing alone was sufficient, because it also included the

3    notice and waiting period requirement.  Indiana doesn't get

4    away with depriving voters of one NVRA protection just because

5    it provides voters another protection of the NVRA.  Just

6    because you have an air bag doesn't mean that it's okay to

7    take off your seatbelt.

8          That was supposed to be funny.  I thought other

9    people would laugh.

10          In any event, Your Honor, the fail-safe doesn't

11   always work out well for the voters and that the process

12   causes confusion at the polls, and wrongfully purged voters

13   actually get a provisional ballot, which are not counted.  I

14   have on screen a document that goes on pages and pages and

15   pages and was submitted, and I just lift up some examples that

16   show purged voters who got provisional ballots which were not

17   counted.  I've highlighted some examples from Clay, Crawford,

18   Hamilton, and Hancock.  We could provide a lot more, Your

19   Honor.  These are just some examples of provisional ballots

20   that don't work out.

21          But let's say, even in theory, they had the perfect

22   process on election day, which they don't.  Voters who've been

23   purged are still in a worse situation than had they not been

24   purged, because they can't look themselves up on the on-line

25   voter registration portal, so they won't know what their

1  sample ballot looks like, they won't know where they're

2  supposed to go for --

3           THE REPORTER:  I'm sorry.  You need to slow down.

4           MS. PEREZ:  I'm so sorry.

5           They won't know where (sic) their sample ballot

6  looks like and they won't know where to go to vote.

7           Defendants toss out a lot of objections to our

8  lawsuit.  Now, sometimes they're fashioning a standing

9  argument, sometimes it's a jurisdictional issue, sometimes

10 it's a preliminary injunction element.  I'm going to address

11 them one by one.

12          So standing.  Defendants object to my client's

13 standing under a number of theories, none of which are

14 unavailing.  Plaintiffs League of Women Voters and NAACP have

15 standing on two grounds, on their own behalf as organizations

16 that engage in the public discourse and try to register

17 voters, and on behalf of their members.

18          And I will note, Your Honor, that you're familiar

19 with the record, and we have amply briefed this.  What I will

20 say is that at least eight courts in the last decade have

21 found that nonprofit groups have standing to challenge voter

22 purge practices.

23          I have on screen for you a list of cases that we

24 cited in our brief, Your Honor, but we didn't want to waste a

25 lot of trees.  These are just the ones that expressly found

1  standing in a purged case.  If we wanted to, we could provide

2  a lot of cases that -- in which courts allowed purged cases to

3  proceed to the merits and didn't even question standing, and

4  an even longer list of cases in which civic groups have been

5  found upstanding to bring lawsuits to enforce many other

6  provisions of the NVRA.  It is so routine then, practically

7  axiomatic, that Plaintiffs have standing to bring these kinds

8  of claims, that I would submit that the defendants' argument

9  borders on the frivolous.

10         So to just put a point on it, practices that impair

11  an organization's mission or force it to divert resources are

12  sufficient to establish standing.  Now, this comes from the

13  seminal *Havens* case, and Plaintiffs have alleged in their

14  declarations that we're going to suffer numerous

15  particularized and concrete injuries that would result from

16  the enforcement of SB 442.

17         And, Your Honor, this would also speak to

18  irreparable harm.  Some of these injuries are on screen for

19  you now.  They include that SB 442 will improperly purge

20  eligible voters; that Plaintiffs have already spent resources

21  on getting registered; that SB 442 will require Plaintiffs to

22  reregister, improperly purge voters; that SB 442 will require

23  Plaintiffs to unnecessarily expand its voter education

24  programs to rend voter confusion; and that SB 442 will compel

25  Plaintiffs to increase poll monitoring efforts to aid

1    (unintelligible) per voters and voters needing to cast

2    provisional ballots.

3              I'm going to spend a little bit of time on the

4    Rokita case, Your Honor, because that was the primary case

5    cited by Defendants to suggest that we didn't have standing.

6    The district court found that the Democratic Party had

7    standing in that case, but at that time, which was awhile ago,

8    declined to extend *Havens* outside the fair housing context to

9    include some Plaintiff organizations.

10             I will note that the Supreme Court and the Seventh

11   Circuit affirmed Rokita in an appeal under another case name,

12   and that was *Crawford v. Marion County*, but those courts did

13   two highly relevant things:  One, they extended *Havens*' theory

14   of organizational standing outside the fair housing context;

15   and, two, they expressly reserved judgment on whether some of

16   the organizational plaintiffs had standing.

17             I would also note that since that time, numerous,

18   numerous, numerous courts have concluded that the *Havens*'

19   theory of organizational harm applies outside the fair housing

20   contents and have actually used that case in purged cases

21   challenged under the NVRA by groups like my clients to provide

22   standing.

23             But the Seventh Circuit also found that the

24   Democratic Party had standing to challenge the Indiana law

25   that was at issue in this case, and its reasoning were very

26

1   similar grounds to my organizational plaintiffs here.  I have

2   a snippet of that on screen for you.  The new law injures the

3   Democratic Party by compelling the party to devote resources

4   to getting to the polls those of its supporters who would

5   otherwise be discouraged by the new law from bothering to

6   vote.  The new law, SB 442, injures the League of Women Voters

7   and the NAACP by compelling those organizations to devote

8   resources to getting to be able to vote those of its

9   supporters, those of its members, who would be otherwise

10  unable to vote because of the law.

11          As to our second theory, Plaintiffs have standing to

12  sue on behalf of their members.  They have more than 1,300

13  league members across the state and approximately 5,000 NAACP

14  members, and they're all at risk of being purged.  The

15  prospects of member purge confer standing, Your Honor, and

16  this also goes to irreparable harm.  Why?  Because voters who

17  are purged cannot cast a ballot on election day.  They'll

18  count, and they will experience great delay and confusion at

19  the polls if they're somehow able to vote on another process.

20  And that, again, Your Honor, is if they even get there.

21  Again, voters removed from the rolls don't receive election

22  mailings, can't look themselves up.

23          So injury.  Defendants are trying to argue that we

24  sued the wrong entity, that we should have sued the county

25  clerks, because they are the ones who actually effectuate the

1  removal after the individual is flagged by Crosscheck and the

2  state process assigns its point system.  They say -- they make

3  two rationales for this.  One, they say that it implicates our

4  standing because it's not fairly traceable; and they also say

5  we're speculating about harm, because it will only come about

6  when the counties act.

7           I'm just going to say, simply, and our briefs make

8  clear on this, this argument fails because the NVRA requires

9  states to designate NVRA officials.  That is on screen for

10 you.  And Indiana has done so, Your Honor, and they are the

11 defendants in this case.  Numerous courts, numerous courts,

12 Your Honor, have found that NVRA officials have to ensure

13 compliance with the NVRA.  We cite four from the last decade,

14 including three from the last three years in our brief, and

15 there are more.

16          Indiana's county election administrators, Your

17 Honor, play the same role as other county election

18 administrators across the country.  It would be impractical

19 and contrary to the purposes of the NVRA if organizations and

20 voters like my clients had to go to all of them.  In Indiana,

21 that would mean going to 92 different counties just because a

22 state law was violating a person's statutory rights under the

23 NVRA.  Courts have repeatedly rejected attempts by states'

24 chief election administrators to avoid liability for NVRA

25 violation just because, under their scheme, election

1 administrators at the local level play a role in election

2 administration.

3         I'll move on to ripeness, Your Honor.  Defendants

4 initially challenged our standing on ripeness grounds because

5 the State had represented that it will not enforce the law

6 until after July 1st.

7         THE COURT:  Of?

8         MS. PEREZ:  This year.

9         THE COURT:  2018?

10        MS. PEREZ:  Yes, ma'am.

11        I will respond that the last quarter century of

12 standing doctrine, at least, confer standing when an injury is

13 imminent as opposed to requiring an injury that has already

14 happened.  We've gotten some recent declarations that I don't

15 know how it will be used by Defendants, but may be used to

16 suggest that more changes might be coming to Crosscheck.

17        A change that makes the process more lawful will

18 certainly be welcome by Plaintiffs, but it is a bit

19 frustrating that we're all here because Defendants would not

20 agree to enjoin SB 442 until we got a ruling on the merits.

21 If their position has changed, we are willing to talk about

22 this, but right now we only have a formal representation that

23 they will hold off until July 1st, and this makes this an

24 imminent injury that is ripe for disposition on a PI motion,

25 which is what we're here for today.

1          So the balance of hardships and public interest

2   favor an injunction.  The right to vote is precious, and when

3   the opportunity to vote is lost in an election, it's lost

4   forever.  There's no harm to the State, Your Honor, in

5   operating Crosscheck the way that it did prior to SB 442.

6          And if it pleases the Court, I'd like a few minutes,

7   at the end of all presentations, for a quick rebuttal, but at

8   this time I'm happy to answer your questions or turn it over

9   to Mr. Jedreski.

10          THE COURT:  I have no questions.

11          MS. PEREZ:  Thank you, Your Honor.

12          THE COURT:  You may turn it over.

13          MS. PEREZ:  And, Your Honor, I'm giving you some

14   copies of the exhibits.

15          THE COURT:  Thank you.

16          MR. JEDRESKI:  Good morning, Your Honor.  Matt

17   Jedreski on behalf of Common Cause.  May it please the Court,

18   I'd like to start with the standing argument that's specific

19   to Common Cause, and then I'm going to talk about the

20   uniformity claim that's common to both plaintiffs or all

21   plaintiffs, as well as address a few of the notice and waiting

22   issues that my co-counsel referenced, and finally address the

23   remaining elements of the injunction standard.

24          Common Cause is a nonprofit, grass roots

25   organization in Indiana with about 12,000 members who live and

1  vote in the state.  Its mission is to promote ethics, good

2  government, and eliminating barriers to elections.  It has one

3  employee, and that is Ms. Vaughn, who submitted an affidavit,

4  and who is here today.

5           When SB 442 was being contemplated by the

6  Legislature, Common Cause was there.  They spoke with the

7  general counsel for Defendant Lawson and they submitted

8  testimony to the Legislature, and they raised the exact

9  concerns that we're here addressing.  And those concerns were

10 reiterated after the law came into effect last year in July.

11          And the standing that Common Cause is here to assert

12 is based on the same diversion of resources theory advanced by

13 the other plaintiffs, but there's a slight difference, because

14 Common Cause has already suffered harm as a result of SB 442.

15 Common Cause provides training and education for its members,

16 for volunteers, for the public, and for other organizations

17 that address poll access and voting rights issues.

18          And in response to SB 442, Common Cause has had to

19 change those trainings.  It's had to change its curriculum to

20 address the new law and to begin preparing its constituents

21 for remedying the effects of this law when it comes to

22 actually voters being purged and elections -- and issues that

23 are going to arise on election day.  Common Cause has had to

24 devote time during these educational sessions to actually

25 addressing those issues.  And Common Cause has had to devote

1   time to responding to inquiries after these sessions, from its

2   members and the people who attend, about this new law.  And

3   Ms. Vaughn has affirmed that this is stuff that has already

4   happened.

5           And Common Cause has extremely limited resources.

6   It is literally just one part-time employee.  And each one of

7   these stages where it's had to address this new law has meant

8   that it has been unable to promote its other related goals for

9   eliminating barriers to voting, including advocating for

10  nonpartisan redistricting, early voting sites, and other poll

11  access issues.

12          Now, these harms are going to only increase as we

13  approach July 1st of 2018 when Defendants will begin actually

14  sending these names to the counties and begin the purge

15  process.  And they're going to certainly ramp up as we

16  approach election day in a few months.

17          The other harm that Common Cause has articulated is

18  that when we actually get to election day, Common Cause

19  provides its voluntaries and Ms. Vaughn's own time to respond

20  to inquiries and issues that arise during the election itself.

21  It has volunteers that actually work at the polls and it has

22  volunteers that answer phone calls.  And these all -- all

23  these volunteers are responding to issues raised by voters as

24  well as other organizations that relate to poll access issues.

25          And with SB 442 in effect, as it imminently will be,

32

1  we'll have more of these voters finding their registrations

2  canceled erroneously, just as Ms. Perez has pointed out has

3  happened previously with the Crosscheck process.  That means

4  these, again, limited resources are going to be diverted from

5  helping voters on other poll access issues and forced to be

6  diverted to helping voters who have been erroneously canceled

7  as a result of SB 442 and handling inquiries from other

8  organizations to the same.  So that is the diversion of

9  resources standing asserted by Common Cause.  It's for a harm

10  that has already taken place, that is ongoing, and that it

11  will imminently suffer even more in the future.

12          We've also asserted an associational standing

13  theory, and that is on behalf of the 12,000 or so members of

14  Common Cause Indiana whose voting registrations are at risk by

15  this law, imminently at risk by this law.  And I'm not going

16  to repeat the same arguments that Ms. Perez made.

17          So I want to turn to the NVRA violations at issue.

18  First, I have the unlucky task of talking about the confidence

19  factors, because that involves math.  And the reason that I

20  want to bring those up in particular is because the defendants

21  offered these in response to Plaintiffs' motions as a way that

22  this process is more reliable, such that the Court should feel

23  more comfortable allowing these registrations to be canceled

24  automatically.

25          First, I'd note that these confidence factors were

1  hastily pushed into law in response to the motions filed and

2  the actions taken by the plaintiffs in these lawsuits, and

3  they're highly flawed.  And the reason is because they give

4  these various categories that a county official or the State

5  will match to create a confidence level that they believe is

6  sufficient.

7          And there's no evidence in the record of where this

8  came from or what these point values actually represent, but

9  even more obviously is that a lot of these categories are

10  simply inapplicable.  Crosscheck cannot and does not provide

11  to Defendants or to the counties the full Social Security

12  number of an out-of-state record, the Indiana address of an

13  out-of-state record.  And as Ms. Perez pointed out, they

14  actually mask the last four of the Social Security number.

15          And if you go through the confidence factors and

16  their point values and you set aside that, it could never be

17  the case that Defendants will have an Indiana ID, full Social,

18  or Indiana address.  The only way to get to the 75-point

19  threshold is if there is a last four Social matching in

20  addition to all the names and the birthdate.

21          And the problem with that is that all the records

22  that are going to be sent to the counties, they're going to

23  have to make assumptions, and, in fact, they are making these

24  assumptions.  And the two of them are, number one, they're

25  assuming that Crosscheck has correctly matched this last four

34

1   Social, and they have no way of verifying that.  And the

2   second, and perhaps more concerning, assumption that Ms. Perez

3   also pointed out is that they have to assume the record

4   they're receiving was of a voter who subsequently registered

5   in another state.  They don't get the date of registration,

6   and so that's a second assumption they're making.  So the

7   confidence factors, as a principle and as set forth in the

8   statute, don't provide any real confidence.  In fact, they do

9   the opposite.  They provide false confidence.

10          Now, we also provided the source code, which we

11  asked Defendants for, and I understand that this source code

12  might be a work in progress, and there might be further

13  changes to it, but just looking at that source code, our

14  expert, Dr. McDonald, noted that, number one, it provides

15  points when there are no data.

16          So if both records lack a suffix, the source code

17  gives it four points -- or five points.  But, even more

18  concerning is that if the records are inconsistent, the source

19  code provides points.  If the middle initial -- I'm sorry, the

20  first letter of the middle name is the same in both records,

21  the source code provides five points.  But that means that the

22  middle name in one record could be Sophia, the middle -- and

23  the other record could be Stanislaw, and the source code would

24  say that's a match, five points.

25          And we don't have the source code, because we -- the

1   full source code, because we haven't gotten it, but it appears

2   that the source code might also double count.  So that same

3   middle -- the first letter of the middle name, if it's an

4   exact match, the source code would give it 10 points for a

5   full middle name match, but it might also, as far as we're

6   concerned, give it five points for the first letter match.

7   And, again, this might be subject to change, but this is what

8   the law is now and this is what the process is now, and so

9   that's what the Court must evaluate.

10          THE COURT:  And who's looking at this?  The clerk,

11  the county clerk, will get this data?

12          MR. JEDRESKI:  The county clerk gets the ultimate

13  hopper, the record in the hopper.  So what the defendants --

14  let me -- maybe it helps to kind of just briefly walk through

15  the process.  Crosscheck sends their records to the State.

16  The State performs its analysis and it applies these

17  confidence factors.  And that's not done by an individual,

18  that's done by computer software, and so that's what the

19  source code is.  And then, what that subsequently sends to the

20  counties isn't -- is just the record that appears in the

21  hopper.  So that's the screen that shows what the data is from

22  the Indiana voter and the out-of-state record.

23          THE COURT:  Okay.

24          MR. JEDRESKI:  So I want to -- there's one more

25  point that I forgot to mention on standing, which is that the

1   *Crawford* case in the Seventh Circuit, they actually did find

2   diversion of resources standing for the organization.  That

3   wasn't something they just reserved on; they affirmatively

4   found standing on diversion of resources theory.

5            So I want to turn now to the uniformity claim that's

6   common to all plaintiffs in this case.  The NVRA requires that

7   list maintenance procedures be uniform and nondiscriminatory.

8   Uniformity is a simple enough term, and the case law has

9   interpreted it, under its plain meaning, as a list maintenance

10  procedure that applies equally to everyone in the same way.

11  And that includes on a county-by-county basis.

12           Now, SB 442 requires counties to "determine" whether

13  a record provided by Crosscheck matches an Indiana

14  registration, and it's in that process that we have

15  uniformity.  And it really occurs in two different ways, or at

16  least two different ways.  The first way is that counties

17  testified, because they have no guidance from Defendants

18  whatsoever on how to make this determination, that they've

19  come up with their own subjective tests for determining

20  whether two records match and to therefore cancel the

21  registration.

22           And the second way that SB 442 is nonuniform is that

23  when these counties are evaluating records, they'll sometimes

24  ask the codirectors for guidance or for their advice on a

25  particular situation or a particular point of NVRA law.  And

1   the codirectors have different opinions on these critical

2   issues that we're talking about today, and will give these

3   differing opinions to different county officials.

4           So I want to talk about each of those in a little

5   more depth.  The -- as we set forth, all the plaintiffs set

6   forth, in their briefing, the county officials -- we only

7   testified -- or, sorry.  We only deposed a sort of small

8   sample of these counties, but remarkably they testified pretty

9   consistently that when they're looking at Crosscheck data,

10  they say, "Hey, is this name sufficiently unique or funny or

11  odd?"  They use different words.  And if so, they would have

12  far more confidence that that registration is indeed an

13  out-of-state -- or that record is an out-of-state registration

14  by the same Indiana voter and will find a match.

15          But if they, as in the county clerks, find the name

16  a little more common, they won't necessarily find that, and

17  they'll want to find more information or they'll want to do

18  follow-up.  And some of the names provided by the county

19  clerks, for example, were -- Nicolette Marcos would be a name

20  they found, that one clerk found, sufficiently funny or odd

21  that they would cancel that registration by finding a match.

22  And John Smith was a name that was more common.

23          And this is something that's inherent in the fact

24  that the codirectors do not provide any guidance on how to

25  make this determination.  And not only that, but their

38

1  position is, they can't really tell the counties what to do.

2  And if you look at the communications, we provided some

3  e-mails between counties and Ms. Nussmeyer, they always end

4  with, "You're going to have to just ask your own lawyer."

5  They really defer -- they ask the counties to defer their own

6  judgment.

7       And the result in that is that counties are coming

8  up with these own tests, and we have 92 different counties.

9  And even within each of those county offices, the testimony is

10  you have one person or another, or sometimes multiple people,

11  working on this process, and so you might have the same

12  subjective tests that differ even within counties.  So that's

13  two different levels of uniformity just on that point.

14       Now, I want to turn to this second issue of

15  uniformity, which is the fact that the codirectors provide

16  different opinions and different advice to the counties.  This

17  results from the structure of the Indiana Election Division.

18  Each county office has two clerks who are in charge of the

19  list maintenance.  One is a democrat and one is a republican.

20  That's also true of the Indiana Election Division codirectors.

21  One, Ms. Nussmeyer, is a democrat; and Mr. King is a

22  republican.

23       The testimony that we saw from the county, and what

24  we see in the e-mails, is that it tends to be the democratic

25  county officials will reach out to Ms. Nussmeyer or her staff

1   when they have a question, and the republican county officials

2   reach out to Mr. King or his staff when they have a question.

3   And that becomes a serious problem when there's such a

4   difference of opinion between Mr. King and Ms. Nussmeyer about

5   what the NVRA requires.  And they don't always consult with

6   each other, and as the evidence in the record shows, they'll

7   give their opinion without really reference to each other.

8           So here's a point that is very critical.  Mr. King

9   testified that it's his opinion that a county voter

10  registration official can look at the information in

11  Crosscheck, and if they determine that's a match, that's

12  sufficient to cancel the registration under SB 442.  They

13  don't need to see any underlying documentation or research

14  that any further.

15          Mr. King also testified that if a county voter

16  official received an e-mail from an out-of-state official

17  describing a voter that the out-of-state official believed

18  might be registered in both states, that would suffice as a

19  confirmation in writing or a written request of the voter to

20  cancel that registration.

21          Now, contrarily, Ms. Nussmeyer testified the

22  opposite.  She said that she believed that a representation by

23  an out-of-state official would not be a basis for

24  cancellation, and that she would encourage the official to get

25  original documentation of that out-of-state registration.

                                                                40

1           This creates obvious lack of uniformity among

2    counties, and even within counties, in terms of who's

3    getting -- which voters are getting more research, which

4    voters are getting canceled automatically based on the

5    Crosscheck results with all of their flaws.

6           Now, another piece of evidence that shows this

7    uniformity is the actual data from the past 3 years of

8    Crosscheck, which were in Exhibit 2, both parties' motions,

9    and which were summarized in the expert report of Dr. Michael

10   McDonald.  And what Dr. McDonald found was that there were 11

11   counties in Indiana that canceled 100 percent of the

12   Crosscheck matches, there was at least one county that

13   canceled zero percent of those Crosscheck matches, and there

14   were all sorts of ranges in between.  And what that data told

15   to Dr. McDonald, a data expert, was that it was highly

16   unlikely that this is the result of counties applying uniform

17   standards and procedures.  And that makes sense given the

18   testimony from the counties and testimony from the

19   codefendants.

20          And one more point I want to make about that data,

21   and this ties to the confidence factor, is if you look, there

22   are counties who received matches in prior years because

23   Defendants have informally applied these confidence factors

24   before the law was passed in March, making them a statute.

25   And in the data, in that pivot table, it shows that there were

1  counties who received Crosscheck matches of a 100 percent

2  confidence factor, and they rejected those matches.  So that

3  means that counties are looking at something that supposedly

4  has a 100 -- perfect 100 score of confidence and finding it

5  wasn't a match.

6         So I want to just address a few points that

7  Defendants raised contrary to the uniformity claim.  The first

8  was that the law is uniform because it's written in one way

9  and it applies to all counties, but that's not the standard.

10 The standard is whether it is applied to the voters in a

11 uniform manner.  And that's what was made clear in the case

12 *Project Vote v. Blackwell* and the other cases cited by the

13 parties.

14         The defendants also argue that Common Cause and the

15 other plaintiffs can't point to anything within the NVRA or

16 case law that imposes a duty on the defendants to train county

17 officials.  That might be true in a literal sense, but as

18 Ms. Perez pointed out, the NVRA imposes a duty on the

19 defendants to ensure compliance with the NVRA.

20         And for the record, Defendants do provide training

21 and they do provide guidance.  They provide annual trainings

22 to all the county officials, including on voter list

23 maintenance.  They issue guidebooks on performing voter list

24 maintenance.  They issue business rules and step-by-steps to

25 counties.  And so this is something they can and they do.

1  And, in fact, if it's required to ensure NVRA compliance, then

2  that's something that they do have to do.

3          And there's one -- there's another case that relates

4  to the duty of defendants to ensure compliance with the NVRA,

5  and that's the *U.S. v. Missouri* case out of the Eighth

6  Circuit.  And there it said it's fine if states want to

7  delegate responsibility to local or county officials to carry

8  out the list maintenance or the duties under the NVRA, but it

9  is -- they cannot delegate the responsibility of the state to

10 ensure that there's a compliant program.

11          And if Defendants are going to take the position

12 that Indiana law prohibits them from ensuring compliance, then

13 what *U.S. v. Missouri* says is that Indiana law, the entire

14 program, is going to be problematic under the NVRA and that

15 the United States might need to step in and ask the State to

16 rewrite that program.

17          Defendants also argue that there's no data yet in

18 these Crosscheck hoppers, so, therefore, there's no current

19 uniform -- nonuniform practice.  This is the same sort of

20 ripeness argument that Ms. Perez already addressed, but I just

21 want to note, there will be data starting on July 1st, 2017.

22 The counties testified that they've been making these

23 determinations about whether there's a match since this

24 particular law, that's 3-7-38.2-5(d)-(e), has been in effect

25 in some form since 2013.

43

1          And it's required the counties to make the same

2     determinations that they're required to under SB 442.  The

3     counties testified they intend to keep doing what they've been

4     doing, and so we know that July 1st they're going to get that

5     data and they're going to keep doing the same nonuniform

6     practices that they've been doing for, apparently, years.

7          Finally, and this is related -- this is sort of

8     related.  Defendants argue that they could still issue

9     guidance or rules that might affect this.  And Ms. Perez also

10    addressed this, so I'm not going to dwell on it, but Common

11    Cause, like I mentioned, has been raising its concerns about

12    this law since last January, and at every step of the way

13    since then, Defendants have had one response, "You're wrong,

14    this law complies with the NVRA as written."

15         And the first time we heard anything about something

16    they might do differently was in opposition to the motion.  It

17    just seems to me like a naked attempt to try to defeat the

18    motion rather than a genuine attempt to try to remedy the

19    infirmities in the law that the parties have been pointing out

20    for a year or more.

21         And what's more is that we don't have any

22    indication -- I mean, frankly this would have been the time to

23    say so, what they're going to do, what they think is wrong,

24    how are they going to fix these things, and they didn't do it.

25    And I don't think they're going to do it.  And we have two

44

1   months until these purges are going to start.  And voters are

2   going to start to immediately feel the harm from this, because

3   it doesn't just affect their ability to vote on election day,

4   but as Ms. Perez pointed out, they're not going to receive

5   election mail, get-out-the-vote parties aren't going to have

6   them on their radar, they're not going to be able to check the

7   Web site, and things like that.

8           So, yes, it is true that Defendants could next week

9   or July, the week before July 1st, issue some rules and

10  guidance, but what they're essentially asking is that the

11  Court hold off and that we do 150 pages more of briefing and

12  get back in here on an expedited basis, possibly, if they

13  might issue some guidance that they haven't even indicated.

14  And so that's not justice and that's not going to -- that

15  doesn't defeat the ripeness of this dispute, because the harm

16  is imminent and it's based on the law as it exists and the

17  guidance as it exists and the practices that have been going

18  on under this law.

19          And, finally, on that point, the one thing that

20  SB 442 really did to this law is eliminate notice and waiting.

21  It is unequivocal what the Indiana Legislature's intent was in

22  making that amendment.  It seems highly unlikely that

23  Defendants are going to issue guidance or business rules

24  telling counties to start doing notice and waiting.  And so

25  there is no way that they can implement a rule that's going to

1  fix that infirmity.  And that's setting aside that their

2  position is also that they can't require counties to do

3  anything.

4          So I want to turn now to irreparable harm.  I

5  described the harm that Common Cause has already suffered as a

6  result of this law, and I've also already described the

7  imminent harm that it will face as we ramp up efforts to

8  counteract this law by July 1st and leading up to the

9  election.  And that is sufficient, under the cases that have

10 been already cited, to establish irreparable harm, as well, we

11 have irreparable harm to the members of Common Cause under its

12 associational standing theory, who will be subjected to this

13 law without any -- without knowing it and having their

14 registrations canceled.  The fact that we're going to have to

15 increase the number of volunteers at voting sites and those

16 voting volunteers will have to divert their time to remedying

17 these kinds of canceled registrations as opposed to other poll

18 access issues will be irreparable harm.

19         On the flip side of that, the defendants haven't

20 identified any irreparable harm that they will face by the

21 granting of this injunction.  They've certainly identified the

22 integrity of the election as a value and one that the NVRA

23 requires, but integrity of the election includes ensuring that

24 voters who are properly registered remain properly registered.

25 And further, Defendants haven't articulated how the failure to

1   implement this particular voting list maintenance in some way

2   increases the -- or, sorry, decreases the integrity of the

3   election.

4          And I want to note that Indiana will still have many

5   ways of performing list maintenance even if the Court granted

6   this injunction, including ways to cancel voters'

7   registrations at the request of the voter if the voter has

8   moved and been identified by the national change of address

9   database, which is something that Indiana checks on a monthly

10  basis and sends out to counties.  And if there's a -- Indiana

11  has a program they send statewide mailers to identify

12  out-of-state movers.  That won't be affected by this

13  injunction.  And Indiana also identifies people who have moved

14  by nonreturned -- or, sorry, returned or undeliverable jury

15  notices.  So it has this variety of programs, including

16  specifically to identify the same people that this particular

17  list maintenance program is trying to identify, people who

18  have moved.

19         Finally, the public interest favors this injunction.

20  There are 10,000-plus voters at risk of having their

21  registrations canceled.  That's the figure that is anticipated

22  based on past Crosscheck results.  These folks won't receive

23  election mail, they won't be on the target of get-out-the-vote

24  efforts, they won't be able to check their polling place

25  on-line or get updates about that.  And even if they do manage

1  to make it to the polling place, they face this complex

2  procedure to cast a ballot, and that ballot can be challenged

3  and might not be counted.

4         So granting this injunction eliminates the risk of

5  this disenfranchisement without creating any new substantial

6  threats to the election -- the integrity of the election

7  process, and, therefore, it is in the public interest.  And

8  for this reason, Common Cause requests that the Court

9  enjoin -- preserve the status quo and enjoin Section

10  3-7-38.2-5(d)-(e) pending final resolution on the merits.

11         I would like to reserve time for rebuttal, and I'm

12  happy to answer any questions the Court has.

13         THE COURT:  No questions.

14         MR. JEDRESKI:  Thank you, Your Honor.

15         THE COURT:  Thank you.

16         If you'd come on up to the lectern.

17         MR. GARN:  Thank you, Your Honor.

18         THE COURT:  And, Mr. Garn, you may.  You may,

19  Counsel.

20         MR. GARN:  Thank you.  And good morning, Your Honor.

21         THE COURT:  Good morning.

22         MR. GARN:  Plaintiffs argue that this Court needs to

23  enjoin the defendants from carrying out Indiana law because

24  they argue thousands of voters may be disenfranchised.  Common

25  Cause even comes up with a number of 10,000 voters.  But

48

1  Plaintiffs, none of them, have been able to identify a single

2  voter, a single registrant, who had been improperly removed

3  under either SEA 442, the law that's in effect now, or the

4  previous Crosscheck relevant statute that was in effect.

5           Before we even get there, though, there's a question

6  of what information is out there, who could be disenfranchised

7  under this law.  And for that to happen, these are the things

8  that would have to happen:  First, Indiana's voter

9  registration information would have to go to Crosscheck in the

10 first place.  It hasn't even gone to Crosscheck.  It's

11 impossible for the Election Division to send the information

12 to Crosscheck right now.  They've been given no instructions

13 about how to do it, what information to give.  They have done

14 that in the past for previous years, but there's nothing

15 that's been given at all to Crosscheck.

16          THE COURT:  But is it going to be sent in after

17 July 1?

18          MR. GARN:  We don't know.  We didn't -- so the

19 July 1 date is a litigation date.  That was what we agreed to

20 with the plaintiffs to work around the primary schedules, and

21 underlying the stipulation was just the fact of the calendar.

22 There was no way that the information could get from the State

23 to the hoppers before that date, so it didn't really matter.

24 That was the earliest date that the Division felt that it

25 could get that information there.  We don't have any

1  information from Crosscheck.  The Election Division doesn't

2  have any way to upload the information right now.

3           THE COURT:  Why not?  Does the State not intend to

4  implement the new law --

5           MR. GARN:  The State --

6           THE COURT:  -- ever?

7           MR. GARN:  The State may if they're given the

8  ability to upload the information from Crosscheck.  Crosscheck

9  is a separate organization that is -- that is a data sharing,

10  works with the Kansas Secretary of State office, but we

11  don't -- nothing is happening with Crosscheck right now.  They

12  don't have any information as to how to do that.  Usually that

13  would happen in January.

14           This isn't a part of the record, but my -- what's

15  going on, I believe, and from my understanding, is that there

16  are, as with many organizations, the federal government, state

17  governments, there are concerns about data breach, and there's

18  a Department of Homeland Security review being done of

19  Crosscheck right now.

20           And many states are asking for some sort of

21  verification that the information that they send will be

22  accurate, will be secure.  And until they get that, they're

23  not sending the information.  And Crosscheck isn't accepting

24  any information, isn't doing anything to say when we could

25  upload the information, so the information is with the

1  Election Division now.  It is not with Crosscheck.

2          THE COURT:  So we're going to stay status quo here

3  in Indiana; is that what you're saying?

4          MR. GARN:  Until there's a capability of uploading

5  it.  And then the Election Division would have to follow

6  Indiana law, and so they'd have to upload that information,

7  but at this point nobody knows when that will be.  And this

8  idea that things are going to happen on July 1st is quite

9  speculative.

10          THE COURT:  Okay.

11          MR. GARN:  So the information -- the first step

12  would be to get the information to Kansas, to Crosscheck.

13  That's -- they're not able to do that right now.  The second

14  thing would be, it would have to come back from Kansas.  And

15  if it's not with Kansas, it can't come back from Kansas.  So

16  that would be the second thing.  The third thing would be the

17  information would have to go through the confidence factors.

18  This is recent litigation under HEA 1253 that was passed in

19  this most recent General Assembly session.  That gives the

20  number qualities to where the Election Division vendor would

21  sort the information, apply the confidence factors on whatever

22  information there may be.

23          The plaintiffs put a lot of -- spent a lot of time

24  talking about the confidence factors and they might not apply,

25  or they -- it doesn't -- it's not clear why this confidence

1   factor would be in effect.  The thing is, we don't know what

2   information is going to Crosscheck.  Crosscheck has changed

3   their procedures.  And before, the plaintiffs have pointed out

4   and said, based on what happened in 2017, this confidence

5   factor makes no sense.  But we don't know what's going to

6   happen in 2018, if anything happens in 2018.

7           THE COURT:  So are you saying the Crosscheck

8   database process is flawed and may be subject to data

9   breaches?

10          MR. GARN:  That's --

11          THE COURT:  One of the factors that's --

12          MR. GARN:  I know of -- I'm not aware of any data

13  breaches, I'm not, but that is something that Crosscheck, like

14  the Indiana Election Division, like any organization that's

15  holding sensitive information, they're being very careful with

16  it.  We, in our litigation, passing back information, we were

17  quite careful with it.  It's not because our system is flawed.

18  It's because we just want to make sure that we're trying to

19  stay one step ahead of people who are trying to hack.  And so

20  that's the concern.

21          THE COURT:  Okay.

22          MR. GARN:  So the information would have to come

23  back from Crosscheck.  It would go through the confidence

24  factors.  They've raised it to 75 points.  That is a very high

25  number for figuring out -- for information for the voter

1   registration to get to the county hopper.  So there are

2   different numbers that apply.

3           So it would have to go through the confidence

4   factors, and then that information would need to go to the

5   county hoppers.  And then, when it finally got there, however

6   many would get to the county hoppers, if any, and there's

7   still -- if there's a match where you have last name, first

8   name, last four digits of Social Security number, address, and

9   middle name all matching perfectly, Indiana law still requires

10  that the county officer, election officer, goes through and

11  determines that that person is the same person.  That's left

12  to the discretion -- under the law, there's -- it's not

13  specified specifically how the county officers are supposed to

14  do that, but that's what they have to do under Indiana law.

15          Then let's say someone is improperly removed, which

16  is incredibly speculative given that we're not even to any

17  information getting to Kansas -- getting to Crosscheck.  Then,

18  if someone were to try to vote, there's still the fail-safe,

19  there's still the provisional ballot -- or there's still the

20  fail-safe where it's not a provisional ballot that a person

21  would have to -- would be able to vote.

22          THE COURT:  It's not a provisional ballot?

23          MR. GARN:  It's not a provisional ballot.  It is --

24          THE COURT:  It's --

25          MR. GARN:  It is a -- a person fills out an

53

1   affidavit and says, "I still live at this residence," and then

2   the person would still be able to vote.  And that's federal

3   law that's been codified by Indiana law.

4          THE COURT:  So this is something new?  Because,

5   currently, if you go to the ballot and they say you've been

6   purged, you have to do a provisional.

7          MR. GARN:  Well, it depends on why -- and we'd like

8   to stay away from the word "purged," but I understand that

9   that's a common term.  But if someone has been removed, it

10  depends on why they've been removed.  If they've been removed

11  for one reason, like someone -- it was in the news about the

12  governor being -- in Florida being removed because of death.

13  That made -- that's just a cancellation.  They could be gone.

14  But if under this, they are -- there is a -- it's a different

15  mechanism, it's a different kind of voting that would go on.

16         THE COURT:  So if you go to the ballot to -- if you

17  go to your polling place to vote and they tell you you've been

18  removed because of your address, that they're saying that they

19  think you've moved out of state, you're telling me you don't

20  get a provisional ballot anymore?

21         MR. GARN:  You get a -- you fill out an affidavit

22  and then you vote.

23         THE COURT:  So this is something new?  I've never

24  heard of that, but if it's something new --

25         MR. GARN:  Well, it's the federal law for how you

1  vote.

2             THE COURT:  Okay.

3             MR. GARN:  I mean, I think some of it may be

4  semantics as to whether it's provisional or not, but it's a

5  real ballot.  It's not subject to being analyzed later unless

6  there's a specific challenge.

7             THE COURT:  Okay.  So, Mr. Garn, if the Crosscheck

8  system is not going to be implemented anytime in the future,

9  that we know of, there's no exact start date, then in what way

10  would the State be harmed if this injunction is issued and the

11  amendment is not allowed to go into effect and we stay status

12  quo until the State gets everything worked out?

13            MR. GARN:  Because --

14            THE COURT:  What's the harm?

15            MR. GARN:  The harm would be this Court, by issuing

16  an order, would be issuing an advisory opinion about something

17  that hasn't taken effect, hasn't gone into effect, nothing has

18  happened.  It would be this Court stepping in and

19  micromanaging the Election Division's work.  The election --

20            THE COURT:  Well, Common Cause says that they have

21  been affected, that their staff -- they have one staff member,

22  who's a part-time person, and that they're -- I guess they're

23  volunteers, and their members aren't able to train properly

24  because they don't know what this new law is.  It's a law,

25  it's on the books.

55

1          MR. GARN:  Right.  And -- but the thing is, if the

2     Court goes through --

3          THE COURT:  That they'd have to utilize their

4     resources on this, where they could be out registering voters.

5     So they're saying they've been harmed.  And there's case law

6     that says that is a legitimate harm.

7          MR. GARN:  The problem with that is that in the

8     other cases where there's a diversion question, it's where

9     something is happening.  So they pointed to *Crawford v. Marion*

10    *County*, where there is a violation, there's something that's

11    ongoing, and they are working to address that.  Here, nothing

12    has happened.  It's all pre --

13         THE COURT:  But the law has been passed.  It's no

14    longer a bill.  It's the law.

15         MR. GARN:  Right.  And you can't -- so, by

16    organizing and arguing against a facial challenge to a statute

17    where there is absolutely a way for this statute to be

18    implemented in such a way as to comply with the NVRA, to

19    challenge that just on its face, there's no case law that lets

20    someone jump in and -- you'd be able to use -- you'd be

21    able -- that would be an exception that would be able to

22    challenge any kind of law that goes out there and say, "Well,

23    this has the potential for violating federal law or the

24    Constitution."  And anybody who doesn't like a certain law

25    would be able to use that associational or organizational

1  standing to get into federal court and have a case or

2  controversy, which is really, in effect, an advisory opinion

3  about something that's not happening.

4          THE COURT:  Okay.  All right.  I don't understand

5  that, but is there a case that explains that?

6          MR. GARN:  It all comes --

7          THE COURT:  Which case?

8          MR. GARN:  I mean, the problem is, there is --

9  there's no authority for that.  I mean, with the Marion

10 County, it was *Crawford*.  The case was the ID that was in

11 effect.  That was -- there was that requirement there.  But

12 there was still no harm there, as the Supreme Court held.

13 They were doing more of the balancing.

14          I think it's important to remember where we are in

15 this case.  The plaintiffs are asking for the extraordinary

16 relief of a preliminary injunction when nothing has happened.

17 There's nothing to be challenged here except for the statute

18 itself, which there is -- like I said, there's absolutely a

19 way for this to be -- to comply with the NVRA, and the

20 plaintiffs are really challenging -- the plaintiffs want it

21 both ways.  They want to say, look how this has happened in

22 the past, and this is how it was carried out when it had the

23 mailing, the notice, and wait period.  They're saying, like,

24 look how it was done that way --

25          THE COURT:  Okay.

1          MR. GARN:  -- and that is absolutely how it's going

2    to work in the future.  And that's just not -- there's no --

3    nothing in the record to back that up, because the Division,

4    the Election Division, does not -- they don't have the

5    information yet.  They don't know what they would be providing

6    guidance about, and there's just nothing there yet.

7          THE COURT:  So they're status quo?  They're going to

8    implement this, just leave everything as is?

9          MR. GARN:  They are working on it.  They're looking

10   at -- I mean --

11         THE COURT:  They're going to ignore this law?

12         MR. GARN:  No.  They are not going to issue --

13   they're not going to issue guidance about something that is

14   not something that's happening now, that is going to be

15   happening in the foreseeable future.  The plaintiffs keep

16   talking about July 1st, but, again, the information has to

17   come.

18         As far as the harm goes, the plaintiffs -- the

19   plaintiffs here argue that votes should matter and we

20   should -- that that is all important, and it absolutely is.

21   And the Election Division works hard to balance the, in

22   somewhat competing obligations under the NVRA, to increase the

23   number of eligible voters.  And the Election Division and the

24   Secretary of State work hard.  You go on the Web site, you see

25   all the time, they're like, "This is how you register to vote

1   in Indiana," so they're doing that under the NVRA.

2          But there's also the mandate that they remove

3   ineligible voters.  And an ineligible voter would be someone

4   who is registered in another state subsequent to registering

5   in Indiana.  That's a clear intention of the NVRA.  And that

6   is what the Election Division and the General Assembly have

7   used -- to want to use Crosscheck simply as a tool to try to

8   identify those people who are registered in another state

9   subsequent to their registration in Indiana.

10          It's a problem.  Indiana has been on the receiving

11   end of lawsuits where we have too many on the rolls, the

12   United States, private organizations, and so when Indiana

13   tries to do something to remedy this problem through its

14   statute, through a couple of statutes -- and it's trial and

15   error, trying to figure out the best way to do this -- the --

16          THE COURT:  Well, if Indiana is not ready to

17   implement their new law, that's the purpose of a preliminary

18   injunction.  The law is in effect.  The bill was signed into

19   law July 1, 2017, it's effective that date.  So at any time

20   the State of Indiana could begin its Crosscheck system, and

21   that's why they filed for the preliminary injunction, to put a

22   hold on this, to enjoin until the State of Indiana figures out

23   what it's going to do.

24          If the State of Indiana is saying that maybe there's

25   some data breach issues, I assume, and the Department of

1   Homeland Security wants you guys to wait, wants the State of

2   Indiana to wait on implementing the Crosscheck system --

3           MR. GARN:  Well, that -- so -- so Indiana isn't --

4   from my understanding, Indiana isn't working with the

5   Department of Homeland Security on this.

6           THE COURT:  Okay.

7           MR. GARN:  This -- and that's why we just don't know

8   what's going on with Crosscheck, because that is -- that's

9   another organization.  There are other organizations, data

10  organizations.  There's ERIC, E-R-I-C, which other states work

11  with to do the same kind of data sharing.  That's a

12  subscription system.  But this isn't an unusual thing for

13  states to share this information.  So, as far as the law goes,

14  though, I mean, I think that the plaintiffs are putting the

15  cart before the horse on this.  We don't know -- they want to

16  enjoin something --

17          THE COURT:  That's been passed into law.  They want

18  to stop a law, they want to enjoin a law --

19          MR. GARN:  Yes.

20          THE COURT:  -- because they stated the reasons why

21  they believe this law needs to be enjoined, that it would

22  disenfranchise some people --

23          MR. GARN:  And they're basing that --

24          THE COURT:  -- and we never want that to happen.

25          MR. GARN:  Absolutely not.  And that's why Indiana

60

1  does such hard work to make sure that they're not removed

2  improperly.  And that's why Plaintiffs have not been able to

3  identify a single human being who was removed improperly under

4  the Crosscheck system as it applied in the past.  They have

5  received reams of information, and not one person has been

6  disenfranchised under this that they've been able to identify.

7          THE COURT:  Well, that's because it hasn't gone into

8  effect because, by agreement of the parties, you haven't done

9  the Crosscheck; correct?

10          MR. GARN:  Based on -- Crosscheck has been used in

11 the past.

12          THE COURT:  Okay.

13          MR. GARN:  Crosscheck has been used.  And the only

14 thing that's changed -- a couple things have changed.  One,

15 the codification of the confidence factor.  That has gone into

16 effect.  So more information -- it's more rigorous at the

17 state level before it would get to the county level.  So more

18 information could have gone to the counties under previous

19 versions of the Crosscheck program.

20          THE COURT:  Okay.  All right, let's talk about, do

21 you agree they have standing?

22          MR. GARN:  No, because there's no case or

23 controversy right now, because it's -- the statute itself --

24 they're making a facial challenge.  They're making a facial

25 challenge, and there is absolutely a way for this to be read

1   for SEA 442 in conjunction with HEA 1253 to be read in a way

2   that complies with the NVRA.

3           So the NVRA mandates voter list maintenance

4   programs, and we've gone through that before.

5   52 U.S.C. 20501, right at the beginning, the purposes are to

6   ensure the accurate and current voter registration rolls are

7   maintained.  Then, about a decade later, after the NVRA, there

8   was the Help America Vote Act which was enacted, HAVA was

9   enacted, after *Bush v. Gore* and the problems that were

10  identified there.

11          THE COURT:  Okay.

12          MR. GARN:  That makes -- that also emphasizes the

13  obligations of states to maintain accurate records.  So they

14  have -- there are -- there are the obligations to do programs,

15  use tools to make sure people aren't -- ineligible voters

16  aren't on the rolls.  The plaintiffs have an overly rigid

17  understanding of NVRA.  There's a clear legislative intent

18  that Congress didn't want people to be registered in two

19  states at the same time.

20          Further, Plaintiffs ignore Indiana law.  All the

21  emphasis this morning and in their briefings has been focused

22  on Crosscheck, that it's automatic, that if there's a match,

23  if it goes to the county election officer and there's a match,

24  then that was used, repeatedly today, automatically canceled.

25  Indiana law does not say that.  Indiana law specifically says

62

1   that a county officer must determine that the -- must

2   determine two things:  First, that the person -- the two

3   people in the match are, in fact, the same people; and the

4   second thing is to make sure that the registration in the

5   other state was subsequent to the registration in Indiana.

6               THE COURT:  Who makes that determination?

7               MR. GARN:  The county election officers.

8               THE COURT:  What do they have to look at to make

9   that determination?

10              MR. GARN:  Well, it would depend on what's in

11  Crosscheck.  I mean, right now Crosscheck, it doesn't have the

12  date, so --

13              THE COURT:  So is it going to have the date?

14              MR. GARN:  We don't know.

15              THE COURT:  So Crosscheck, you agree, it's

16  unreliable right now?

17              MR. GARN:  Well, if it doesn't have a date, then the

18  election officer would have to determine that the date was

19  later.

20              THE COURT:  How would they do that?

21              MR. GARN:  They would -- if it's not on Crosscheck,

22  if it's not there, which is what we keep hearing today, they

23  would have to reach out to the other state to determine.  And

24  that may be looking at the registration in the other state.

25              THE COURT:  So they would have to get the actual

1  registration?

2       MR. GARN:  Yes, which would be a confirmation --

3  one, it would be a request of the registrant.  Two, it would

4  be a confirmation in writing that the person has moved to the

5  other state.  So there is absolutely a way for this to be

6  implemented in a way that everyone agrees that this would

7  be -- this would comply with the NVRA.

8       THE COURT:  So why does the new statute not just

9  send the notice to the person and ask, as we've done in the

10 past in Indiana, that they get mailed something saying, "Have

11 you moved?"

12      MR. GARN:  Because --

13      THE COURT:  Why don't we do that?  Isn't that the

14 better way?  And then, if they don't respond or --

15      MR. GARN:  Well, the NVRA doesn't require that it be

16 done in a way that we all agree on.  There's a --

17      THE COURT:  The way that we've done for years in

18 Indiana.  Why are we changing it to this way that seems more

19 unreliable?

20      MR. GARN:  Well, it could, in fact, be more reliable

21 if the person -- if the county officer reaches out to the

22 State and gets the actual information.  That -- then you don't

23 have the two-year waiting, you don't have to worry about

24 someone sending a notification back, things like that.  So

25 that is an -- and it's a way that they could do it.  I've

64

1  given up trying to understand either Congress or the General

2  Assembly and why things happen a certain way, but the bottom

3  line is that the NVRA provides a great deal of flexibility.

4       We have a federal system, and plaintiffs are

5  demanding a uniformity with the NVRA that just flies in the

6  face of what the NVRA itself requires.  They have terms like

7  "request in writing" -- or "register requests" or "confirms in

8  writing."  There's a vagueness within the NVRA that provides

9  discretion at the state level, which is, in turn, given to the

10 counties.

11      Indiana has set up a system.  Indiana, the way that

12 it used to be with the Election Division, there was a board,

13 and that was controlled by the governor, whatever party of the

14 governor that had the majority vote.  That would govern how

15 the Election Division would work, the predecessor to the

16 Election Division.  Now it's a bipartisan system.  Indiana,

17 they have to compromise.  And it's disappointing that Indiana

18 has this system and is being -- there's a certain level of

19 attack for trying to work out a compromise with the way we

20 have it, our political system.  And so --

21      THE COURT:  What's wrong with the old way where the

22 county voter registration office sends an address confirmation

23 notice to the Indiana address of the voter?

24      MR. GARN:  I don't know, but that's not what the

25 NVRA requires.  In fact --

1          THE COURT:  But Indiana required prior to July 1,

2     2017.

3          MR. GARN:  Right.  And there have been -- and

4     Indiana gets the communication from the DOJ, and it gets sued

5     because of loaded rules, where Indiana -- certain counties

6     have more people on the rolls than there are people

7     registered, than there are voting age people in the counties

8     themselves.  This is a nationwide problem.

9          The amicus brief, they cite the Pew foundation

10    bipartisan report that showed how big of a problem this is.

11    And it's only growing more problematic as data information

12    is -- the cost of holding this information, where to hold it.

13    There are concerns about -- I mean, we don't want -- we need

14    to have -- we need to ensure the integrity of the elections

15    and we need to make sure that the rolls are accurate as

16    possible, because that's where we get into problems.  That's

17    one of the places where we get into problems.

18          THE COURT:  Okay.

19          MR. GARN:  So -- and we put this in our brief -- the

20    opposition to the brief.  This could be understood in a couple

21    of different ways.  And Indiana recognizes -- Indiana has a

22    flexible approach to these programs.  So one of the things

23    that Indiana does is, even if this is seen as a request of the

24    registrant to remove that person from the rolls, Indiana still

25    says, "We're not going to do any of this 90 days before the

1   election."  That's not mandated, but they don't do that.  So,

2   to say that that somehow is a problem, I'm not quite sure I

3   follow that if Indiana is giving more protection through this.

4           And it's kind of like the confidence factor.

5   There's no obligation to do this, but Indiana has enacted

6   certain mechanisms, put certain mechanisms in place to try to

7   make things easier, try to make things more accurate.  And I

8   think some of the problem was there was just too much data

9   coming back from Crosscheck.  And we've -- the Election

10  Division has tried to make that a little more manageable,

11  and --

12          THE COURT:  So doesn't the statute specifically

13  refer to Crosscheck?  The memorandum of understanding with the

14  Kansas Secretary of State referred to in the statute involves

15  Indiana's participation in the database matching program

16  called Interstate Voter Registration Crosscheck.  That's in

17  the statute.

18          MR. GARN:  Yes, absolutely.

19          THE COURT:  But you're saying that Crosscheck is

20  unreliable?

21          MR. GARN:  No.  I'm saying that it's -- it doesn't

22  really --

23          THE COURT:  We don't want to use it?

24          MR. GARN:  What's that?

25          THE COURT:  We don't want to use it in Indiana

67

1  yet?

2          MR. GARN:  No.  I'm just saying, one, Indiana can't

3  use it right now, because they can't upload it.

4          THE COURT:  Why can't we upload it?

5          MR. GARN:  Because --

6          THE COURT:  Is it broken?

7          MR. GARN:  It's closed.  It's like -- there's

8  just -- there's -- it's like if you were trying to upload

9  information onto -- if you were trying to buy a ticket or

10 something and the portal is just not allowing you to enter in

11 the information.

12         THE COURT:  Okay.  And why is that?

13         MR. GARN:  We don't know.  We're not Crosscheck.

14 But we're required to participate in this program, but Indiana

15 law doesn't require us to do -- doesn't require the Election

16 Division to do something that's impossible at this point.

17         THE COURT:  Okay.  So, as soon as we're able to

18 upload, we assume you would -- Indiana will upload.

19         MR. GARN:  The Election Division needs to follow

20 Indiana law.  So, yes, they would upload it if that became a

21 possibility.

22         THE COURT:  So that might be in July --

23         MR. GARN:  Maybe.

24         THE COURT:  -- 2018?

25         MR. GARN:  Maybe.

1          THE COURT:  Okay.  Well, that's why they need --

2   that's why they're asking for the injunctive relief --

3          MR. GARN:  But --

4          THE COURT:  -- to make sure that doesn't happen.

5          MR. GARN:  But the way -- but the challenge is

6   coming from the way it had happened in the past.  They --

7   again, they want it both ways.  They want to say this is what

8   happened under the Crosscheck program before, this was -- for

9   example, this was the source code that was used.  There's no

10  source code.  There's no source code being implemented.

11         They're saying this is the guidance that was given

12  to the county officer, the county election officials before.

13  There's no guidance.  There's nothing to -- there's no way to

14  make an as-applied challenge here, because there's nothing to

15  apply it to.

16         But, again, the plaintiffs are saying, look at how

17  it was done in the past and look at all the problems, but

18  they've not identified anybody who was even identified for

19  that mailer improperly.  They've identified no false matches

20  in Indiana under the way Crosscheck used to -- maybe that's a

21  better way to say it.

22         THE COURT:  Okay.

23         MR. GARN:  They haven't identified any false matches

24  at all under the prior law.

25         THE COURT:  Okay.  All right.  We'll see if they

1  have some on rebuttal.  You still haven't told me how the

2  State of Indiana will be harmed --

3          MR. GARN:  Well --

4          THE COURT:  -- if an injunction is issued.

5          MR. GARN:  I think it's the same reason why Article

6  III requires a case for controversy.  It's because courts

7  should not --

8          THE COURT:  Oh, you said it would be an advisory

9  opinion?

10          MR. GARN:  Yes.  And what we're talking about here

11  is democracy.  You have a democratically elected General

12  Assembly, you have a bipartisan political arm that is making

13  decisions, and based on something that hasn't happened, this

14  Court would be saying, "Don't do that."  There's a paradox

15  there with the stated interests of the plaintiffs here to say,

16  like, we're here to further democracy, but the Court stopped

17  this democratically-enacted statute.

18          THE COURT:  Because the plaintiffs are arguing that

19  if a voter is improperly removed from the registration rolls,

20  not only will that voter have to do either a provisional

21  ballot or an affidavit that you've talked about, but they've

22  argued that that voter will not get their notices about

23  upcoming elections and the candidates and the notice of their

24  voting place, because they've been purged or removed from the

25  list.  So isn't that a harm that we want to protect against?

70

1          MR. GARN:  All of that is so speculative at this

2    point in that -- and we do not know how this is going to be

3    enacted.  The plaintiffs cite *Florida State Conference of the*

4    *NAACP v. Browning*, 52 F.3d 1153.  That's the Eleventh -- it

5    came out of the Eleventh Circuit.  They cite that as a reason

6    for not -- why this Court should do the same and stop this.

7          First of all, that's a HAVA case, it's not an NVRA

8    case.  The plaintiffs identify it as an NVRA case.  It's not.

9    And in that one, as well, there was -- something was

10   happening, something was going on where they -- there was a

11   hardship that was placed, there was something being enacted.

12         So, in addition to the facial challenge where,

13   again, on the -- well, on the facial side, both parties are

14   making a facial challenge.  There is a way, as I mentioned,

15   for this to pass muster under the NVRA, without question.  And

16   that would be if a county officer, county election officer,

17   were to look at the actual registration in the other state.

18         In terms of as-applied, that only Common Cause makes

19   the argument, NAACP didn't make an as-applied argument.

20   There's, again, a misunderstanding about what's happening.

21   They're saying -- this was on page -- this is docket 85 of

22   Common Cause on page 8.  The Court can and should evaluate the

23   law as it exists today, informed by how counties and

24   defendants have implemented it over the past five years.  But

25   they haven't implemented it.  This law hasn't been implemented

1   at all, so there's no way to base a decision on what's going

2   to happen when nothing has happened.

3           The Common Cause -- counsel for Common Cause said

4   that HEA 1253, that's the one that implemented the confidence

5   factors, that it was rushed in response to this motion.

6   There's nothing in the record to support that.  This is

7   something that the election officials, the Election Division,

8   has been using for at least since -- for a year before, so

9   it's just a --

10          THE COURT:  It was just implemented March 15, 2018?

11          MR. GARN:  Right.  But this is something that the

12  Election Division on their own, figuring out the best way to

13  use the data that was coming back from Crosscheck, what to do

14  with that.

15          THE COURT:  Okay.

16          MR. GARN:  So it's just a simple codification --

17  well, it's not just a simple codification.  It actually makes

18  it more rigorous than what the Election Division itself was

19  using.  Throughout this, the plaintiffs use a verb tense,

20  present tense, of what the Election Division is doing.  Again,

21  they're not implementing this right now.

22          THE COURT:  Okay.

23          MR. GARN:  Dr. McDonald, he testified --

24          THE COURT:  I have a question.

25          MR. GARN:  Yes.

1          THE COURT:  If a voter is wrongfully removed from

2    the registration rolls, but they can still cast their ballot

3    under the fail-safe provision, then what is the point of

4    having a voter registration system?

5          MR. GARN:  In the -- to keep track of who -- well,

6    one is --

7          THE COURT:  How is there no harm to voters just

8    because the State has this fail-safe voting procedure in

9    place?

10         MR. GARN:  Well, some states, given how small they

11   are, some states just do away -- I think it's one of the

12   Dakotas.  They don't have a registration.  So, for example,

13   NVRA doesn't apply to them.

14         THE COURT:  What about big states --

15         MR. GARN:  Bigger states, they --

16         THE COURT:  -- big states?

17         MR. GARN:  -- they need this.  I mean, they're

18   just -- people want to be registered.  People want to know.  I

19   mean, they go there and they can do this.  So there's -- it's

20   meant to be a fail-safe.  It's not supposed to just be a

21   one-size-fits-all, everyone just walk in, because it just --

22   the logistics of it, there's no way you could have everybody

23   sign an affidavit and go through those every time saying, "I

24   live at this location."  It's just -- it would be -- that

25   would open it -- that would open it up for all kinds of

1    problems.

2            The registration, the fail-safe, that can be

3    challenged if someone were to go there and sign the affidavit

4    and someone were to say, "No, I know you moved to Michigan

5    three weeks ago."  If, like, a poll worker were to have that

6    information, then that could be challenged.

7            And then another system kicks into place where you

8    would figure out, oh, did the person actually move or not?  So

9    there's -- it's not just we're done here.  It can be that, and

10   probably the majority of that, but none of that is before -- a

11   part of the record right now.  And, again, we're at the

12   preliminary injunction stage, where it's extraordinary leave

13   for something that's terribly speculative.

14           Dr. McDonald testified that some counties had

15   canceled 100 percent of the Crosscheck.  That's not correct.

16   They didn't cancel anyone's registration based on Crosscheck,

17   because, again, the mailing, the notice -- the mailing and

18   notice period was in effect.  So no one is just simply -- no

19   one has been canceled 100 percent under Crosscheck at all.

20           It has to -- in the earlier version, it went through

21   the process.  Now, if something does happen, that is not

22   mandated.  But, again, the county officer, the county election

23   officer, needs to determine that that person is the same

24   person and that the voting -- the voter registered in the

25   other state later than Indiana.

1          THE COURT:  Okay.  So -- but didn't I hear that the

2     State can't tell those counties what to do?  And what if one

3     county says, "Well, I don't have time to call people in

4     another state to figure it out, I'm just going to strike it"

5     --

6          MR. GARN:  Well --

7          THE COURT:  -- they're allowed to do that; correct?

8          MR. GARN:  I'm sorry?

9          THE COURT:  You're telling me that the county

10    officials, if there's -- if it looks like Crosscheck has an

11    error, they're to call the county -- they're to call the

12    county clerk in the state where the second address is

13    registered?

14         MR. GARN:  They could do that.  That is permissible.

15    That is absolutely permissible under the law.  And that

16    gets --

17         THE COURT:  That's not required.

18         MR. GARN:  Right, and -- but that's not what a

19    facial challenge -- a facial challenge means that there's no

20    way that this can be permitted.  And that is -- that is

21    absolutely -- "determine" is left.  The word "determine," that

22    act is left to the counties.

23         THE COURT:  Okay.  That was --

24         MR. GARN:  Now --

25         THE COURT:  That was the plaintiffs' uniformity

75

1  argument --

2            MR. GARN:  Right.  And --

3            THE COURT:  -- that each clerk can do what they want

4  to do.

5            MR. GARN:  They can -- no, they can't do what they

6  want to do.  They -- that has been the impression, and it's

7  a -- frankly, it's a troublesome impression that these

8  counties are just somehow eager to get people off the rolls.

9  They're not.  These are -- these are people that live in the

10  communities.  They want to protect their voters.

11            And that's what the Election Division -- what's what

12  the State of Indiana has recognized, that it's kind of a

13  subsidiary argument, or that things should be handled at the

14  lowest level they can possibly be handled at, because those

15  people there have an interest in making sure that people in

16  their community are properly registered, and that people who

17  are not there, who have moved, are ineligible to vote, that

18  those people are not on the registry.

19            THE COURT:  Okay.

20            MR. GARN:  As far as what the hoppers look like now,

21  I'd like to point out a couple things.  Just -- there's a --

22  there seemed to be some confusion in the briefing about what's

23  going on now as far as the hoppers.

24            THE COURT:  Okay.

25            MR. GARN:  So I'm going to --

1           THE COURT:  Okay.

2           MR. GARN:  So this is docket 74.  This is Common

3    Cause's reply brief.  Right there, it says that, "A county

4    official has three selection choices within the SVRS hopper

5    for each purportedly matched voter registration: 'match

6    approve' (voter is removed without notice); 'match reject'

7    (voter is not removed); or 'research needed.'"

8           And then, in support of that statement, they go to

9    Exhibit K at 5, and that's Ms. Nussmeyer's deposition, where

10   they go to Ms. Nussmeyer's deposition, which is page 70 of the

11   deposition.  "So if a record is placed into the Crosscheck

12   hopper, what the current operation is is that the county would

13   have three choices, match approved, match reject, or research

14   needed."  So that says that there are those three options.

15          THE COURT:  Okay.

16          MR. GARN:  But what they point to is the hopper in

17   the -- this is part of the guidance, the instructions that are

18   given to the election officials.  So, again, they noted that

19   there are three options there.  There's match approved, match

20   rejected, or research needed.

21          The problem with their characterization of what

22   happens in this hopper and the way that the hopper is set up

23   right now, although the hopper is completely closed down now,

24   match approved, in their brief, they say the voter is removed

25   without notice.  That's not correct.  That is not how the

1  hopper is set up right now.

2           And it says it right there, "match approved."  The

3  record is processed from the hopper, the NCOA mailer is

4  generated.  So that's the way it's set up now.  It's still set

5  up the way that the old -- under the old statute.  So, again,

6  this just emphasizes how premature this all is.  This is

7  guidance for a system that isn't going to be used anymore.

8           THE COURT:  Okay.  When is this dated?

9           MR. GARN:  That is --

10          THE COURT:  When was this screen shot taken?

11          MR. GARN:  This -- this was from the -- I believe

12  it's the 2017 maintenance.  It's the latest one.  It just

13  hasn't been updated because there's no -- the Crosscheck

14  data -- we don't know what's going to go to Kansas, to the

15  Crosscheck, we don't know what's going to come back.  We don't

16  know how it's going to be filtered through.  So that guidance

17  just hasn't been provided to the counties yet.

18          THE COURT:  Is that page in the docket?

19          MR. GARN:  Yes.

20          THE COURT:  Okay.  What document number was that?

21          MR. GARN:  Docket number 7411.  And that's page --

22  page ID 543.

23          THE COURT:  Okay.

24          MR. GARN:  So that's part of the Indiana -- the SVRS

25  system is -- Indiana is required, under HAVA, to set up a

1  computerized system, and that's what they do.  They provide

2  guidance to the counties as to what they're supposed to do.

3  They will continue to provide guidance.  They're just not

4  going to be providing guidance on something that's not there.

5  There are 92 counties, there are a lot of county election

6  officials, and if they start -- we're in primary season now

7  until next week.  They have a lot to do.  There's -- it would

8  be premature for them to give guidance on something like this

9  when there's nothing to give guidance about.

10              THE COURT:  Okay.

11              MR. GARN:  Again, Indiana -- I mean, some of the

12  complaint is with the way that Indiana has set up its Election

13  Division.  It is a perfectly balanced bipartisan system.  They

14  work together.  It's quite refreshing to see how well they

15  work together.  There are disagreements, and plaintiffs, in

16  several locations, point out some of the disagreements within

17  the guidance itself.

18          That guidance where there is a disagreement is not

19  about what's challenged here.  It has nothing to do with

20  Crosscheck.  So when there is a disagreement, what they'll do

21  is, they'll have a guidebook and they'll say this is one view,

22  this is another view, because the NVRA isn't crystal clear as

23  to what's required.  So they do their best and they work

24  out -- it's pretty amazing that they can -- they work out as

25  much as they do, but there's no need to do this right now, to

1  work on that, trying to get a compromise when we don't know

2  what's going to be there.

3        The plaintiffs -- in these cases, we kind of get

4  into a problem because there's a 30(b)(6) of the Election

5  Division.  The Election Division can't act unless both

6  division codirectors act together.  That's under Indiana law,

7  and the case law is *Sammons v. Conrad*, 740 N.E.2d 114.  It's

8  an Indiana Supreme Court case from 2000 where they have to do

9  it together.  So Plaintiffs have quoted the Election Division

10 directors in isolation, saying one says this, one says this,

11 but until there's a guidance, until there's a clear

12 instruction or recommendation as to what the county officers

13 are supposed to do, that's -- it's pretty speculative at this

14 point.

15       My guess is there will be a disagreement, but

16 they -- and they do disagree, and that's clear from the

17 depositions, but they've disagreed about stuff before where

18 they work out a compromise.  So there's no reason for -- to

19 short circuit that compromise and that process and say, "You

20 can't do anything at this point," instead of seeing how the

21 political process works.  That's what Indiana law does.  It

22 works fairly well, from what we've seen.

23       In addition, and I mentioned this earlier, there's

24 a -- in terms of the uniformity problems, again, this is a

25 problem with -- if it is a problem, it's a problem with the

1   NVRA itself.  There's a lot of ambiguity, there's a lot of

2   flexibility that's given.  There's not this overly rigid

3   system.  This is a -- NVRA was passed in the early '90s, so

4   it's a quarter of a century old, and a lot has changed since

5   that time.  We have the Internet.

6          So the Election Division -- all these election

7   officers are trying to fit NVRA with HAVA in our 21st century

8   world, and the -- and that's why they do things like, okay,

9   this may be a cancellation of a registrant by request, but

10  we're still going to use the 90-day because that will make it

11  safer.  So there's this flexibility given here.  It's not this

12  overly rigid system that the plaintiffs portray.

13         NVRA requires -- the NVRA itself is a private right

14  of action, and they use specific language that a person who is

15  aggrieved by a violation of this chapter, and that's 52 U.S.C.

16  20510(b), there's been no violation.  Again, if there's going

17  to be a challenge at this point, it can only be a facial

18  challenge.  And there is a way to read this statute in such a

19  way that it absolutely, without controversy, complies with the

20  statute, with the NVRA.

21         Plaintiffs have cited several cases.  Just to point

22  out one, *Judicial Watch v. King*, I am intimately familiar with

23  that case.  That was here in Indiana.  That's at 993 F.Supp

24  919, where they argue that it was a, quote/unquote, purging

25  case where organizational standing was found.  In that case in

1 particular, it was eventually dismissed, voluntarily

2 dismissed, by the plaintiffs.  The issue there was coming from

3 the other side, where the plaintiffs were saying Indiana

4 wasn't doing enough to clean up the rolls.

5          So they had absolutely -- and what Judge Lawrence

6 said in that was they've been harmed because they're saying

7 Indiana isn't doing something that they're required to do.

8 That's the allegation.  That's not happening here.  The

9 plaintiffs aren't saying something -- they're saying something

10 will happen maybe, and we just don't know.  And we don't know

11 what that will look like, and at this point it would be far

12 too speculative to jump in at this point.

13          THE COURT:  Okay.

14          MR. GARN:  Another case that we've cited here,

15 there's *ACORN v. Fowler*.  That's at 178 F.3d 350.  That came

16 out of the Fifth Circuit.  And that's another case where it's

17 closer to where we are now, where the plaintiffs in that one,

18 the court said that it's much too speculative to do that

19 because we don't know -- the court there didn't know -- there

20 was nothing to point to.  So that would be a case where a

21 court did say, "We can't do anything at this point.  It's too

22 speculative to know what's going to happen."

23          And, again, just in closing, the -- there is a

24 public interest here.  There's a public interest in making

25 sure that a democratically elected body -- that their laws are

1  allowed to be implemented and without undue management from a

2  court.

3         And right now, without knowing more about what

4  instructions will be given to the election -- from the

5  Election Division to the counties, whether -- what information

6  will go to Crosscheck, what information will come back, how

7  that -- how the counties will be implementing it themselves at

8  that point -- at this point, it is the -- there is a public

9  interest.  The public would be harmed by stopping that

10 political process right now without more.  So, for that

11 reason, we would ask the Court to deny all the plaintiffs'

12 requests for preliminary injunction.

13        THE COURT:  Okay.

14        MR. GARN:  Thank you.

15        MS. PEREZ:  May I, Your Honor?

16        THE COURT:  We're going to take a break.  We've been

17 in session for two hours.  The court reporter needs to relax

18 his hands, so we'll take about a 10-minute restroom break and

19 then we'll come back and finish up.

20        THE COURTROOM DEPUTY:  All rise.

21        (Recess at 11:03, until 11:14.)

22        THE COURT:  We are back on the record and ready for

23 rebuttal.

24        MS. PEREZ:  Yes, ma'am.  Again, Myrna Perez for the

25 NAACP and League of Women Voters.  I'd like to first put on

1   screen, Your Honor, if you don't mind, a copy of SB 442, the

2   bill that is being -- or the law that is being challenged now.

3   I would point out one thing that is not in dispute, which is

4   that prior to SB 442, the law required a notice and waiting

5   period, and after SB 442, it does not.

6           One part that's not in this section because -- in

7   this highlighted part, but it is in the record, because I

8   didn't believe I would need it, is the fact that it indicates

9   that not less than 30 days -- not later than 30 days after

10  receiving the information from Crosscheck, it is supposed to

11  take action on it.

12          This speaks to the issue of ripeness, because

13  Mr. Garn, whom I have a great deal of affection and respect

14  for, has indicated that they will implement SB 442 as soon as

15  they are ready to do so.  Now, we are acutely aware of the

16  problems of NVRA compliance under the statute as it's written

17  on its terms, and many of the parties in this room informed

18  them before it had passed.  Common Cause provided testimony,

19  the Brennan Center indicated that it is a problem on some of

20  our Web sites.  They passed it anyway.

21          And then we sent them -- if you could put on screen

22  the notice letter -- a -- what's required under the NVRA,

23  called an NVRA notice letter.  We are required to send an

24  election administrator that we are about to sue this kind of

25  notice to make sure we are not misusing judicial resources and

84

1  running into court haphazard or merely exploiting some poor

2  election administrator who doesn't have good lawyers and

3  putting them on notice that there's a problem.

4          It is such a flagrant violation, Your Honor, that,

5  candidly, I thought Mr. Garn was going to come back to me and

6  say, "Don't worry about what you see on the statute, we're

7  going to figure out some way to make this legal."  They

8  didn't.  They responded with Mr. Bonnet's letter, which is now

9  on the screen, doubling down eight -- seven pages of doubling

10 down about why Crosscheck removals don't require the notice

11 and waiting period, why they're going to enforce our fears

12 about Indiana law, and that there was no more room for

13 discussion.  Additionally, we --

14          THE COURT:  And, for the record, you're showing

15 docket 42-7?

16          MS. PEREZ:  That is correct, Your Honor.  It's part

17 of the record.

18          THE COURT:  Okay.  So that I can find it when I --

19          MS. PEREZ:  Yeah.  You sure can, ma'am.  And the

20 Common Cause plaintiffs have their own version of this letter,

21 because, like us, they are required to provide notice, which

22 is an attempt, a good faith attempt, to try and avoid a bunch

23 of people coming on planes and using this kind of judicial

24 resources.

25          So we also have information from them in that letter

1   indicating that they are going to act on this law when they're

2   ready.  Now, we would be the first persons to say that the

3   world has changed, and I would be happy for the right decision

4   to be made, even if it is coming late, even if it's coming

5   after we've gotten on a plane, but the fact that they're

6   saying speculatively that somehow, some way, this might be

7   interpreted to fit within the NVRA does not deprive our right

8   of a preliminary injunction.

9          They could get a -- whatever clarity they're looking

10  for at any time, and we need to make sure that our voters are

11  not removed improperly, and we need to do it in advance of the

12  election in order to make sure it happened.

13         We repeatedly went to the State with requests to try

14  and avoid a preliminary injunction hearing, to see if we could

15  come up with some sort of agreement that they were going to

16  hold this in abeyance until we got a complaint on the merit,

17  and at that point we could have done a bunch of testimony.

18  That didn't happen.  We're here today.  And, again, I will

19  always welcome settlement talks about, you know, the State

20  coming to us and saying, "We agree not to do X, Y and Z."  But

21  in the face of that, or in the face of an enforceable

22  stipulation, a preliminary injunction is entirely appropriate.

23         I then want to go on to the argument that they keep

24  making about us not finding a single voter.  I first want to

25  apologize to the Court in case there was any confusion in my

1   desire to not overload with standing doctrine.  I'm a bit of a

2   standing nerd, so I always have to try to limit myself.

3          My clients allege that they have already been

4   injured by this.  You can see this in their declarations of 21

5   and 22 from Mr. Anderson, who is in the courtroom; and in

6   Ms. Bolling's, who has also just joined us in the courtroom,

7   for declaration 22.  They have already had to spend time

8   talking to election officials, talking to voters, trying to

9   warn people about what's going to happen, having to change

10  their materials.  So their injury has already happened.

11         But, importantly, they keep saying -- or, I'm sorry.

12  Mr. Garn keeps indicating that we haven't presented one person

13  who has been injured either now, which it hasn't gone into

14  effect yet, and that's where the imminence prong is, and,

15  again, 25 years of standing doctrine makes very clear that we

16  can prevent the injury from happening and still have standing.

17         But, also, under the old system, which critically,

18  critically, critically had the notice and waiting period, the

19  NVRA tolerates some level of unreliability because second or

20  thirdhand information is used if they provide notice and

21  waiting.  That is why we didn't sue under the old law.  That

22  is why, when the NCOA data is criticized for having a lot of

23  information wrong on it, it is because there is a notice and

24  waiting provision that gives the voter an opportunity to say,

25  "Wait a minute, Mr. Election Administrator, or Ms. Election

87

 1    Administrator, you've got it wrong.  I still live here."

 2            And they don't just have the opportunity to be given

 3    a paper.  They can't purge them until they've waited two

 4    different federal elections in which the voter didn't do

 5    anything, didn't request a ballot, didn't go to the polls,

 6    didn't -- you know, in some states didn't sign a petition.  It

 7    exists because there's a recognition that this second and

 8    thirdhand data is not going to be reliable.

 9            And voting rights advocates, like the lawyers here

10    and like our clients, know that we cannot legislate perfection

11    in those efforts.  And that is because there are protections

12    that Congress decided were an appropriate balance.  We're

13    talking about an appropriate balance.  And Indiana has

14    disturbed that balance in a major way by getting rid of the

15    notice and waiting requirements.

16            I will note that Mr. Garn himself indicated that

17    we're in the middle of primary season, so we cannot be messing

18    around with the worry that at any point in time Kansas is

19    going to get their act together and they're going to send this

20    information out, they're going to start doing these Crosscheck

21    matches, and that we're not going to be there.

22            He invoked the case of *NAACP v. Browning*.  That was

23    my case.  And in that case, I represented a colleague of

24    Ms. Bolling's, Ms. Adore Norasi.  That case was, in many ways,

25    the mirror image of this case.  In this case, if you find a

1  match and you meet the other criteria, they will remove you

2  from the rolls.  In that case, if you try to register and they

3  couldn't match you, they wouldn't put you on the rolls.

4         We don't cite it as a purged case, but we do cite it

5  for the proposition of when organizations like my clients'

6  have organizational standing.  And, because it involved

7  persons who registered and thought that they were going to be

8  able to vote and thought that they could participate in the

9  process, but because of some sort of bureaucratic matching

10  requirement prevented them from doing, it's incredibly apt,

11  it's incredibly powerful.  There's a reason why so many voting

12  rights cases across the country depend upon it, because it

13  made plain the different ways in which organizations like my

14  clients' have standing.

15         He argued that -- Mr. Garn argued that we weren't

16  taking into account the confidence factors or the point level

17  system.  We are aware of them.  We're aware that they were

18  recently codified.  Mr. Jedreski, I thought quite capably,

19  indicated why they weren't reliable.  And then he noted about

20  the fail-safe with the regular ballot.  And that seemed to

21  cause a great deal of confusion, so I'm going to talk about

22  that.

23         First, I want to say that it's legally

24  insignificant.  It doesn't help.  This -- the only way

25  Mr. Garn might be able to use it is for the irreparable harm.

89

1    It doesn't actually matter in terms of their violation,

2    because it's in the NVRA.  The NVRA requires it.  He admitted

3    that.  And the NVRA also requires the notice and waiting

4    period, and it requires both of them because they thought both

5    were necessary in order to protect the voter.

6              But it doesn't even go to the irreparable harm.  We

7    noted on screen some examples, real live examples, in which

8    voters who had moved got provisional ballots.  And when I

9    talked about, and when our brief talks about, confusion at the

10   polls, it's because election administrators, voters, poll

11   workers, do not understand when to invoke the fail-safe and

12   what it means and what actually happens on the ground.

13             There's actually very good testimony from my clients

14   in their declarations, in which they indicated that voters who

15   were wrongfully thought to have moved cast provisional

16   ballots -- and you will see that in the record -- which is why

17   I was arguing that everything has to go right.

18             Someone needs to be able to recognize, oh, this is

19   not just some person who's not on the rolls.  This is some

20   person that can be invoked for the fail-safe, and then

21   everything in that process has to go right.  But you have

22   proof on your screen, Your Honor, that it doesn't.  It

23   doesn't.  Those are examples, and we could present a lot more,

24   in which someone who moved got a provisional ballot, or

25   declined to do a provisional ballot because it was too much of

1  a hassle and they were too frustrated.  There is one example

2  of that.

3       But, to get up here and say that a voter who has

4  moved and was wrong -- or a voter who did not move, but was

5  wrongfully identified has an option of voting a regular

6  ballot, just that they sign an affidavit, defies pages and

7  pages and pages of testimony and record in this case.

8       Mr. Garn also suggested that we were purporting that

9  the folks who got matched by Congress were canceled

10 immediately.  We're very aware of the confidence system, we're

11 very aware of the point factors.  We know that it's not

12 automatic.  What we're instead saying is that it's not

13 reliable.  And we have lots and lots of testimony -- if you

14 can bring that up -- of the -- of the county clerks, please.

15      We have lots of testimony indicating they don't know

16 what the registration date is, they have to accept the data as

17 given.  They -- you know, they have to presume that inferences

18 like the data, like Crosscheck, got it right.  Even very basic

19 things like, did somebody hand-enter it correctly when they

20 were typing?  These are all things they have to accept.  These

21 are things that are in the record.  You can see them on the

22 face of the counties.  We could put more.  It does not, as a

23 practical matter, work, that a person is given all of the

24 process that is needed in order to fulfill the obligations of

25 the NVRA, especially given the fact that the statute does not

1   require it.

2         He argued that the 90-day -- the exempting

3   Crosscheck from the 90-day process was merely an extra thing

4   that they did.  You know, I, Your Honor, would submit that

5   it's pretty damning evidence of the fact that this is a

6   litigation strategy.  They used to treat it differently, they

7   called it something different.  I've provided some slides

8   where they have something that they call "request of the

9   registrant," and they have something called "Crosscheck."

10        And the only way they can get out of liability in

11  this claim for the notice and waiting requirement is if they

12  either call it "written confirmation for a voter" or they call

13  it a "request of the registrant," but they treat it as two

14  different things.  This litigation was the first time we have

15  ever heard that they were trying to equate the two.  And their

16  own guidance, their own testimony, their own rules, defy that.

17        You know, I'm not exactly sure if they've abandoned

18  their fairly traceable argument, like an offshoot of the

19  standing, because now Mr. Garn is suggesting that they can

20  tell the county clerks what to do.  We agree, as the chief

21  election administrators, as the chief election officers, as

22  NVRA officers, they have an important role to play in terms of

23  setting guidance, setting standards, and ensuring compliance

24  with the NVRA.  That is their duty, that is why they are

25  appropriate defendants, and that is why they are on the hook

1  for this NVRA violation.

2         They spent a lot of time suggesting that we were

3  impugning the structure of the Election Division.  We're not.

4  Mr. Garn suggested that we were impugning clerks.  We're not.

5  We love clerks.  We know that they have a really tough job,

6  they're under-resourced.  My organization actually tries to do

7  a lot of advocacy to get them more funding.  What we are

8  disputing is the fact that they have the appropriate rules and

9  guidance, both from a statutory level at the State and from

10 the guidance that they're given, to make sure that they're

11 following the law beforehand.

12        The argument that this would be harmful to the

13 democratically elected process is not nearly the kind of

14 injury, especially since the law had already passed and the

15 law had been in place before they added SB 42 -- SB 442 to the

16 mix, it's not particularly availing.  And in any event, I do

17 not believe that Mr. Garn and his clients are the ones to

18 assert it.

19        The Legislature was put on notice in numerous ways

20 that this law, as drafted, would be in violation.  Mr. Garn

21 and his clients were put on notice that they needed to tell us

22 real quick if they were going to find some way of interpreting

23 it in a way that made it cohere with the NVRA, and we'd be

24 very happy for them to do so.  And it didn't.

25        But what we do know is that voters are going to

93

1  experience a statutory violation of the NVRA, they're going to

2  be deprived one of their statutory rights, and there's very

3  tangible rights in that anybody who is purged from this will

4  have their right to vote impeded.  And when you lose the right

5  to vote in an election, you can never get it back for that

6  election.  You are silenced then and done.  It's irreparable

7  injury.

8          And what I would like to just say one last time --

9  if you could put on the first screen, with the statute -- we

10 didn't come into court when the prior law had been passed.  It

11 had the notice and waiting period.  We understand, as much as

12 many of us in the room are skeptical of Crosscheck, that

13 Congress gave some room to election administrators to clean

14 their rolls.

15         They got rid of the notice and waiting period.  In

16 the course of doing this, they implemented an ad hoc process

17 where counties are all over the map in terms of what they do,

18 in terms of what protections they give voters, in terms of who

19 they seek guidance from, and what they think they need to do.

20 That is sufficient for the NVRA violations that we allege, and

21 it is more than sufficient, Your Honor, to impose a

22 preliminary injunction on SB 442 unless and until we get

23 something enforceable by a court that they're going to abide

24 by these protections.  And we haven't seen any of that.  And

25 until then, Your Honor, this case is ripe, this case is ready

94

1    for your disposition and, I would argue, is absolutely

2    necessary.

3            THE COURT:  Okay.  Thank you.

4            MR. JEDRESKI:  Thank you, Your Honor.  I'm going to

5    try to avoid duplication and just hit a few points in

6    addition.

7            So, first, just to reiterate that, the State has

8    argued that we don't really know when this is going to be

9    implemented.  And because the State brought it up, we did ask

10   in litigation to have this held off until after the general

11   election, because we thought that would slow this down and

12   allow us to develop a full record, and they refused.  And I

13   think that's a pretty good indicator that they will implement

14   this law as soon as they are able.

15           This is all computerized.  The law could --

16   Crosscheck could tell them on Monday, "We're ready."  By

17   Tuesday the State could have the records, and by Wednesday the

18   counties could have them.  And, further, I want to reiterate

19   that Common Cause has already been harmed and will continue to

20   be harmed, as the Court has already noted.

21           I also want to address this issue that a voter will

22   be given a provisional ballot.  First, I want to note that the

23   State conceded that it's incredibly burdensome and complex to

24   use this process of using an affidavit, or whatever the

25   process is.  But I also want to point out that Common Cause

1   submitted evidence through Ms. Vaughn's affidavit, and that is

2   Common Cause docket number 74-24, that voters aren't given

3   provisional ballots sometimes when they're told that they've

4   been -- they've had their registration canceled, or they're

5   not provided any information in the way the State provided.

6   And, as Ms. Perez pointed out, it's sort of a perfect case

7   scenario where they're able to cast a normal ballot.  Even if

8   they do, they can be challenged.  And I think that's probably

9   likely in a situation like this, and that results in a

10  provisional ballot.

11          The State also said that there's no diversion here,

12  no diversion of resources, because the law hasn't actually

13  been implemented.  But diversion of resources standing applies

14  in pre-implementation cases, for example, *Common Cause v.* --

15  *Common Cause of Colorado v. Buescher*.  There the Court held

16  that the harm was caused in part by voters calling Common

17  Cause before the law's implementation, but based on their

18  information they had heard about these purges coming up.  And

19  that's exactly the kind of harm that Common Cause is

20  experiencing here with concerns by their members and others in

21  simply trying to prepare people for this inevitable

22  implementation.

23          There's this other argument throughout the

24  defendant's presentation about how the plaintiffs are relying

25  on the past law, as if that's something completely different.

1   And I think that the NAACP plaintiffs have made it pretty

2   clear already, but the new law, SB 442, is almost essentially

3   identical but for a very small, incredibly important change.

4   They got rid of notice and waiting.  That means the sections

5   of the law that the Common Cause was focused on in this

6   argument, the uniformity piece, and all the testimony about

7   the counties -- by the counties about how they interpreted the

8   word "determine" when there's a match and "determine" when

9   there's a subsequent data registration, none of that has

10  changed.

11          And that's absolutely consistent with what the

12  counties have said they're going to do.  They said that,

13  "We're going to keep doing what we're doing except that we're

14  going to cancel without notice," because that's the change

15  that this new law has made.  That's the only change.  And

16  Defendants haven't provided any guidance suggesting that they

17  should be doing something different with regards to parts of

18  the law that they've been implementing for years.

19          There was a really interesting moment where the

20  Court was asking the State about what kind of guidance they

21  could implement, what kind of -- what could a county official

22  be doing to confirm that there was a match, to make that

23  determination, beyond looking at the Crosscheck records.  And

24  defendant said they could look at the out-of-state

25  registration.  And that was kind of a shocking moment for us,

1  because we hadn't heard Defendant suggest that they would

2  advise that or require it.  And, certainly, that's contrary to

3  what Defendant King testified to.  He said they do not need to

4  look at out-of-state registration.

5          And that's contrary to what the counties testified

6  to.  They said they don't need to look at out-of-state

7  registration.  That's not what they do.  That's not -- it's

8  contrary to, as Ms. Perez pointed out, the way the defendants

9  have positioned themselves in this new law throughout this

10 litigation and before.

11         And I understand that there's this great idea of

12 compromise behind the system of having bipartisan codirectors,

13 but I disagree that there isn't a dispute amongst them on a

14 point of importance to this case, because, as we presented

15 already, Defendant King and Defendant Nussmeyer disagree about

16 whether an original voter registration is required before

17 immediate cancellation under the previous law or the new law.

18 That is a central point to this case, and it's where they

19 disagree.  And this is a disagreement, presumably, that has

20 existed since 2013, because that is as long as the states --

21 or the counties have been trying to make this determination

22 that is the central part of the new law.

23         And I'm not going to pull it up, but there's an

24 e-mail that we include in the record, it's 74-7, and that's a

25 2016 e-mail between Ms. Nussmeyer and a county official that

1   relates to this.  And Ms. Nussmeyer says it's her opinion that

2   you need to see underlying documentation.  This is an issue

3   that's been on the minds of the codefendants, the codirectors,

4   for years, and there hasn't been a compromise.

5          I'm not really sure what the compromise is short of

6   it being one way or the other.  And, certainly, the position

7   that we're taking is that the way the law sets up now, and the

8   way that Defendant King has interpreted it, and the way that

9   the counties are interpreting it, where they don't look at

10  out-of-state registrations, is a violation of the NVRA.

11         Very briefly, the defendants referenced a Pew study,

12  and that was something that the amicus -- that was in the

13  amicus brief.  And I just want to note that the amicus here

14  was party to a lawsuit in the District Court in Florida,

15  Southern District of Florida, in a recent trial, *American*

16  *Civil Rights Union v. Snipes*.  And in a decision after trial,

17  the Court said that that analysis in that study was flawed to

18  the extent it concluded that more people are registered than

19  eligible.  So that study has been held by at least one

20  district court, and that analysis or that conclusion presented

21  by the amicus has been presented as inaccurate.

22         Defendants also mention that previously there's

23  these 100 percent matches, but those voters were getting

24  notice and waiting, and this is in reference to Dr. McDonald's

25  point that there were 11 counties who found 100 percent of the

1   time that there were matches.  I'm not sure of the point of

2   that, because under the new law, the counties won't get notice

3   and waiting.  That's the whole point of the new law.  That's

4   100 percent of voters who, under this law that is on the books

5   today, that will be implemented imminently, they will be

6   canceled without notice and waiting.

7            And, finally, just on this idea that the harm to the

8   State is in the courts tinkering with a law that's been

9   enacted by a Democratic assembly, I'm not going to say this

10  nearly as articulately as Ms. Perez, but I believe that the

11  role of the Court is to do just that, is to, when there is a

12  law that's passed that is unconstitutional or is preempted by

13  a federal law, that it is the role of the Court to step in and

14  stop that law from being implemented.  And that's -- there's a

15  public interest in that, as well.

16           And, finally, just on the issue of relief, we're

17  asking that the Court enjoin the law as it's currently

18  written.  And I think the Court might have made reference to

19  enjoining the amendment itself.  And to the extent that the

20  Court wishes to refer back to -- revert back to the previous

21  version of the law, I just wanted to say that Common Cause is

22  concerned the previous version of the law may have also

23  allowed for immediate cancellation of voter records based on

24  some of the county testimony.  And that's because it did say

25  that if, in addition to matching the name -- or matching the

1  voter and determining the date was later, that if the county

2  official also determined that that voter had authorized

3  cancellation of their Indiana registration, then they can

4  immediately cancel, they don't have to go through notice and

5  waiting.

6         And our reading of that law, before this new law,

7  was that that actually required looking at the original

8  out-of-state form.  And so I think that to the extent the

9  Court wishes to revert back to the old law, we would ask the

10  Court also to order that all voters who are identified receive

11  notice and waiting and that the defendants issue guidance to

12  provide for uniform determinations under the statute, as we

13  pointed out in our uniformity claim.

14         Thank you, Your Honor.

15         THE COURT:  Okay.  Did you want to say something?

16  Would you address the relief?  If the Court does enjoin, what

17  does -- what's your position on that, Mr. Garn?

18         MR. GARN:  That's the first we've heard of that

19  issues with the way it was implemented before.  I'm not quite

20  sure where that comes from.  I will show, again, that this is

21  the way the hopper looked before.  And the only -- the only

22  options with this hopper for the Crosscheck information is

23  match approved -- or let's go to match rejected, so nothing

24  happens; research needed, it goes -- it's on pause; match

25  approved.  Again, despite the brief, what the brief says,

1   right there on it, match approved, the NCOA mailer is

2   generated.  That's the way it is.  So I'm not sure where the

3   information is coming from about what happened in the past.

4           And, again, this just comes back to, the plaintiffs

5   are -- they say this is how it's going to be, this is how it

6   was done, but they're picking and choosing the stuff that they

7   don't like and saying, like, this is absolutely how it's going

8   to be in the future, when there's nothing to apply it to.  The

9   only thing we have is the way it was here, and --

10          THE COURT:  And the current status?

11          MR. GARN:  The current status.  So, as far as relief

12  goes, I mean, again, the plaintiff used the word "tinkering."

13  This isn't the time, we're not there yet.  We would find that

14  that would be premature.

15          THE COURT:  Okay.

16          MR. GARN:  So, thank you.

17          THE COURT:  All right.  All right, I don't need to

18  hear any more argument.  So thank you very much, lawyers.

19  You've been very helpful, and we'll get you a ruling as soon

20  as we can.

21          MR. GARN:  Thank you.

22          MR. JEDRESKI:  Thank you, Your Honor.

23          MS. PEREZ:  Thank you, Your Honor.

24          THE COURT:  We are adjourned.  And it was nice to

25  meet all of you.  You're all very good lawyers.

1            THE COURTROOM DEPUTY:  All rise.

2            (Proceedings adjourned at 11:44 a.m.)

3

4

5

6            CERTIFICATE OF COURT REPORTER

7

8      I, David W. Moxley, hereby certify that the

9  foregoing is a true and correct transcript from

10  reported proceedings in the above-entitled matter.

11

12

13

14  /S/ David W. Moxley_____  May 17, 2018
    DAVID W. MOXLEY, RMR/CRR/CMRS
15  Official Court Reporter
    Southern District of Indiana
16  Indianapolis Division

17

18

19

20

21

22

23

24

25