## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| INDIANA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (NAACP), and LEAGUE OF WOMEN VOTERS OF INDIANA, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:17-cv-02897-TWP-MPB |
| CONNIE LAWSON, in her official capacity as Secretary of State of Indiana, J. BRADLEY KING, in his official capacity as Co-Director of the Indiana Election Division, and ANGELA NUSSMEYER, in her official capacity as Co-Director of the Indiana Election Division, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## ORDER GRANTING PLAINTIFFS'
## MOTION FOR PRELIMINARY INJUNCTION

This matter is before the Court on a Motion for Preliminary Injunction filed pursuant to

Federal Rule of Civil Procedure 65 by Plaintiffs Indiana State Conference of the National

Association for the Advancement of Colored People ("NAACP") and League of Women Voters

of Indiana ("League") (collectively, "Plaintiffs") (Filing No. 41). The Plaintiffs challenge the

legality of Indiana Senate Enrolled Act 442 (2017) ("SEA 442"), codified at Indiana Code § 3-7-

38.2-5(d)–(e), which amends Indiana's voter registration laws. The National Voter Registration

Act of 1993, 52 U.S.C. §§ 20507–20511 ("NVRA"), established procedural safeguards to protect

eligible voters against disenfranchisement and to direct states to maintain accurate voter

registration rolls. The NVRA placed specific requirements on the states to ensure that these goals

were met. The Plaintiffs argue that SEA 442 violates the NVRA by circumventing its procedural

safeguards. The Plaintiffs seek preliminary injunctive relief to prohibit the Defendants from implementing or enforcing SEA 442. For the following reasons, the Court **grants** the Plaintiffs' Motion for Preliminary Injunction.

## I.   <u>BACKGROUND</u>

The NVRA was enacted to reduce barriers to applying for voter registration, to increase voter turnout, and to improve the accuracy of voter registration rolls. Under the NVRA, a voter's registration may be removed from the rolls if the voter requests to be removed, if they die, because of a criminal conviction or mental incapacity, or because of a change in residency. The NVRA provides, "In the administration of voter registration for elections for Federal office, each State shall . . . conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(a)(4).

The NVRA further provides, "[a]ny State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office . . . shall be uniform [and] nondiscriminatory." 52 U.S.C. § 20507(b)(1). Furthermore, the NVRA directs,

> A State shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence unless the registrant-
>
> (A) confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered; or
>
> (B) (i) has failed to respond to a notice described in paragraph (2); and
>
> (ii) has not voted or appeared to vote (and, if necessary, correct the registrar's record of the registrant's address) in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice.

52 U.S.C. § 20507(d)(1).  Paragraph (2) describes that the notice must be "a postage prepaid and pre-addressed return card, sent by forwardable mail, on which the registrant may state his or her current address."  52 U.S.C. § 20507(d)(2).

Thus, in the context of removing voter registrations because of a change in residency, Section 20507(d)(1) requires either (1) the voter confirms in writing their change in residency, or (2) notice was mailed to the voter who then did not return the notice card and did not vote during the next two federal general elections.

Plaintiff NAACP is a nonpartisan, nonprofit organization that was chartered in 1940 (Filing No. 44). It has approximately 5,000 members in Indiana. *Id*. It was founded with the purposes of assisting African-American citizens to ensure political, educational, social, and economic equality of rights for all persons and to fight against racial discrimination. *Id*.  Since its founding, promoting civic engagement has been vital to the NAACP's mission.  *Id*.  The NAACP fulfills this mission by registering voters, educating voters, monitoring the polls, and advocating for policies that ensure the election system is accessible.  Historically, both in Indiana and throughout the country, voter registration and election practices have interfered with the ability of minority, low-income, and other traditionally disenfranchised communities to participate in democracy. Voter registration is central to the NAACP's mission of empowering minority voters because of the barriers the registration process has posed to participation for these communities.  *Id*.  They are also concerned that using the Interstate Voter Registration Crosscheck Program ("Crosscheck") as provided under SEA 442 will disproportionately harm minority voters because African-Americans and other minority groups are more likely to have common shared names, and therefore could be more likely to be identified by the Crosscheck program.  *Id*.

3

The League of Women Voters of Indiana ("League") is a nonpartisan, nonprofit organization that was founded in 1920 (Filing No. 43).  It is affiliated with the national League of Women Voters. Since its inception, the main purpose of the League has been to encourage people to vote (including by registering them to vote), keep them informed as voters, and also seek out information from candidates and public officials to serve the electorate and the citizenry. *Id.*  The League conducts voter registration drives, encourages and assists individuals in voting, and conducts other activities to boost civic engagement, which has been essential to its mission since its founding.  It considers voter registration drives to be critical in ensuring voters get on the rolls. *Id.*  The League has more than 1,300 members in Indiana. *Id.*

Defendant Connie Lawson ("Lawson") is the Indiana Secretary of State, and in that capacity she is the chief election official in the State of Indiana.  She is charged with performing all ministerial duties related to the state's administration of elections.  Ind. Code §§ 3-6-3.7-1, 3-6-4.2-2(a).

Defendants Bradley King ("King") and Angela Nussmeyer ("Nussmeyer") are co-directors of the Indiana Election Division within the Secretary of State's office, and in that capacity they are jointly the "NVRA official" designated under Indiana law as responsible for the coordination of Indiana's responsibilities under the NVRA.  Ind. Code § 3-7-11-1. These co-directors are individually appointed by the Governor based on recommendations from Indiana's Democratic and Republican parties, respectively.  Each co-director has a four-year term that coincides with the term of the Indiana Secretary of State.  *Id.* § 3-6-4.2-3.2.  King and Nussmeyer thus are charged with coordinating county voter registration.  They are considered Indiana's "NVRA officials". Ind. Code § 3-7-11-1.

Each county in the State of Indiana has either a county election board or a county board of registration.  Ind. Code §§ 3-6-5-1, 3-6-5.2-3.  Pursuant to the official policies, guidance, and standard operating procedures issued by King and Nussmeyer as the co-directors, the individual county boards conduct elections and administer election laws within their county.  Ind. Code §§ 3-6-5-14, 3-6-5.2-6.  The county boards are responsible for maintaining the voter registration records in their county by adding, updating, and removing voter registrations (Filing No. 42-21 at 12–15).

While the county boards are responsible for actually physically maintaining their voter registration records, this list maintenance is dictated by the policies, procedures, and guidance established by the election division co-directors and constrained by the election division's business rules governing the electronic statewide voter registration system (Filing No. 42-21 at 12–15). King and Nussmeyer are responsible for building, managing, and maintaining the statewide voter registration system, which includes creating the protocols within the system and issuing official policies, guidance, and standard operating procedures to guide the county boards on their duties under state and federal law.  They also provide training to the county boards.  *Id.*; Ind. Code § 3-6-4.2-14.  The official guidance from King and Nussmeyer as reflected in the protocols, documents, and trainings are mandatory (Filing No. 42-21 at 82; Filing No. 42-23 at 21–22).

Regarding the electronic statewide voter registration system, King and Nussmeyer establish the standard operating procedures and the business rules that determine how the system operates.  This includes dictating what information will be provided to county election officials to help them maintain their individual county voter rolls, and it also dictates what actions the county officials are able to take within the "online portal" of the statewide system (Filing No. 42-21 at 77, 110–11).

King and Nussmeyer receive and respond to questions from county election officials through telephone calls and emails.  In advising county officials, King and Nussmeyer often respond to the county's inquiries independently and without consulting one another (Filing No. 42-21 at 20–21).  King and Nussmeyer do not always agree on the required policies and procedures, including about voter registration and list maintenance, when they respond to inquiries from the counties.  *Id.* at 22–23.  King and Nussmeyer ultimately relegate responsibility for NVRA compliance to the counties by directing counties to use their best judgment in implementing the instructions the co-directors provide. *Id.* at 12–13, 24; Filing No. 42-24 at 62–63.

Indiana participates in the Interstate Voter Registration Crosscheck program ("Crosscheck") as a method for identifying voters who may have become ineligible to vote in Indiana because of a change in residence.  Ind. Code § 3-7-38.2-5(d).  Crosscheck is an interstate program that was created and is administered by the Kansas Secretary of State.  The program is designed to identify voters who have moved to, and registered to vote in, another state.  This is accomplished by comparing voter registration data provided by participating states.  The participating states submit their voter registration data to Crosscheck, which then compares the first name, last name, and birthdate of registered voters to identify possible "matches" or duplicate voter registrations.  The output data of possible matches is then sent back to the participating states. The individual states decide what to do with the Crosscheck data (Filing No. 42-2).

Each year Indiana provides its statewide voter registration list to the Kansas Secretary of State to compare to data from other participating states through Crosscheck.  Crosscheck then sends a list of possible matches back to Indiana, and within thirty days of receiving the list, Indiana's statute requires that the "NVRA official" (in this case King and Nussmeyer) "shall provide [to] the appropriate county voter registration office" the name and any other information

obtained on any Indiana voters who share "identical . . . first name, last name and date of birth of [a] voter registered in [another] state."  Ind. Code § 3-7-38.2-5(d).  While the statute requires King and Nussmeyer to provide this voter data to the county election officials, they have acknowledged that they only forward the data to the county officials if the data meets a certain "confidence factor," which King and Nussmeyer determine based on additional matching data points, such as address, middle name, or social security number (Filing No. 42-21 at 67–71; Filing No. 42-22 at 23–24).  No data has been sent yet by King and Nussmeyer to the county election officials for the 2018 election cycle (Filing No. 51-3 at 3).

Once the county officials receive the voter data, they determine whether the voter identified as a possible match is the same individual who is registered in the county and whether the voter registered to vote in another state on a date after they had registered in Indiana.  Ind. Code § 3-7-38.2-5(d).  Within the statewide voter registration system, the county official may select for each possible matched voter registration "match approved," "match rejected," or "research needed".  (Filing No. 42-20 at 7.)  The information provided from Crosscheck to the county officials in the statewide voter registration system is limited to the personal data of voters.  It does not include any underlying source documents (Filing No. 42-21 at 97–98).

The current configuration of the statewide voter registration system does not provide information about the dates of registration in Indiana and other states to assist in determining what state registration occurred first (Filing No. 42-20 at 7; Filing No. 42-21 at 126).  Some county officials just assume that the Indiana registration predates the other state's registration, which leads to cancelling the Indiana registration (Filing No. 42-25 at 33; Filing No. 42-28 at 77; Filing No. 42-23 at 34; Filing No. 42-24 at 57–58).  Even if dates of registration information was provided, this information is not complete or consistent because states that participate in Crosscheck do not

always populate the registration date field, and they have different policies in how they determine which date to use, so there is no uniform practice among states (Filing No. 42-21 at 100; Filing No. 42-22 at 29; Filing No. 42-19 at 2).

King and Nussmeyer do not provide guidance or a standardized procedure to the county election officials for how to determine whether the record of an Indiana voter is actually the same individual who is registered in another state or how to determine whether the out-of-state registration is more recent (Filing No. 42-22 at 44–45).  Some counties simply approve all matches that appear as possible matches from Crosscheck (Filing No. 42-14).  Each county has the discretion to cancel or not cancel a voter's registration based on their analysis of the data received from other states and Crosscheck (Filing No. 42-22 at 44).

The state statutory authority and directives upon which the above-described processes are based is found at Indiana Code § 3-7-38.2-5(d)–(e). Prior to its amendment in 2017, Indiana Code § 3-7-38.2-5(d)–(e) read:

> (d) The NVRA official shall execute a memorandum of understanding with the Kansas Secretary of State. Notwithstanding any limitation under IC 3-7-26.4 regarding the availability of certain information from the computerized list, on January 15 of each year, the NVRA official shall provide data from the statewide voter registration list without cost to the Kansas Secretary of State to permit the comparison of voter registration data in the statewide voter registration list with registration data from all other states participating in this memorandum of understanding and to identify any cases in which a voter cast a ballot in more than one (1) state during the same election. Not later than thirty (30) days following the receipt of information under this subsection indicating that a voter of Indiana may also be registered to vote in another state, the NVRA official shall provide the appropriate county voter registration office with the name of and any other information obtained under this subsection concerning that voter, if the first name, last name, and date of birth of the Indiana voter is identical to the first name, last name, and date of birth of the voter registered in the other state. **The county voter registration office shall determine whether the individual: (1) identified in the report provided by the NVRA official under this subsection is the same individual who is a registered voter of the county; (2) registered to vote in another state on a date following the date that voter registered in Indiana; and**

**(3) authorized the cancellation of any previous registration by the voter when the voter registered in another state.**

(e) If the county voter registration office determines that the voter is described by subsection (d)(1) through (d)(3), the county voter registration office shall cancel the voter registration of that voter. **If the county voter registration office determines that the voter is described by subsection (d)(1) and (d)(2), but has not authorized the cancellation of any previous registration, the county voter registration office shall send an address confirmation notice to the Indiana address of the voter.**

(Emphasis added.)  However, SEA 442 amended this Code section effective July 1, 2017, which now reads:

(d) The NVRA official shall execute a memorandum of understanding with the Kansas Secretary of State. Notwithstanding any limitation under IC 3-7-26.4 regarding the availability of certain information from the computerized list, on January 15 of each year, the NVRA official shall provide data from the statewide voter registration list without cost to the Kansas Secretary of State to permit the comparison of voter registration data in the statewide voter registration list with registration data from all other states participating in this memorandum of understanding and to identify any cases in which a voter cast a ballot in more than one (1) state during the same election. Not later than thirty (30) days following the receipt of information under this subsection indicating that a voter of Indiana may also be registered to vote in another state, the NVRA official shall provide the appropriate county voter registration office with the name of and any other information obtained under this subsection concerning that voter, if the first name, last name, and date of birth of the Indiana voter is identical to the first name, last name, and date of birth of the voter registered in the other state. **The county voter registration office shall determine whether the individual: (1) identified in the report provided by the NVRA official under this subsection is the same individual who is a registered voter of the county; and (2) registered to vote in another state on a date following the date that voter registered in Indiana.**

**(e) If the county voter registration office determines that the voter is described by subsection (d), the county voter registration office shall cancel the voter registration of that voter.**

(Emphasis added.)

SEA 442 has removed from the statute the requirement to determine whether the individual voter authorized the cancellation of any previous registrations when they registered in another state.  The amendment also removes the requirement to send an address confirmation notice to the

voter when cancellation has not been confirmed by the voter. Before the statute was amended, pursuant to business rules set by King and Nussmeyer, whenever a county official determined that a possible match was indeed truly a match and approved the match, that selection in the statewide voter registration system would generate a confirmation notice that was mailed to the voter. This mailing allowed a person to confirm their registration at the current address, update their registration, or cancel it.  If the voter did not respond to the mailer, they would be placed in "inactive" status.  After being placed in inactive status, only if the voter did not vote over the course of the next two federal general election cycles could Indiana cancel the voter's registration (Filing No. 42-22 at 47).

Also prior to the amendment, county officials were required to confirm that voters who appeared to have registered in another had also authorized the cancellation of any previous registration by the voter when the voter registered in the other state.  If the county official could not determine that the voter had authorized the cancellation of any previous registration, the state statute required the county board to send an address confirmation notice to the Indiana address of the voter.  This was consistent with the written confirmation notice and waiting procedures in the NVRA at 52 U.S.C. § 20507(d).  This requirement has been removed by SEA 442.

On August 23, 2017, the Plaintiffs filed this lawsuit seeking declaratory and injunctive relief, requesting that the Court declare Indiana Code § 3-7-38.2-5(d)–(e) violates the NVRA and enjoining Indiana from implementing and enforcing the amended statute (Filing No. 1). On March 9, 2018, the Plaintiffs filed their Motion for Preliminary Injunction (Filing No. 41).  On May 2, 2018, the parties presented oral argument to the Court on the Motion (Filing No. 56).

After this lawsuit was initiated, the Indiana General Assembly enacted House Enrolled Act 1253 ("HEA 1253"), which went into effect on March 15, 2018.  HEA 1253 added "confidence

factors" to Indiana Code § 3-7-38.2-5(d), thereby codifying the Election Division's policy of providing to the county officials only those registrations that meet certain match criteria.

## II.   <u>LEGAL STANDARD</u>

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008). "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* (Citation and quotation marks omitted). Granting a preliminary injunction is "an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 389 (7th Cir. 1984) (citation and quotation marks omitted).

When a district court considers whether to issue a preliminary injunction, the party seeking the injunctive relief must demonstrate that "it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that issuing an injunction is in the public interest." *Grace Schs. v. Burwell*, 801 F.3d 788, 795 (7th Cir. 2015). The greater the likelihood of success, the less harm the moving party needs to show to obtain an injunction, and vice versa. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America, Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008).

## III.   <u>DISCUSSION</u>

Congress enacted the National Voter Registration Act to enhance voting opportunities for every American. Plaintiffs challenge the legality of SEA 442, codified at Indiana Code § 3-7-38.2-5(d)–(e), which amends Indiana's voter registration laws. Plaintiffs explain that the NVRA established procedural safeguards to protect eligible voters against disenfranchisement. The NVRA placed specific requirements on the states to ensure that these goals were met. Plaintiffs

argue that SEA 442 violates the NVRA by circumventing its procedural safeguards—the notice-and-waiting period requirement as well as the requirement that a state's list maintenance system be uniform and nondiscriminatory.

Plaintiffs also assert that they have a claim under 42 U.S.C. § 1983 arising from the implementation of SEA 442.  They contend that the exclusive use of Crosscheck leads to discriminatory results because Crosscheck is less reliable when applied to minority voter populations where identical first and last names are more prevalent.  However, Plaintiffs fail to develop this argument, the Defendants do not address § 1983, and Plaintiffs fail to discuss or argue anything about § 1983 in the reply brief.  Because this argument and claim has not been developed, the Court will not address a § 1983 claim.

Plaintiffs argue that a preliminary injunction is appropriate because it will ultimately prevail on the merits, and without an injunction, Plaintiffs and their members will suffer irreparable harm from the unlawful purging of voter registrations without notice.  They further argue that the Defendants must comply with the NVRA and, at a minimum, send confirmation notices before cancelling voter registrations based on change of residency and the Crosscheck data. The Defendants assert that Indiana has gone to great lengths to ensure that it is both actively and justifiably removing those from its rolls who are no longer qualified to vote.  And as a failsafe, Indiana provides a simple process for any individual who may have been mistakenly removed to still vote, therefore, Common Cause's request for a preliminary injunction should be denied.

To obtain a preliminary injunction, Common Cause must establish the following four factors as to each provision it seeks to enjoin: "[1] that it is likely to succeed on the merits, [2] that it is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in its favor, and [4] that issuing an injunction is in the public interest." *Grace Schools*,

801 F.3d at 795.  The first two factors are threshold determinations; "[i]f the moving party meets these threshold requirements, the district court 'must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied.'"  *Stuller, Inc.*, 695 F.3d at 678 (quoting *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)).  The Court will address the first two threshold factors in turn, before addressing the final factors.

A.    **Likelihood of Success on the Merits**

Plaintiffs argue that they will prevail on the merits of their claim because SEA 442 plainly violates the NVRA.  The NVRA establishes requirements that states must satisfy when maintaining their voter registration rolls.  One such requirement is that a state "shall not remove" a voter from its list of eligible voters due to change in residence unless: (a) the voter confirms such a residence change in writing; or (b) the voter fails to respond to a confirmation notice with specific content prescribed by the statute and the voter does not vote in the jurisdiction during the next two federal election cycles. 52 U.S.C. § 20507(d)(1). These procedural safeguards of written confirmation from the voter or the notice and waiting period are in place to protect against wrongful disenfranchisement.

Plaintiffs assert that, contrary to these requirements, SEA 442 requires King and Nussmeyer to provide county officials with data about every voter who Crosscheck identifies as a possible match.  After receiving this data produced by Crosscheck, the county officials "shall cancel the voter registration of that voter" immediately, without any notice and without waiting the two federal election cycles, if the county official believes that the duplicate records in Crosscheck belong to the same voter and that the voter's out-of-state registration post-dates the Indiana registration.

Plaintiffs argue that the Crosscheck system has inherent flaws and limitations, which make it an unreliable source on which to base voter registration cancellations without further investigation. Plaintiff's offer evidence that Crosscheck produces many false positives because many people have a matching first name, last name, and birthdate, but in reality, they are not the same person. Crosscheck and the state's voter registration system are unreliable because they do not collect or disseminate the actual voter registration documents, thereby depriving states of the opportunity to verify the conclusory data with the underlying documents. The system also has limited data and functionality, which reduces its reliability for county officials to cancel voter registrations based solely on Crosscheck and the data uploaded into the statewide voter registration system.

Furthermore, the data definitions are not consistently used or applied by each of the participating states, and thus, some data may be missing or may be used in disparate ways by the different states. This is especially true of the dates of registration. Plaintiffs point out that, because of these inherent limitations with Crosscheck, historically, it has been used only as a starting point in Indiana's voter cancellation process. Crosscheck will now be used to determine whether a duplicate voter registration exists and then cancellation of the Indiana registration will promptly follow.

Before enactment of SEA 442, Indiana used Crosscheck matches as a starting point to determine whether a voter registration could be cancelled. If there was a "match," county election officials would confirm whether the individual registered to vote in Indiana actually was the same individual registered to vote in another state. The county official would then determine whether the registration in the other state occurred after the registration in Indiana. Then the county official would determine whether the voter had authorized cancellation of any previous registrations. If

14

all these conditions were met, the county official would cancel the Indiana registration, but if the last condition was not met, the county official would mail a notice to the voter and provide the waiting period for an "inactive" voter.

Plaintiffs argue that SEA 442 violates the NVRA by removing the last condition: confirming that the voter authorized cancellation of any previous registrations. They contend that SEA 442 violates the NVRA by removing the notice and waiting period requirement where authorized cancellation has not been confirmed. As this relates to Crosscheck, they argue a Crosscheck "match" does not constitute a voter's authorization to cancel any previous registrations. Crosscheck provides only second-hand information that should be accompanied with the notice and waiting period protection when the state does not have an affirmative authorized cancellation from the voter. Plaintiffs point out that even Nussmeyer warned the legislative aides working on the passage of SEA 442 that "federal law does not permit the cancellation" of voters from the registration rolls as mandated by SEA 442 (Filing No. 42-27 at 2). Nussmeyer also stated in an email to a county election official that "it's a violation of state and federal law for a voter registration official to cancel a voter's registration unless they have signed authorization from the voter that they want their registration cancelled. Unless there's a change at the federal level, this is how the process has to play out." (Filing No. 42-10 at 3.) Because SEA 442 eliminates the requirement of written confirmation or a notice and waiting period, it violates the NVRA, and Plaintiffs assert that they will prevail on the merits.

In addition, Plaintiffs assert that SEA 442 violates the NVRA because it is not a uniform approach to cleaning up voter registration rolls. Because the state does not provide enough specific guidance to the county election officials regarding how to determine whether a voter registration is a matched duplicate in another state, they assert it is not uniform. The state also leaves it up to

the county election officials to determine which voter registrations should be purged from the rolls, and those local county officials interpret and apply the standards and information differently. Plaintiffs point to examples of how local officials apply the purging standards differently.  One county official will send a notice and wait two election cycles before cancelling an Indiana voter registration if that official received a notice of registration from another state (Filing No. 42-24 at 83).  However, under these same facts, another county official will immediately cancel the Indiana registration upon receipt of notification from another state (Filing No. 42-23 at 36–37).  Some county officials explain that they will cancel registrations of "matched" individuals if the name is unusual but not if it is a common name (Filing No. 42-23 at 32–33; Filing No. 42-25 at 33; Filing No. 42-28 at 45–46).  The non-uniformity is also exhibited by the fact that some counties simply approve all matches that appear as possible matches from Crosscheck, while other counties do not (Filing No. 42-14).

In addition, the state's approach is not uniform because the two state co-directors, King and Nussmeyer, provide different guidance to local county election officials when those county officials call one of the co-directors to ask questions about implementing voter regulations and laws.  They often do not consult with each other about responses to provide to the county officials, and they occasionally do not agree with each other about policies and procedures.

Plaintiffs assert that they have a high likelihood of success on the merits because SEA 442 plainly violates the NVRA's requirement to provide notice and a waiting period where the voter has not already authorized cancellation of their previous registrations.  And additionally, they argue they will succeed on the merits because the state's approach to purging its registration rolls is not uniform or reasonable.

16

The Defendants first argue that Plaintiffs lack standing because they have suffered no injury in fact and Plaintiffs lack standing on their own behalf because their choice of how to allocate their limited resources is not an injury inflicted by the Defendants, and it is an "injury" of Plaintiffs' own making. They argue that Plaintiffs' assertion of injury is highly speculative and cannot support standing. The Defendants also assert that Plaintiffs lack organizational standing to represent their members because the individual members do not have standing to sue in their own right because of a lack of injury to them.  The Defendants argue that because the new Crosscheck program procedures have not yet been implemented, nobody has been deprived of the right to vote because of SEA 442.

Similarly, the Defendants contend there is no threat of actual or imminent harm because it has not cancelled any voter registrations and will not do so before July 1, 2018, and even if a voter registration is cancelled, the voter will still be permitted to vote (albeit through the "alternative voting procedure").  The Defendants also argue that any alleged injury cannot be traced back to the named Defendants because the cancellation of voter registrations is carried out by county election officials, not the named statewide election officials.  Thus, the Defendants assert, there is no injury and no standing.

Concerning the merits of the claim, the Defendants assert that, even if standing could be established, the challenged statute complies with the requirements of the NVRA by establishing a procedure to remove voter registrations from the rolls when individuals have registered to vote in another state.  They note that the challenged statute has been amended yet again since Plaintiffs filed their Complaint.  The amendment took effect on March 15, 2018, but it has not yet been implemented by King and Nussmeyer.  The amendment directs King and Nussmeyer to apply a set of "confidence factors"—*i.e.* additional personal information such as social security number,

street address, driver's license number, zip code—to the data received from Crosscheck before sending the information to the county election officials, who then determine whether a registration should be cancelled. The Defendants argue that this added measure of confidence factors allows the Defendants to more accurately determine that an individual is indeed the same person who is registered to vote in another state, and thus, the registration in Indiana can then be cancelled.

The Defendants argue removal of a voter's registration is permissible based on the voter's registration to vote in a different state because that registration in another state can be considered a request for removal from the voter rolls of previous states or can be considered a "confirmation in writing" that the voter has changed their residence. The Defendants rely on SEA 442's requirement that the county election officials determine whether the voter has registered in a different state after the voter registered to vote in Indiana. Because they confirm the subsequent registration in a different state, the county official can remove the voter from the rolls because that subsequent registration can be treated as a request for removal from Indiana's voter registration roll. The Defendants argue that this same logic applies to the "confirmation in writing" aspect of the statute, which allows cancellation of the voter registration. The Defendants assert that an out-of-state voter registration form is written confirmation of the voter's change in residency. They argue that this is consistent with sections of the NVRA where registering in another state can be considered (1) a request for removal from the voter roll in their previous state of residence under 52 U.S.C. § 20507(a)(3)(A), or (2) a confirmation in writing that the registrant has changed residence under 52 U.S.C. § 20507(d)(1)(A).

Regarding uniformity among the county election officials, the Defendants argue that King and Nussmeyer provide training to them and also provide a manual of policies and procedures to give guidance. The county election officials are uniformly required to follow the law by

determining whether the duplicate matches from Crosscheck are indeed the same person and then whether the out-of-state registration occurred after the Indiana registration.  Then they may cancel the Indiana voter registration.  The Defendants further assert that the state and its election officials should be able to give full faith and credit to the records of other states to determine that voters have changed their residence to other states.

Plaintiffs reply that lawsuits brought by nonprofit and civic organizations challenging voter-purge practices are commonplace, and the Defendants' standing argument lacks support in the law.  An independent basis for organizational standing exists when a defendant's conduct makes it difficult or impossible for the organization to fulfill one of its essential purposes or goals. *Common Cause of Colo. v. Buescher*, 750 F. Supp. 2d 1259, 1269 (D. Colo. 2010).  The *Buescher* court also explained, "An organization has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts." *Id.* (citation and quotation marks omitted). Plaintiffs also rely on the United States Supreme Court case of *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982), which made clear that when an organization diverts its resources to counter the challenged conduct, "there can be no question that the organization has suffered injury in fact," and "[s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on [an] organization's resources—constitutes far more than simply a setback to [its] abstract social interests." *Id.*

The Seventh Circuit explicitly recognized this "diversion-of-resources" theory in *Crawford v. Marion County Election Board*.  There, the court held that the Democratic Party had standing in its own right to challenge Indiana's photo ID law because it was "compelled" to divert its resources to combat the law's negative effects in order to achieve the organization's goals, and standing

"requires only a minimal showing of injury." 472 F.3d 949, 951 (7th Cir. 2007). The diversion of its resources and the frustration of its mission are the precise injuries that Plaintiffs have suffered in this case. Plaintiffs assert they also has standing because their members face a real threat of being disenfranchised by SEA 442.

Regarding the Defendants' assertion that any injury cannot be fairly traceable to them, Plaintiffs explain that the Defendants are the NVRA officials in the state and are ultimately responsible for the state's compliance with the NVRA. A state's NVRA official is the proper defendant where the actual voter registration has been delegated to—and actual NVRA violations committed by—local officials. *See Harkless v. Brunner*, 545 F.3d 445, 451–52, 455 (6th Cir. 2008).

Plaintiffs state the Court should disregarding the Defendants' argument that they might provide future guidance to county officials that will be in compliance with the NVRA but not consistent with the language of the challenged statute. As well, Plaintiffs argue the Court should disregard the "confidence factors" argument because those factors do not reliably identify an actually matched voter registration. These confidence factors do not address or resolve the issue of a lack of notice to voters when the voter has not confirmed anything in writing or asked to be removed. The confidence factors cannot be a substitute for the NVRA's requirements.

Plaintiffs further reply that the Defendants' argument completely ignores the NVRA's requirement to provide notice and a waiting period when a voter has not confirmed in writing that the voter has changed residence. Rather, the Defendants wrongly argue that the simple act of registering in a different state is written confirmation of a change in residence. The NVRA states that the written request or confirmation must come from the voter, yet the state's information is coming from Crosscheck, a third-party, not the voter. Plaintiffs point out that where a state relies

20

on third-party information—such as a change of address form provided by the United States Postal Service (which originated with the voter)—to determine that a voter has changed residence, the NVRA requires that the state still use the notice and waiting period procedure.  Plaintiffs argue that the Crosscheck data cannot serve as a request from the voter to cancel previous registrations or be construed as authorization to cancel previous registrations.  Such data is not a request from the voter; a request from the voter would require that the voter ask to be removed from the voter rolls.  Similarly, Plaintiffs also argue that the Crosscheck data is not confirmation in writing from the voter.

The Court first determines that Plaintiffs have standing to pursue their claim for declaratory and injunctive relief.  Plaintiffs have presented evidence that they already have been compelled to divert its resources to address SEA 442 and that their collective mission focus has been affected. They have shown that injury is imminent after SEA 442 is implemented.  This diversion of resources has been determined sufficient to confer standing upon organizations, *Havens Realty Corp.*, 455 U.S. at 379, and standing "requires only a minimal showing of injury."  *Crawford*, 472 F.3d at 951.  The Defendants are the NVRA officials in the state and are responsible for the state's compliance with the NVRA. Furthermore, they establish the guidelines, policies, and procedures for maintaining the state's voter registration rolls.  The local county election officials are required to follow the Defendants' directives.  Therefore, the injury in this case is fairly traceable to the named Defendants.  Thus, Plaintiffs have standing to proceed.

Regarding the likelihood of success on the merits, the Court determines that Plaintiffs have a high likelihood of success on the merits of their claim that SEA 442 violates some of the requirements of the NVRA and threatens disenfranchisement of eligible voters.

21

The NVRA plainly requires that a state "shall not remove the name of a registrant from the official list of eligible voters . . . on the ground that the registrant has changed residence unless the registrant," (1) "confirms in writing that [they have] changed residence," or (2) has failed to respond to a mailed notification and has not voted to two federal election cycles.  52 U.S.C. § 20507(d)(1).  These are simple procedural safeguards to protect registered voters, and states are required to follow these safeguards.  Before its amendment by SEA 442, Indiana Code § 3-7-38.2-5(d)–(e) provided for the notice and a waiting period required by the NVRA when a voter did not confirm in writing of their change in residence or did not request to be removed from the voter rolls.  SEA 442 removes this procedural safeguard.  The Defendants' reliance on the new "confidence factors" is misplaced because they do nothing to address the NVRA's requirement in particular cases to provide for notice and a waiting period.

The act of registering to vote in a second state as determined by Crosscheck cannot constitute a written request to be removed from Indiana's voter rolls or a confirmation in writing from the voter that they have changed their address.  A voter's act of registering to vote is simply that—a registration to vote.  There is no request for removal, and the voter is not confirming for Indiana that they have had a change in residence.  Notably this information is not coming from the voter but rather from Crosscheck, which may or may not be reliable.  During oral argument, Defendant's counsel admitted concerns regarding the reliability and security of Cross Check.  (Filing No. 62 at 49-51)[1].  It is significant that the NVRA still requires the notice and waiting

---

[1] Defendants' counsel Jefferson Garn ("Garn") argued the following: "This isn't a part of the record, but my -- what's going on, I believe, and from my understanding, is that there are, as with many organizations, the federal government, state governments, there are concerns about data breach, and there's a Department of Homeland Security review being done of Crosscheck right now." (Filing No. 62 at 49). Thereafter, the Court asked; "so are you saying the Crosscheck database process is flawed and they may be subject to data breaches?" and Garn responded "… It's not because our system is flawed. It's because we just want to make sure that we're trying to stay one step ahead of people who are trying to hack. And so that's the concern." (Filing No. 62 at 51).

period before cancelling a voter registration when a change in address has been confirmed through the U.S. Postal Service, which might be more reliable than Crosscheck. The information provided by the U.S. Postal Service originates from the voter, yet notice and a waiting period is still required by the NVRA before cancelling the registration. 52 U.S.C. § 20507(c)(1). Because SEA 442 removes the NVRA's procedural safeguard required in particular cases of providing for notice and a waiting period, the Court determines that Plaintiffs have a high likelihood of success on the merits of their claim.

The Court briefly notes that it appears the implementation of SEA 442 will likely fail to be uniform based on the evidence that King and Nussmeyer provide differing guidance to county officials on how to determine whether a particular registered voter is a duplicate registered voter in a different state. This is also true based on the evidence that county officials are left to use wide discretion in how they determine a duplicate registered voter, and they have used that discretion in very divergent ways.

**B.**     <u>**Irreparable Harm with No Adequate Remedy at Law**</u>

Plaintiffs assert that the first and obvious irreparable harm is the wrongful disenfranchisement of registered voters. But beyond disenfranchisement, Plaintiffs also explain that if a voter is improperly removed from the registration rolls, that voter will not receive information about upcoming elections, dates, or precinct locations (<u>Filing No. 42-21 at 80</u>; <u>Filing No. 42-25 at 35</u>–36). Even if a wrongly removed voter does show up at the polls to vote, they will be forced to cast a provisional ballot or utilize the cumbersome "fail-safe" voting system. These options are onerous and are not required of other eligible voters who have not been wrongly removed from the registration rolls. These burdens slow down the voting process at the polls and suppress voter participation.

Plaintiffs also argue that courts have routinely held that interference with an organization's voter registration activities constitutes irreparable harm.  An organization is harmed if the "actions taken by [the defendant] have perceptibly impaired [its] programs." *Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994) (citing *Havens Realty Corp.*, 455 U.S. at 379).  "[C]onduct that limits an organization's ability to conduct voter registration activities constitutes an irreparable injury."  *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1350 (N.D. Ga. 2016); *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155 (N.D. Fla. 2012).  Where organizational plaintiffs are compelled to divert and expend their resources to address a defendant's allegedly wrongful conduct, this is "enough to satisfy their burden of showing a likelihood of suffering irreparable harm." *Action NC v. Strach*, 216 F. Supp. 3d 597, 643 (M.D.N.C. 2016).

Plaintiffs argue that it will suffer irreparable harm without an injunction prohibiting implementation of SEA 442 because their organizations' limited resources will be diverted to helping educate Indiana voters and ensuring that eligible voters are not disenfranchised.  Much of Plaintiffs' work will have to be done again because of wrongful cancellations of voter registrations. Irreparable harm very likely will occur to Plaintiffs' members by their wrongful disenfranchisement.

The Defendants respond that no irreparable harm exists because SEA 442 has not yet been implemented, and when it is implemented, even if a voter is wrongfully removed from the registration rolls, they may still vote under the "fail-safe" provisions of Indiana's election law. Thus, they assert, nobody will be deprived of the right to vote.

Plaintiffs reply that SEA 442 is enacted into law, and the Defendants have stated that they will start implementing it in July 2018.  Irreparable harm of wrongful disenfranchisement is

24

imminent after the Defendants begin implementing the law.  The fact that it has not yet occurred because the Defendants have agreed to not implement SEA 442 yet is of no consequence to the irreparable harm that certainly will occur.   In addition, courts overwhelmingly have held disenfranchisement is an irreparable harm.  *Elrod v. Burns*, 427 U.S. 347, 373–74, n.29 (1976); *Frank v. Walker*, 196 F. Supp. 3d 893, 917 (E.D. Wis. 2016); *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012) (once the opportunity to vote in a given election is denied, that opportunity is gone forever).  Plaintiffs further reply that the Defendants' reliance on its "fail-safe" alternative voting procedure to justify SEA 442 is misplaced because the NVRA requires such a "fail-safe" voting procedure as an additional protection to voters, not as a replacement to the other requirements of the NVRA.

The Defendants' argument that no irreparable harm exists because SEA 442 has not yet been implemented is unavailing.  The very purpose of a preliminary injunction is to prevent an imminent harm from occurring or to quickly abate an irreparable harm that has already begun.  Next, the Court agrees with Plaintiffs that the Defendants' "fail-safe" voting procedure cannot justify implementation of SEA 442 because the NVRA requires that "fail-safe" voting procedure as an additional protection to voters, not as a replacement or alternative to the other requirements of the NVRA.  The harm that occurs from eliminating one required procedural safeguard is not negated by the continued use of a different additional procedural safeguard.

As has been held by numerous other courts, a violation of the right to vote is presumptively an irreparable harm.  *See, e.g.*, *Frank*, 196 F. Supp. 3d at 917; *Browning*, 863 F. Supp. 2d at 1167.  Because an individual cannot vote after an election has passed, it is clear that the wrongful disenfranchisement of a registered voter would cause irreparable harm without an adequate remedy

at law.  The Court also agrees that "conduct that limits an organization's ability to conduct voter registration activities constitutes an irreparable injury." *Project Vote, Inc.*, 208 F. Supp. 3d at 1350.

## C.   Balance of Potential Harms

Plaintiffs argue that a balance of the potential harms from an injunction weighs heavily in their favor.  Depriving eligible citizens of the right to vote is a very significant harm, while not allowing the state to purge voter registrations in a manner that short-circuits the NVRA's requirements causes no harm to the state.  Maintaining accurate voter registration rolls is important and prescribed by the NVRA; however, the state has many procedures that allow it to reasonably and more accurately clean up its voter registration rolls such as using the statewide notification mailers or cancelling registrations based on death, incarceration, incapacity, or written request.

The Defendants respond that, when an injunction is sought against a political branch of government, public policy considerations favor denial of the injunction because judicial interference with a public program diminishes the scope of democratic governance, and the government's interests are presumed to be the public's interests.  They argue an injunction would hinder efforts to protect the integrity of the electoral process and to ensure accurate and current voter registration rolls.

The Court finds that the balance of equities weighs heavily in favor of granting an injunction.  Plaintiffs' members and the voters they seek to assist face the imminent and irrevocable consequence of disenfranchisement of thousands of Indiana voters, only months before a federal election.  In contrast, Defendants would face only the prospect of waiting until after adjudication of the merits of Plaintiffs' challenge to implement extremely prejudicial aspects of an election bill that was passed only recently.  Weighing the balance of hardships, together with the public's interest in avoiding barriers to voter registration and increasing the number of eligible citizens

registered to vote, the need is clear for a preliminary injunction to halt the implementation of SEA 442 while the Court reaches a determination on the full merits of the case.  An injunction prohibiting the implementation of SEA 442 will not impose any new or additional harm or burdens on the Defendants concerning their efforts to maintain accurate voter registration rolls and to ensure fair elections.  The Defendants still have numerous ways that comply with the NVRA to clean up the state's voter registration rolls.  On the other hand, not issuing an injunction and allowing SEA 442 to be implemented risks the imposition of significant harm on Plaintiffs and their members through the disenfranchisement of rightfully registered voters.

**D.**     **Public Interest**

The NVRA's purpose is to both increase the number of eligible citizens to register to vote and participate in the electoral process; and …ensure that accurate and current voter registration rolls are maintained.  52 U.S.C. § 20501(b).  The public has a "strong interest in exercising the fundamental political right to vote."  *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).  Plaintiffs argue the public interest is best served by protecting the right to vote and not disenfranchising eligible voters.  Similar to their response regarding the balance of harms, the Defendants argue that the public interest is best served by allowing SEA 442 to be implemented to ensure the integrity of voter registration rolls and the electoral process.

The Court agrees with Plaintiffs that the greater public interest is in allowing eligible voters to exercise their right to vote without being disenfranchised without notice.  If a voter is disenfranchised and purged erroneously, that voter has no recourse after Election Day.  While the Defendants have a strong public interest in protecting the integrity of voter registration rolls and the electoral process, they have other procedures in place that can protect that public interest that do not violate the NVRA.

E.      **Posting Bond**

A preliminary injunction will not impose any monetary injuries on the Defendants, and in the absence of such injuries, no bond should be required.  *See Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996).  Therefore, Plaintiffs need not post a bond.

## IV.      CONCLUSION

Because each of the factors for the issuance of a preliminary injunction weighs in favor of Plaintiffs, the Court **GRANTS** Plaintiffs' Motion for Preliminary Injunction (Filing No. 41). Pursuant to Federal Rule of Civil Procedure 65(d), the Court **ISSUES A PRELIMINARY INJUNCTION** prohibiting the Defendants from taking any actions to implement SEA 442 until this case has been finally resolved.  A similar ruling is issued in related case *Common Cause Indiana v. Lawson et al.,* 1:17-cv-3936-TWP-MPB.  Plaintiffs need not post a bond.

**SO ORDERED.**

Date:  6/8/2018

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

28

DISTRIBUTION:

Jonathan Brater
BRENNAN CENTER FOR JUSTICE
jonathan.brater@nyu.edu

Matthew Richard Elliott
INDIANA ATTORNEY GENERAL
Matthew.Elliott@atg.in.gov

Jefferson S. Garn
INDIANA ATTORNEY GENERAL
Jefferson.Garn@atg.in.gov

Kyle Hunter
INDIANA ATTORNEY GENERAL
kyle.hunter@atg.in.gov

Trent A. McCain
MCCAIN LAW OFFICES, P.C.
Trent@McCain.Law

Ellison Sylvina Ward Merkel
QUINN EMANUEL URQUHART &
SULLIVAN LLP
ellisonmerkel@quinnemanuel.com

Diana Lynn Moers Davis
INDIANA ATTORNEY GENERAL
diana.moers@atg.in.gov

Myrna Perez
BRENNAN CENTER FOR JUSTICE
perezm@brennan.law.nyu.edu

Aleksandrina Penkova Pratt
INDIANA ATTORNEY GENERAL
aleksandrina.pratt@atg.in.gov

Sascha N. Rand
QUINN EMANUEL URQUHART &
SULLIVAN LLP
sascharand@quinnemanuel.com

Kelly Suzanne Thompson
INDIANA ATTORNEY GENERAL
kelly.thompson@atg.in.gov

Ellyde R. Thompson
QUINN EMANUEL URQUHART &
SULLIVAN LLP
ellydethompson@quinnemanuel.com

Alexandre J. Tschumi
QUINN EMANUEL URQUHART &
SULLIVAN LLP
alexandretschumi@quinnemanuel.com