UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| INDIANA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (NAACP) and LEAGUE OF WOMEN VOTERS OF INDIANA, | |
| Plaintiffs, | |
| v. | Docket No. 1:17-cv-02897-TWP-MPB |
| CONNIE LAWSON, in her official capacity as the Indiana Secretary of State; J. BRADLEY KING, in his official capacity as Co-Director of the Indiana Election Division; ANGELA NUSSMEYER, in her official capacity as Co-Director of the Indiana Election Division, | |
| Defendants. | |
| COMMON CAUSE INDIANA, | |
| Plaintiff, | |
| v. | Docket No. 1:17-cv-03936-TWP-MPB |
| CONNIE LAWSON, in her official capacity as the Indiana Secretary of State; J. BRADLEY KING, in his official capacity as Co-Director of the Indiana Election Division; ANGELA NUSSMEYER, in her official capacity as Co-Director of the Indiana Election Division, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Myrna Pérez
Eliza Sweren-Becker
BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271
(646) 292-8310

Sascha N. Rand
Ellyde R. Thompson
Ellison Ward Merkel
Geneva McDaniel
Alexandre J. Tschumi
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

Trent A. McCain
MCCAIN LAW OFFICES, P.C.
363 S. Lake St., Suite 2
Gary, IN 46403
(219) 884-0696

*Counsel for Plaintiffs Indiana State
Conference of the National Association for the
Advancement of Colored People (NAACP) and
League of Women Voters of Indiana*

Sophia Lin Lakin*
Adriel I. Cepeda Derieux*
Dale Ho*
AMERICAN CIVIL LIBERTIES UNION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 519-7836

Stuart C. Naifeh *
Kathryn C. Sadasivan*
DEMOS
80 Broad Street, 4th Floor
New York, NY 10004
(212) 485-6055

Matthew R. Jedreski*
Grace Thompson*
Kate Kennedy*
DAVIS WRIGHT TREMAINE LLP
1200 Third Avenue, 22nd Floor
Seattle, WA 98101
(206) 622-3150

Chiraag Bains*
DEMOS
740 6th St., NW, 2nd Floor
Washington, DC 20001
(202) 864-2746

Gavin M. Rose, No. 26565-53
Stevie J. Pactor, No. 35657-49
ACLU OF INDIANA
1031 E. Washington Street
Indianapolis, IN 46202
(317) 635-4059

William R. Groth, No. 7325-49
FILLENWARTH DENNERLINE GROTH &
TROWE LLP
429 E. Vermont Street, Suite 200
Indianapolis, IN 46202
(317) 353-9363

*Counsel for Plaintiff Common Cause Indiana*

*Admitted Pro hac vice*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ..................................................................................................................1

THE NATIONAL VOTER REGISTRATION ACT..........................................................3

PROCEDURAL POSTURE ................................................................................................4

STATEMENT OF MATERIAL FACTS NOT IN DISPUTE...........................................6

      A.     Voter List Maintenance in Indiana ............................................................6

            1.     Defendants Oversee and Administer Indiana's Voter List Maintenance ......................................................................................6

            2.     Indiana's Voter Registration Cancellation Process Prior to SEA 442............................................................................................7

            3.     Indiana's Voter Registration Cancellation Process Under SEA 442 ...........9

                  4.     The District Court Enjoined Implementation of SEA 442 and the Seventh Circuit Affirmed ....................................9

            5.     Indiana's Voter Registration Cancellation Process Under SEA 334 .........10

            6.     Illustrative Data Processing ............................................................15

                  a.     Non-Uniformity ..................................................................15

                  b.     "Date of Registration"........................................................18

      B.     The Plaintiffs..............................................................................................19

            1.     Plaintiffs Are Committed to Registering Voters and Protecting Voters' Rights ..................................................................19

ARGUMENT ......................................................................................................................23

I.     LEGAL STANDARDS ................................................................................................24

      A.     Summary Judgment .....................................................................................24

      B.     Law of the Case ...........................................................................................25

II.     SEA 334 AND DEFENDANTS' IMPLEMENTATION THEREOF VIOLATE
        THE NVRA BY PERMITTING CANCELLATION OF A VOTER
        REGISTRATION WITHOUT DIRECT CONTACT WITH A REGISTRANT .............26

        A.      The NVRA Forbids Cancellation Without Direct Contact with a Registrant........26

        B.      SEA 334 and Defendants' Implementation Thereof Permit Cancellation of
                Voter Registrations Without Direct Contact with a Registrant ...........................28

                1.      SEA 334 Replaces Crosscheck with IDEA to Identify Voters Who
                        May Have Moved Out-of-State Based on Voting Records. .....................29

                2.      SEA 334 Permits Cancellation of IDEA Matches without Meeting
                        the NVRA's "Request of the Registrant" or "Confirm[ation] in
                        Writing" Requirements ...............................................................................30

        C.      The Record Illustrates Why the NVRA Forbids Cancellation Without
                Direct Contact with a Registrant........................................................................32

CONCLUSION..........................................................................................................................33

## <u>INTRODUCTION</u>

After nearly three years of litigation, the Indiana legislature ignored two court rulings and passed legislation, at Defendants' urging, that fails to address the violations of federal law that led this court to enjoin Senate Enrolled Act ("SEA") 442.[1] Defendants have swapped in one interstate database for another and continue to permit voter registration cancellations based solely on third-party information. This Court and the Seventh Circuit enjoined Defendants from doing just that under Senate Enrolled Act 442. Both courts made resoundingly clear that Indiana officials cannot remove a voter from the rolls on the basis that the voter has moved absent direct contact with the voter, unless officials provide notice and wait two general election cycles, as the National Voter Registration Act ("NVRA") requires. Yet, Defendants prepared an amendment, SEA 334, that *still* permits unlawful purges of Indiana voters without the NVRA-mandated notice and waiting period.

Before SEA 442, Indiana required federally-mandated notice to remove a voter from the rolls. SEA 442 eliminated that notice requirement when a voter was flagged as a "match" in the Interstate Voter Registration Crosscheck Program ("Crosscheck"). But after this Court and the Seventh Circuit concluded that SEA 442's procedure was unlawful, Secretary Lawson and Co-Director King drafted language that once again fails to bring state law into compliance with the NVRA's clear mandate. Although SEA 334 restores Indiana's pre-SEA 442 language requiring a determination as to whether a voter "authorized" cancellation, SEA 334 adds a yawning loophole that allows officials to remove voters in the same way that this Court and the Seventh Circuit forbade. Specifically, SEA 334 provides that county registrars should "consider" "written notice

---

[1]   Hereinafter, "SEA 442" shall refer to Senate Enrolled Act 442, sec. 15, Ind. Code §§ 3-7-38.2-5(d)-(e) (2017); "HEA 1253" shall refer to House Enrolled Act 1253, sec. 3, Ind. Code §§ 3-7-38.2-5(d)-(f) (2018); "SEA 334" shall refer to Senate Enrolled Act 334, secs. 6-8, Ind. Code §§ 3-7-38.2-5, -5.1, -5.5 (2020). Redlines reflecting SEA 442, HEA 1253, and SEA 334's amendments to Indiana Code are attached as Exs. 1, 2 & 3, respectively, to the Declaration of Alexandre J. Tschumi ("TD").

from another state to an Indiana county voter registration official" as "confirmation that [an] individual is registered in another jurisdiction and has requested cancellation of the Indiana registration." SEA 334 § 5.5(f)(2). Explicitly, "[a] copy of the actual voter signature *is not required* to be provided to the county *for the voter's status to be canceled* if the written notice is forwarded by the election division." *Id.* (emphasis added). In other words, SEA 334 still expressly allows purges without direct contact from the voter, and without notice and waiting. This unequivocally violates the NVRA, which

> forbids a state from removing a voter from that state's registration list unless: (1) it *hears directly* from the voter via a "request" or a "confirm[ation] in writing" that the voter is ineligible or does not wish to be registered; or (2) the state goes through the statutorily prescribed process of (a) notifying the voter, (b) giving the voter an opportunity to respond, and (c) then waiting *two* inactive election cycles before removing a suspected ineligible voter who never responds to the notice. *Both of these avenues focus on direct contact with the voter.*

*Common Cause Ind. v. Lawson*, 937 F.3d 944, 959 (7th Cir. 2019) (first and third emphases added).

Rather than comply with the NVRA, SEA 334 makes superficial changes while failing to remedy the core flaw of SEA 442 that gave rise to this litigation. Defendant King has represented that there has been no definitive ruling in this case, notwithstanding this Court and the Seventh Circuit's clear statements as to what the NVRA requires. But the Seventh Circuit's ruling is the law of the case, and Defendants should not get a second bite at the apple by implementing policy that already has been found unlawful under a different bill number.

Plaintiffs respectfully request that the Court enter summary judgment in Plaintiffs' favor and that the Court permanently enjoin Defendants from implementing any voter list maintenance program that permits county voter registration officials to remove, or otherwise removing, any Indiana registrant from the list of eligible voters because of a change in residence absent: (1) a "request" or "confirm[ation] in writing" directly from the voter that the voter is ineligible or does not wish to be registered; or (2) the National Voter Registration Act-prescribed process of (a) notifying

the voter, (b) giving the voter an opportunity to respond, and (c) then waiting two inactive federal election cycles.

## THE NATIONAL VOTER REGISTRATION ACT

Congress enacted the NVRA to "reduc[e] barriers, particularly government-imposed barriers, to applying for voter registration." H.R. REP. No. 103-9, at 3 (1993). Specifically, Congress recognized that historically, restrictive laws and procedures, including residency requirements, "elaborate administrative procedures," and "selective purges" of voter registration lists, had the effect of suppressing voter turnout. *Id*. at 2. The NVRA "sets the boundaries within which states must operate when they administer the voter-registration process," *Common Cause*, 937 F.3d at 947, which are designed to "increase the number of eligible citizens who register to vote in elections for Federal office;" "to protect the integrity of the electoral process;" and "to ensure that accurate and current voter registration rolls are maintained," 52 U.S.C. §§ 20501(b)(1), (3)-(4). In sum, "Congress enacted the National Voter Registration Act to *enhance* voting opportunities for every American." *Ind. State Conf. of the NAACP v. Lawson*, 326 F. Supp. 3d 646, 655 (S.D. Ind. 2018) (emphasis added).

The NVRA enumerates five reasons for which voters may be removed from voter rolls without providing the required notice, response opportunity, and waiting period (the "Notice-and-Waiting Requirements"): (i) the voter has requested to be removed, 52 U.S.C. § 20507(a)(3)(A), (ii) the voter is ineligible under state law due to criminal conviction, *id*. § 20507(a)(3)(B), (iii) the voter is ineligible under state law due to mental incapacity, *id.*, (iv) the voter has died, *id*. § 20507(a)(4)(A); or (v) the voter has confirmed in writing a changed address, *id*. § 20507(a)(4)(B), (d)(1)(A). Only reasons (i) and (v) could possibly apply to this case.[2] Thus,

---

[2] The inapplicable reasons for removal are omitted from the following discussion of the NVRA statutory framework.

Indiana has two relevant options for removing a registrant from the voter rolls: It may do so "at the request of the registrant," *id.* § 20507(a)(3); *or* "by reason of . . . a change in the residence of the registrant," so long as the "registrant . . . confirms in writing that the registrant has changed residence" or "has failed to respond to a notice [and] has not voted or appeared to vote" in consecutive general Federal elections, *id.* §§ 20507(a)(4)(B), (d)(1)(A)-(B).

The Notice-and-Waiting Requirements provide a registrant with the opportunity to correct an incorrect conclusion on the part of the county that the voter has changed residence based on second-hand evidence.[3] The Notice-and-Waiting Requirements are essential given the possibilities of error when doing large and systematic list maintenance efforts and the disenfranchisement that can result from those errors.

## PROCEDURAL POSTURE

On August 23, 2017, the Indiana State Conference of the National Association for the Advancement of Colored People ("NAACP") and the League of Women Voters of Indiana ("League") filed an action against Connie Lawson, in her official capacity as the Indiana Secretary of State ("Secretary of State," "Lawson," or "Secretary Lawson"); J. Bradley King, in his official capacity as Co-Director of the Indiana Election Division ("King" or "Co-Director King"); and Angela Nussmeyer, in her official capacity as Co-Director of the Indiana Election Division ("Nussmeyer" or "Co-Director Nussmeyer"; together with King, "Co-Directors"; and together with Lawson and King, "Defendants"). Dkt. 1, No. 1:17-cv-02897-TWP-MPB. On October 27, 2017,

---

[3] The Notice-and-Waiting Requirements provide that the voter must be sent a notice via forwardable mail with a pre-addressed and pre-paid card that can be returned to the county, allowing the voter to confirm her address. *Id.* § 20507(d)(2).

Common Cause Indiana ("Common Cause," and together with the NAACP and the League, "Plaintiffs") also filed an action against Defendants. Dkt. 1, No. 1:17-cv-03936-TWP-MPB.[4]

Plaintiffs alleged that the Indiana Code violated the NVRA by permitting removal of voters from the voter registration rolls without providing the required notice, response opportunity, and waiting period, and, thereby, that Defendants' implementation of state law violated the NVRA. *NAACP* Dkt. 1 ¶ 1, *Common Cause* Dkt. 1 ¶ 1. And Plaintiffs further alleged that Defendants' implementation of state law would result in non-uniform, discriminatory, and illegal cancellations of voter registrations in violation of the NVRA. *NAACP* Dkt. 1 ¶ 1, *Common Cause* Dkt. 1 ¶ 1.

On June 8, 2018, this Court enjoined "Defendants from taking any actions to implement SEA 442 until th[e] case has been finally resolved." *NAACP*, 326 F. Supp. 3d at 664. The Court "determine[d] that Plaintiffs have a high likelihood of success on the merits of their claim that SEA 442 violates some of the requirements of the NVRA and threatens disenfranchisement of eligible voters." *Id.* at 661. This Court also "note[d] that it appears the implementation of SEA 442 will likely fail to be uniform," *id.* at 662, in further violation of the NVRA, 52 U.S.C. § 20507(b)(1). On August 27, 2019, the Seventh Circuit affirmed this Court "was correct to find that the Organizations are likely to succeed on the merits of their challenge." *Common Cause*, 937 F.3d at 949. The Court held that the NVRA "forbids a state from removing a voter from that state's registration list unless: (1) it hears *directly* from the voter via a 'request' or a 'confirm[ation] in writing' that the voter is ineligible or does not which to be registered; or (2) the state goes through the statutorily prescribed [Notice-and-Waiting Requirements]. Both of these avenues focus on *direct*

---

[4] Hereinafter, references to documents filed in the case *Indiana State Conference of the National Association for the Advancement of Colored People (NAACP) et al. v. Lawson et al.*, No. 1:17-cv-02987-TWP-MPB, shall be cited as "*NAACP* Dkt. #" and references to documents filed in the case *Common Cause Indiana v. Lawson et al.*, No. 1:17-cv-03936-TWP-MPB, shall be cited as "*Common Cause* Dkt. #."

contact with the voter." *Id.* at 959 (emphases added; first alteration in original). The "omi[ssion of] any direct contact with the voter . . . is fatal." *Id.* at 958.

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

### A. Voter List Maintenance in Indiana

#### 1. *Defendants Oversee and Administer Indiana's Voter List Maintenance*

Secretary Lawson is Indiana's chief election official charged with performing all election administration ministerial duties. Ind. Code §§ 3-6-3.7-1, 3-6-4.2-2(a). King and Nussmeyer are Co-Directors of the Indiana Election Division (the "Election Division" or "IED") and jointly preside over it. *Id.* §§ 3-6-4.2-3(a)-(b), -5. The NVRA requires that Indiana "designate a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities under [the NVRA]." 52 U.S.C. § 20509. Indiana has delegated that responsibility to the Co-Directors of the Election Division, Ind. Code § 3-7-11-1, and overlapping responsibilities to Secretary Lawson, in whose Office the Election Division sits. *Id.* § 3-6-4.2-1.[5] Secretary Lawson is also the State's chief election official and is charged with implementing "a single, uniform, official, centralized, and interactive statewide voter registration list" "in a uniform and nondiscriminatory manner." *Id.* § 3-7-26.3-3. Defendants are thus directly responsible for overseeing the counties' voter list maintenance and their compliance with the NVRA. *Id.* §§ 3-6-3.7-1, -4.2-2(a).

---

[5] State law delegates various responsibilities related to voter registration to the Secretary of State and the Co-Directors, jointly. *See, e.g.*, Ind. Code § 3-7-26.3-4 (granting joint ownership of the State Voter Registration System to the Secretary of State and Co-Directors so they might "ensure the proper maintenance and administration of the list"); *id.* § 3-7-26.3-29(10) (requiring the State Voter Registration System "[c]ontain full audit controls and management reports to track and manage the work of county voter registration office employees, including the ability of the secretary of state or the co-directors of the election division to determine whether a county voter registration office is performing voter list maintenance functions in the manner required by [Indiana Code Article 7, which governs voter registration]").

Indiana has 92 counties.[6] Each county has either an Election Board or Board of Registration. Ind. Code § 3-6-5-1; *see also id.* § 3-6-5.2. The Co-Directors must promulgate official policies, guidance, and standard operating procedures instructing county election boards and boards of registration on their duties under state and federal law, and provide training on these policies and procedures. *Id.* § 3-6-4.2-14; *NAACP* Dkt. 42-21 at 11:5-20. While the 92 county boards maintain voter registration records within their jurisdictions, list maintenance is governed by policies, procedures, and guidance promulgated by the Co-Directors, and constrained by the IED's "business rules" governing the electronic State Voter Registration System ("SVRS"), a digital dashboard in which Indiana voter list maintenance takes place. *Id.* at 12:14-14:11, 76:4-15, 109:9-17, 110:20-23; *NAACP*, 326 F. Supp. 3d at 651.[7] "The official guidance from King and Nussmeyer, as reflected in these protocols, documents, and trainings are mandatory." *NAACP*, 326 F. Supp. 3d at 651.[8] King and Nussmeyer "dictat[e] what information will be provided to county officials . . . and . . . what actions the county officials are able to take within the 'online portal' of the statewide system." *Id.*

2. *Indiana's Voter Registration Cancellation Process Prior to SEA 442*

From 2015 to 2020, Indiana used Crosscheck as a "method for identifying voters who may have become ineligible to vote in Indiana because of a change in residence." *Id.* at 652. Participating states submit annually their official lists of registered voters to Crosscheck, which uses them to identify "apparent duplicate registration[s]" by comparing data using just three fields—first name, last name, and birth date. *NAACP* Dkt. 42-2 at 3. Crosscheck does not receive or distribute primary voter registration documents, which might include a voter's signature or prior residence address,

---

[6] *Indiana County Numbers and County Names*, http://www.state.in.us/fssa/files/Indiana_county_numbers_names.pdf (last visited July 1, 2020).
[7] The SVRS is "a single, uniform, official, centralized, and interactive statewide voter registration list." Ind. Code §§ 3-7-26.3-3, -4.
[8] *See also NAACP* Dkt. 42-21 at 81:2-25; *NAACP* Dkt. 42-23 at 20:11-21:5, 41:14-42:6; *NAACP* Dkt. 42-24 at 20:4-6, 21:16-18, 22:5-11, 45:17-46:12; *NAACP* Dkt. 42-25 at 16:1-24, 18:2-7; *NAACP* Dkt. 42-26 at 15:14-18, 16:13-25.

with its lists of "matches." *Id.* at 2-3; *NAACP* Dkt. 42-21 at 96:20-25. Nor does Crosscheck include signatures or former addresses among the identifying information provided to participating states. *NAACP* Dkt. 42-2 at 2-3.

The IED provided Crosscheck with Indiana's list, TD Ex. 1 § 5(d), and upon receiving comparison data back from Crosscheck, IED provided counties with lists of all Indiana voters having an "identical" "first name, last name, and date of birth of the voter registered in the other state," and "any other information obtained," *id.* The IED applied to Crosscheck data "confidence factors" assigning points when certain data fields matched. *NAACP* Dkt. 42-21 at 67:7-23.[9] Records exceeding a point threshold, *id.*, were placed into SVRS "hoppers," which are SVRS data folders for county processing, *NAACP* Dkt. 42-28 at 19:15-22.

Prior to SEA 442's 2017 enactment, Indiana Code required that:

The county voter registration office shall determine whether the individual:
(1) identified in the report provided by the NVRA official . . . is the same individual who is a registered voter of the county;
(2) registered to vote in another state on a date following the date that voter registered in Indiana; and
(3) authorized the cancellation of any previous registration by the voter when the voter registered in another state.

TD Ex. 1 §§ 5(d)(1)-(3). Under that law, if the county made the first two determinations, but not the third, it was required to "send an address confirmation notice to the Indiana address of the voter." *Id.* § 5(e). If the county made all three determinations, it was required to "cancel the registration of that voter." *Id.*

In the SVRS hopper, counties would review the information provided by the IED, and select one of three options: "match approved," "match rejected," or "research needed." *NAACP*, 326 F. Supp. 3d at 652. Approvals automatically generated address confirmation notices, *NAACP*

---

[9] Prior to the 2018 enactment of HEA 1253, TD Ex. 2, which codified the confidence factors, IED policy required their application. *NAACP* Dkt. 42-21 at 68:15-21. As such, the confidence factors were in effect at all relevant times.

Dkt. 42-21 at 70:20-71:3; *NAACP* Dkt. 42-22 at 46:2-10, reflecting that they were tied to the first

two determinations under then-Indiana Code, *see* TD Ex. 1 § 5(e). If the voter did not respond to the

mailer, the voter would be put in inactive status but would not be removed from the rolls unless the

voter did not vote over the course of the next two federal general election cycles. *NAACP* Dkt. 42-22

at 46:11-24.

      *3.  Indiana's Voter Registration Cancellation Process Under SEA 442*

      In 2017, the Indiana General Assembly enacted SEA 442. SEA 442 amended its predecessor

law to provide for cancellation of a registration upon making only the first two "determin[ations],"

striking altogether the references to determination that an individual "authorized the cancellation of

any previous voter registration" and "address confirmation notice." SEA 442 § 5(e). Under SEA 442,

county approval of matches would generate cancellations rather than mailers. *NAACP* Dkt. 42-22

at 37:14-38:3. Thus, SEA 442 mandated the cancellation of a voter registration, without following

the Notice-and-Waiting Requirement for approved matches. *Id.* at 37:14-38:3, 38:13-16.

      *4.  The District Court Enjoined Implementation of SEA 442 and the Seventh Circuit
         Affirmed*

      On June 8, 2018, this Court enjoined "Defendants from taking any actions to implement

SEA 442 until th[e] case has been finally resolved." *NAACP*, 326 F. Supp. 3d at 664. The Court

"determine[d] that Plaintiffs have a high likelihood of success on the merits of their claim that

SEA 442 violates some of the requirements of the NVRA and threatens disenfranchisement of

eligible voters." *Id.* at 661. The Court found that SEA 442 removed the NVRA's "simple procedural

safeguard[]" that "a state 'shall not remove the name of a registrant from the official list of eligible

voters . . . on the ground that the registrant has changed residence unless the registrant,'

(1) 'confirms in writing that [they have] changed residence,' or (2) has failed to respond to a mailed

notification and has not voted to two federal election cycles." *Id.* (quoting 52 U.S.C. § 20507(d)(1));

*see also id.* at 650. The Court noted that "information is not coming from the voter . . . ." *Id.*

The Seventh Circuit affirmed this Court "was correct to find that the Organizations are likely to succeed on the merits of their challenge," *Common Cause*, 937 F.3d at 949. The Court also held that the NVRA "forbids a state from removing a voter from that state's registration list unless: (1) it hears *directly* from the voter via a 'request' or a 'confirm[ation] in writing' that the voter is ineligible or does not wish to be registered; or (2) the state goes through the statutorily prescribed [notice and waiting process]. Both of these avenues focus on *direct* contact with the voter." *Id.* at 959 (emphases added; second alteration in original).

On October 30, 2019, the Court stayed litigation until May 1, 2020, *sua sponte*, to see whether the Indiana legislature would make any changes to SEA 442 that might affect the cases. *NAACP* Dkts. 116, 127.

### 5. *Indiana's Voter Registration Cancellation Process Under SEA 334*

On March 21, 2020, Governor Eric Holcomb signed SEA 334, which amended SEA 442, voided the state's memorandum of understanding with the Kansas Secretary of State, and mandated Indiana's withdrawal from Crosscheck. SEA 334 §§ 5.5(a)-(b). In Crosscheck's place, SEA 334 established the Indiana Data Enhancement Association ("IDEA"), an organization functionally identical to Crosscheck that receives member states' voter lists and returns purported matches.[10] SEA 334 § 5.5(b). Secretary Lawson and Co-Director King were primary drafters of SEA 334 and

---

[10] Co-Director Nussmeyer testified *against* SEA 334, stating she was "not in support of the state creating a Kansas Crosscheck program . . . " and that its primary effect would "have Indiana become the next Kansas," *Hr'g before the Ind. S. Comm. on Elections*, Jan. 23, 2020 (hereinafter "S. Hr'g"), http://iga.in.gov/information/archives/2020/video/committee_elections_3500/ (last visited July 1, 2020). State Representative Wesco, SEA 334's House sponsor, wrote in a letter to Common Cause's Policy Director that the bill was "[c]reating a cross-check of voter registrations with other states . . . ." Supplemental Declaration of Julia Vaughn ("VSD") Ex. A at 1. And Senator Walker, SEA 334's nominal author, introduced the bill as "creating a voter maintenance list crosscheck database, modeling some of the actions off of existing products and former systems . . . ." S. Hr'g.

proponents of IDEA. S. Hr'g.[11] SEA 334 delegates oversight of IDEA to the Co-Directors and Secretary of State. IDEA is administered by Indiana's NVRA official (the Co-Directors). SEA 334 § 5.5(a). Not later than July 1, 2020, "the NVRA official shall adopt an order for the administration of voter list maintenance programs to be performed by IDEA." *Id.* § 5.5(b). If the Co-Directors fail to adopt an order by then, the Secretary of State steps into their shoes. *Id.*

Under SEA 334, IDEA seeks to use "matches" between state data to identify voters who have moved to and registered to vote in another state. *NAACP* Dkt. 42-2 at 3; *Hr'g before the Ind. House Comm. on Elections & Apportionment*, Feb. 20, 2020 (hereinafter "H.R. Hr'g")[12] (nominal author Senator Walker describing IDEA as "a voter list maintenance list crosscheck database, model[ed] off of existing products and former systems"). Within 30 days of comparing data from other states, the NVRA official is to provide to counties lists of all Indiana voters having (i) an "identical" "first name, last name, and date of birth of the voter registered in the other state," and (ii) whose records meet the "confidence factor" threshold. HEA 1253 § 5(d); SEA 334 § 5.5(c)(1)-(2); *see also* S. Hr'g (King: IDEA is a program "where each state would voluntarily provide data to Indiana, Indiana would use the existing confidence factors in our state statutes, and provide data back to the participating states."). IDEA does not collect or disseminate the actual voter registration documents underlying its "matches," SEA 334 §§ 5.5(b), (f), and does not involve direct contact with registrants, *id.* §§ 5.5(a)-(c).

SEA 442 and SEA 334 both require counties to make "determinations" prior to cancelling a

---

[11] Testifying on his and the Secretary's behalf in support of SEA 334, Co-Director King stated, "*[t]he Secretary of State's office has proposed in the bill*, as introduced, stepping in to form [IDEA] . . . ." S. Hr'g. Senator Walker, the Bill's nominal author, stated, "334 does have Amendment No. 1, which is pertaining to the adoption of the voter list maintenance program, *to get that in the form as the Secretary of State's looking to implement and adopt that program*." *Id.* (emphasis added).

[12] http://iga.in.gov/information/archives/2020/video/committee_elections_and_apportionment_0500/ (last visited July 1, 2020).

voter registration. Both permit cancellation of a voter registration absent direct contact with a registrant. The following illustrates a portion of SEA 334's amendment of SEA 442:

> ### SEA 334 (redline against SEA 442)
>
> (d) The county voter registration office shall determine whether the individual:
> >   (1) identified in the report provided by the NVRA official under ~~this~~ subsection (c) is the same individual who is a registered voter of the county; ~~and~~
> >   (2) registered to vote in another state on a date following the date that voter registered in Indiana; and
> >   (3) authorized the cancellation of any previous registration by the voter when the voter registered in another state.
> (e) If the county voter registration office determines that the voter is described by subsection (d), the county voter registration office shall cancel the voter registration of that voter. If the county voter registration office determines that the voter is described by subsection (d)(1) and (d)(2), but has not authorized the cancellation of any previous registration, the county voter registration office shall send an address confirmation notice to the Indiana address of the voter.

TD Ex. 3 § 5.5(d)-(e).

SEA 334 requires that counties make an additional "determination" that an individual "authorized the cancellation of any previous registration by the voter when the voter registered in another state." SEA 334 § 5.5(d)(3). This reinstates the third "determination" required under SEA 442's predecessor law and removed by SEA 442. *Compare* TD Ex. 1 § 5(d)(3) *with* SEA 334 § 5.5(d)(3). What constitutes "authoriz[ation of] cancellation of any previous registration by the voter when the voter registered in another state" has never been defined by the Indiana Code. TD Ex. 1; TD Ex. 3.

The term "authoriz[ation of] cancellation" is not parallel to the text of the NVRA, which refers only to removals at the "request of the registrant" or following "confirm[ation] in writing that the registrant has changed residence." 52 U.S.C. §§ 20507(a)(3)(A), (d)(1)(A). However, SEA 334 sets forth that "authoriz[ation of] cancellation" can be satisfied absent direct contact with a registrant.

Specifically, SEA 334 adds a provision, not present in SEA 442 or its predecessor, offering types of information that Defendants and counties "may" rely upon in making "determinations," including the determination of whether a voter "authorized the cancellation":

> (f) The county voter registration office may rely on written information provided either directly by a voter registration office in another state or forwarded from the election division from the office in the other state as follows:
>> (1) If this information is provided directly from the other state to the Indiana county voter registration official, the out-of-state voter registration official must provide a copy of the voter's signed voter registration application which indicates the individual authorizes cancellation of the individual's previous registration.
>> (2) If the election division forwards written notice from another state to an Indiana county voter registration official, the county should consider this notice as confirmation that the individual is registered in another jurisdiction and has requested cancellation of the Indiana registration. A copy of the actual voter signature is not required to be provided to the county for the voter's status to be canceled if the written notice is forwarded by the election division.
> County voter registration officials shall review the date the individual registered out of state and the date the individual registered in Indiana to confirm which registration is more recent when performing the officials' analysis under this subsection.

SEA 334 § 5.5(f).

"[W]ritten notice" is a broader concept than a voter registration form or direct contact with a registrant. *See, e.g.*, *NAACP* Dkt. 42-22 at 41:19-42:13 ("It can be a printout from a county voter registration office that identifies the individuals who've indicated an address somewhere in Indiana. It can take the form of a copy of the individual's new voter registration record. And it can also come as a compilation made at the state level that lists that information. Can also take the form of emails from an individual at the county or in some states municipal level regarding that voter registration activity."). Representative Wesco, a sponsor of SEA 334, confirmed that the "written information" or "written notice" from another state need not be a signed out-of-state voter registration form or a direct communication with the registrant. He wrote, "When a voter registers in a new state, it is common practice for election officials to send notice of cancellation to the voter's previous state. . . .

*These notices use different formats and contain different levels of detail regarding the voter's registration in the new state.*" VSD Ex. A at 2 (emphasis added). Representative Wesco attached six sample "notices," only two of which contained direct communication with a registrant. *Id.* at 3-8.

IED policy does not require a county to acquire or review a copy of an underlying out-of-state voter registration form to determine that an individual "authorized . . . cancellation." At his deposition, Co-Director King testified that determining "authoriz[ation of] . . . cancellation" does not require actual review of a signed out-of-state voter registration form or direct contact with a registrant:

> Q. Do you, in making that determination that a voter registration application constitutes voter authorization, is it your position that in order to cancel an Indiana registration based on an out of state registration, subsequent out of state registration, are you required to see the actual form?
> A. No.
> Q. Would it be enough that an out of state official represented to you that such a form exists?
> A. Yes.
> Q. So your position is that a county can cancel that voter registration record without seeing the actual form, the actual voter registration form from the out of state registration?
> A. That is correct.
> Q. That's the position of the Indiana Election Division?
> MR. GARN: Objection; form; foundation.
> A. I think I can say that has been the practice of the Indiana Election Division since the enactment of the NVRA . . . .

*NAACP* Dkt. 42-22 at 70:23-71:21.

Describing how Indiana would determine whether a voter flagged by IDEA had "authorized the cancellation of any previous registration by the voter when the voter registered in another state," SEA 334 §§ 5.5(d)(3), Co-Director King testified, "[t]he additional work that might be required under [SEA] 334 would be that in some cases, the Election Division might have to confirm from Illinois whether or not . . . the registration form . . . authorized canceling of his previous registration." H.R. Hr'g. That is, Indiana would not receive information directly from the

registrant, *id.*, or see that registrant's voter registration form, *see id.*; SEA 334 § 5.5(f) ("A copy of the actual voter signature is *not* required to be provided to the county for the voter's status to be canceled if the written notice is forwarded by the election division." (emphasis added)). Rather, IED would ask another state whether a voter registration form had language containing an authorization to cancel previous voter registrations. H.R. Hr'g. The Fiscal Impact Statement also confirms SEA 334 does not substantially change voter list maintenance procedures. *See* TD Ex. 4 at 3 ("*Voter Cancellation*–Similarly, as described under the IDEA section directly above, county voter registration offices would have very similar procedures to conduct voter checks and cancellations under the IDEA program as under the current program. Therefore, this provision is not likely to significantly change the expenditures or workloads of county voter registration offices.").

Facing questions regarding SEA 334's compliance with federal law and effective injunctions, Co-Director King stated that "the most important point to understand is that no final ruling has yet been issued in this litigation" and that "Indiana election legislation has gone on to the US Supreme Court. That's the only place where we will have a final answer, either by a hearing, or by denial of certiorari to this particular litigation, assuming it continues without settlement." H.R. Hr'g. King further stated "I don't want anyone to be under the misimpression that a court has definitively ruled anything with regard to the provisions that are in current law or as amended by 334. Although, certainly the Seventh Circuit has indicated that it has serious issues with them." *Id*. King did not represent that SEA 334 complied with the NVRA or cured Defendants' NVRA violations. *Id.*

6. *Illustrative Data Processing*

a. *Non-Uniformity*

The Co-Directors often receive and respond to counties' inquiries regarding voter list

independently, and without consulting one another.[13] The Co-Directors may also disagree on policies and procedures in response to counties' inquiries. *See, e.g.*, *NAACP* Dkt. 42-21 at 21:7-22:3; *see also NAACP*, 326 F. Supp. 3d at 651-52. County officials typically reach out to the Co-Director sharing their political affiliation, *see NAACP* Dkt. 42-23 at 13:16-22; *NAACP* Dkt. 42-25 at 14:1-8; *NAACP* Dkt. 42-24 at 16:16-25; *NAACP* Dkt. 42-26 at 13:2-4. Where the Co-Directors provide conflicting instructions, they allow counties to use their discretion to implement whichever conflicting instruction they elect. *NAACP* Dkt. 42-21 at 11:14-12:13, 23:17-23; *NAACP* Dkt. 42-24 at 61:4-62:6. The Co-Directors "ultimately relegate responsibility for NVRA compliance to the counties by directing counties to use their best judgment in implementing the instructions the co-directors provide." *NAACP*, 326 F. Supp. 3d at 652.

The Co-Directors inform the counties that their direction is advisory and optional. *NAACP* Dkt. 42-21 at 16:14-19, 19:23-20:24, 153:16-23; *NAACP* Dkt. 42-22 at 32:25-33:9.[14] Counties are not provided any direction as to how they must "determine" whether the individual "identified in the report provided by the NVRA official . . . is the same individual who is a registered voter of the county." Ind. Code § 3-7-38.2-5(d); *NAACP* Dkt. 42-21 at 73:13-21. This "same individual" determination is common to SEA 334 and SEA 442. No written guidance, manual, step by step instruction, or standard operating procedure states that *any* additional inquiry is required or even suggested.[15] And in fact, counties rarely review or request any material outside of the data provided to them by the Election Division. *NAACP* Dkt. 42-23 at 30:7-13; *NAACP* Dkt. 42-25 at 30:20-31:16;

---

[13] *See, e.g.*, *NAACP* Dkt. 42-5; *see also NAACP*, 326 F. Supp. 3d at 652.

[14] *NAACP* Dkt. 42-21 at 16:14-19; *NAACP* Dkt. 42-22 at 32:25-33:9.

[15] *See, e.g.*, *NAACP* Dkt. 42-15 at 34, Indiana Election Division); *NAACP* Dkt. 42-16 at 3, Indiana Election Division); *NAACP* Dkt. 42-20 ; *NAACP* Dkt. 42-17; *NAACP* Dkt. 42-3 at 21; *NAACP* Dkt. 42-4 at 19; *NAACP* Dkt. 42-18 at 12; *see also NAACP* Dkt. 42-28 at 30:12-24, 42:9-43:8; *NAACP* Dkt. 42-21 at 143:3-10, 153:16-23; *NAACP* Dkt. 42-23 at 30:14-21; *NAACP* Dkt. 42-25 at 30:20-31:16.

*NAACP* Dkt. 42-28 at 29:4-30:24.

Without oversight, counties apply state law regarding voter list maintenance non-uniformly. Three clerks independently suggested that they approve matches on the basis of unusual names— without regard to the prevalence of the name in the other county or state.[16]

Defendants' own data confirms that Indiana's 92 counties conduct voter list maintenance non-uniformly. *See NAACP* Dkt. 42-14. For example, 15 counties approved 100% of the Crosscheck matches forwarded to them by the IED. *Id.* Fourteen more counties approved more than 99% of Crosscheck matches. *Id.* On the other hand, some counties approved matches more cautiously. *See id.*[17]

Plaintiffs deposed county officials in seven representative counties whose differing match rates suggested non-uniform application of law. In Elkhart County, officials processed *zero* records the Crosscheck hopper, because it was "[not] useful" and "redundant" of other voter list maintenance and "didn't feel it a good use of our county money" or "an efficient use of [its] time and resources." TD Ex. 5 at 51:13-52:3, 55:21-56:16. In Allen County, the Democratic and Republican sides of the office alternate weeks processing data in hoppers. TD Ex. 6 at 15:11-16:21. The Democratic county official was surprised to hear that her own county had approved 98.7 percent of records in the Crosscheck hopper. *Id.* at 70:13-71:4. In Dearborn County, the Republican County Clerk testified

---

[16] *See NAACP* Dkt. 42-23 at 31:10-32:13 (stating she would not cancel the voter registration of a person who had a name "too common to assume that it is the same person," but would cancel the voter registration "if she had a super odd name"); *NAACP* Dkt. 42-25 at 32:9-13 ("[I]f they have an unusual name . . . but you don't have, maybe, the Social Security number, you might go ahead and accept it if you have the same date of birth and an extremely unusual name."); *NAACP* Dkt. 42-28 at 44:9-45:20 (stating she would match "Nicholette Marcos" but not "John Smith").

[17] For example, Clark County (rejecting 28% of matches); Delaware County (failing to process a single match and leaving 2,062 matches "pending"); Elkhart County (approving 0.2%, rejecting 22%, and leaving 78% pending); Lake County (rejecting 41%); Porter County (approving 48%, rejecting 0.7%, leaving 44% pending, and marking 7% "Research Needed"); St. Joseph County (approving 77%, rejecting 15%, and leaving 8% pending).

she not know whether Indiana was a member of Crosscheck or whether or how it was used for voter list maintenance in Indiana. TD Ex. 7 at 50:17-52:10. The Co-Directors have undertaken no study of how counties make voter list maintenance decisions. *NAACP* Dkt. 42-21 at 127:23-128:1 ("Q. Beyond providing guidance, do you take any steps to understand what the counties are doing to make this [cancellation] determination? A. No.").

      *b.*   *"Date of Registration"*

Crosscheck shows that states use different definitions for the field "date of registration." *NAACP* Dkt. 42-19.[18] Many states, including Indiana when it was a participant, do not supply definitions at all. *NAACP* Dkt. 42-19. Indiana compared the "dates of registration" it received even though data provided by different states "may reflect different points of the process." *NAACP* Dkt. 42-21 at 98:15-101:20. SVRS "filtering is done without regard to what definition of date of registration the other state applies." *NAACP* Dkt. 42-22 at 30:16-25. Indiana does not "distinguish between states that use a similar procedure to what Indiana uses versus states which may have a completely different definition for what date of registration may mean." *Id.* at 28:15-21; *see also id.* at 23:15-24:23.[19]

---

[18] *See also NAACP*, 326 F. Supp. 3d at 657 ("[T]he data definitions are not consistently used or applied by each of the participating states, and thus, some data may be missing or may be used in disparate ways by the different states. This is especially true of the dates of registration."); TD Ex. 8 at 41:8-13; TD Ex. 9 at 96:16-97:3, 121:21-122:10; *NAACP* Dkt. 42-22 at 28:9-14. Some states used the most recent voter-initiated update as a proxy for date of voter registration. *NAACP* Dkt. 42-19. Some states update the field for events like changing political parties, updating names, moving within a county, or leaving and returning; others do not. *Id.*; TD Ex. 8 at 61:11-21; TD Ex. 9 at 121:11-122:5.

[19] A recent state-by-state study also found that "an implausibly large number of registrants . . . (1 in 50) are listed as registering on January 1st." *NAACP* Dkt. 42-12 at Summary of Key Results. Yet, January 1st is "one of the least likely days for a registration application to be processed" because government offices are closed. *Id.* at 20. In Indiana, roughly 1% of voters have January 1 registration dates. *Id.* at 23 fig.8. Five of the six states having more than 5% of voters with January 1 registration dates were Crosscheck participants in 2016.

Counties testified that they would "approve" a "matched" voter registration without examining any information related to when voters had registered to vote in another state. *NAACP* Dkt. 42-23 at 33:12-19; TD Ex. 10 at 76:21-77:4. Counties *assumed* the voter's out-of-state registration was the more recent one. *NAACP* Dkt. 42-25 at 32:18-25 ("Yes. That's what we're told that ours is the oldest."); TD Ex. 10 at 75:15-76:17, 77:17-19, 81:25-82:11. Indeed, the NVRA official did not give the counties the supposed out-of-state "date of registration" provided by Crosscheck. *NAACP* Dkt. 42-23 at 33:12-19; *NAACP* Dkt. 42-22 at 24:6-12; *NAACP* Dkt. 42-28 at 77:1-4.; TD Ex. 6 at 45:14-22; *NAACP* Dkt. 42-24 at 56:19-24; TD Ex. 5 at 79:4-12; *NAACP* Dkt. 42-28 at 76:13-25. Nor are counties told by Defendants that different states use different definitions of "date of registration." TD Ex. 6 at 74:10-75:3; TD Ex. 10 at 100:11-24; TD Ex. 5 at 110:12-16. Counties receive no guidance or training on how to analyze dates of registration, *NAACP* Dkt. 42-21 at 74:1-7; *NAACP* Dkt. 42-23 at 37:6-13.

## B. The Plaintiffs

### 1. *Plaintiffs Are Committed to Registering Voters and Protecting Voters' Rights*

Plaintiffs are three nonprofit organizations focused on increasing civic participation. A large part of Plaintiffs' work involves promoting and facilitating voter participation. In particular, voter registration is a vital part of the Indiana NAACP's and League's missions, and has been since each group's founding. Helping Indiana citizens get on (and stay on) voter registration lists is critical to supporting civic participation, because voters cannot participate in Indiana elections without being registered. Plaintiffs also support laws and policies that allow eligible voters to cast ballots without risk of wrongful disenfranchisement. Plaintiffs hereby incorporate by reference the factual descriptions of their organizations, their missions, and their efforts to counteract the effects of SEA 442. *See NAACP* Dkt. 41, 43, 44; *Common Cause* Dkt. 74, 74-24.

The Indiana NAACP has already expended scarce resources to combat SEA 442 and the

Crosscheck Program. *NAACP* Dkt. 44 ¶ 22. In response to SEA 334, the Indiana NAACP will be forced to expand its voter education and poll monitoring programs to address the law's effects, and these efforts will be even more difficult because of limits to in-person engagement during the COVID-19 pandemic. *See* Supplemental Declaration of Barbara Bolling-Williams ¶ 13. In addition, the Indiana NAACP will have to encourage and assist voters in checking their registration status to ensure they have not been purged incorrectly. *Id.* These efforts come at time when the Indiana NAACP is facing unusually limited resources, given fundraising limitations and new costs arising from the pandemic. *Id.* ¶ 14. Combating the effect of purges under SEA 334 would drain resources that the Indiana NAACP relies on to prepare for Election Day and advocate for other democratic policies. *Id.*; *NAACP* Dkt. 44 ¶¶ 10, 13.

Purging voters immediately without notice and the waiting period, as permitted under SEA 334, would harm the League's ability to boost voter engagement and undermine League efforts to register Indiana voters. Declaration of Linda Hanson ¶¶ 15, 17. Moreover, combating the effects of an illegal voter purge months before the election will consume significant League resources. *Id.* ¶ 22. The League will have to devote resources to ensuring that voters have not been improperly purged. For example, the League would have to devote time and resources toward encouraging voters to check their registration status. *Id.* ¶ 14. Any time that League members spend addressing the risk of a voter purge by educating voters or re-registering purged voters takes away time and resources that could otherwise be spent registering new voters or assisting voters with other purposes. *Id.* ¶ 22.

One county official testified that her office "work[s] with a number of organizations, the League of Women Voters, the NAACP, various community organizations, where we conduct an ongoing training to try to familiarize people, and . . . encourage people to take the responsibility for

checking their voter registration." TD Ex. 6 at 53:11-17, 54:6-56:11. The office "couldn't [get the message out to check one's voter registration] without partnering with various organizations who help us get the word out, because they are dealing with their own populations . . . ." *Id.* at 93:8-12. "It's an ongoing effort." *Id.* Members of the NAACP and the League volunteer as poll workers and attend trainings that teach them how to, among other things, "deal with fail-safe procedures [and] voter registration issues." *Id.* at 78:2-79:5. Counties "recruit people from various organizations to work as our temps." *Id.* at 56:4-8.

Since enactments of SEA 442 and SEA 334, Common Cause Indiana has had to devote significant staff and time and resources to ameliorating the effects of these laws, including conducting activities such as training sessions aimed at educating voters and community activists about the increased risk of erroneous voter registration cancelations. Supplemental Declaration of Julia Vaughn ¶¶ 19-20. In the past, for example, Common Cause Indiana has conducted training sessions for member volunteers to serve as poll monitors, and it anticipates doing so again for the 2020 general election. *Id.* ¶ 21. Topics for these trainings have focused on polling place procedures, voter rights, and what to do when a poll monitors thinks a voter's rights are being violated. *Id.* Common Cause Indiana's staff spends considerable time developing a curriculum and presentation materials for these sessions. *Id.* ¶ 22. Because of SEA 442 and SEA 334, the organization has had to change its curriculum and presentation materials to address the increased risk of voters being erroneously removed from the voter rolls. *Id.* It also has had to adjust its long-term planning for these trainings to take into account an increased need to educate volunteers on voter purge issues created as a result of SEA 334. *Id.* ¶ 21.

Common Cause Indiana will also have to spend a greater portion of the fixed amount of time it has for these sessions discussing SEA 442 and SEA 334's effects, which necessarily diverts from

time that it could spend talking about other issues. *Id.* ¶ 24. Discussing the impact of SEA 442 and SEA 334 on voters also generates questions both during and after the sessions to which Common Cause Indiana has to respond. *Id.* ¶ 23. As Common Cause has only one full-time employee in Indiana, fielding these calls takes away from Common Cause's ability to work on its other priorities in the state. *Id.* ¶¶ 23-24.

In the past, Common Cause Indiana volunteers and voters have also called Common Cause Indiana on Election Day because their names had been erroneously removed from the voter roll. *Id.* ¶ 24. Common Cause Indiana believes that the number of these calls will increase significantly once SEA 334 is implemented. *Id.* In previous elections, the organization has had 50-80 volunteers serving as poll monitors in the field. *Id.* ¶ 25. Because Ms. Vaughn is usually the only person fielding calls from them, she will be less able to address other poll access issues that inevitably come up on what is a very busy day for our organization. *Id.* Common Cause Indiana volunteers at polling sites on Election Day will also have to spend more time assisting the increase in voters who have been erroneously removed from the rolls and will be less able to assist voters with other poll access issues. *Id.* ¶ 26. The time that Common Cause Indiana has expended and will continue to expend addressing the effects of SEA 334 necessarily diverts time that the organization spends on its other advocacy, education, voter assistance, and lobbying efforts, including but not limited to its efforts to expand early voting and implement non-partisan redistricting, as well as its education and assistance related to poll monitoring and volunteering on Election Day. *Id.* ¶ 27.

Voters who have been and are continuing to be registered through the Plaintiffs' voter registration programs are directly vulnerable to the automatic cancellation of their registrations based on Crosscheck and IDEA results that SEA 442 and SEA 334 mandate and thus face imminent likelihood of disenfranchisement.

The District Court has already made factual findings consistent with the foregoing descriptions of the NAACP, the League, and Common Cause Indiana, their missions, and their efforts to counteract the effects of SEA 442, *NAACP*, 326 F. Supp. 3d at 650-51; *Common Cause Ind. v. Lawson*, 327 F. Supp. 3d 1139, 1142-43 (S.D. Ind. 2018), and the Court of Appeals affirmed their standing to challenge SEA 442, *Common Cause*, 937 F.3d at 946 ("We conclude that the plaintiff organizations in each case adequately demonstrated their standing to bring these actions and that the district court did not abuse its discretion by granting preliminary relief."). Plaintiffs actions are ongoing, as SEA 334 is substantially similar to SEA 442. Since the enactment of SEA 334, Plaintiffs have redoubled their efforts.

## ARGUMENT

Plaintiffs bring this claim under 42 U.S.C. § 1983 and Section 11(b) of the NVRA. The NVRA provides a private right of action for "a person who is aggrieved by a violation of this chapter . . . ." 52 U.S.C. § 20510(b)(1). To establish a claim under 42 U.S.C. § 1983, two elements must be satisfied: (1) a deprivation of a right secured by the Constitution or the laws of the United States and (2) the deprivation was caused by a person acting under the color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988).

Defendants have made clear that they intend to cancel voter registrations through procedures and for reasons that this Court and the Court of Appeals have already said the NVRA forbids. Defendants admit to facts showing that SEA 334 operates identically to the enjoined SEA 442 in all material ways. Unrebutted testimony of third parties corroborates those facts. As explained below, Plaintiffs have met their burden for this Court to grant summary judgment in their favor.

23

I.    **LEGAL STANDARDS**

A.    **Summary Judgment**

Summary judgment is called for where no genuine dispute of material fact remains and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Proc. 56(a); *United States v. Adent*, 821 F.3d 911, 914 (7th Cir. 2016). Summary judgment is "not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." *Foxworthy v. Buetow*, 492 F. Supp. 2d 974, 979 (S.D. Ind. 2007); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The movant "bears the initial responsibility of informing the district court of the basis for its motion," *Celotex*, 477 U.S. at 323, and identifying those portions of "the pleadings, the discovery and disclosure materials on file, and any affidavits" that show the absence of a genuine issue of material fact, Fed. R. Civ. Proc. 56(c). Once the moving party meets that burden, "the nonmovant must set forth specific facts demonstrating that a genuine issue of material fact exists for trial, and may not rely upon mere allegations or denials of the pleadings." *Wollin v. Gondert*, 192 F.3d 616, 621 (7th Cir. 1999). In other words, the non-moving party must demonstrate, through specific evidence, that a genuine issue of triable fact remains. *Doe v. Roe No. 1*, 52 F.3d 151, 154 (7th Cir. 1995). The "mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment," and, if "the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Foxworthy*, 492 F. Supp. 2d at 979 (*quoting Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir.1996)).

B.      Law of the Case

The doctrine of law of the case establishes "a presumption that a ruling made at one stage of a lawsuit will be adhered to throughout the suit." *Avitia v. Metro. Club of Chi., Inc.*, 49 F.3d 1219, 1227 (7th Cir. 1995). Where an "original ruling was by a higher court, the lower court [is] required . . . to adhere to the ruling unless the reasons for departure are truly compelling, such as a contrary ruling by a still higher court." *Id*.; *see also Cole Energy Dev. Co. v. Ingersoll-Rand Co.,* 8 F.3d 607, 609 (7th Cir.1993); *Wilder v. Apfel*, 153 F.3d 799, 803 (7th Cir. 1998) (the doctrine "requires the trial court to conform any further proceeding on remand to the principles set forth in the appellate opinion unless there is a compelling reason to depart" (quotation marks omitted)).

Both this Court and the Seventh Circuit have ruled on the meaning of relevant NVRA requirements, which now operate as law of the case. Specifically, the Seventh Circuit affirmed that the NVRA requires that Indiana have "direct contact with the voter" prior to any removal from the voter registration rolls. *See Common Cause*, 937 F.3d at 958 ("Indiana insists that [SEA 442] complies with the NVRA, despite the fact that it omits any direct contact with the voter . . . . The state attempts to trivialize that omission, but a review of the NVRA reveals that it is fatal.").

Although these rulings took place in the posture of a preliminary injunction ruling and affirmance, they were not preliminary factual determinations or applications of the law to the facts—they were rulings on the meaning of the federal statute governing this case. As such, these rulings became law of the case. *See Matter of Oil Spill by Amoco Cadiz Off Coast of France on Mar. 16, 1978*, 954 F.2d 1279, 1291 (7th Cir. 1992) ("The Supreme Court recently said, 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" (citing *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 816 (1988))); *Culp v. Madigan*, 270 F. Supp. 3d 1038, 1054 (C.D. Ill. 2017), *aff'd sub nom. Culp v.*

*Raoul*, 921 F.3d 646 (7th Cir. 2019) (applying law of the case to legal conclusions of the Seventh Circuit's decision on appeal of a denied preliminary injunction); *Sierra Club v. Khanjee Holding (US) Inc.*, 655 F.3d 699, 704 (7th Cir. 2011) ("Matters decided on appeal become the law of a case to be followed on a second appeal, unless there is plain error of law in the original decision.").

## II.    SEA 334 AND DEFENDANTS' IMPLEMENTATION THEREOF VIOLATE THE NVRA BY PERMITTING CANCELLATION OF A VOTER REGISTRATION WITHOUT DIRECT CONTACT WITH A REGISTRANT

### A.    The NVRA Forbids Cancellation Without Direct Contact with a Registrant

In spite of the Seventh Circuit's clear directive that any voter list maintenance program based on change in residence *must* include direct contact with a registrant prior to cancellation of the voter's registration, Defendants have authored an amended law that repeats its predecessors' flaws to a tee and delegated its implementation to themselves.

Section 8 of the NVRA allows Indiana to remove a registrant from the voter rolls only "at the request of the registrant," 52 U.S.C. §§ 20507(a)(3); *or* "by reason of . . . a change in the residence of the registrant," so long as the "registrant . . . confirms in writing that the registrant has changed residence" or "has failed to respond to a notice [and] has not voted or appeared to vote" in consecutive general Federal elections, *id.* §§ 20507(a)(4)(B), (d)(1)(A)-(B); *see also NAACP*, 326 F. Supp. 3d at 650. The Notice-and-Waiting Requirements are set out, in turn, in Section 20507(d)(2) and provide that the voter must be sent a notice via forwardable mail with a pre-addressed and pre-paid card that can be returned to the county, allowing the voter to confirm her address. 52 U.S.C. § 20507(d)(2). Absent confirmation in writing, or a return of the notice card, the state cannot cancel the voter registration unless the registrant also fails to contact the election office or appear to vote in two federal elections. *Id.* § 20507(d)(1). "The statute . . . relies . . . on follow-up with the individual voter." *Common Cause*, 937 F.3d at 959. That way, the Notice-and-Waiting

Requirements provide a registrant with opportunity to correct an incorrect conclusion that the voter has changed residence. This notice and waiting period is essential given the possibilities of error when doing large and systematic list maintenance efforts and the consequences of disenfranchisement from those errors.

The Court of Appeals did not mince words: The NVRA "forbids a state from removing a voter from that state's registration list unless: (1) it hears directly from the voter via a 'request' or a 'confirm[ation] in writing' that the voter is ineligible or does not which to be registered; or (2) the state goes through the statutorily prescribed [Notice-and-Waiting Requirements]. Both of these avenues focus on direct contact with the voter." *Id.* at 959 (first alteration in original); *see also id.* at 959 ("[T]he NVRA prohibit[s] . . . removing voters without either hearing from them directly or going through the notice process."). The "omi[ssion of] direct contact with the voter whose name has been flagged" is "fatal." *Id.* at 958.

"[T]he NVRA's procedures for removal must be followed 'to the letter.'" *Id.* at 962 (quoting *Husted v. A. Philip Randolph Inst.*, 138 S. Ct.1833, 1842 (2018)). In pertinent part, those procedures are twofold.

*First*, with respect to "request[s] of the registrant," the Court of Appeals recognized that the NVRA sets a minimum standard: "when a state does not itself possess a copy of a communication from a suspected Indiana registrant, it does not have a 'request of the registrant' sufficient by itself to permit immediate removal of that voter's name from the rolls." *Id.* at 961. That is, absent *possession* of a sufficient underlying document from the registrant herself, such as a voter registration form, Indiana may not purport to cancel at the "request of the registrant." *Id.* "[T]he state must receive a direct request from 'the registrant' before de-registering that person." *Id.*

*Second*, the NVRA requires that "[a] State shall not remove the name of a registrant . . . unless the registrant . . . confirms in writing that the registrant has changed residence." 52 U.S.C. § 20507(d)(1)(A)." If Indiana has information suggesting a registrant may have left the state, "the NVRA *then* requires that the state either 'confirm' the information with the registrant before removing the person from the rolls or attempt to provide personal notice." *Common Cause*, 937 F.3d at 962. "It stretches the meaning of 'confirm' past its limits to ignore its key feature of corroborating or verifying a prior piece knowledge [sic]." *Id*. Indiana "cannot . . . skip past the requirement that it confirm the move directly with the voter or use the notice procedure prescribed by statute." *Id*.

**B.      SEA 334 and Defendants' Implementation Thereof Permit Cancellation of Voter Registrations Without Direct Contact with a Registrant**

Notwithstanding the Seventh Circuit's affirmance of this Court's injunction, Defendants Lawson and King drafted a bill that once again fails on its face to comply with the NVRA. SEA 334 continues the simple, fatal violations of its predecessors: it illegally permits removal from the rolls without "(1) hear[ing] directly from the voter via a 'request' or a 'confirm[ation] in writing' that the voter is ineligible or does not which to be registered; or (2) . . . go[ing] through the statutorily prescribed [Notice-and-Waiting Requirements]." *Id.* at 959 (second alteration in original). As with SEA 442, SEA 334 "does away with the process of personal contact with the suspected ineligible voter and allows Indiana election officials to remove a person from the rolls . . . *without direct notification of any kind.*" *Id*. [20] It does not follow the NVRA's "critical" requirement "that the *registrant* must inform the state about the change in residence, or the *registrant* must fail to respond

---

[20] *See also NAACP*, 326 F. Supp. 3d at 661 ("[I]nformation is not coming from the voter but rather from Crosscheck . . . ."); *Common Cause*, 937 F.3d at 946 (SEA 442 "allow[ed] Indiana immediately to remove a voter based on information received from a third-party database rather than in response to direct contact with the voter."); *id*. at 961 ("[T]he system [Indiana] chose flouts the NVRA's command that the state rely on the registrant herself.").

to a notice sent by the state inquiring about continued eligibility." *Id.* at 948. Because it "fatal[ly]"

"omits any direct contact with the voter," it violates the NVRA. *Id.* at 958.

1.   *SEA 334 Replaces Crosscheck with IDEA to Identify Voters Who May Have Moved Out-of-State Based on Voting Records.*

Just as SEA 442 used Crosscheck to find potential "matches" indicating an Indiana voter may

have moved to another state, SEA 334 does the same thing, merely replacing Crosscheck with

IDEA. *See* Facts §§ A.4-5. IDEA, like Crosscheck, does this by trying to identify voters who have

purportedly registered to vote in another state. *NAACP* Dkt. 42-2 at 3; H.R. Hr'g (Senator Walker

describing IDEA as "a voter list maintenance list crosscheck database, model[ed] off of existing

products and former systems"). IDEA, like Crosscheck, purports to compare certain voter

registration information provided by participating states with Indiana's own voter records to identify

"matches" between Indiana voter records and out-of-state records where the (i) first name, last name,

and dates of birth match. *See* Facts §§ A.4-5. As under SEA 442, SEA 334 requires the application

of "confidence factors" to these "matches," with the IED forwarding "matches" that meet the 75-

point threshold to relevant counties for processing. *See id.*; S. Hr'g (King: "[A]fter receiving notice

from [IDEA] that an Indiana voter may be registered in another state, the Election Division would

provide the County Voter Registration Office these matching—potentially—records."); *NAACP*

Dkt. 42-2 at 3; *NAACP* Dkt. 42-21 at 66:16-67:1. Finally, IDEA, like Crosscheck, does not involve

direct contact with a registrant, or collect or disseminate the actual voter registration documents

underlying its "matches." SEA 334 §§ 5.5(a)-(b); SEA 334 §§ 5.5(b), (f); *NAACP*, 326 F. Supp. 3d

at 653; *NAACP* Dkt. 42-21 at 96:20-97:9.

For all relevant intents and purposes, Indiana has created another Crosscheck. S. Hr'g

(Nussmeyer stating she was "not in support of the state creating a Kansas Crosscheck program" and

that IDEA's primary effect "is [to] have Indiana become the next Kansas"); *see also* Facts § A.5.

Neither procedure demands that officials first hear "directly" from the voter; if SEA 442 violates the NVRA—as this Court and the Seventh Circuit held—then so does SEA 334.

> 2.    *SEA 334 Permits Cancellation of IDEA Matches without Meeting the NVRA's "Request of the Registrant" or "Confirm[ation] in Writing" Requirements*

SEA 334 maintains SEA 442's requirement that counties "determine" whether the matched data from IDEA indeed reflects the same voter registered in two states. SEA 334 adds one requirement before a county can cancel the registration that did not exist in SEA 442 – that the county "determin[e]" the individual "authorized the cancellation of any previous registration by the voter when the voter registered in another state." SEA 334 § 5.5(d)(3). This standard does not follow the NVRA, which speaks of removal at the "request of the registrant" and "confirm[ation] in writing that the registrant has changed residence." 52 U.S.C. §§ 20507(a)(3)(A), (d)(1)(A). And as Defendants have made clear, a county can determine an "authoriz[ation of] cancellation" without reviewing a signed out-of-state voter registration form or having direct contact with a registrant. *See* SEA 334 § 5.5(d)(3); *NAACP* Dkt. 42-22 at 70:23-71:23; *See* Facts § A.5.

SEA 334 goes a step further and specifically provides for cancellation without any direct communication from a voter:

> If the election division forwards written notice from another state to an Indiana county voter registration official, the county should consider this notice as confirmation that the individual is registered in another jurisdiction and has requested cancellation of the Indiana registration. A copy of the actual voter signature is not required to be provided to the county for the voter's status to be canceled if the written notice is forwarded by the election division.

SEA § 3-7-38.2-5.5(f)(2). That is, the IED can forward the county a "written notice" that the Indiana voter is registered in another state—which is **not** the voter's supposed out-of-state registration—to trigger cancellation of the voter's registration without notice. According to Defendants, "written notice" could be just about anything—"a printout from a county voter registration office," or "a compilation made at the state level that lists" voter registration information, or an "email[] from an

individual at the county or in some states municipal level regarding that voter registration activity." *NAACP* Dkt. 42-22 at 42:1-13; *see also* VSD Ex. A at 2 ("These notices use different formats and contain different levels of detail regarding the voter's registration in the new state," also attaching sample "notices," four of which contained no direct communication with a registrant). In concrete terms, the IED could forward a county registrar an email from an Ohio election official saying that Jane Doe registered to vote there recently, and the county would consider that sufficient to cancel Jane Doe's Indiana voter registration without notice.

This is the same theory of "indirect contact with the voter" that the Seventh Circuit held unlawful. *Common Cause*, 937 F.3d at 959. The process under SEA 334 still "does away with the process of personal contact with the suspected ineligible voter and allows Indiana election officials to remove a person from the rolls . . . *without direct notification of any kind.*" *Id*. [21]

While this Court and the Seventh Circuit concluded that such indirect contact was neither a "confirmation" nor a "request" from the voter, the drafters of SEA 334 wrote their disagreement with these holdings into the law, instructing counties that they should indeed consider these third-party "written notices" as "***confirmation*** that the individual is registered in another jurisdiction ***and has requested*** cancellation of the Indiana registration." SEA § 3-7-38.2-5.5(f)(2) (emphasis added). Obviously, this does not render the practice NVRA-compliant. The Court of Appeals rejected these positions in certain terms:

> Indiana's first argument is that the registration information received from another state counts as a "request" from the registrant to unregister under § 20507(a)(3)(A). The state's second suggestion is that Act 442's procedure is permissible under the NVRA because the new registration is a written confirmation that the registrant has

---

[21] *See also NAACP*, 326 F. Supp. 3d at 661 ("[I]nformation is not coming from the voter but rather from Crosscheck . . . ."); *Common Cause*, 937 F.3d at 946 (SEA 442 "allow[ed] Indiana immediately to remove a voter based on information received from a third-party database rather than in response to direct contact with the voter."); *id.* at 962 ("[T]he system [Indiana] chose flouts the NVRA's command that the state rely on the registrant herself.").

changed residence, and that fact alone is enough to permit Indiana to remove the name under § 20507(d). A closer look at both arguments reveals them to be a stretch, at best.

*Common Cause*, 937 F.3d at 959.

The Court of Appeals then meticulously dismantled both arguments. Cancellation upon written information or notice from a third party (Crosscheck, IDEA, or another state) is neither "at the request *of the registrant*" nor "*the registrant* confirm[ing] in writing that the registrant has changed residence." *See id.* at 960 ("The ordinary meaning of 'remov[al] . . . at the request of the registrant' is that the registrant requests removal." (alteration in original)); *id.* at 961 ("The statute states that '[a] State shall not remove the name of a registrant . . . unless the registrant confirms in writing that the registrant has changed residence.' § 20507(d)(1)(A). To re-state the obvious, Crosscheck is not the resident, nor is it the resident's agent. . . . A plain-meaning reading of the NVRA dictates that the states need to 'confirm' something—in this instance the initial information they received. It stretches the meaning of 'confirm' past its limits to ignore its key feature of corroborating or verifying a prior piece knowledge." (alteration in original)).

"On its face," the NVRA prohibits states from "removing voters without either hearing from them directly or going through [its] notice process." *Id.* at 959. Because SEA 334 still relies on third-party information to identify Indiana voters who may have moved out of state, and still allows counties to cancel those voters' registrations without any direct contact with the voters and without Notice-and-Waiting, it still violates the NVRA just like SEA 442 did.

## C.    The Record Illustrates Why the NVRA Forbids Cancellation Without Direct Contact with a Registrant

The NVRA necessitates direct contact or Notice-and-Waiting Requirements prior to cancellation for good reason. They provide registrants with opportunities to correct an incorrect conclusion on the part of the county that the voter has changed his or her residence based on second-

hand evidence. They are essential given the possibilities of error when doing large and systematic list maintenance efforts and the consequences of disenfranchisement from those errors. The record in this case demonstrates *exactly* why the Notice-and-Waiting Requirements exist.

The record is rife with flawed data and incorrect conclusions. *First*, counties do not apply the law uniformly. *See* Facts § A.6.a. Different counties apply the law differently and Defendants enforce no oversight. *Id. Second*, "date of registration" data does not evince actual dates of voter registration. *See* Facts § A.6.b. It is plainly insufficient to use this vague data to support a conclusion as to whether one voter registration postdates another or whether the data corresponds to registration activity at all. *Id. Third*, counties do not apply the law uniformly. *See* Facts § A.6.a. Indiana's miscues epitomize why the NVRA was enacted:

> We live in a representative democracy, in which the voice of the people is essential to the legitimacy of our governing institutions. Democracy starts with each voter's act of showing up at the polls to express his or her preferences. The integrity of the voting process is critical, and one measure to protect that integrity is the voter-registration process. A name on a voter roll in Indiana is there only because a voter took the trouble to put it there. Laws such as the NVRA ensure that the states do not undo that work without good reason. "[T]he right ... to vote is a fundamental right," 52 U.S.C. § 20501(a)(1). The NVRA is designed to ensure that the competing interest in preventing abuse does not wind up disenfranchising American voters.

*Common Cause*, 937 F.3d at 962.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant summary judgment in their favor and enter a permanent injunction prohibiting Defendants' implementation of SEA 334 §§ 5.5(d)-(f) and prohibiting Defendants from otherwise removing any Indiana registrant from the list of eligible voters because of a change in residence absent: (1) a "request" or "confirm[ation] in writing" directly from the voter that the voter is ineligible or does not wish to be registered; or (2) the National Voter Registration Act-prescribed process of (a) notifying the voter,

(b) giving the voter an opportunity to respond, and (c) then waiting two inactive federal election

cycles.

DATED: July 1, 2020                                    Respectfully submitted,

*/s/ Alexandre J. Tschumi*                             */s/ Matthew R. Jedreski*
Sascha N. Rand                                        Matthew R. Jedreski*
Ellyde R. Thompson                                    Grace Thompson*
Ellison Ward Merkel                                   Kate Kennedy*
Geneva McDaniel                                       DAVIS WRIGHT TREMAINE LLP
Alexandre J. Tschumi                                  1200 Third Avenue, 22nd Floor
QUINN EMANUEL URQUHART &                              Seattle, WA 98101
SULLIVAN, LLP                                         (206) 622-3150
51 Madison Avenue, 22nd Floor
New York, NY 10010                                    Sophia Lin Lakin*
(212) 849-7000                                        Adriel I. Cepeda Derieux*
                                                      Dale Ho*
Myrna Pérez                                           AMERICAN CIVIL LIBERTIES UNION
Eliza Sweren-Becker                                   125 Broad Street, 18th Floor
BRENNAN CENTER FOR JUSTICE                            New York, NY 10004
AT NYU SCHOOL OF LAW                                  (212) 519-7836
120 Broadway, Suite 1750
New York, NY 10271                                    Stuart C. Naifeh *
(646) 292-8310                                        Kathryn C. Sadasivan*
                                                      DEMOS
Trent A. McCain                                       80 Broad Street, 4th Floor
MCCAIN LAW OFFICES, P.C.                              New York, NY 10004
363 S. Lake St., Suite 2                              (212) 485-6055
Gary, IN 46403
(219) 884-0696                                        Chiraag Bains*
                                                      DEMOS
*Counsel for Plaintiffs Indiana State*                740 6th St., NW, 2nd Floor
*Conference of the National Association for the*      Washington, DC 20001
*Advancement of Colored People (NAACP) and*           (202) 864-2746
*League of Women Voters of Indiana*
                                                      Gavin M. Rose, No. 26565-53
                                                      Stevie J. Pactor, No. 35657-49
                                                      ACLU OF INDIANA
                                                      1031 E. Washington Street
                                                      Indianapolis, IN 46202
                                                      (317) 635-4059


**[Signature Block Continued on Next Page]**

William R. Groth, No. 7325-49
FILLENWARTH DENNERLINE GROTH &
TROWE LLP
429 E. Vermont Street, Suite 200
Indianapolis, IN 46202
(317) 353-9363

*Counsel for Plaintiff Common Cause Indiana*

*Admitted Pro hac vice

**CERTIFICATE OF SERVICE**

I, Alexandre J. Tschumi, an attorney, certify that on July 1, 2020, I caused a true and correct copy of the foregoing declaration (and accompanying exhibits) to be served on counsel for Defendants.

/s/ Alexandre J. Tschumi
Alexandre J. Tschumi