# EXHIBIT 5

# In the Matter Of:

*INDIANA STATE CONFERENCE OF NAACP, ET AL.*

*-v-*

*CONNIE LAWSON, ET AL.*

————————————————————————

# Chad Clingerman, 30(b)(6)

*June 18, 2019*

————————————————————————

1                    UNITED STATES DISTRICT COURT

2                    SOUTHERN DISTRICT OF INDIANA

3
INDIANA STATE CONFERENCE OF  )
4  THE NATIONAL ASSOCIATION FOR )
THE ADVANCEMENT OF COLORED   )
5  PEOPLE (NAACP) and LEAGUE OF )
WOMEN VOTERS OF INDIANA,     )
6                               )
            Plaintiffs,        )
7                               )
     -v-                       )  Case Number 1:17-cv-02897
8                               )
CONNIE LAWSON, in her         )
9  official capacity as the     )
Indiana Secretary of State,   )
10 et al.,                       )
                               )
11             Defendants.       )

12

13            The Rule 30(b)(6) deposition of ELKHART COUNTY

14  CLERK'S OFFICE upon oral examination of CHAD CLINGERMAN, a

15  witness produced and sworn before me, Susan J. Snyder,

16  Notary Public in and for the County of Kosciusko, State of

17  Indiana, taken on behalf of the Plaintiffs at the offices of

18  Yoder Ainlay Ulmer & Buckingham, LLP, 130 North Main Street,

19  Goshen, Indiana on Tuesday, June 18, 2019 at 9:33 a.m.,

20  pursuant to the applicable rules.

21

22

23            STEWART RICHARDSON DEPOSITION SERVICES
                 Registered Professional Reporters
24            1251 North Eddy Street, Suite 200
                  South Bend, Indiana 46802
25                    (574) 300-3885

```
 1                           APPEARANCES

 2

 3    FOR THE PLAINTIFFS:

 4         Ms. Eliza Sweren-Becker
           Counsel, Democracy Program
 5         BRENNAN CENTER FOR JUSTICE AT NYU LAW
           120 Broadway, Suite 1750
 6         New York, New York  10271
           (646) 925-8765
 7         eliza.sweren-becker@nyu.edu

 8         Mr. Alexandre J. Tschumi
           QUINN EMANUEL
 9         51 Madison Avenue, 22nd Floor
           New York, New York  10010
10         (212) 849-7507
           alexandretschumi@quinnemanuel.com

11

12    FOR THE DEFENDANTS:

13         Aleksandrina Penkova Pratt
           Deputy Attorney General
14         STATE OF INDIANA OFFICE OF THE ATTORNEY GENERAL
           302 West Washington Street, IGCS 5th Floor
15         Indianapolis, Indiana  46204
           (317) 232-4849
16         aleksandrina.pratt@atg.in.gov

17
      FOR THE DEPONENT:
18
           Mr. Nathaniel M. Jordan
19         Ms. Kathy Taft
           YODER AINLAY ULMER & BUCKINGHAM, LLP
20         130 North Main Street
           Goshen, Indiana  46526
21         (574) 533-1171
           njordan@yaub.com
22         ktaft@yaub.com

23

24

25
```

```
 1                  INDEX OF EXAMINATION

 2                                                      PAGE

 3   DIRECT EXAMINATION                                    5

 4       By Ms. Sweren-Becker

 5   DIRECT EXAMINATION                                   96

 6       By Mr. Tschumi

 7   CROSS-EXAMINATION                                   131

 8       By Ms. Pratt

 9   REDIRECT EXAMINATION                                133

10       By Mr. Tschumi

11

12             INDEX OF PLAINTIFFS' EXHIBITS

13                                                      PAGE

14   Exhibit 1      Notice of Deposition                  6

15   Exhibit 2      Elkhart County mailing, NVRA,         9

16                  IC 3-7-38.2-5

17   Exhibit 3      email string 7/14/16                 29

18                  re:  Interstate Crosscheck

19   Exhibit 4      email string 1/11/16                 33

20                  re:  Interstate Crosscheck

21   Exhibit 5      email string 12/19/17                40

22                  re:  Legislative update

23   Exhibit 6      email string 1/11/16                 47

24                  re:  Interstate crosscheck

25
```

```
 1                INDEX OF PLAINTIFFS' EXHIBITS

 2                        (continued)

 3                                                        PAGE

 4   Exhibit 7       email string 7/14/16                  50

 5                   re:  Interstate Crosscheck hopper

 6   Exhibit 8       Senate Enrolled Act 442               64

 7   Exhibit 9       Indiana SRVS Multi-State Voter List    70

 8                   Maintenance Step-by-Step

 9   Exhibit 10      emails from Bingham County, Idaho      75

10   Exhibit 11      PowerPoint presentation               86

11                   Voter List Maintenance

12   Exhibit 12      email from Tammy Dooley               91

13                   re:  2016 IVRA Conference Follow-up

14   Exhibit 13      Election Division spreadsheet          99

15   Exhibit 14      Baker Tilly email 1/18/17             106

16                   2017 Date of Registration Definition

17   Exhibit 15      2016 Election Day Handbook            115

18   Exhibit 16      Form VRG 4/12 Request to Update       120

19                   Voter Registration

20

21

22

23

24

25
```

```
 1                      CHAD CLINGERMAN,
 2        called as a witness by the Plaintiffs, having been
 3        first duly sworn or affirmed, was examined and
 4        testified as follows:
 5                      DIRECT EXAMINATION
 6   BY MS. SWEREN-BECKER:
 7   Q.   Thank you for joining us, Mr. Clingerman.  My name
 8        is Eliza Sweren-Becker.  I represent the Indiana
 9        State Conference of the NAACP and the League of
10        Women Voters of Indiana; this is my colleague, Alex
11        Tschumi, who also represents the same plaintiffs.
12        Could you state your name for the record.
13   A.   Chad, C-h-a-d, Clingerman, C-l-i-n-g-e-r-m-a-n.
14   Q.   And have you ever been deposed before?
15   A.   No.
16   Q.   Okay.  So we'll walk through some of the rules of
17        the road for depositions.
18   A.   Okay.
19   Q.   Your statements here are under oath, and any
20        statement made here can be used in court as a sworn
21        statement.  In other words, your statements here
22        have the same effect as if you were testifying in
23        court before a judge.  If you need to take a break
24        at any point, please feel free to let us know and we
25        can accommodate that.  Our only request is that if
```

```
 1        list maintenance?
 2   A.   Yes.
 3                     (Plaintiffs' Exhibit 7 marked.)
 4   Q.   I'm going to pass you what will be marked as
 5        Exhibit 7.  Is this an email from Angie Troyer to
 6        you?
 7   A.   Yes, it is.
 8   Q.   Who is Angie Troyer?
 9   A.   She was my previous voter registration outreach
10        coordinator.
11   Q.   So she had the job that Kelsy now has?
12   A.   Yes.
13   Q.   Okay.  And in this email to you, Angie writes
14        "Honestly, I don't trust the State."  Is that
15        correct?
16   A.   Yes, she writes that.
17   Q.   Had Angie ever told you that she doesn't trust the
18        Election Division, the co-directors or the Secretary
19        of State?
20                     MS. PRATT:  Objection, hearsay.
21   A.   Yes.
22   Q.   Do you recall discussing this with her outside the
23        context of this email?
24   A.   Yes, I did.
25   Q.   Can you tell me about those conversations?
```

```
 1   A.   This was us having a plan --
 2                   MS. PRATT:  Same objection.
 3   A.   -- in 2016 to try to increase our absentee turnout.
 4        We want to send a absentee application to all those
 5        who had done so in previous elections, to try to
 6        increase that turnout.  We were trying to figure out
 7        a way to do that that would be cost-efficient.
 8   Q.   And what is your understanding of Ms. Troyer did not
 9        trust the State?
10   A.   Because we were probably working out cross purposes
11        of what we want to do for ourselves compared to what
12        the State was doing for everybody.
13   Q.   What were those cross purposes?  For example, what
14        were your purposes and what was your understanding
15        of the State's purposes?
16   A.   So when they first did this Interstate Crosscheck
17        hopper back in '16, I also knew that a large
18        statewide voter list mailing was coming at the same
19        time.  I felt that this was redundant, that -- why
20        would I want to send these notices through the
21        hopper if these same kind of notices are going to
22        come through the statewide voter list mailing
23        project?  I didn't feel it a good use of our County
24        money to waste that postage for something that's
25        going to happen again and not increase -- not change
```

```
 1          the timeline when someone who has been inactivated
 2          through this process might then have their
 3          registration canceled through the entire process.
 4   Q.     Okay.  We'll circle back around to that in
 5          particular, but are there things that you don't
 6          trust the State to accomplish?
 7   A.     I feel that sometimes they don't -- the State,
 8          including the General Assembly, doesn't understand
 9          how on-the-ground election stuff works.  Sometimes
10          they forget that.  So sometimes they can do things
11          that feel at cross purpose of what we're trying to
12          do.
13   Q.     Are there examples of when that has occurred?
14   A.     Sometimes in -- as you saw before, Wendy Hudson, my
15          former clerk, was on the ledge committee trying to
16          get legislation that would be fairly useful for
17          on-the-ground administration, that legislators don't
18          understand why we're going to do this so it doesn't
19          happen.  Feel like it makes our job more difficult
20          to do.
21   Q.     Are there procedures or legislation that have come
22          down either from the State or from the Legislature
23          that have made your jobs harder to do?
24   A.     Yeah.  We are what's called a vote center county,
25          which means our voters can vote at any location.
```

```
 1          Previous to this primary, we used all -- what is
 2          called "DRE equipment," Direct Record Electronic --
 3          I've probably got the acronym wrong.  But it's known
 4          as DRE equipment, which basically all the
 5          tabulation's done on electronic touch screen.  We
 6          felt that those -- that piece of equipment could
 7          handle what are called provisional ballots by
 8          themselves, however, we were -- no, those cannot be
 9          used for original ballots, you have to have paper
10          copies that -- paper copies for provisional ballots,
11          which cause us to spend a bunch of money every
12          election to print a bunch of these paper copies to
13          have at every vote center.
14   Q.  Going back to basics for a minute.  Can you describe
15          your understanding of what voter list maintenance
16          entails?
17   A.  Yes.  It is a process to help remove people from
18          your voter rolls who no longer live in your
19          jurisdiction, either county or state or whatever.
20          People tend to be bad about notifying old counties
21          when they've moved, so this process will help us get
22          those folks off our rolls who no longer live here.
23   Q.  And in your office, who performs voter list
24          maintenance?
25   A.  If it's directly for the postcards, I do.  If it's
```

```
 1        other list maintenance such as death or
 2        incarceration, Jackie Wolf and Jamie Hall generally
 3        handle that.
 4    Q.  When you undertake voter list maintenance activities
 5        or updates, do you record those somewhere or does
 6        the system record them?
 7    A.  I believe the system records them.
 8                    MS. SWEREN-BECKER:  Would it be helpful
 9            to take a break now?
10                    THE WITNESS:  Yes, it would.
11                    MS. SWEREN-BECKER:  Let's go off the
12            record.
13                    (Recess taken.)
14    BY MS. SWEREN-BECKER:
15    Q.  We were talking a moment ago about voter list
16        maintenance, and I wanted to transition to the
17        statewide mailer process; are you familiar with
18        that?
19    A.  I am familiar with the parts that I see.
20    Q.  Based on your understanding, how does the statewide
21        mailer process work?
22    A.  Every two years, the State contracts with a company;
23        they send out a postcard to the mailing address of
24        every registered voter in the state.  If that
25        postcard comes back to them, they send out a second
```

```
 1          postcard to that same mailing address that has the

 2          inquired questions.  When those come back, they

 3          get -- the image of that postcard gets scanned into

 4          either SVRS, this year I think, or it used to be a

 5          separate program.  That information is also put in

 6          the statewide system in various hoppers.

 7     Q.   And if a person doesn't respond to one of those

 8          postcards, what happens?

 9     A.   If they don't respond to the first postcard, nothing

10          happens.  If they don't respond to the second

11          postcard, after 30 days, it would then make that

12          person's registration called "inactive."

13     Q.   And if that person who hasn't responded to two

14          postcards then fails to vote in two election cycles,

15          what happens?

16     A.   If they fail to vote in two federal general

17          elections, then they can be removed from the rolls.

18     Q.   And do you find this general practice to be an

19          efficient way to conduct voter list maintenance?

20     A.   Yes.

21     Q.   You mentioned this earlier, but by contrast do you

22          find the Crosscheck hopper useful in conducting

23          voter list maintenance?

24     A.   No.

25     Q.   Why is that?
```

1    A.   Because as we said before, it was the same purpose

2         that was going to happen later anyway.  We had the

3         same -- using this postcard method.  I would have

4         sent out the same mailer to them with the three

5         questions on it.  If these folks are truly not in

6         our state anymore, they would have been caught up in

7         the larger statewide postcard mailings.  I felt that

8         I would be wasting my postage doing this for my

9         county when this is going to happen later that year

10        anyway.

11   Q.   So was the Crosscheck hopper necessary to conduct

12        voter list maintenance?

13   A.   For myself, no.

14   Q.   And was it an efficient use of your time and

15        resources?

16   A.   For myself and my office, no.

17   Q.   We've talked a couple of times about hoppers.  What

18        are hoppers?

19   A.   They are, I guess, subsections of the statewide --

20        sorry -- the SVRS.  There are several.  The ones we

21        use on a daily basis are what's called the BMV

22        hopper, which is registrations we get from the BMV;

23        the Online hopper, registrations we get online; the

24        DOH hopper, which is records from the State

25        Department of Health we get concerning people who

```
 1        may have passed away; the DOC hopper, records we get

 2        from the State Department of Corrections concerning

 3        people who may have been incarcerated.  Some of the

 4        hoppers that just let us mass print things or email

 5        section.  Under the one that has -- if you've

 6        generated a report, it might be in this hopper.

 7        There are several subhoppers.  But most of the ones

 8        we'll use I said first, the BMV ones and the DOC,

 9        DOH ones.

10   Q.   And how do you use the hoppers?

11   A.   There's a hyperlink on the home page of SVRS.  Go to

12        that hyperlink, you'll get a list of names, and

13        depending on which hopper it is, a search function

14        that may work one of different ways.  The lists

15        themselves are sortable by certain columns.  The

16        general practice that we usually use is we have a

17        lot of records in these hoppers, so we'll search

18        by -- use the search function to find a particular

19        record, and then there's another hyperlink for the

20        last name, and that hyperlink will do whatever we

21        need to do with that record.

22   Q.   In addition to you, who in your office has access to

23        the hoppers?

24   A.   To the BMV, Online, DOH, and DOC, all four of my

25        staff members have access.  To the voter list
```

```
 1        out-of-state registration, does that give you more
 2        confidence in a match?
 3   A.   It would, yes.
 4   Q.   Because you would be able to compare their
 5        signature, for example?
 6   A.   Yes.
 7   Q.   Do you recall ever receiving inquiries like this one
 8        from somebody out of state, but in fact there was no
 9        match?
10   A.   It's possible.  I don't have them specifically
11        written down.
12   Q.   Sure.  Turning back toward Senate Enrolled Act 442,
13        we were on page 10 and we were just talking about
14        the first requirement which is that the county makes
15        sure that it's the same individual.  If we turn to
16        subpart (d)(2), the law asks the county to
17        "determine whether the individual is registered to
18        vote in another state on a date following the date
19        that the voter registered in Indiana."  Is that
20        correct?
21   A.   Correct.
22   Q.   And Senate Enrolled Act 442 did not change that
23        requirement; is that correct?
24   A.   Correct.
25   Q.   How would you determine, before the enactment of
```

```
 1         Senate Enrolled Act 442, whether a person was
 2         registered out of state at a date following their
 3         registration in Indiana?
 4   A.    Specifically through the Crosscheck hopper or in
 5         general?
 6   Q.    When a match appeared in the Crosscheck hopper, how
 7         would you determine whether the out-of-state
 8         registration post-dated the Indiana registration?
 9   A.    We wouldn't be able to, because that information was
10         not in the hopper.
11   Q.    Okay.  So is it correct that the hopper does not
12         provide you with the registration dates belonging to
13         the particular records?
14   A.    Correct.
15   Q.    So would there be any basis for making a
16         determination that the Indiana record predates the
17         non-Indiana registration?
18   A.    From within the hopper, no.
19   Q.    Would you ever seek information from outside the
20         hopper?  For example, calling up that county in
21         Tennessee?
22   A.    Probably not, because that would not be a good use
23         of our time to do so.
24   Q.    I understand you didn't use the Crosscheck hopper
25         much, but what would you do to determine this
```

```
 1            question of the date of registration, if anything?
 2                      MS. PRATT:  Objection, speculative.
 3    Q.   What did you do on the few occasions where you
 4         reviewed hopper matches, Crosscheck hopper matches?
 5    A.   I didn't because I possibly believed, either rightly
 6         or falsely, that when these records are put in the
 7         Crosscheck hopper, that kind of thing had been taken
 8         care of pre it going to this hopper.
 9    Q.   So your understanding is that either Crosscheck or
10         the Indiana Election Division had previously
11         determined that the out-of-state registration
12         post-dated the Indiana registration?
13    A.   I believe that was on my mind when I looked at these
14         records.
15    Q.   Okay.  Just to confirm again, under the new law, SEA
16         442 doesn't require you to do anything different
17         with respect to, one, determining whether the
18         individual is the same; or two, determining whether
19         the out-of-state registration post-dates the Indiana
20         registration; is that correct?
21    A.   Correct.
22    Q.   And turning to the third prong which is crossed
23         through in the draft we're looking at here.
24         Previously, the county was asked to "determine
25         whether the individual authorized the cancellation
```

```
 1        lead to a match rejection.
 2   Q.   But certainly there would be -- strike that.
 3             But you've offered a very specific example.  You
 4        can't make that same statement generally, correct?
 5   A.   Without knowing how this all went together in the
 6        system, I'm kind of speculating.  So I don't want to
 7        speculate further than that.
 8   Q.   Okay.  And as we discussed earlier, in the first
 9        instance you aren't even provided the registration
10        dates in the Crosscheck hopper, correct?
11   A.   Correct.
12   Q.   Has the Election Division or Secretary of State's
13        Office ever disclosed to you that states submitting
14        data to Crosscheck do not have the same
15        understanding of what "date of registration" means?
16   A.   I don't believe they ever have, no.
17   Q.   And does that create any uncertainty for you
18        personally about the matches that are appearing in
19        the Crosscheck hopper?
20   A.   Now that I know about it, it would.
21   Q.   And returning back to your statement that it might
22        be sufficient if voter registration dates that were
23        supplied to you from another state were far enough
24        apart from the one in SVRS -- am I capturing what
25        you were suggesting?
```