# EXHIBIT 6

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF INDIANA
 3
    INDIANA STATE CONFERENCE     )
 4  OF THE NATIONAL              )
    ASSOCIATION FOR THE          )
 5  ADVANCEMENT OF COLORED       )
    PEOPLE (NAACP) and LEAGUE    )  Case No.
 6  OF WOMEN VOTERS OF           )  1:17-cv-02897-TWP-MPB
    INDIANA,                     )
 7                               )
           Plaintiffs,           )
 8                               )
           -v-                   )
 9                               )
    CONNIE LAWSON, in her        )
10  official capacity as the    )
    Indiana Secretary of         )
11  State; J. BRADLEY KING, in  )
    his official capacity as     )
12  Co-Director of the Indiana   )
    Election Division; ANGELA    )
13  NUSSMEYER, in her official   )
    capacity as Co-Director of   )
14  the Indiana Election         )
    Division,                    )
15                               )
           Defendants.
16
17       30(b)(6) DEPOSITION OF MAYE L. JOHNSON
18       DATE:    May 2, 2019
19       TIME:    1:03 p.m.
20       PLACE:   BECKMAN LAWSON, LLP
21                201 W. Wayne Street
22                Fort Wayne, Indiana 13802
23
24
25  JOB NO. 160166
```

Page 2

```
 1            APPEARANCES
 2  FOR THE PLAINTIFFS:
 3      ALEXANDRE TSCHUMI, ESQ.
 4      QUINN EMANUEL URQUHART & SULLIVAN
 5      51 Madison Avenue
 6      New York, New York 10010
 7      -and-
 8      ELIZA SWEREN-BECKER, ESQ.
 9      BRENNAN CENTER FOR JUSTICE AT
10      NEW YORK UNIVERSITY SCHOOL OF LAW
11      161 Avenue of the Americas
12      New York, New York 10013
13
14
15  FOR THE DEFENDANTS:
16      PARVINDER NIJJAR, ESQ.
17      STATE OF INDIANA OFFICE OF THE ATTORNEY GENERAL
18      302 West Washington Street
19      Indianapolis, Indiana 46204
20      -and-
21      LAURA MASER, ESQ.
22      BEERS MALLERS BACKS & SALIN
23      110 West Berry Street
24      Fort Wayne, Indiana 46802
25
```

Page 3

```
 1             INDEX OF EXAMINATION
                                    PAGE
 2  WITNESS: MAYE L. JOHNSON             5
 3  DIRECT EXAMINATION                   5
    BY MR. TSCHUMI:                      5
 4  BY MS. SWEREN-BECKER                67
 5  CROSS-EXAMINATION                   97
 6  BY MS. NIJJAR                       97
 7  RE-DIRECT EXAMINATION              100
    BY MR. TSCHUMI                     100
 8
 9       INDEX OF PLAINTIFFS' EXHIBITS
10  NUM.        DESCRIPTION         PAGE
11  Exhibit 15   Tammy Dooley, 8/8/2016 e-mail    43
12
13      INDEX OF PREVIOUSLY MARKED EXHIBITS
14  NUM.        DESCRIPTION         PAGE
15  Exhibit 1   Subpoena and Notice      7
16  Exhibit 2   Senate Enrolled Act No. 442     46
17  Exhibit 3   Multi-State Voter List Maintenance
                Step-by-Step, Bates CC019699 through
18              CC019702                 63
19  Exhibit 4   Sordelet to Schust 4/7/2017 e-mail,
                Bates CC019730           65
20
    Exhibit 5   Voter List Maintenance IVRA
21              Conference, May 17th & 18th, 2017,
                Bates CC031967 through
22              Bates CC031998           64
23  Exhibit 6   Voter List Maintenance 2018 Election
                Administrator's Conference,
24              November 30, 2017, Bates CC032395
                through CC032424         65
25
```

Page 4

```
 1      INDEX OF PREVIOUSLY MARKED EXHIBITS
 2  NUM.        DESCRIPTION         PAGE
 3  Exhibit 8    House Enrolled Act No. 1253    66
 4  Exhibit 13   2016 Election Day Handbook     76
 5  Exhibit 14   VRG-4/12                       81
```

Page 5

```
 1  MAYE L. JOHNSON
 2       MAYE L. JOHNSON,
 3  having been first duly sworn, was examined and
 4  testified as follows:
 5       DIRECT EXAMINATION
 6  BY MR. TSCHUMI:
 7  Q.  Thank you, Ms. Johnson, for coming in today and
 8      for being so patient and waiting for us.  My name
 9      is Alex Tschumi.  I'm an attorney for the Indiana
10      State Conference of the NAACP and the League of
11      Women Voters.  And this is Eliza Sweren-Becker,
12      who is representing the same plaintiffs in this
13      case.  This lawsuit is against Connie Lawson,
14      Bradley King, and Angela Nussmeyer, who are being
15      sued in their official capacities as co-directors
16      of the Election Division and Secretary of State.
17          Would you, please, state your name for the
18      record.
19  A.  My name is Maye, middle initial L, for Lee,
20      Johnson.
21  Q.  And have you been deposed before, Ms. Johnson?
22  A.  I have not.
23  Q.  So just by way of introduction, you've been sworn
24      under oath, so your statements are under oath.  So
25      they'll be admissible in this action, and under
```

Page 14

MAYE L. JOHNSON
But for the most part, the chief deputy is responsible for going into the system on a daily basis. She also oversees the training -- has the training of the systems operator. And I oversee both individuals.
Q. And is your position a full-time position?
A. Yes, it is.
Q. And how long have you been a board member?
A. Seven-and-a-half years.
Q. And the entirety of that time, was Mr. Schust a republican board member?
A. Yes.
Q. Would you describe your working relationship with Mr. Schust?
A. I would say we have a good working relationship. We meet, usually, on a weekly basis.
Let me just back up to say, that when I came to voter registration seven-and-a-half years ago, the training that I received was primarily from the chief deputy, who had been with the County in that position for 12 or 13 years and she was preparing to retire. The training that I received in regards to the statewide voter registration system came from this individual.

Page 15

MAYE L. JOHNSON
The day-to-day operating procedures, standard operating procedures, that training, I would say, was about 70 percent from my chief deputy, at the time, and Barry Schust was also very instrumental on helping me get my feet on the ground in the beginning, and just learning the office process and procedures. And what I learned, very quickly, is that we have to work together in order to meet the workload demands.
Q. And how do you divide the workload between the democratic and republican side?
A. We alternate weeks. One week, one side is responsible for the mail, the processing of the mail and the actual mailing out. And the other side of the office is responsible for hopper responsibilities. So we alternate. So we're constantly seeing -- we're constantly doing the same work, is what I'm saying, which gives us a chance to check out each other, as well.
Q. Mr. Schust told us that there are certain voter list maintenance tasks that fall outside of the weekly alternation system. Is that correct?
A. I'm sorry, would you repeat that again?
Q. He told us that you alternate workflows weekly,

Page 16

MAYE L. JOHNSON
but he also said there are certain, more general tasks, that do not fall within the weekly alternate calendar. Is that correct?
A. That's correct. There's an overflow.
Q. And what type of tasks?
A. Well, say, for instance, if we are preparing for an election, if we receive a large amount of updated voter registrations or new voter registrations that we cannot complete in a timely fashion, we share that work; one side will ask for the assistance of the other. The ongoing review of the work sometimes means that we have to get our heads together and determine how we can split the work up, in order to meet our needs, if I'm making sense to you.
Q. You are. And when it comes to voter list maintenance, and, specifically, maintenance in the Crosscheck hopper, is that subject to the same alternate weekly schedule?
A. Yes.
Q. Do you and Mr. Schust consult on all matters?
A. No, we do not.
Q. What types of matters don't you consult on?
A. Well, what we consult on, we're -- for voter list

Page 17

MAYE L. JOHNSON
maintenance projects, we consult on the need for planning, based on what we have to do. If there's a large amount of filing or what have you, I'm inclined to check with Barry, or Barry will check with me, in regards to what kind of workforce we need to bring in to get the work done.
We haven't conferred in a long time about anything related to code or a different interpretation of code, which we did early on, when I arrived, because it was all new to me; and there were times where there might be a particular code that my understanding of it was not quite the same as his. At which time, he would consult with or confer with the republican co-counsel at the Indiana Election Division, and I, in turn, would consult with, at that time, I believe it was Trent Deckard, who was the democratic representative.
Q. And what were some of the items that you and Mr. Schust disagreed upon?
A. You know, I have been trying to remember. I can't remember anything that we disagreed on. It might have been something that I didn't quite understand and I would talk to Barry and I felt I needed further explaining of, and at which time, I would

Page 42

MAYE L. JOHNSON

hundreds of records, we do our best to spot check, but we do not check every record. And it also depends on what that state's system is. It may not be the same as ours.

What I'm saying is, is we make decisions based on what we have, on what we see. The likelihood of us recognizing a transposed number, I'd say, we're pretty good at that. And we do our best.

Q. So we have discussed Crosscheck before, and Crosscheck goes by a number of names, being Crosscheck, the interstate program, the MultiState program, the Kansas program. If I refer to them as Crosscheck, is that all right with you?

A. I believe so, yes.

Q. What is your understanding of what Crosscheck is?

A. Well, Crosscheck is a way for states to track voters and to try to keep a record of people from crossing state lines, who don't cancel their registration in a timely fashion and they vote somewhere else. We're a mobile society, people go, they are crossing, back and forth, state lines. And what we find is, perhaps the last thing people think of when they are getting ready

Page 43

MAYE L. JOHNSON

to move is to change their voter registration.

Q. I'm going to hand you a document to be marked as Exhibit 15.

(EXHIBIT 15, Tammy Dooley, 8/8/2016 e-mail, marked for identification.)

BY MR. TSCHUMI:

Q. This is an e-mail sent by Tammy Dooley on August 8, 2016, to, among others, Amy Scrogham and Beth Dlug. Who are Amy Scrogham and Beth Dlug?

A. Beth Dlug is the director of the election board, or Election Division. And Amy, I believe, is a co-director.

Q. Are you a member of the NVRA?

A. Yes. I renewed my membership. I had to think for minute, but yes, I am.

Q. Do you attend their meetings?

A. For the most part. The last meeting I did not attend, I was ill. But my chief deputy did attend.

Q. Would you mind turning to page -- to header number 4, which is -- the header states: Is the VLM Hopper, slash, Mailing the same as the Interstate Crosscheck Hopper?

A. Where? Oh -- 4. And you're asking me --

Page 44

MAYE L. JOHNSON

Q. And you see where I am at?

A. Yes.

Q. Okay. And do you see the sentence, beginning: The interstate Crosscheck hopper -- and it continues -- "the Interstate Crosscheck Hopper is populated with, "all caps," POSSIBLE matches of voters that are also registered in another participating state that could, "all caps," POSSIBLY have a more recent voter registration than you do."

Would you say that that's an accurate statement?

A. Yes.

Q. Do you have uncertainty as to the accuracy of Crosscheck hopper matches?

A. Rephrase -- would you ask the question again?

Q. Of course. Are you confident in the accuracy of matches in the Crosscheck hopper?

A. Yes and no.

Q. What do you mean, yes and no?

A. If we don't have all of the information, which includes not only the confidence factors, and they have met confidence -- a certain level of confidence factors before they are put in the

Page 45

MAYE L. JOHNSON

hopper. But in final analysis, if we don't have a signature, if the date of their registration is not included, I don't think we can be one hundred percent sure.

Q. And are you certain that records that are placed in the interstate Crosscheck hopper satisfy the requirement that the out-of-state registration is more recently filled out than the in-state registration?

A. Am I certain?

Q. Yeah.

A. No.

Q. Do you have any visibility into that, the registration date of the out-of-state voter registration?

A. No. We have visibility -- we know the date of the registration here, but we don't know -- the registration dates are not necessary -- they are not provided in the hopper. And it's a question. If you're asking me, am I one hundred percent secure, no.

Q. And you also don't have visibility into the out-of-state registration form. Correct?

A. No.

Page 46

MAYE L. JOHNSON

Q. So you can't compare signatures, for example?
A. We cannot.
Q. And you can't see whether or not the out-of-state registration lists a former address in your county, because that's not provided?
A. I'm not sure. I'm not sure.
Q. Well, I'll give you something that may refresh your recollection. What training or official guidance do you receive from the State regarding county implementation of -- or strike that.
   What training or official guidance do you receive from the State regarding the processing of data in the Crosscheck hopper?
A. Well, we received training as part of the statewide mandatory training conference that we attend. There are also webinars. There are notifications sent, from the State. There is also information available, step-by-step, to my recollection, as to how to proceed. If that's the question.
Q. Would you mind looking at the exhibit in front of you, that's been marked Exhibit 2? It's that one. Are you familiar with a Senate Enrolled Act 442?
A. No.

Page 47

MAYE L. JOHNSON

Q. Would you mind --
A. Not right off the top of my head, no, I'm not.
Q. Would you mind turning to page 10 of this document? And page 10 of this document corresponds to the provision of the Indiana Code regarding the interstate Crosscheck program.
   Does it correspond to that?
A. I believe so.
Q. And does this refresh your recollection that Senate Enrolled Act 442 modified that provision?
A. I'm not sure, but I believe so.
Q. Are you, at least, familiar with the code framework for -- that directs county voter registration offices how to process Crosscheck data?
A. Yeah. We have constant review.
Q. And is it your understanding that county voter registration offices are required to determine whether the individual in the Crosscheck hopper is the same individual who is a registered voter -- strike that.
   Is it your understanding that the County Voter Registration Office is required to determine whether the individual identified in the

Page 48

MAYE L. JOHNSON

Crosscheck report is the same individual registered to vote in your county?
A. Yes.
Q. Is it your understanding that there's an additional determination to be made, that the individual identified in the Crosscheck report was registered to vote in another state on a day following the date that voter registered in Indiana?
A. That's the understanding.
Q. And is it your understanding that if those two determinations are satisfied, that, prior to the passage of SEA 442, the County Voter Registration Office would mark "match approved" and generate an interstate mailer?
A. Yes, prior to.
Q. Is it your understanding that SEA 442 modified that law to provide that if those two questions are answered affirmatively, the voter's registration should be outright canceled?
A. Yes.
Q. Do you have an opinion on SEA 442?
       MS. NIJJAR: I'm going to object. This is a 30(b)(6) deposition. I

Page 49

MAYE L. JOHNSON

think her opinion is irrelevant.
       MR. TSCHUMI: I can still ask for her personal opinion. But the objection is noted.
       THE WITNESS: Your question?
BY MR. TSCHUMI:
Q. Do you have an opinion as to the quality of SEA 442 as a piece of legislation?
A. I'm not totally comfortable.
Q. Why aren't you totally comfortable with SEA 442?
A. Well, we are charged to make a decision to cancel a person's voter registration, and, sometimes, I don't feel we have as much information as we need. We can only do our job based on what we see and what is provided, and I have been uncomfortable.
Q. And under the previous statutory -- under the previous code provisions, answering the two operative questions affirmatively would generate a mailer.
A. Yes.
Q. And did that give you comfort, that you wouldn't be incorrect in cancelling a voter registration?
A. A degree of comfort.
Q. Why do you say, "a degree of comfort"?

Page 50

MAYE L. JOHNSON

A. Well, I think that's a big step. It helps to ensure. It gives us added confidence that the person will at least be notified that they have been canceled.
   Does it go far enough? I'm not sure. And I'm not sure what "far enough" is, to be honest.
Q. But at least sending the mailer gives some option by which the recipients can correct a wrongful determination. Correct?
A. That's right. I agree. Yes.
Q. Is it your understanding that the interstate mailer is sent as a means of complying with the National Voter Registration Act?
A. Yes, that's my understanding.
Q. And is it your interpretation that cancelling a voter who appears in the Crosscheck hopper without sending an interstate mailer would violate the National Voter Registration Act?
A. I'm not sure.
Q. But it is your understanding that the notification gives a voter an opportunity to correct, and in addition to that, the ability to vote in the next two general election cycles, is related to federal statutory requirement?

Page 51

MAYE L. JOHNSON

A. Yes. But with the understanding -- this is how I have made peace with my understanding of what we are charged to do. The voter's record is still there. If there is a cancellation, it doesn't mean that the voter is removed from the voter rolls. If that voter shows up to vote and is told that the -- he is -- his or her voter registration has been canceled, all they have to do is show that they're not the same voter or whatever -- whatever the case may be, and we have a means to conduct instant research, to enable that person to still vote. And it's going to take two federal elections that they miss. The record is still there; it's canceled, it is not purged from the rolls, and it can still be corrected. This is how I have been able to sleep better at night.
Q. And do the changes in SEA 442 cause you to sleep worse at night?
A. I sleep very well. Thank you.
   You do your best, based on the information that you have, with the understanding that no one is going to be prevented from voting if they can show that they have lived at this address. And

Page 52

MAYE L. JOHNSON

that is easy enough to do. And that they are a qualified voter. We will work with the voter to enable them to vote. I'm not aware of anyone who has been denied the right to vote because of this system.
Q. Well --
A. We were so concerned, on our side of the office, when we started to work with this Crosscheck system, as well as the statewide voter registration maintenance project that we do, which is necessary to keep the rolls accurate. It's an efficient means of recordkeeping. However, the consolation is, is that those records are not purged, the record is there.
   One of the issues that we have had, and we have addressed as best we can, is to provide information to the voter that even if your record is canceled, by whatever reason, by mistake, the State's mistake -- we make mistakes from time to time -- there is still time to rectify the situation, because the record is still there. It may be inactive. All the voter has to do is show up. It may have been canceled, as people are killed off from time to time. I have talked to

Page 53

MAYE L. JOHNSON

deceased voters, because their record has been canceled by a mistake. And that individual finds out on Election Day, or calls. We conduct it -- and "we," I'm referring to is our side of the office. We have worked with various community organizations and the local news media, to try to inform people what voter list maintenance is. It is not necessarily -- it is not the purging of records.
   We work with a number of organizations, the League of Women Voters, the NAACP, various community organizations, where we conduct an ongoing training to try to familiarize people, and quite frankly, to encourage people to take the responsibility for checking their voter registration.
   I didn't mean to give a speech. I'm sorry.
Q. That was very helpful. You referred to a voter showing up on Election Day --
A. Yes.
Q. -- are you referring to the fail-safe?
A. Oh, yes. Yes. Unfortunately, many of the voters are not that familiar with fail-safe procedures. Yes.

Page 54

MAYE L. JOHNSON

Q. Well, my colleague, Ms. Sweren-Becker will be asking you questions about that, so I'll put that off to the side. But just know that we're going to drill down on it more closely.

You mentioned that you had worked with the -- is it a local chapter or state chapter of the NAACP?

A. The local chapter.

Q. And you also spoke with the League of Women Voters?

A. Yes. We have conducted numerous voter registration trainings around the new state form that requires someone to complete the little box, voter registration box. And just -- and explaining exactly how this process works, and the importance of doing your best, if you are going to do third-party registration, to do it the proper way. Because to bring back incomplete information or what -- that, in its own way, can threaten a person's ability to be able to vote.

Q. And you mentioned doing your best to make sure that people check that they are still on the rolls prior to --

A. Yes.

Page 55

MAYE L. JOHNSON

Q. -- have you done any work with the NAACP or the League of Women Voters related to that?

A. Yes.

Q. What did you do with them?

A. We conducted workshops. We have conducted several workshops. And whenever we are asked, we provide information. Not only on that, but also on fail-safe procedures. Because many of the local members are conducting third-party voter registration, as does the local NAACP, and they utilize young people in doing this. And we do our best to provide training, which is part of the community outreach that our side of the office does. Because many times -- and we also do this with the news media.

Both Barry and I, both, have worked with the news media, to make them understand. Because some of the news stories were, quite frankly, alarming to voters. People thought that their -- voters were being -- their records were being purged, right and left. And we did our best to provide information on what -- on the correct due diligence that they need to perform, to work with us to ensure that the record is intact and it's up

Page 56

MAYE L. JOHNSON

to date.

And we have found many people just don't understand this process. We do our best, on my side of the office, to recruit people from various organizations to work as our temps, because it gives them a better understanding of how this process works. There's nothing like firsthand knowledge of how it works, and that would include the fail-safe procedures. Because many people, we find, simply do not know what they don't know.

Q. And does the use of Crosscheck data place an additional burden on voters to make especially sure, each election cycle, they are still on the rolls?

A. I don't know that that's an additional burden. It's something they should be aware of. When people are crossing state lines, and Americans are a very mobile society; we may go to another state for a few months and move back. But people should understand the importance of keeping their voting records updated.

Q. But there's a chance a voter who has not actually moved, may have been flagged by the Crosscheck system?

Page 57

MAYE L. JOHNSON

A. Yes. Yes, it's possible.

Q. So that voter would have an additional burden that they otherwise would not, to ensure they stay on the rolls?

A. Let's say, that as a voter, it would be a shock to me to arrive at the polls and find out that I had been canceled. And, especially, by mistake. But knowing what I know, I know that it's just a matter of completing a form, a VRG-4/12, or perhaps making a stop by voter registration to correct the record, if you know that. Many people don't.

Q. Would you say that knowledge of the fail-safe, across your county -- strike that.

Would you say that, across your county, voters are knowledgeable of the existence of a fail-safe?

A. No.

Q. Would you mind taking a look at what's been previously marked as Exhibit 3. Do you recognize this as the Crosscheck Step-by-Step provided by the State to county voter registration offices?

A. Yes, I do.

Q. Is this a primary resource you use in conjunction

Page 66

MAYE L. JOHNSON
Q. Have you ever received any directions from the State as to what careful review means?
A. I'm not sure.
Q. Do you know whether Allen County conducts careful review in the same manner that other counties in Indiana conduct careful review?
    MS. NIJJAR: I'm going to object. Outside the scope of the deposition.
BY MR. TSCHUMI:
Q. You may answer.
A. I'm not aware of what other counties do. Are we still on the interstate Crosscheck?
Q. No. I'm done with that. I think, a minute ago, you mentioned a step-by-step that might look at in connection with the processing of Crosscheck data. Was it anything separate and apart from the one we've looked at?
   Not that. I'm sorry. It would be this one (indicating), Exhibit 3.
A. To my knowledge, this was it. I don't remember anything else.
Q. Would you mind looking at the document previously marked Exhibit 8, which would be in the pile to

Page 67

MAYE L. JOHNSON
your right. Are you familiar with House Enrolled Act 1253?
A. Yes, I am.
Q. Is it your understanding that House Enrolled Act 1253 codified the confidence factors that were already used in connection with the Crosscheck hopper?
A. Would you repeat the question?
Q. Is it your understanding that House Enrolled Act 1253 made official the confidence factors that were already used in connection with the Crosscheck hopper?
A. Yes.
Q. So House Senate Enrolled Act 1253 didn't add anything new to what already existed before the bill was passed?
A. I don't believe so.
Q. Thank you. I'm going to hand it over to my colleague to continue.
    MS. SWEREN-BECKER: Would anyone like a brief break?
    (A brief recess was taken.)
    DIRECT EXAMINATION
BY MS. SWEREN-BECKER:

Page 68

MAYE L. JOHNSON
Q. So we've talked a bit today about the guidance that you receive or don't receive as to how to make determinations as you -- as the office processes Crosscheck matches. And my understanding, based on what you have said so far, is you generally don't speak with board members from other counties. Is that accurate?
A. We speak with other board members at the conferences. But no, I don't remember having a conversation with any other board member about this process. No. Except, at the conferences and training sessions.
Q. Do you have any reason to believe that other counties process Crosscheck data differently than Allen County does, based on those conversations?
A. No.
Q. So I'm going to -- or ask you to look at what's marked as Exhibit 10, in the stack to your right. What I believe is marked as Exhibit 10. You will note that it also says "Exhibit 14" on the cover. That's in reference to a filing that was done earlier in the case, but we'll refer to this, going forward, as Exhibit 10. And if you turn the page, you'll see that

Page 69

MAYE L. JOHNSON
this is a spreadsheet produced by the Election Division, in this litigation, that shows the frequency with which each county selected match approved, match rejected, or research needed, as well as the number of pending records.
   Do you see the categories, at the top?
A. Yes. Yes.
Q. There are a lot of numbers on the page. Please, let me know if you need to take more time. But in the second main row is Allen County.
A. Yes.
Q. And do you see there that between 2015 and 2017, Allen County selected match approved 4691 times, match rejected 61 times, and research needed zero times?
A. Yes.
Q. Do those figures sound about right to you?
A. They certainly could be, yes.
Q. And do you have any -- do you know why those 61 matches were rejected?
A. No.
Q. Do you know what would be sufficient information for you or your chief deputy to reject a match?
A. If we believed that it wasn't the same voter.

Page 70

MAYE L. JOHNSON

1
2  Q. Based on the sixth sense that you had mentioned
3     earlier?
4  A. Yes.
5  Q. And do you know why no records were marked
6     research needed, during that same period?
7  A. No, I don't.
8  Q. Does it sound right to you that based on the
9     numbers, you're looking at 98.7 percent of records
10    in the Crosscheck hopper were marked match
11    approved in Allen County during that time period?
12 A. Would you rephrase the question or repeat?
13 Q. So the numbers we're looking at on the sheet are
14    total numbers. But based, generally, on those
15    total numbers, does it sound right -- and you have
16    done the calculation -- that 98.7 percent of the
17    Allen County records in the Crosscheck hopper were
18    marked match approved?
19 A. Does it sound right?
20 Q. Does that reflect the general numbers you're
21    looking at here?
22 A. Yes.
23 Q. Does that sound high to you?
24 A. Yes.
25 Q. Can you elaborate on this?

Page 71

MAYE L. JOHNSON

1
2  A. I'm not comfortable with elaborating on it, since
3     I'm not the one going in and doing this. Am I
4     comfortable? No.
5  Q. And to the extent that you have had any
6     conversations with other officials in other
7     counties, do you think that their numbers would be
8     similarly high?
9  A. I don't know.
10 Q. Since we have the opportunity, with this material
11    in front of us, let's turn down to, for example,
12    Clark County, which is on the second page. And I
13    know you don't have the percentage in front of
14    you, but would you take my word for it that Clark
15    County approved 72.5 percent of matches and
16    rejected 27.5 percent of matches?
17 A. Would I take your word?
18 Q. Based on the numbers and a quick look at the math.
19 A. Yes.
20 Q. And similarly, turning down to, for example,
21    Elkart County, which is on the following page,
22    toward the bottom, would you take my word for it
23    that Elkhart County approved just .2 percent of
24    matches, rejected 22.2 percent of matches, and
25    left the remainder pending?

Page 72

MAYE L. JOHNSON

1
2     Please, take your time.
3  A. And the question is?
4  Q. Is that an accurate summary of the numbers, based
5     on your review?
6  A. I don't know. But it could be, yeah.
7  Q. Looking through the counties we just looked at,
8     including Allen County, and feel free to take a
9     further look at other counties, if you would like,
10    why do you think the approval and rejection varied
11    among counties so much?
12 A. I don't know.
13 Q. Based on the differences that you're observing in
14    the document, do you believe that different
15    counties might be applying different methods of
16    approving or rejecting matches in the Crosscheck
17    hopper?
18 A. That's possible. But I don't know.
19 Q. Of course. Do you think that this variation may
20    be caused by the Election Division's failure to
21    give clear instruction as to when to select match
22    approved, match rejected, or research needed?
23 A. I don't know.
24 Q. Fair enough. Is it your understanding that if a
25    record gets into the Crosscheck hopper, that means

Page 73

MAYE L. JOHNSON

1
2     that there has been a determination that the
3     out-of-state registration occurred after the
4     Indiana registration?
5  A. That's my understanding, yes.
6  Q. And --
7  A. But I'm not sure how they determine that.
8  Q. And with that in mind, I would like you to turn to
9     what I believe is Exhibit 11. Which is in the
10    stack to your right. And if you could flip to the
11    page behind the second blue sheet. You'll see
12    another spreadsheet, hopefully.
13 A. Yes.
14 Q. And this is a Crosscheck-supplied list of the
15    definitions used by states for the term, "date of
16    registration." Is that correct?
17    Does Indiana provide a definition of date of
18    registration?
19 A. Yes. You mean, in the hopper?
20 Q. Well, let's take it step by step.
21 A. Okay.
22 Q. What is the definition, as you understand it, as
23    date of registration for Indiana?
24 A. Date of registration is when the registration is
25    entered into the system.

Page 74

MAYE L. JOHNSON
Q. And is there a reason why the State would not have provided that definition to Crosscheck?
A. I don't know.
Q. Do you notice that other states have similarly not provided a definition?
   If you could answer verbally.
A. Repeat the question.
Q. Do you know notice in the document before you, that other states, in addition to Indiana, did not provide a definition for date of registration?
A. Yes. Yes.
Q. And do you also notice that for the states that did provide a definition, that those definitions differ?
A. Yes.
Q. And has the Election Division or the Secretary of State's office ever disclosed to you that the states submitting data to Crosscheck do not have the same understanding of what date of registration means?
A. I don't know.
Q. Looking at this document and seeing that states do have differing definitions of date of registration, does that create any uncertainty for

Page 75

MAYE L. JOHNSON
you about the matches that ultimately appear in the Crosscheck hopper?
A. Yes.
Q. And why is that?
A. Well, again, the more information you have, the more informed decision you can make. If the information is not there, it makes it difficult to take the right action.
Q. Understood. Let's move on to talk about what happened at the polls on Election Day and to talk more specifically about the fail-safe that you mentioned earlier.
A. Yes.
Q. Now, my understanding is, is that the Board of Registration is not responsible for training poll workers. Is that correct?
A. No, we are not.
Q. Do you have any information about how that training is done?
A. Well, I'm a former poll worker. I think the training, for the most part, is good. Does it go deep enough? And what I mean by that, does it really deal enough with fail-safe procedures? As I remember, and I haven't been a poll worker

Page 76

MAYE L. JOHNSON
in 15 years, at that time, it was not.
   I'm going to answer this question to the best of my ability.
Q. Of course.
A. The average poll worker is 70. And having dealt with 70-year-olds with some of the training that we provide through outreach, they tend to do things the same way -- this is the way I was taught, this is the way the process is.
   Laws change, procedures change, and they're not as informed as many think they are. And I say that because part of what I do away from voter registration, the day-to-day, is we conduct training for poll workers, on the democratic side. And before each election, we find out how much the poll workers have forgotten. And I'm being kind. It's a problem to find people who are young enough to retain the information.
   I think the training that is provided -- I think it's good. Does it go far enough? How much is enough? We need younger poll workers. And that's my answer, based on what I know, what I experience.
Q. If you could refer to what I think is Exhibit 13,

Page 77

MAYE L. JOHNSON
the 2016 Indiana Election Day Handbook. Do you know if this is distributed to poll workers as part of their training?
A. I do not know.
   (Interruption; phone.)
Q. If there is anything you need to attend to, please do.
A. No, there's not. I can't figure out how to turn my phone off.
Q. No problem. So we were referring to the 2016 Election Day Handbook, and I had asked if you knew if this was part of the training for poll workers, if this is distributed to poll workers at any point?
A. I don't know. I'm not familiar with the training.
Q. Okay.
A. Am I allowed to give an opinion, here?
   MS. MASER: There's no question pending.
BY MS. SWEREN-BECKER:
Q. What is your opinion about the handbook?
A. I think it's a good -- I think this is excellent, based on just -- I think it would be helpful, and I think it's also, perhaps, beyond many of the

Page 78

MAYE L. JOHNSON

```
 1    poll workers.
 2  Q. When you say "beyond," what do you mean by that?
 3  A. They are at a point where they have done this work
 4    the same way, because the same people -- and these
 5    are dedicated assistants. They show up, but they
 6    tend to want to do it the same way. How much of
 7    it -- and I'm only basing this on the feedback
 8    that we receive when we go out and conduct
 9    training for half of the poll workers.
10  Q. So you do conduct some training?
11  A. We do training -- now, this is the political part
12    of what I do. This is for the Allen County
13    Democratic Party. When we recruit poll workers,
14    we offer a refresher course for any of the poll
15    workers who work the polls. And we deal with
16    fail-safe procedures, voter registration issues,
17    to encourage them to consult voter registration,
18    to try to limit the number of provisional ballots
19    that we receive for each election. This is aside
20    from voter registration. This is what I do on my
21    own time.
22  Q. Understood. And when you do those trainings, do
23    you ever work with the NAACP or League of Women
24    Voters on those trainings?
```

Page 79

MAYE L. JOHNSON

```
 1  A. No. This is strictly from the party. There are
 2    members of the NAACP and the League who do attend
 3    those trainings, because some of them are poll
 4    workers.
 5  Q. I see. If you could turn to Exhibit 12, which is
 6    in the shrinking stack on your right. And on the
 7    second page of Exhibit 12, you'll see under
 8    Indiana Code 3-7-48-5 subsection (b), which
 9    permits a voter to vote where the voter formerly
10    resided --
11  A. Yes.
12  Q. -- "according to the registration record, if the
13    voter makes an oral or written affirmation to a
14    member of the precinct election board that the
15    voter continues to reside at the address shown as
16    the voter's former residence on the voter's
17    registration record."
18      Is that part of what your understanding --
19  A. Yes.
20  Q. -- of what the fail-safe is?
21  A. Yes, it is.
22  Q. Just for the benefit of our court reporter, try to
23    wait until I finish the question until you answer,
24    because it's hard for her to report that.
```

Page 80

MAYE L. JOHNSON

```
 1  A. I'm sorry.
 2  Q. And if you turn back to the handbook, page 22,
 3    which is Exhibit Number 13, you'll see a
 4    flowchart.
 5  A. Yes.
 6  Q. The flowchart provides direction as to what should
 7    occur during a general election when a voter has
 8    moved within the state of Indiana. In general, do
 9    you find this flowchart easy to understand?
10  A. Yes and no. I can tell you that we review it, in
11    voter registration, before each election. Is it
12    easy to understand and remember? No. We refresh
13    our own memories as best we can. My systems
14    operator is working on this right now, to get
15    ready for next Tuesday.
16  Q. Do you think the poll workers who may receive this
17    information would be able to follow the flowchart?
18  A. Some.
19  Q. And one of the paths suggested by the flowchart
20    ends with "voter fills out a VRG-4/12 form"?
21  A. Uh-huh.
22  Q. I think that's a form you referenced earlier?
23  A. Yes.
24  Q. And that would be in the stack on your right, as
```

Page 81

MAYE L. JOHNSON

```
 1    Exhibit 14?
 2  A. Yes.
 3  Q. Is this the form that a voter would use to make
 4    the attestation that I described --
 5  A. Yes.
 6  Q. -- earlier?
 7  A. I'm sorry for interrupting.
 8  Q. That's okay.
 9  A. Yes.
10  Q. What do you call it?
11  A. We call it the change form.
12  Q. This is the change form?
13  A. Yeah.
14  Q. Okay. Do you think that poll workers know when to
15    use the VRG-4/12 form?
16       MS. NIJJAR: I'm going to object.
17       She's already answered she doesn't
18       know what training they receive.
19  BY MS. SWEREN-BECKER:
20  Q. Okay. You may answer.
21  A. They do receive this training. This form is a
22    part of the packet. That, I am sure of. But it's
23    been my experience after about two o'clock on
24    Election Day, sometimes I think some of the poll
```

Page 90

1  MAYE L. JOHNSON
2      provisional ballot count?
3  A.  No, it does not.
4  Q.  So by virtue by having any sort of challenge at
5      all, including a challenge you don't understand,
6      the provisional ballot would not count?
7  A.  To my knowledge, no.  The only interaction that we
8      have with provisional ballots is the yellow forms
9      that we receive, that are taken from -- it's a
10     copy of the cover of the envelope.  And in
11     some -- we can't even read them,
12     they're -- they're not legible.  We do the best we
13     can with them.
14         But again, we can only conduct research and
15     an investigation based on what we receive.
16 Q.  Once a registration has been canceled, that person
17     ceases to appear on the active voter registration
18     rolls.  Is that correct?
19 A.  That's right.
20 Q.  Does that person remain on inactive rolls?
21 A.  Well, either they're inactive or they are
22     canceled.
23 Q.  So if you're canceled --
24 A.  But we still have the record there, is what I'm
25     saying.

Page 91

1  MAYE L. JOHNSON
2  Q.  So you retain records of canceled registrations?
3  A.  Yes, we do.  The record is there, whether it's
4      canceled, whether the status has been changed to
5      inactive.  And we keep the original registration
6      form.  So every record, every move, every name
7      change, is there -- the paper form.  And it's been
8      scanned into the electronic system, which is why
9      we do our best to get poll workers to call us.
10     And we also do our best to train people to inform
11     people -- and voters still are not as informed as
12     they should be about the avenues to pursue if
13     something happens and you're denied the right to
14     vote on a machine.  So they can't find your name,
15     but it happens we can.  We're not sure why that
16     happens.  It could be a technical glitch, it could
17     be operator -- an operator issue.  But the
18     information is there, whether it's canceled
19     because of being disfranchised, whatever, it's
20     there, along with an explanation as to why this
21     record was canceled.
22 Q.  Would somebody whose registration was canceled
23     receive notices of upcoming elections?
24 A.  No.
25 Q.  And would somebody whose registration was canceled

Page 92

1  MAYE L. JOHNSON
2      receive notices of polling location changes?
3  A.  No.
4  Q.  So if a person's registration was incorrectly
5      canceled, they may not know about upcoming
6      elections or where they could vote, even to use
7      that fail-safe option?
8  A.  It's possible.
9  Q.  How would they know?
10 A.  Well, the election board sends out -- and I
11     can't -- I don't know, exactly.  I know I received
12     a mailer in the past few days from the election
13     board, telling me where my polling place is.  But
14     I'm an active voter.  Someone who is a
15     disenfranchised voter, because of being convicted
16     and confined, who is not out, is not sent a
17     notice.  And those notices, for the more part,
18     even when a person's record is canceled, when we
19     receive notice through the hopper from the
20     Department of Corrections that someone
21     has -- record is canceled because they have been
22     convicted and imprisoned, there's a notice sent
23     out.  But usually the person is in jail, so it
24     comes back, 90 percent of the time.
25         The other instance, if you're deceased, there

Page 93

1  MAYE L. JOHNSON
2      will be no notice sent.  And occasionally,
3      someone's record is changed to deceased, because
4      of similar names or what have you.  Which it is a
5      good idea to check your voter registration record.
6      And we do our best to get that message out to
7      people.
8          And we couldn't do it without the use of the
9      local media and, quite frankly, without partnering
10     with various organizations who help us get the
11     word out, because they are dealing with their own
12     populations and so on.  It's an ongoing effort.
13 Q.  Would somebody whose registration was canceled be
14     able to logon to indianavoters.in.gov to look at
15     his or her voter information?
16 A.  As long as they have a driver's license, they can
17     logon, and they do.  And when they find out they
18     have been canceled or inactive or what have you --
19     but yes, they can.  Anyone can -- if you have a
20     driver's license or voter ID number, you can logon
21     to the State system.
22 Q.  If a voter learned that she was wrongfully removed
23     from the rolls, for whatever reason, how confident
24     are you that the voter would know that they could
25     show up at the polls and vote by fail-safe?

Page 94

1  MAYE L. JOHNSON
2  A. Well, if the voter shows up at the polls and they
3     don't know they have been canceled, it's a rude
4     awakening, they will find out there.
5         Do they know that they can call voter
6     registration to find out why they have been
7     canceled? All I can tell you is we get calls,
8     every Election Day, from people -- usually, it's
9     from people who are out of jail, who have paid
10    their debt to society, and they are not aware they
11    have to re-register to vote. They know they were
12    registered when they went into the system and were
13    convicted. But do they know? No.
14        But we work with probation offices, federal
15    and even local, to inform the people who work with
16    these populations. But it's an ongoing effort.
17    They don't know what they don't know.
18 Q. Are you aware, do you know the number of people
19    who vote after making an attestation using
20    VRG-4/12?
21 A. No, I don't. No.
22 Q. But your recollection is that there's typically a
23    thick stack of people who have filled out this
24    affidavit?
25 A. There's a -- those affidavits are included. When

Page 95

1  MAYE L. JOHNSON
2     we get the -- we get those back, we receive those
3     back, which helps update our files and so on.
4         What happens with the provisional ballot, if
5     I understand your question correctly, those are
6     taken from the cover of the envelope, the
7     information, and sometimes it is not legible.
8  Q. So just taking a step back, and let's separate the
9     VRG-4/12 forms from the provisional ballots. You
10    receive the VRG-4/12 forms after an election?
11 A. Yes, we do.
12 Q. Do there tend to be a lot of them? Can you
13    estimate how many?
14 A. I can't estimate how many, but there's usually a
15    good number of them, which really helps us to
16    update our files. So that part is working, if I'm
17    answering your question.
18 Q. Just to ballpark what a good number is, is that
19    500? A hundred? Fifty?
20 A. More than a hundred.
21 Q. And turning to provisional ballots. I know you're
22    not counting them one by one, but how many
23    provisional ballots do you --
24 A. Over a hundred. And for the presidential
25    election, sometimes in the hundreds. The number

Page 96

1  MAYE L. JOHNSON
2     has gone down with the use of the iPads.
3  Q. Turning now to the lawsuit that has brought us all
4     together. Have you been told anything about the
5     lawsuit by the Election Division or the Secretary
6     of State's office or the State Attorney General's
7     office?
8  A. No. Other than receiving subpoenas, no.
9  Q. Do you know if any of those state officials spoke
10    with your attorney?
11 A. No.
12 Q. Are you aware of a court order, from last year,
13    that halted the implementation of SEA 442?
14 A. (Nods head up and down.)
15 Q. What is your understanding of why the court
16    stopped the state from implementing SEA 442?
17 A. I'm sorry, but I don't recall. I don't.
18 Q. That's okay. Has the lawsuit or the injunction
19    issued by the court been discussed in your office,
20    at all?
21 A. Not to my recollection.
22 Q. Has it been discussed at statewide conferences or
23    the IVRA conference?
24 A. No. I remember seeing something in a newspaper
25    report about a lawsuit, or a news report. I don't

Page 97

1  MAYE L. JOHNSON
2     remember where I saw it, but I did see something.
3  Q. Did you receive any instructions from the Election
4     Division or the Secretary of State in terms of how
5     you should follow the court's halting of the
6     implementation?
7  A. No, I have not.
8  Q. That covers all of my questions. Is there
9     anything we want to follow up on?
10        MR. TSCHUMI: No. Subject to
11    cross-examination.
12        CROSS-EXAMINATION
13 BY MS. NIJJAR:
14 Q. Back on the record. Ms. Johnson, my name is
15    Parvinder NIJJAR, I work at the Indiana Attorney
16    General's Office. I represent the defendants in
17    this case. I have a few questions for you. It
18    shouldn't take very long, maybe five minutes.
19 A. All right.
20 Q. So you were asked to review what's been marked as
21    Exhibit 13.
22 A. Yes.
23 Q. Do you have any role in creating this handbook?
24 A. No.
25 Q. You spoke about the challenges to -- challenges