**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| INDIANA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (NAACP) and LEAGUE OF WOMEN VOTERS OF INDIANA,<br><br>    Plaintiffs,<br><br>    v.<br><br>CONNIE LAWSON, in her official capacity as the Indiana Secretary of State; J. BRADLEY KING, in his official capacity as Co-Director of the Indiana Election Division; ANGELA NUSSMEYER, in her official capacity as Co-Director of the Indiana Election Division,<br><br>    Defendants. | Docket No. 1:17-cv-02897 |

**DECLARATION OF LINDA HANSON**

DECLARATION OF LINDA HANSON

I, Linda Hanson, hereby state, under penalty of perjury, that the following information is true to my knowledge, information, and belief:

Personal Background and Position

1. I am the co-president of the League of Women Voters of Indiana. I have served in that capacity since 2019.

2. I joined the board for the League of Women Voters of Indiana in 2018.

3. In my capacity as co-president of the League of Women Voters of Indiana, I help coordinate the activities of our local leagues on a number of statewide matters. I communicate regularly with local leagues on their voter registration and voter education activities.

4. I am also a member of the Muncie-Delaware County League of Women Voters, for which I serve as the spokesperson.

5. I have been a member of the League of Women Voters for approximately 40 years. My mother was a League member and regularly assisted at the polls on election days. I grew up with the understanding that it was a civic obligation to help citizens register to vote, to educate voters, and to assist them at the polls. Beginning in 2011, after I retired as a Professor of English at Ball State University, I became more actively engaged with my local league in Muncie-Delaware County.

League of Women Voters of Indiana

6. I hereby incorporate by reference the description of the League as provided by my predecessor, Oscar Anderson, Dkt. 43, ¶¶ 5–6.

7. The Indiana League is active throughout the state, with 22 local leagues and approximately 1,600 members.

League Voter Registration Activities

8. I hereby incorporate by reference the description of the League's voter registration activities as provided by Mr. Anderson, Dkt. 43, ¶¶ 8–14.

9. Beyond organized drives, League members take any opportunity to register voters. For example, I recently participated in a march organized by Black Lives Matter, and during the march I provided voter registration forms to unregistered individuals (many of whom will be eligible to vote for the first time this year) and discussed voting and Census participation with fellow demonstrators.

Other League Voter Engagement Activities

10. I hereby incorporate by reference the description of the League's other voter engagement activities as provided by Mr. Anderson, Dkt. 43, ¶¶ 16–20.

Senate Enrolled Act 334

11. It is my understanding that the Indiana Legislature enacted Senate Enrolled Act 334 ("SEA 334) earlier this year, establishing the Indiana Data Enhancement Association ("IDEA") to replace the Interstate Voter Registration Crosscheck program.

12. I also understand that SEA 334 permits the removal of voters from registration lists immediately, without notice, an opportunity for the voter to respond, or a waiting period upon receipt of a written information from another state – even if that written information fails to include the voter's out-of-state registration. Voters who are purged in error will therefore have no warning or opportunity to correct the error.

13. It is my understanding that SEA 334 has not been implemented yet (though the law is already technically in effect). The League has numerous concerns about voters being purged under the new law.

14. If SEA 334 is implemented, the League will have to devote resources to ensuring that voters have not been improperly purged. For example, we will devote time and resources toward encouraging voters to check their registration status.

15. It is my opinion that purging voters immediately without notice and the waiting period would harm voters and interfere significantly with the League's ability to boost voter engagement.

16. Because voters will be removed without prior notice, we will have no way of knowing in advance whether a League member will be removed from the voter rolls, which could happen shortly before the November 2020 elections. If they are removed in this time window, there will be very little time to correct errors. For League members, for whom civic participation and voter registration are core activities, the prospect of being removed from the voter rolls in this manner would be very alarming.

17. Because of the lack of notice that will accompany the removals, we also will have no way of knowing whether voters whom League members have registered will be removed from registration lists between July 1, 2020 and the November election. It would defeat the entire purpose of registering eligible Hoosiers to vote if they were then erroneously deleted from the registration list. Because of the impending date of removal and the lack of notice given to voters or the public, there will be little time to correct mistakes even if they could be discovered.

18. In addition to direct voter removals, SEA 334 will create problems at polling places which will frustrate the League's efforts to ensure smooth and voter-friendly Election Day experiences.

19. I am concerned that a purge under SEA 334 could lead to eligible voters being missing from the poll book when they show up to vote.

20. If voters are missing from the poll book, they may not be allowed to vote ballots that count on Election Day. My understanding is that when a voter is missing from the poll book, the voter may be required to cast a provisional ballot. In my experience, voters who are forced to cast provisional ballots often express frustration and worry that their votes are not actually counted.

21. If voters are purged erroneously and prevented from casting ballots because of problems at the polls, those problems cannot be remedied after Election Day. Even if the League could somehow identify voters they had previously registered who were then purged prior to the 2020 election, and subsequently register them to vote again after November, those voters would still have lost the opportunity to vote in 2020. When citizens are disenfranchised inappropriately and not able to participate, it diminishes the entire process and sullies the results, regardless of whether one agrees with the outcome of the elections.

22. In addition, combating the effects of an illegal voter purge months before the election will consume significant League resources. Any time League members spend addressing the risk of a voter purge by educating voters or re-registering purged voters takes away time and resources that could otherwise be spent registering new voters or assisting voters with other purposes.

23. The League has limited time and money. We have one part-time staff member who has worked approximately 20 hours over the last year. The rest of the League's work is done by volunteers. Our annual funding is typically less than $50,000, per year, primarily from member dues and donations. This budget, along with additional expenditures which League members pay for out of pocket, is almost entirely devoted to voter engagement activities. For

example, we spend a large amount of money on printing and copying voter registration and voter engagement materials.

24. Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 1st day of July, 2020.

*Linda Hanson*
Linda Hanson
Co-President
League of Women Voters of Indiana