UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| INDIANA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (NAACP) and LEAGUE OF WOMEN VOTERS OF INDIANA,<br><br>              Plaintiffs,<br><br>       v.<br><br>CONNIE LAWSON, in her official capacity as the Indiana Secretary of State; J. BRADLEY KING, in his official capacity as Co-Director of the Indiana Election Division; ANGELA NUSSMEYER, in her official capacity as Co-Director of the Indiana Election Division,<br><br>            Defendants. | Docket No. 1:17-cv-02897 |

**PLAINTIFFS' PROPOSED FINDINGS OF FACT, SUMMARIES OF THE RELEVANT FACTS IN DEPOSITIONS, AND CONCLUSIONS OF LAW**

Plaintiffs, by counsel, submit their proposed findings of fact, summaries of the relevant facts in depositions, and conclusions of law, pursuant to Parts VIII.A.4(a) and VIII.A.5 of the Order on Case Management Plan. Dkt 79, to be used in the bench trial for this Action.

**FINDINGS OF FACT**

***Voter List Maintenance in Indiana***[1]

1.     Defendants oversee and administer Indiana's voter list maintenance programs.

---

[1]  Section titles are intended to provide an organizational structure to Plaintiffs' proposed findings of fact. They are not intended to limit the applicability of certain facts to certain issues.

2.      Secretary of State Lawson ("Secretary of State," "Secretary Lawson," or "Secretary of State Lawson") is Indiana's chief election official and performs all election administration ministerial duties.

3.      J. Bradley King ("King" or "Co-Director King") and Angela Nussmeyer ("Nussmeyer" or "Co-Director Nussmeyer"; together with King, the "Co-Directors"; and together with Lawson and King, "Defendants") are Co-Directors of the Indiana Election Division (the "Election Division" or "IED") and jointly preside over it.

4.      Indiana has delegated that responsibility of "NVRA Official," a responsibility derived from the NVRA, to the Co-Directors and overlapping responsibilities to Secretary Lawson, in whose Office the Election Division sits.

5.      Indiana has 92 counties, each of which has either an Election Board or Board of Registration.

6.      The Co-Directors promulgate official policies, guidance, and standard operating procedures instructing county election boards and boards of registration on their duties under state and federal law, and provide training on these policies and procedures.

7.      While the 92 county boards maintain voter registration records within their jurisdictions, list maintenance is governed by policies, procedures, and guidance promulgated by the Co-Directors, and constrained by the IED's "business rules" governing the electronic State Voter Registration System ("SVRS"), a digital dashboard in which Indiana voter list maintenance takes place.

8.      The official guidance from the Co-Directors, as reflected in these protocols, documents, and trainings are mandatory.

9.      County voter registration offices consider guidance from the Co-Directors to be binding and mandatory.

10.     The Co-Directors dictate what information will be provided to county officials and what actions the county officials are able to take within the online portal of the SVRS.

### Indiana's Voter Registration Cancellation Process Prior to SEA 442

11.     From 2015 to 2020, Indiana was a participant state in the Interstate Voter Registration Crosscheck Program ("Crosscheck").

12.     From 2015 to 2020, Indiana used Crosscheck as a method for identifying voters who may have become ineligible to vote in Indiana because of a change in residence.

13.     Crosscheck participating states submit annually their official lists of registered voters to Crosscheck, which uses them to identify apparent duplicate registrations by comparing data using just three fields—first name, last name, and birth date.

14.     Crosscheck does not receive or distribute primary voter registration documents, which might include a voter's signature or prior residence address, with its lists of "matches."

15.     Crosscheck does not include signatures or former addresses among the identifying information provided to participating states.

16.     The IED provided Crosscheck with Indiana's list and upon receiving comparison data back from Crosscheck, IED provided counties with lists of all Indiana voters having an the same first name, last name, and date of birth of the voter registered in the other state.

17.     IED applied to Crosscheck data "confidence factors" assigning points when certain data fields matched.

18.     Prior to the 2018 enactment of House Enrolled Act 1253 ("HEA 1253"), which codified the confidence factors, IED policy required their application.

19.     Records exceeding a point threshold were placed into SVRS "hoppers," which are SVRS data folders for county processing.

20.     Prior to SEA 442's 2017 enactment, Indiana Code required that:

> The county voter registration office shall determine whether the individual:
>
> (1) identified in the report provided by the NVRA official . . . is the same individual who is a registered voter of the county;
> (2) registered to vote in another state on a date following the date that voter registered in Indiana; and
> (3) authorized the cancellation of any previous registration by the voter when the voter registered in another state.

21.      In the SVRS hopper, counties would review the information provided by the IED, and select one of three options: "match approved," "match rejected," or "research needed."

22.     Approvals automatically generated address confirmation notices, reflecting that they were tied to the first two determinations under then-Indiana Code.

23.     If the voter did not respond to the mailer, the voter would be put in inactive status but would not be removed from the rolls unless the voter did not vote over the course of the next two federal general election cycles.

### Indiana's Voter Registration Cancellation Process Under SEA 442

24.     In 2017, the Indiana General Assembly enacted SEA 442.

25.     SEA 442 amended its predecessor law to provide for cancellation of a registration upon making only the first two "determin[ations]," striking the references to determination that an individual "authorized the cancellation of any previous voter registration" and "address confirmation notice."

26.     Under SEA 442, county approval of matches would generate cancellations rather than mailers.

27.     SEA 442 mandated the cancellation of a voter registration, without following the Notice-and-Waiting Requirement for approved matches.

### *Indiana's Voter Registration Cancellation Process Under SEA 334*

28.     On March 21, 2020, Governor Eric Holcomb signed SEA 334, which amended SEA 442, voided the state's memorandum of understanding with the Kansas Secretary of State, and mandated Indiana's withdrawal from Crosscheck.

29.     In Crosscheck's place, SEA 334 established the Indiana Data Enhancement Association ("IDEA").

30.     IDEA is an organization functionally identical to Crosscheck that receives member states' voter lists and returns purported matches.

31.     Co-Director Nussmeyer testified against SEA 334.

32.     Secretary Lawson and Co-Director King were primary drafters of SEA 334 and proponents of IDEA.

33.     The Co-Directors and Secretary of State are responsible for oversight over SEA.

34.     IDEA is administered by Indiana's NVRA official (the Co-Directors).

35.     SEA 334 states that not later than July 1, 2020, "the NVRA official shall adopt an order for the administration of voter list maintenance programs to be performed by IDEA."

36.     If the Co-Directors fail to adopt an order by then, the Secretary of State may step into their shoes.

37.     IDEA seeks to use "matches" between state data to identify voters who have moved to and registered to vote in another state.

38.     IDEA does not collect or disseminate the actual voter registration documents underlying its "matches," and does not involve direct contact with registrants.

39.    SEA 442 and SEA 334 both require counties to make "determinations" prior to cancelling a voter registration.

40.    SEA 334 amended SEA 442 as demonstrated in the following redline comparison:

 (d) The county voter registration office shall determine whether the individual:
        (1) identified in the report provided by the NVRA official under ~~this~~ subsection (c) is the same individual who is a registered voter of the county; ~~and~~
        (2) registered to vote in another state on a date following the date that voter registered in Indiana; and
        (3) authorized the cancellation of any previous registration by the voter when the voter registered in another state.
 (e) If the county voter registration office determines that the voter is described by subsection (d), the county voter registration office shall cancel the voter registration of that voter. If the county voter registration office determines that the voter is described by subsection (d)(1) and (d)(2), but has not authorized the cancellation of any previous registration, the county voter registration office shall send an address confirmation notice to the Indiana address of the voter.

41.    SEA 442's predecessor law, SEA 442, and SEA 334 each contain the identical text:

"The county voter registration office shall determine whether the individual:
        (1) identified in the report provided by the NVRA official . . . is the same individual who is a registered voter of the county; . . .
        (2) registered to vote in another state on a date following the date that voter registered in Indiana . . . ."

42.    SEA 442's predecessor law and SEA 334 both contain the identical text:

"The county voter registration office shall determine whether the individual: . . .
        (3) authorized the cancellation of any previous registration by the voter when the voter registered in another state."

43.    SEA 334 reinstates the third "determination" required under SEA 442's predecessor law.

44.    There is no "determination" in the text of SEA 334 that was not also contained in the text of SEA 442's predecessor.

45.    County voter registration office have and will continue to determine "authoriz[ation of] cancellation" without reviewing signed voter registration forms.

46.     SEA 334 added a provision, not present in SEA 442 or its predecessor, listing types of information that Defendants and counties "may" rely upon in making "determinations," including the determination of whether a voter "authorized the cancellation":

> (f) The county voter registration office may rely on written information provided either directly by a voter registration office in another state or forwarded from the election division from the office in the other state as follows:
>> (1) If this information is provided directly from the other state to the Indiana county voter registration official, the out-of-state voter registration official must provide a copy of the voter's signed voter registration application which indicates the individual authorizes cancellation of the individual's previous registration.
>> (2) If the election division forwards written notice from another state to an Indiana county voter registration official, the county should consider this notice as confirmation that the individual is registered in another jurisdiction and has requested cancellation of the Indiana registration. A copy of the actual voter signature is not required to be provided to the county for the voter's status to be canceled if the written notice is forwarded by the election division.
>
> County voter registration officials shall review the date the individual registered out of state and the date the individual registered in Indiana to confirm which registration is more recent when performing the officials' analysis under this subsection.

47.     It is common practice for election officials to written notices or written information to county voter registration offices or the Election division regarding purported changes of residence by Indiana registrants.

48.     Indiana county voter registration offices and the Election Division receive written notices and written information from other states that do not contain registrants' signatures or evidence direct contact with registrants.

49.     The Election Division does not require that county voter registration offices review an actual signed out-of-state voter registration form or directly contact a registrant to determine that a registrant has authorized cancellation of her Indiana registration.

50.     Defendants have taken the position that they cannot require that county voter registration offices review an actual signed out-of-state voter registration form or directly contact

a registrant to determine that a registrant has authorized cancellation of her Indiana registration because Defendants claim they cannot mandate that county voter registration offices take any required steps to determine that a registrant has authorized cancellation of her Indiana registration.

51.    Defendants will not require that county voter registration review an actual signed out-of-state voter registration form or directly contact a registrant before cancelling her voter registration record either because i) Defendants will permit county voter registration offices to do so or ii) because Defendants claim they cannot require them to do so.

### *Non-Uniformity*

52.    The Co-Directors often receive and respond to counties' inquiries regarding voter list independently, and without consulting one another.

53.    The Co-Directors disagree on policies and procedures in response to counties' inquiries.

54.    County officials typically reach out to the Co-Director sharing their political affiliation.

55.    Where the Co-Directors provide conflicting instructions, they allow counties to use their discretion to implement whichever conflicting instruction they elect.

56.    The Co-Directors relegate responsibility for NVRA compliance to the counties by directing counties to use their best judgment in implementing the instructions the co-directors provide.

57.    The Co-Directors inform the counties that their direction is advisory and optional.

58.    Counties were not provided any direction by Defendants as to how they must make the "determin[ations]" under SEA 442's predecessor and SEA 442.

59.    No written guidance, manual, step by step instruction, or standard operating procedure states that any inquiry was required or even suggested prior to making the "determin[ations]" under SEA 442's predecessor and SEA 442.

60.    Counties will not be provided any direction by Defendants as to how they must make the "determin[ations]" under SEA 334.

61.    No written guidance, manual, step by step instruction, or standard operating procedure states that any inquiry was required or even suggested prior to making the "determin[ations]" under SEA 334.

62.    If Defendants do provide direction to counties, Defendants take the position that such direction is advisory and optional.

63.    Defendants will leave it up to counties to decide how to make the "determin[ations]" under SEA 334.

64.    Defendants have undertaken no study of how counties make voter list maintenance decisions.

65.    Counties rarely review or request any material outside of the data provided to them by the Election Division.

66.    Counties approve a "matched" voter registration without examining any information related to when voters had registered to vote in another state.

67.    Counties apply law regarding voter list maintenance non-uniformly.

68.    Counties conduct voter list maintenance non-uniformly.

69.    Counties' non-uniform application of law and non-uniform voter list maintenance is caused by Defendants' acts or omissions.

70. Counties made "determin[ations]" non-uniformly under SEA 442's predecessor law.

71. Counties approve matches on the base of criteria like unusual names—without regard to the prevalence of the name in the other county or state.

72. Some counties approved 100% of matches forwarded to them by the IED under SEA 442's predecessor law. These approvals required the counties to make the same "determin[ations]" as SEA 334.

73. Some counties approved more than 99% of matches forwarded to them by the IED under SEA 442's predecessor law. These approvals required the counties to make the same "determin[ations]" as SEA 334.

74. Some counties approved substantially fewer than all matches forwarded to them by the IED under SEA 442's predecessor law. These approvals required the counties to make the same "determin[ations]" as SEA 334.

75. At least one county approved no matches forwarded to them by the IED under SEA 442's predecessor law.

76. Absent vigorous oversight by Defendants, Counties will make "determin[ations] non-uniformly under SEA 334.

77. Defendants have abdicated their responsibilities to conduct such oversight.

### *"Date of Registration"*

78. Different states use different definitions for "date[s] of registration."

79. Indiana compares the "dates of registration" it received even though data provided by different states may reflect different definitions.

80.     Indiana does not distinguish between states that use a similar procedure to what Indiana uses versus states which may have a completely different definition for what date of registration may mean.

81.     Counties assume a voter's out-of-state registration is the more recent one if a record is provided to them by the IED.

82.     Counties are not told by Defendants that different states use different definitions of "date of registration."

83.     Counties receive no guidance or training on how to analyze dates of registration.

### *Plaintiffs*

84.     The NAACP and the League ("Plaintiffs") are nonprofit organizations focused on increasing civic participation. A large part of Plaintiffs' work involves promoting and facilitating voter participation.

85.     In particular, voter registration is a vital part of Plaintiffs' missions, and has been since each group's founding.

86.     Helping Indiana citizens get on (and stay on) voter registration lists is critical to supporting civic participation, because voters cannot participate in Indiana elections without being registered.

87.     Plaintiffs also support laws and policies that allow eligible voters to cast ballots without risk of wrongful disenfranchisement.

88.     The Indiana NAACP has already expended scarce resources to combat SEA 442 and the Crosscheck Program.

89.     In response to SEA 334, the Indiana NAACP will be forced to expand its voter education and poll monitoring programs to address the law's effects, and these efforts will be even more difficult because of limits to in-person engagement during the COVID-19 pandemic.

90.     In addition, the Indiana NAACP will have to encourage and assist voters in checking their registration status to ensure they have not been purged incorrectly.

91.     These efforts come at time when the Indiana NAACP is facing unusually limited resources, given fundraising limitations and new costs arising from the pandemic.

92.     Combating the effect of purges under SEA 334 would drain resources that the Indiana NAACP relies on to prepare for Election Day and advocate for other democratic policies.

93.     Purging voters immediately without notice and the waiting period, as permitted under SEA 334, would harm the League's ability to boost voter engagement and undermine League efforts to register Indiana voters.

94.     Combating the effects of an illegal voter purge months before the election will consume significant League resources.

95.     The League will have to devote resources to ensuring that voters have not been improperly purged. For example, the League would have to devote time and resources toward encouraging voters to check their registration status. *Id.* ¶ 14.

96.     Any time that League members spend addressing the risk of a voter purge by educating voters or re-registering purged voters takes away time and resources that could otherwise be spent registering new voters or assisting voters with other purposes. *Id.* ¶ 22.

97.     County officials work with Plaintiffs to conduct trainings to try to familiarize people, and encourage people to checking their voter registration.

98.     Voters who have been and are continuing to be registered through the Plaintiffs' voter registration programs are directly vulnerable to the automatic cancellation of their registrations based on Crosscheck and IDEA results that SEA 442 and SEA 334 mandate and thus face imminent likelihood of disenfranchisement.

## SUMMARIES OF RELEVANT FACTS IN DEPOSITIONS

**Deposition of Bethany Sheller, dated February 28, 2018[2]**

Sheller is a Voter Registration Deputy of the Hamilton County Registration Board. Tr. 7:7-10. Her colleague Pat Toschlog is a Democrat. *Id.* 10:3-8. Duties are split between them. *Id.* Sheller only interacts with Co-Director King, rather than Co-Director Nussmeyer, because King is a Republican. *Id.* 13:16-22. When she needs clarification regarding the law, she calls Co-Director King or his assistant Dale Simmons. *Id.* 14:10-20. She attends conferences at which Co-Directors King and Nussmeyer present, including regarding updates to laws or things they believe the counties are not doing correctly. *Id.* 16:9-17:1. The Co-Directors' guidance is "mandatory." *Id.* 17:7-17. "If they tell us that a statute or a law has changed, then we will change the way we do something in the office." *Id.* However, "[e]very once in a while they'll say this is up to your county for interpretation . . . . And they will tell us if they disagree on something as well . . . ." *Id.*; *see also id.* 18:5-9. When the Co-Directors disagree, the counties make the decision. *Id.* 17:25-18:4. The Hamilton County Registration Board does not have any written policies except for what the Election Division gives it. *Id.* 19:4-11. The Election Division supplies a voter registration guidebook and the information in it is "mandatory." *Id.* 20:11-13. The Election Division supplies standard operating procedures and step-by-steps and they are "mandatory." *Id.* 20:16-21:5.

The Co-Directors don't "tell [them] how to do it, they had just told [them] that it's up to us to determine whether it's a match or not." *Id.* 30:14-21.  With regards to the first two "determin[ations] contained in SEA 442's predecessor law, the Election Division gave no instruction regarding how to analyze the questions. *Id.* 36:3-7. When determining whether to verify a match, she considers "whether [the] name is too common to assume that that is the same person," but "if she had a super odd name, you know, like if it was a really odd name and only the date of birth matched, I would match them." *Id.* 31:10-32:9. When a record was placed in the Crosscheck "hopper" she would assume that the Indiana registration predates the out-of-state registration. *Id.* 33:15-19. She does no analysis on the date of registration of individuals. *Id.* 36:19-37:5. They've received no training on that. *Id.* 37:10-13.

When the Election Division sends the county a notice from another state "that people have registered in the other states," then "we do cancel." *Id.* 22:17-23:14. The county receives "written reports" and "written reports" from the Election Division "and so we cancel them" without sending a mailer. *Id.* 38:9-39:8. She cancels them "because the Indiana Election Division has sent them to us[, a]nd I have addressed that before with Indiana Election Division, and they said if we receive a report from them, . . . then it is a good report and you have to cancel people." *Id.* 39:9-16.

---

[2]   Dkt. 42-23.

**Deposition of Pat Toschlog, dated February 28, 2018[3]**

Toschlog is a Voter Registration Deputy of the Hamilton County Registration Board. Tr. 6:9-19.

Each year, the Co-Directors have a conference and "provide us with updates on the laws for the following years and point out things that people need to be looking for. And they . . . tend to do reviews at that time of things that we need to do. *Id*. 13:4-13. Co-Director Nussmeyer is her contact at the IED and she never contacts Mr. King. *Id.* 14:1-13. She has gone to Nussmeyer and Sheller has gone to King and they have received conflicting directions because "they don't necessarily agree on things." *Id.* 15:2-10.

She does not know whether the direction provided in emails from the Co-Directors is mandatory, but she interprets it to be mandatory. *Id.* 16:15-19. She also looks to the voter registration guidebook, written by the IED. *Id.* 16:25-17:13. She considers that to be "help" but "since it's about the only thing we do have, we pretty much go by it." *Id.* She consider's IED's standard operating procedures to be mandatory. *Id.* 18:2-7.

When a record was placed in the Crosscheck "hopper" she would assume that the Indiana registration predates the out-of-state registration. *Id.* 32:18-25.

When SEA 442 was passed, she did not believe she was going to change how she performed her analysis under the new law because the determinations were "the same." *Id.* 37:20-38:2.

**30(b)(6) Deposition of Hendricks County Voter Registration Clerk (Tammy Dooley), dated March 6, 2018[4]**

Dooley is the Hendricks County Voter Registration Clerk. Tr. 5:18-19.

When she has questions about voter registration she contacts the Election Division. *Id.* 8:10-15. When she calls to ask for guidance or advice, the Co-Directors interpret the Indiana Code and it is up to her to determine "what the interpretation means to us and applies to our situation." *Id.* 9:21-10:5. She is not comfortable interpreting law. *Id.* 52:12-16.

When evaluating a match, she considers a unique name to be valuable. *Id.* 44:9-12. She does not ask or consider whether the name is atypical in the other jurisdiction. *Id.* 45:11-20.

---

[3]    Dkt. 42-25.

[4]    Dkt. 42.28.

**Deposition of Cindy Mowery, dated February 27, 2018**[5]

Mowery is the Republican Co-Director of the Marion County Board of Registration. Tr. 7:16-8:1. Summarizing the dynamics, she testified, "both of us know . . . what party we belong to, and there are things that you have to do that, you know, is business." *Id.* 12:14-16. She typically contacts Dale Simmons, the Republican chief deputy, with questions, and her democratic counterpart contacts Angela Nussmeyer. *Id.* 16:16-25. She believes that the Co-Directors are in charge of the state's NVRA compliance. *Id.* 25:3-6.

The Election Division offers guidance and legal opinions. *Id.* 14:24-15:7. The guidance "isn't binding, but the election code is." *Id.* 15:15-16:8. "[W]hen we call and talk with them, they will cite and Indiana election code" and the county will make a decision based on its own interpretation of the code.. *Id.* "[W]e determine how we react to what the code says." *Id.* She considers the voter registration guidebook to be "guidance" and compliance is mandatory because it is based on the Code. *Id.* 21:4-21. The Election Division's step-by-steps are mandatory because they are based on the Code, including the one regarding Crosscheck. *Id.* 21:25-22:9., 45:17-46:12.

**Deposition of LaDonna Freeman, dated February 27, 2018**[6]

Freeman is the Democrat Co-Director of the Marion County Board of Registration. Tr. 6:23-7:3. She and Ms. Mowery, the Republican Co-Director, have had disagreements on the correct application of law. *Id.* 12:8-11. They contact someone at the Election Division to resolve them. *Id.* 12:12-13:1.

She receives training from the Co-Directors, who send emails, set up standard operating procedures, give webinar trainings, and hold conferences. *Id.* 15:6-10. The guidance in the standard operating procedures is mandatory. *Id.* 15:14-18. Information in the voter registration guidebook is mandatory. *Id.* 16:12-14. Information in the step-by-steps is mandatory. *Id.* 16:21-25.

The Election Division Co-Directors are in charge of Indiana's compliance with the NVRA. *Id.* 18:11-22. She has never received training from the Co-Directors specifically on NVRA compliance. *Id.* 18:23-19:1.

---

[5]  Dkt. 42.24.

[6]  Dkt. 42.26.

**30(b)(6) Deposition of Elkhart County Clerk's Office  (Chad Clingerman), dated June 18, 2019**

Clingerman is the Office Manager for Voter Registration at the Elkhart County Clerk's Office. Tr. 11:10-25. If he has a question about voter list maintenance procedures, he skips the County board members and goes straight to the Election Division. *Id.* 18:17-21. He asks them for clarifications of how things should be done. *Id.* 18:22-25. He and his co-workers interpret guidance from the Election Division differently "all the time." *Id.* 20:19-21:12. Frequently, the Election Division tells them, it is "up to your county how to interpret the statute, which is not helpful for us." *Id.* Sometimes the guidance is confusing. *Id.* 23:23-24. Where there are disagreements in the Election Division, the counties must interpret law themselves. *Id.* When the Election Division issues guidance to counties, they are required to follow the guidance. *Id.* 22:18-22.  He receives training and guidance from the Election Division at registration conferences, where they cover topics like new legislation. *Id.* 23:20-24:6. The Election Division gives advice on new state laws at the conferences but they do not follow up on whether guidance is followed. *Id.* 26:21-27:5. Where he has questions about implementation of a new law, he will ask the Election Division or county attorney. *Id.* 26:11-16. The Election Division refers him to the code and he interprets it "as a lay person, doing the best I can." *Id.* 31:9-19. The Election Division "made it clear several times that they don't interpret the law, they just kind of do the same thing I do." *Id.* 32:14-18.

He finds the Crosscheck hopper was not useful in conducting voter list maintenance. *Id.* 55:21-24. It was not necessary or efficient. *Id.* 56:11-16. He never processed matches. "My office and myself never took any action on any of the names in that hopper." *Id.* 65:23-66:1.

The county frequently gets "notices" from other states, which are usually passed from the Election Division. *Id.* 41:22-42:10. "[W]e'll get a packet of stuff. Various states send different things to us, and the information on those things varies greatly. Some send a name and an address where they registered in Indiana, plus maybe the last four of a social or some other information. And some states send a copy of their registration from the other states." *Id.* To cancel a registration, "it would be nice" to see a signature on an out-of-state registration, "but it wouldn't necessarily have to be there." *Id.* 42:21-24. "It would be nice" to see a copy of a new out-of-state registration, but not necessary.  *Id.* 42:25-43:4.

Before cancelling a registration, he wants to see a signature "because I want to make sure it's the actual person agreeing to cancel their registration, not someone else." *Id.* 39:15-18.

He does not believe the "fail safe" procedures are known by the public in general. *Id.* 123:9-15.

He sees the Co-Directors as being the individuals in charge of NVRA compliance for Indiana. *Id.* 23:17-19.  If SVRS used protocols that were not compliant with federal law, he would not know. *Id.* 46:18-47:2.

Employees of Elkhart County Clerk's Office have told him that they do not trust the Co-Directors or the Secretary of State. *Id.* 50:17-21.

**30(b)(6) Deposition of Elkhart County Clerk's Office  (Christopher Anderson), dated June 18, 2019**

Anderson is Elkhart County Clerk of the Court. Tr. 8:21-22. He knows of another "Christopher Anderson" in Indiana with the same last four digits of his social security number. *Id.* 38:11-19.

**30(b)(6) Deposition of Allen County Board of Voter Registration  (Maye Johnson), dated May 2, 2019**

Johns on is the Democratic board member of the Allen County Board of Voter Registration. Tr. 9:13-15. The Democratic and Republican sides of the office alternate workloads on a weekly basis. *Id.* 15:11-20. Her Republican counterpart would consult with the Republican co-counsel at the IED and she would consult with the Democratic Co-Director. *Id.* 17:8-18. She has never consulted with Brad King "on any issue." *Id.* 20:5-10. This is based on party affiliation. *Id.* 20:11-13. It is her understanding that county officials across the state communicate only with the Co-Director of their respective parties. *Id.* 20:14-18.

One role of the IED is to provide clarification as it relates to code. *Id.* 21:17-24. They are responsible for training. *Id.* 22:25-23:3. "They will give you their interpretation" of Indiana Code, but "[a]s with much of law, it's interpretation." *Id.* 23:19-21. After her coworker "would talk to Bradley King, after I would talk to whomever the . . . democratic representative, in many instances, we were left to kind of find our way." *Id.* She believes the Co-Directors are giving "leeway" and that they should "take into consideration their interpretation of that code, but really it's up to you, the final decision, because it's your responsibility." *Id.* 25:12-21.

She considers the standard operating procedures and step-by-steps to be mandatory. *Id.* 27:22-28:3. She makes an assumption that they are prepared in compliance with the Indiana Code and NVRA. *Id.* 28:4-11. The protocols and functionalities of SVRS are controlled at the state level. *Id.* 38:20-39:7. She relies on the state to design them in compliance with state and federal law. *Id.* In the absence of a signature from another state, she does not know that two people are the same people. *Id.* 35:19-22.

Her office works with a number of organizations, including the League and NAACP to conduct ongoing training and encourage people to take responsibility for checking their voter registration to figure out if there has been a mistaken cancellation. *Id.* 51:22-53:17. They have conducted numerous voter registration trainings with the League and NAACP. *Id.* 54:6-55:4. She conducted workshops with them. *Id.* 55:5-56:11.

She testified that many people do not know about the failsafe. *Id.* 55:5-56:11, 57:14-19.

She believes the Co-Directors' designation as NVRA Official means they're experts on laws pertaining to the NVRA and that they are responsible for Indiana's NVRA compliance.. *Id.* 25:25-26:15. She is not aware of anything they do to ensure Indiana's NVRA compliance. *Id.*

**Deposition of Angela Nussmeyer, dated February 2, 2018[7]**

Plaintiffs do not intend to offer Co-Director Nussmeyer's deposition, per se, but intend to use it for impeachment, because she will be  testifying live. Plaintiffs reserve the right to put forward a summary of relevant facts in Co-Director Nussmeyer's deposition if, for any reason, she is unable to testify.

**Deposition of J. Bradley King, dated February 2, 2018[8]**

Plaintiffs do not intend to offer Co-Director King's deposition, per se, but intend to use it for impeachment, because he will be  testifying live. Plaintiffs reserve the right to put forward a summary of relevant facts in Co-Director King's deposition if, for any reason, he is unable to testify.

---

[7]  Dkt. 42.21.

[8]  Dkt. 42.22.

## CONCLUSIONS OF LAW

### *Defendants Are Responsible for Indiana and Its Counties' Compliance with the NVRA*

1.    Defendants are responsible for Indiana's compliance with the NVRA, which includes their and the county voter registration offices' compliance. *See Az. Democratic Party v. Reagan*, No. CV-16-03618, 2016 WL 6523427, at *6 (D. Az. Nov. 3, 2016) (rejecting the Secretary of State's contention that she "d[id] not have authority under Arizona law to declare who is, and who is not, a registered voter" because state law "delegate[d] to the Counties, not the State th[at] responsibility"). As the Arizona District Court correctly concluded in Reagan, the NVRA imposes an "authority" and "duty" on the NVRA Official "to ensure that voter registration regulations are administered in a fair and uniform manner," which "extend[ed] to the Secretary's oversight of voter registration as carried out by the counties." *Id.*

2.    Defendants may not abdicate or delegate this responsibility. *See United States v. Mo.*, 535 F.3d 844, 850 (8th Cir. 2008) ("Under the NVRA's plain language, [a State] may not delegate the responsibility to conduct a general program to a local official and thereby avoid responsibility if such program is not reasonably conducted."); *accord Harkless v. Brunner*, 545 F.3d 445, 452 (6th Cir. 2008) (concluding that Ohio's chief election official, was responsible for "implementation and enforcement" of the NVRA).

### *The NVRA Forbids Cancellation Without Direct Contact with a Registrant*

3.    Absent confirmation in writing, or a return of the notice card, Indiana cannot cancel the voter registration unless the registrant also fails to contact the election office or appear to vote in two federal elections. 52 U.S.C. § 20507(d)(1). "The statute . . . relies . . . on follow-up with the individual voter." *Common Cause Ind. v. Lawson*, 937 F.3d 944, 959 (7th Cir. 2019).

4.      The NVRA "forbids a state from removing a voter from that state's registration list unless: (1) it hears directly from the voter via a 'request' or a 'confirm[ation] in writing' that the voter is ineligible or does not which to be registered; or (2) the state goes through the statutorily prescribed [Notice-and-Waiting Requirements]. Both of these avenues focus on direct contact with the voter." *Id.* at 959 (first alteration in original); see also *id.* at 959 ("[T]he NVRA prohibit[s] . . . removing voters without either hearing from them directly or going through the notice process."). The "omi[ssion of] direct contact with the voter whose name has been flagged" is "fatal." *Id.* at 958.

5.      As Indiana's NVRA Official, the Co-Directors must ensure the State and its counties' compliance with the foregoing in more than a passive role. *See Az. Democratic Party v. Reagan*, No. CV-16-03618, 2016 WL 6523427, at *6 (D. Az. Nov. 3, 2016).

### SEA 334 Allows Cancellation Without Direct Contact with a Registrant

6.      "[T]he NVRA's procedures for removal must be followed 'to the letter.'" *Common Cause Ind.*, 937 F.3d at 962 (quoting *Husted v. A. Philip Randolph Inst.*, 138 S. Ct.1833, 1842 (2018)).

7.      SEA 334 permits cancellation of a voter's registration record upon a county voter registration office's determination that "the individual:(1) identified in the report provided by the NVRA official . . . is the same individual who is a registered voter of the county; (2) registered to vote in another state on a date following the date that voter registered in Indiana; (3) authorized the cancellation of any previous registration by the voter when the voter registered in another state." SEA 442 § 5.5(d)(1)-(3).

8.      SEA 334 sets forth examples of two avenues of satisfying this third "determin[ation]." The first requires that when a county voter registration office receives written

notice from another state's official, it acquire a signed out-of-state voter registration form before cancelling a registration record. On the other hand, when the other state's official sends written notice to the Election Division and that written notice is forwarded to the county voter registration official, "[a] copy of the actual voter signature is not required to be provided to the county for the voter's status to be canceled if the written notice is forwarded by the election division." SEA 334 § 5.5(f)(2). Thus, SEA 334 provides an avenue—facilitated by Defendants—for Indiana registrants to be removed from the state's rolls without direct contact. By "do[ing] away with the process of personal contact with the suspected ineligible voter and allow[ing] Indiana election officials to remove a person from the rolls . . . *without direct notification of any kind*," SEA 334 and Defendants' implementation of it violate the NVRA. *Common Cause Ind.*, 937 F.3d at 959.

9.      Moreover, even if "written information" or "written notice" satisfied the NVRA's requirements, SEA 334 is phrased permissively, offering sources Defendants and counties "may" rely upon in making "determinations." SEA 334 § 5.5(f). That is, counties are not even technically bound by Subsection 5.5(f) of SEA 334.

10.     Defendants' made-for-litigation assertion that SEA 334 complies with the NVRA is belied by countervailing evidence. Defendants have taken the consistent position that their guidance as to interpretations of state and federal law and procedures for implementing them are advisory and optional. As such, their atextual assertion that SEA 334 somehow requires possession of a voter registration form before cancellation of a registration, *contra* SEA 334 § 5.5(f)(2) ("A copy of the actual voter signature is not required to be provided to the county for the voter's status to be canceled if the written notice is forwarded by the election division."), does little to ensure Indiana's compliance with the NVRA because counties are, by Defendants' argument, free to implement SEA 334 however they like. Thus, as a secondary matter of law, Defendants violate the

NVRA by failing to ensure that SEA 334 is implemented in compliance with the NVRA's Notice-and-Waiting Requirement.

11.     SEA 442's predecessor law required the identical three "determin[ations] as SEA 334. Thus, the counties implementation of SEA 442's predecessor law is probative of how counties will implement SEA 334, first, without requiring acquisition of a signed out-of-state voter registration and, second, non-uniformly across the state. Because the evidence shows that counties conduct these determinations non-uniformly and usually without acquiring a signed out-of-state voter registration, the implementation of SEA 334 will violate the NVRA's Notice-and-Waiting Requirement and requirement that administration of a voter list maintenance program that is not "reasonable" and "uniform." 52 U.S.C. §§ 20507(a)(4), (b)(1).

### *Plaintiffs Have Standing*

12.     "[T]he plaintiff organizations . . . adequately demonstrated their standing to bring these actions . . . ." *Common Cause*, 937 F.3d at 946.

DATED: August 7, 2020                          Respectfully submitted,

*/s/ Alexandre J. Tschumi*
Sascha N. Rand                              Myrna Pérez
Ellyde R. Thompson                          Eliza Sweren-Becker
Ellison Ward Merkel                         BRENNAN CENTER FOR JUSTICE
Geneva McDaniel                             AT NYU SCHOOL OF LAW
Alexandre J. Tschumi                        120 Broadway, Suite 1750
QUINN EMANUEL URQUHART & SULLIVAN,          New York, NY 10271
LLP                                         (646) 292-8310
51 Madison Avenue, 22nd Floor
New York, NY 10010                          Trent A. McCain
(212) 849-7000                              MCCAIN LAW OFFICES, P.C.
                                            363 S. Lake St., Suite 2
                                            Gary, IN 46403
                                            (219) 884-0696

*Counsel for Plaintiffs Indiana State Conference of the National Association for the Advancement of Colored People (NAACP) and League of Women Voters of Indiana*

## CERTIFICATE OF SERVICE

I, Alexandre J. Tschumi, an attorney, certify that on August 7, 2020, I caused a true and correct copy of the foregoing findings of fact, summaries of the relevant facts in depositions, and conclusions of law to be served on counsel for Defendants.

/s/ Alexandre J. Tschumi
Alexandre J. Tschumi